# Exhibit A

**PCA CASE NO. 2015-32**

**IN THE MATTER OF AN ARBITRATION**

**UNDER THE LAW OF THE KYRGYZ REPUBLIC ON INVESTMENTS IN THE KYRGYZ REPUBLIC OF 27 MARCH 2003 AND**

**IN ACCORDANCE WITH THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW RULES OF ARBITRATION OF 1976**

**-between-**

**STANS ENERGY CORP. AND KUTISAY MINING LLC**

**("Claimants")**

**-and-**

**THE KYRGYZ REPUBLIC**

**("Respondent", and together with the Claimants, the "Parties")**

———————————————————————————

# AWARD

**20 August 2019**

———————————————————————————

**Arbitral Tribunal**
Professor Karl-Heinz Böckstiegel (President)
The Honourable Colin L. Campbell, Q.C.
Mr. Stephen Jagusch, Q.C.

**Registry**
Permanent Court of Arbitration

**Secretary**
Dr. Dirk Pulkowski

**TABLE OF CONTENTS**

I.     INTRODUCTION...............................................................................................1
   A. THE PARTIES ................................................................................................1
   B. THE TRIBUNAL'S TERMINOLOGY AND REASONING.....................................1
   C. THE ESSENCE OF THE CLAIMANTS' CASE .....................................................2
   D. THE ESSENCE OF THE RESPONDENT'S CASE.................................................5
   E. THE SCOPE OF THE PRESENT AWARD .........................................................7
II.    PROCEDURAL HISTORY ................................................................................8
   A. COMMENCEMENT OF THE ARBITRATION......................................................8
   B. CONSTITUTION OF THE ARBITRAL TRIBUNAL..............................................9
   C. WRITTEN AND ORAL PLEADINGS ON JURISDICTION .................................9
   D. AWARD ON JURISDICTION ........................................................................14
   E. WRITTEN PLEADINGS ON THE MERITS AND ANY REMAINING OBJECTIONS
      TO JURISDICTION.......................................................................................15
   F. HEARING ON THE MERITS AND ANY REMAINING OBJECTIONS TO
      JURISDICTION.............................................................................................24
III.   THE PARTIES' REQUESTS ..........................................................................29
   A. THE CLAIMANTS' REQUESTS ....................................................................29
   B. THE RESPONDENT'S REQUESTS .................................................................33
IV.    SUMMARY OF RELEVANT FACTS..............................................................34
   A. RARE EARTH ELEMENTS MARKETS............................................................34
   B. THE KYRGYZ REPUBLIC ............................................................................37
   C. STANS ENERGY'S INVESTMENTS IN THE KYRGYZ REES SECTOR ......................38
      1. Stans Energy's Investments in the Kyrgyz Uranium Sector................................38
      2. Acquisition of the Licenses for Kutessay II and Kalesay ...................................40
      3. Operation Under the License Agreements.........................................................55
         a. License Agreements No. 1.........................................................................55
         b. License Agreements No. 2..........................................................................62
      4. Conclusion of the Kutessay II License Agreement No. 3........................................70
   D. THE RESPONDENT'S MEASURES IN RESPECT OF THE LICENSES........................77
      1. 26 June 2012 Resolution ..........................................................................77
      2. Thirty-days' Work Suspension Order of the Kutessay II License Agreement No. 3......81
   E. ASIARUD REPORTS AND STANS ENERGY'S DISCLOSURE........................................87
   F. JUDICIAL PROCEEDINGS REGARDING THE VALIDITY OF THE GRANTING OF
      THE LICENSES ...............................................................................................89
      1. Proceedings Brought by the Prosecutor General Before the Inter-District Court of
         Bishkek Asking to Invalidate the 21 December Minutes (No 736-N-09)..........................89
      2. Proceedings Brought by Baotou Before the Bishkek City Court Asking to Invalidate the
         SAGMR's 2009 Decisions...........................................................................92
   G. THE CLAIMANTS' ARBITRATION BEFORE THE MCCI ...............................................92
   H. FORMAL TERMINATION OF THE LICENSES BY THE SAGMR...............................94

V.    JURISDICTION AND ADMISSIBILITY .................................................................96

   A. MATERIAL SCOPE OF JURISDICTION UNDER THE 2003 INVESTMENT LAW .....96

      1. Whether Article 3(1) of the 2003 Investment Law Limits the Tribunal's Jurisdiction to Claims Under the Substantive Provisions of the 2003 Investment Law ..........................98

         a. The Claimants' Position ...............................................................................99

         b. The Respondent's Position .........................................................................100

         c. The Tribunal's Analysis ............................................................................102

      2. Whether International Treaties and General International Law Form Part of the Applicable Law Pursuant to Article 2(1) of the 2003 Investment Law ..........................104

         a. The Claimants' Position .............................................................................105

         b. The Respondent's Position .........................................................................108

         c. The Tribunal's Analysis ............................................................................111

   B. WHETHER STANS ENERGY QUALIFIES AS "INVESTOR" HOLDING AN "INVESTMENT" UNDER THE 2003 INVESTMENT LAW .............................................112

      1. Whether the 2003 Investment Law Protects Only "Direct Investments" ......................114

         a. The Respondent's Position .........................................................................115

         b. The Claimants' Position .............................................................................116

      2. Whether Stans Energy's Participation in Kutisay Mining LLC Qualifies as a "Direct Investment" ...........................................................................................117

         a. The Respondent's Position .........................................................................117

         b. The Claimants' Position .............................................................................118

      3. Whether Stans Energy's Participation in Stans KG Qualifies As a "Direct Investment" ...........................................................................................119

         a. The Respondent's Position .........................................................................119

         b. The Claimants' Position .............................................................................120

      4. The Tribunal's Analysis ..........................................................................121

   C. WHETHER KUTISAY MINING LLC QUALIFIES AS AN "INVESTOR" HOLDING AN "INVESTMENT" UNDER THE 2003 INVESTMENT LAW ......................................122

      1. Whether Kutisay Mining LLC Qualifies as an "Investor" ...............................122

         a. The Respondent's Position .........................................................................122

         b. The Claimants' Position .............................................................................123

         c. The Tribunal's Analysis ............................................................................125

      2. Whether Kutisay Mining LLC Qualifies as a "Foreign Investor" ....................125

         a. The Respondent's Position .........................................................................125

         b. The Claimants' Position .............................................................................127

         c. The Tribunal's Analysis ............................................................................128

   D. WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS ACQUIRED THEIR INVESTMENTS THROUGH CORRUPTION ................................129

      1. The Respondent's Position ......................................................................130

      2. The Claimants' Position .........................................................................134

      3. The Tribunal's Analysis .........................................................................137

   E. WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS ACQUIRED THEIR INVESTMENTS IN BREACH OF KYRGYZ LAW ......................139

1. Whether and to What Extent the 2003 Investment Law Contains a Legality Requirement ..............................................................................................................140
    a. The Respondent's Position ..........................................................................140
    b. The Claimants' Position...............................................................................142

2. Whether the Claims Should Be Barred Because the Licenses Were Obtained in Breach of the Prohibition of Money Laundering under the Kyrgyz Criminal Code.................145
    a. The Respondent's Position ..........................................................................145
    b. The Claimants' Position...............................................................................147

3. Whether the Claims Should Be Barred Because the Licenses Were Obtained in Breach of the Tender Requirement Under the Subsoil Law .......................................................149
    a. The Respondent's Position ..........................................................................149
    b. The Claimants' Position...............................................................................151

4. Whether the Claims Should Be Barred Because the Licenses Were Not Obtained in a Genuine Auction, Contrary to Requirements of the Kyrgyz Civil Code .....................153
    a. The Respondent's Position ..........................................................................153
    b. The Claimants' Position...............................................................................155

5. The Tribunal's Analysis ...........................................................................................157

F. WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS BROUGHT THEM IN BAD FAITH ...........................................................................158
1. The Respondent's Position ........................................................................................158
2. The Claimants' Position ............................................................................................159
3. The Tribunal's Analysis ............................................................................................160

VI. MERITS .......................................................................................................................160
A. WHETHER THE RESPONDENT UNLAWFULLY EXPROPRIATED THE CLAIMANTS' INVESTMENTS .........................................................................160
1. Whether the Respondent's Termination of the Licenses Constituted an Expropriation ...........................................................................................................161
    a. The Claimants' Position ...............................................................................161
    b. The Respondent's Position ..........................................................................164
    c. The Tribunal's Analysis................................................................................169

2. Whether the Respondent's Expropriation of the Claimants' Investments was Lawful .......................................................................................................................170
    a. The Claimants' Position ...............................................................................170
    b. The Respondent's Position ..........................................................................173
    c. The Tribunal's Analysis................................................................................175

B. WHETHER THE RESPONDENT FAILED TO ACCORD TREATMENT AS REQUIRED BY ARTICLE 4 OF THE 2003 INVESTMENT LAW ...................................180
1. Whether the Respondent Was Required to Accord Fair and Equitable Treatment to the Claimants .................................................................................................................180
    a. The Claimants' Position...............................................................................180
    b. The Respondent's Position ..........................................................................181
    c. The Tribunal's Analysis................................................................................184

2. Whether the Respondent Failed to Accord Treatment in Accordance with Article 4.4 of the 2003 Investment Law to the Claimants ...............................................................185
    a. Whether the Respondent Breached the Claimants' Legitimate Expectations.................185

b.  Whether the Respondent Acted Arbitrarily ...................................................189
VII.  QUANTUM .............................................................................................................191
    A. LEGAL STANDARD ..........................................................................................192
        1.  The Claimants' Position ..............................................................................192
        2.  The Respondent's Position .........................................................................193
        3.  The Tribunal's Analysis ..............................................................................195
    B. VALUATION DATE ...........................................................................................196
        1.  The Claimants' Position ..............................................................................196
        2.  The Respondent's Position .........................................................................197
        3.  The Tribunal's Analysis ..............................................................................199
    C. VALUATION METHODOLOGY AND QUANTIFICATION...........................200
        1.  The Claimants' Position ..............................................................................200
            a.  The Claimants' Valuation in Accordance with a Market Capitalisation Approach.........200
            b.  The Claimants' Responses to the Tribunal's Questions Annexed to Procedural Order
                No. 9 ..............................................................................................204
        2.  The Respondent's Position .........................................................................209
            a.  The Respondent's Valuation in Accordance with an Income Approach ........................209
            b.  The Respondent's Responses to the Tribunal's Questions Annexed to Procedural Order
                No. 9 ..............................................................................................216
        3.  The Tribunal's Analysis ..............................................................................222
            a.  Methodology.....................................................................................222
            b.  Quantification of Sunk Costs..............................................................231
VIII.  REDUCTION OF DAMAGES ...............................................................................245
    A. THE RESPONDENT'S POSITION......................................................................245
    B. THE CLAIMANTS' POSITION............................................................................247
    C. THE TRIBUNAL'S ANALYSIS ..........................................................................248
IX.  INTEREST .................................................................................................................248
    A. THE CLAIMANTS' POSITION............................................................................249
    B. THE RESPONDENT'S POSITION......................................................................250
    C. THE TRIBUNAL'S ANALYSIS ..........................................................................251
X.  COSTS ........................................................................................................................253
    A. ALLOCATION OF COSTS.................................................................................253
        1.  Applicable Legal Principles .......................................................................253
            a.  The Claimants' Position......................................................................253
            b.  The Respondent's Position .................................................................254
        2.  The Parties' Application of the Legal Principles to their Cost Allocation Claims.........255
            a.  The Claimants' Position......................................................................255
            b.  The Respondent's Position .................................................................258
        3.  The Tribunal's Analysis ..............................................................................261
    B. AMOUNT OF COSTS OF ARBITRATION........................................................262
        1.  The Claimants' Position ..............................................................................262
        2.  The Respondent's Position .........................................................................263
        3.  The Tribunal's Analysis ..............................................................................264

**XI.    DISPOSITIF**............................................................................................................**268**

## LIST OF DEFINED TERMS

| | |
|---|---|
| **Ak-Tilek** | Ak-Tilek Investment LLC. |
| **Alternative Composite Index** | Alternative index of Stans Energy's main traded comparable companies prepared by Mr. Ziff taking into account the companies proposed by Mr. Dellepiane for the purpose of his analysis in his third expert report. |
| **Applications to Order Production** | The Parties' respective applications to the Tribunal with the document production requests that they maintained despite the other side's objections, submitted on 17 August 2017. |
| **AsiaRud** | Asiarudproject Mining Planning-Production Company CJSC. |
| **AsiaRud 2011 Report** | AsiaRud's report issued in July 2011 regarding a technical economic assessment for Kutessay II. |
| **AsiaRud 2013 Report** | AsiaRud's report issued in July 2013. |
| **AUB** | AsiaUniversalBank, a Kyrgyz bank incorporated in August 1997. |
| **Award on Jurisdiction** | Award Regarding Bifurcated Objections to Jurisdiction issued by the present Tribunal on 25 January 2017. |
| **Baotou** | Baotou Hongbo Technology LLC, a Chinese REEs company. |
| **CAMG** | Central Asia Metals Group LLC. |
| **CASE** | Central Asian Stock Exchange. |
| **CIMVal** | Civil Standard Guidelines for Valuation of Mineral Properties – Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on Valuation of Mineral Properties. |
| **Claimants** | Stans Energy Corp and Kutisay Mining LLC. |
| **Claimants' Rejoinder on Jurisdiction in Bifurcated Proceedings** | Rejoinder on Jurisdiction in Bifurcated Proceedings submitted by the Claimants on 29 July 2016. |
| **Claimants' Response** | Response submitted by the Claimants to the Kyrgyz Republic's Request for Bifurcation dated 28 February 2016. |
| **Claimants' Submission on Jurisdiction** | Submission on Jurisdiction by the Claimants on 10 June 2016. |
| **DCF** | Discounted Cash Flow. |
| **December 2014 Statements** | Consolidated financial Statements of Stans Energy for the period ending in December 2014. |
| **Decree No 93** | Resolution No 93 to repeal Kyrgyz Republic Government Resolution No 374 issued on 13 June 2009 "On changing the Boundaries of Chon Kemin State National Park". |
| **Development Fund** | Kyrgyz Republic's Development Fund. |
| **Draft Timetable** | Draft Timetable for the Proceedings on the Merits and Any Remaining Objections to Jurisdiction circulated by the Tribunal on 25 January 2017. |
| **FET** | Fair and equitable treatment. |
| **Financial Statements** | Consolidated Financial Statements of Stans Energy submitted into the record of this arbitration. |
| **Funding Agreement** | Litigation Funding Agreement between the Claimants and Calunius Capital LLP. |
| **GPO** | Kyrgyz Republic's General Prosecutor's Office. |
| **GPO Claim** | Claim filed by the GPO against the SAGMR (defendant) and Kutisay Mining OJSC (third party) before the Inter-District Court of Bishkek, requesting that the court invalidate the 21 December 2009 minutes (No 736-N-09). |
| **Gremar** | Gremar Assets SA, a Panama-registered company. |

| Hearing | Hearing on the Merits and Any Remaining Objections to Jurisdiction held in Paris on 9-13 April 2018. |
|---|---|
| HREEs | Heavy rare-earth elements. |
| Information Reports | Together, the 2010 Information Report and the 2012 Information Report (Exhibits C-214 and C-234) |
| Joint Proposal for a Procedural Timetable | Agreement reached by the Parties concerning the Draft Timetable on 10 February 2017. |
| Kalesay | Kalesay beryllium deposit. |
| Kalesay License | License No 2489 ME issued to Kutisay Mining OJSC for Kalesay dated 21 December 2009. |
| Kalesay License Agreement No. 1 | License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kalesay dated 21 December 2009. |
| Kalesay License Agreement No. 2 | License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kalesay dated 20 September 2010. |
| KCMP | Kyrgyz Chemical and Metallurgical Plant. |
| KRP | Kasha REE Plant, new name given by Stans Energy to the KCMP processing plant. |
| Kutessay II | Kutessay II rare earth deposit. |
| Kutessay II License | License No 2488 ME issued to Kutisay Mining OJSC for Kutessay II dated 21 December 2009. |
| Kutessay II License Agreement No. 1 | License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II dated 21 December 2009. |
| Kutessay II License Agreement No. 2 | License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II dated 20 September 2010. |
| Kutessay II License Agreement No. 3 | License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II dated 15 June 2012. |
| Kutisay Mining LLC | Kutisay Mining Limited Liability Company, a company incorporated in the Kyrgyz Republic and, together with Stans Energy, one of the Claimants in the present arbitration. |
| Kutisay Mining OJSC | Kutisay Mining Open Joint Stock Company. This company was later re-organized as a limited liability company and became Kutisay Mining LLC, one of the Claimants. |
| Law on Normative Legal Acts | Law of the Kyrgyz Republic No 241 "On Normative Legal Acts of the Kyrgyz Republic" dated 20 July 2009. |
| License Agreements No. 1 | Kutessay II License Agreement No. 1 and Kalesay License Agreement No. 1. |
| License Agreements No. 2 | Kutessay II License Agreement No. 2 and Kalesay License Agreement No. 2. |
| Licenses | Kutessay II License and Kalesay License. |
| LREEs | Light rare-earth elements. |
| Main Composite Index | Index of Stans Energy's main traded comparable companies prepared by Mr. Ziff for the purpose of his analysis in his third expert report |
| MCCI | Moscow Chamber of Commerce and Industry. |
| MCCI Arbitration | International arbitration initiated on 30 October 2013 by Stans Energy and Kutisay Mining LLC before the Moscow Chamber of |

| | |
|---|---|
| | Commerce and Industry against the Kyrgyz Republic pursuant to the Moscow Convention. |
| **Merida Convention** | 2003 United Nations Convention against Corruption. |
| **Minister of Economy Order** | Minister of Economy and Antimonopoly Police. |
| **Moscow Convention** | Convention for the Protection of the Rights of Investors, signed in Moscow on 28 March 1997. |
| **National Park** | Chon Kemin State Natural National Park. |
| **NI 43-101** | National Instrument 43-101: Standards of Disclosure for Mineral Projects (24 June 2011) (2011) 34 OSCB 7043. |
| **Notice of Arbitration** | Notice of Arbitration submitted by the Claimants on 13 May 2015. |
| **OECD Convention** | OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. |
| **Parties** | The Claimants and the Respondent. |
| **Procedural Timetable** | Procedural Timetable as reproduced in the attachment to the Tribunal's letter dated 1 June 2017. |
| **REEs** | Rare earth elements. |
| **Rejoinder on Jurisdiction** | Rejoinder on Jurisdiction submitted by the Claimants on 26 February 2018. |
| **Rejoinder on the Merits and Reply on Jurisdiction** | Rejoinder on the Merits and Reply on Jurisdiction submitted by the Respondent on 29 January 2018. |
| **Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction** | Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction submitted by the Claimants on 9 November 2017. |
| **Republic/Kyrgyzstan** | Kyrgyz Republic. |
| **Request to Produce** | The Parties' respective requests for document production. |
| **Resolution No 725** | Resolution No 725 of 1 December 2009 on the Development of Competitive Procedures for Granting Subsoil Use Rights. |
| **Resolution No 736** | Resolution No 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution 410 of 25 June 2009. |
| **Respondent** | Kyrgyz Republic. |
| **Respondent's Application for Security** | Application for Security for Costs and Disclosure of the Claimants' Litigation Funding Agreement submitted by the Respondent on 25 April 2016. |
| **Respondent's Application for Stay of Arbitral Proceedings** | Respondent's Application for Stay of the present arbitral proceedings pending the outcome of the Set-Aside Claim submitted on 9 March 2017. |
| **Respondent's Reply on Jurisdiction** | Reply on Jurisdiction in Bifurcated Proceedings submitted by the Respondent on 5 July 2016. |
| **Respondent's Request for Bifurcation** | Request for Bifurcation of Jurisdiction and Merits submitted by the Respondent on 13 February 2016. |
| **Respondent's Submission on Jurisdiction** | Statement of Defence on Jurisdiction in Bifurcated Proceedings submitted by the Respondent on 13 May 2016. |
| **Response** | Response to the Respondent's Application for Security for Costs and Disclosure of the Litigation Funding Agreement submitted by the Claimants on 20 May 2016. |

| | |
|---|---|
| **Response to the Notice of Arbitration** | Response to the Notice of Arbitration submitted by the Respondent on 11 June 2015. |
| **SAGMR** | Kyrgyz State Agency of Geology and Mineral Resources. |
| **Set-Aside Claim** | Respondent's application to the High Court in London submitted on 22 February 2017 pursuant to Section 67 of the Arbitration Act 1996, requesting that paragraphs 75-80 and 217-236 and Section VI of the Award on Jurisdiction be set aside and/or varied. |
| **Stans or Stans Energy** | Stans Energy Corp, a publicly-traded company incorporated under the laws of Ontario, Canada. It is one of the Claimants in the present arbitration, together with Kutisay Mining LLC. |
| **Stans KG** | Stans Energy KG LLC, a company incorporated in the Kyrgyz Republic. |
| **Statement of Claim** | Statement of Claim submitted by the Claimants on 29 January 2016. |
| **Statement of Defence on the Merits and Memorial on Jurisdiction** | Statement of Defence on the Merits and Memorial on Jurisdiction submitted by the Respondent on 14 June 2017. |
| **Subsoil Law** | Depending on the context, Subsoil Law No. 42 of 24 June 1997, as amended on 4 February 2002; as amended on 17 October 2008; or as amended on 15 July 2011; Law on Subsoil No. 160 of 9 August 2012, as amended on by Law No. 77 dated 24 May 2014. |
| **TEA** | Technical and economic assessment. |
| **TSX** | Toronto Stock Exchange. Stans Energy is listed on its venture division, Toronto Stock Venture Exchanges. |
| **TSX Rules** | Toronto Stock Exchange Rules. |
| **UNCITRAL Rules** | The Arbitration Rules of the United Nations Commission on International Trade Law, adopted in 1976. |
| **USSR** | The Union of Soviet Socialist Republics. |
| **Vesatel (NZ)** | Vesatel United Limited, a company incorporated in New Zealand. |
| **VNIIHT** | Russian Research Institute of Chemical Technology. |
| **WACC** | Weighted Average Cost of Capital. |
| **2003 Investment Law** | Kyrgyz Republic's Law No 66 of 27 March 2003 "On Investments in the Kyrgyz Republic", as amended on 22 October 2009. |
| **2010 Information Report** | Information Report on Works Performed in 2010 and Programme of Work for 2011 at the Kutessay II Field (Exhibit C-214) |
| **2010 Investment Protection Decree** | Decree No 23 of 26 April 2010 of the Provisional Government of the Kyrgyz Republic on the Protection of Investments. |
| **2012 Information Report** | Information Report on Works Performed in 2012 and Program of work for 2013 at the Kutessay II Field (Exhibit C-234) |
| **21 December 2009 Minutes** | Minutes No 1736-N-09 of negotiations between the State Agency of Geology and Mineral Resources (SAGMR) and Kutisay Mining OSJC. |
| **26 June 2012 Resolution** | Resolution issued by a Parliamentary Committee for Development of Industries of the Economy on 26 June 2012. |
| **17 October 2014 Minutes** | Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission on 17 October 2014. |

## I.   INTRODUCTION

### A.   THE PARTIES

1.      The Claimants are Stans Energy Corp ("**Stans Energy**" or "**Stans**"), and Kutisay Mining Limited Liability Company ("**Kutisay Mining LLC**", together with Stans Energy, "**Claimants**"). Stans Energy is a publicly-traded company incorporated under the laws of Ontario, Canada. It directly and wholly owns Stans Energy KG LLC ("**Stans KG**"), a limited liability company registered under the laws of the Kyrgyz Republic. Kutisay Mining LLC is a limited liability company registered under the laws of the Kyrgyz Republic and owned by Stans KG.[1]

2.      The Claimants are represented in this arbitration by Mr. Nigel Blackaby, Mr. Noah Rubins, Ms. Mariia Puchyna, Mr. Simon Consedine, Dr. Daniel Müller and Ms. Shirin Chua of Freshfields Bruckhaus Deringer.

3.      The Respondent is the Kyrgyz Republic ("**Respondent**" or "**Republic**" or "**Kyrgyzstan**").

4.      The Respondent is represented in this arbitration by Dr. Andrei Yakovlev, Mr. Wilson Antoon, Ms. Dorothy Murray, Mr. Alexis Namdar, Ms. Dina Suliman and Mr. Marco Toracca of King & Wood Mallesons; Mr. Anvar Askarov and Mr. Ulan Satarov of Satarov, Askarov & Partners; and Mr. Aiaz Baetov and Mr. Mirlan Dordoev of the Center for Court Representation of the Government of the Kyrgyz Republic;

5.      The Claimants and the Respondent together are referred to as the "**Parties**".

### B.   THE TRIBUNAL'S TERMINOLOGY AND REASONING

6.      The Tribunal has carefully examined all the arguments and evidence presented by the Parties throughout these proceedings. The Tribunal does not consider it necessary to reiterate in this Award all such arguments or evidence, which are well-known to the Parties. Further, insofar as any matter has not been specifically identified or recorded in the body of this Award, this does not mean that it has not been taken into full consideration. The Tribunal discusses only those submissions which it considers most relevant for its decisions. The Tribunal's reasons, without

---

[1]      Claimants' Notice of Arbitration, at paras 11-14.

repeating all the arguments advanced by the Parties, address what the Tribunal considers to be the determinative factors required to decide on the Requests of the Parties.

7.        The Tribunal's use of one Party's terminology is without prejudice to, and in no way reflects, the Tribunal's understanding of a particular issue. Rather, effort has been made to use consistent terminology throughout this Award to facilitate understanding. Likewise, the order in which references are presented is not a reflection of a particular source's value in the eyes of the Tribunal. Instead, effort has been made to format the footnotes consistently and so as to cite all significant documents referenced by the Parties.

8.        The Parties dispute what is the correct English translation of certain provisions of the Subsoil Laws No. 42 and No. 160 and have submitted different versions of those laws. Similarly, as regards the Kyrgyz Law On Investments in the Kyrgyz Republic, the Parties have submitted slightly different English translations. Without prejudice, for convenience, the Tribunal in its own reasoning will generally use and refer to the translations provided by the Claimants. In respect of the Kyrgyz Law On Investments in the Kyrgyz Republic, the Claimants' translation (CLA-98) is in relevant parts consistent with the text published by the Kyrgyz Investment Promotion Agency on its website (CLA-203). In any event, the Tribunal has found that the points in respect of which the Parties have disputed each other's translation are not relevant for the application of a certain provision to the present case.

## C.    THE ESSENCE OF THE CLAIMANTS' CASE

9.        The Claimants bring their claims pursuant to the Law of the Kyrgyz Republic No 66 On Investments in the Kyrgyz Republic, dated 27 march 2003 ("**2003 Investment Law**").

10.       The Claimants assert the Tribunal's jurisdiction on the basis of Article 18 of the 2003 Investment Law.[2] According to the Claimants, they qualify as foreign investors under the 2003 Investment Law, and the Parties have consented to arbitration of the dispute.[3] Stans Energy's participation in Kutisay Mining LLC meets the definition of Article 1(2) of the 2003 Investment Law for a "direct investment".[4] Moreover, even disregarding its ownership in Kutisay Mining LLC, Stans Energy is entitled under the 2003 Investment Law to claim compensation for damage

---

[2]    Statement of Claim, at para. 156.
[3]    Statement of Claim, at para. 156.
[4]    Statement of Claim, at para. 167.

to its shareholding in Stans KG and its indirectly-owned investments.[5] Kutisay Mining LLC qualifies as a foreign investor under Article 1(3)(2), second alternative, of the 2003 Investment Law.[6]

11.      According to the Claimants, the material scope of a tribunal's jurisdiction under the 2003 Investment Law is broad. The Claimants argue that Article 18 contains the Respondent's consent to submit to international arbitration all "investment disputes" with foreign investors. According to the Claimants, the provision is not limited to disputes based on the substantive provisions of the 2003 Investment Law;[7] as a result, the scope of the Tribunal's jurisdiction encompasses claims for breaches of the Moscow Convention on the Protection of the Rights of Investors, signed in Moscow on 28 March 1997 ("**Moscow Convention**") and general international law.[8] The Claimants argue that the law to be applied by the Tribunal comprises the 2003 Investment Law and other relevant rules of Kyrgyz law and international law, including the Moscow Convention.[9] International law should at least be relevant to determine the content of the obligations assumed by the Respondent.[10]

12.      The Claimants reject each of the jurisdictional objections put forward by the Respondent. The Claimants argue that the Respondent has failed to establish that they obtained the Kutessay II and Kalesay licenses (respectively, "**Kutessay II License**" and "**Kalesay License**", and collectively, "**Licenses**") through corruption.[11] The Claimants deny that the 2003 Investment Law contains a "legality requirement".[12] In any event, even if it provided for such requirement, it would not amount to an absolute bar to jurisdiction.[13] Finally, the Claimants argue that the Respondent has failed to establish any breaches of Kyrgyz law by the Claimants that would bar the Tribunal's jurisdiction.[14]

13.      In substance, the Claimants assert that the Respondent took a series of cumulative and interconnected measures, starting with a 26 June 2012 Resolution that deprived the Claimants of the effective use and control of their investments, amounting to an indirect *de facto*

---

[5]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 145-146.
[6]      Statement of Claim, at para. 160.
[7]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 239.
[8]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 245.
[9]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 236.
[10]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 247.
[11]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 205-221.
[12]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 162.
[13]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 168.
[14]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 173-174.

expropriation.[15] This *de facto* expropriation was later judicially endorsed, and implemented through the formal revocation of the Licenses on 17 October 2014, amounting to a direct expropriation of their investments.[16] According to the Claimants, the expropriation of their Licenses occurred arbitrarily, not in the public interest, and without compensation. It was accordingly in breach of Article 6 of the 2003 Investment Law and international law.[17] Furthermore, the Claimants aver that the Respondent was required to accord them fair and equitable treatment.[18] The Respondent has breached that obligation by frustrating the Claimants' legitimate expectations and by acting arbitrarily.[19]

14.      The Claimants assert that Article 6(2) of the 2003 Investment Law does not set out any express compensation standard for unlawful acts and omissions, including unlawful expropriations.[20] In the absence of a *lex specialis*, the Claimants aver that compensation must be determined in accordance with general international law, which requires "full reparation".[21] To ensure full reparation, the Claimants argue that the valuation date must be 25 June 2012, the day before the 26 June 2012 Resolution.[22] They contend that the appropriate valuation method is the market capitalisation approach. Accordingly, the value of Stans Energy is to be established through its share price,[23] to which it is necessary to add a control premium to reflect the full value of the company.[24] This results in a fair market value of US$ 128.23 million as at 25 June 2012.[25] The Claimants allege that the principle of full reparation also applies to the calculation of interest.[26] The Claimants claim pre-award and post-award interest at a commercial rate of 15.5% on the basis of the Weighed Average Cost of Capital ("**WACC**") of Stans Energy,[27] which should accrue semi-annually on a compounded basis.[28]

---

[15]     Statement of Claim, at paras 188, 202.
[16]     Statement of Claim, at para. 201.
[17]     Statement of Claim, at para. 230.
[18]     Statement of Claim, at para. 236.
[19]     Statement of Claim, at para. 244.
[20]     Statement of Claim, at para. 268.
[21]     Statement of Claim, at paras 274-275.
[22]     Statement of the Claim, at para. 286.
[23]     Statement of Claim, at para. 291.
[24]     Statement of Claim, at para. 293.
[25]     Statement of Claim, at para. 297.
[26]     Statement of Claim, at para. 301.
[27]     Statement of Claim, at paras 308, 311.
[28]     Statement of Claim, at paras 312, 314.

D.      THE ESSENCE OF THE RESPONDENT'S CASE

15.      The Respondent asserts that, in order to rely on the protections of the 2003 Investment Law, an entity must be an "investor" which has made a "direct investment". Stans Energy's indirect shareholding in Kutisay Mining LLC does not qualify as a "direct investment".[29] Likewise, Kutisay Mining LLC is not entitled to protection under such law, as it is neither a "foreign investor" nor an "investor" with a qualifying "direct investment".[30]

16.      Additionally, the Respondent argues that the Claimants' claims must be dismissed due to illegality, as the Claimants procured the Licenses through corruption and in breach of fundamental provisions of Kyrgyz law.[31] In this regard, the Respondent refers in particular to (1) Article 183 of the Kyrgyz Criminal Code, which prohibits money laundering; (2) Article 16 of the Subsoil Law, which sets out requirements for public tenders; and (3) Articles 408 and 409 of the Kyrgyz Civil Code, which lay out requirements for auctions.[32]

17.      The Respondent argues that the material scope of jurisdiction of tribunals under the 2003 Investment Law is limited to breaches of the substantive provisions of the 2003 Investment Law.[33] Thus, the claims that an investor may bring are strictly limited to breaches of the provisions of the 2003 Investment Law and, in determining its content, the Tribunal shall refer to Kyrgyz law principles of statutory interpretation.[34] In this regard, the Respondent denies that Article 2(1) of the 2003 Investment Law is an applicable law clause,[35] with the effect that international treaties and general international law become applicable to the present arbitration.[36]

18.      The Respondent denies that the termination of the Licenses amounted to indirect expropriation. Rather, it was merely the consequence of enforcement of Kyrgyz law in accordance with a proper legal procedure.[37] Pursuant to a national court decision which found that the Licenses had been invalidly granted, the Licensing Commission of the State Agency of Geology and Mineral Resources ("**SAGMR**") terminated them under Article 27(5) of the Subsoil Law.[38]

---

[29]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 428, 431.
[30]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 465.
[31]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 358.3.
[32]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 559-560.
[33]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 578, 585-589.
[34]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 578.
[35]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589.
[36]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 590-591.
[37]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 635.
[38]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 636.

Kutisay took part in the invalidation procedure and exercised its right to appeal the termination before national courts.[39] Even if the termination measures could be characterised as an expropriation (which the Respondent denies), the requirements for a lawful expropriation in Article 6 of the 2003 Investment Law were fulfilled, insofar as the expropriation was (1) provided for by Kyrgyz law; (2) in the public interest; (3) carried out on a non-discriminatory basis; and (4) carried out pursuant to a proper legal procedure.[40] According to the Respondent, under the 2003 Investment Law, it is not incumbent upon the Republic to offer compensation to an investor for an expropriation. Rather, it must only make a procedure available to investors through which they may seek compensation.[41]

19.      The Respondent argues that there is no normative source for the Claimants' fair and equitable treatment claim, since no such standard is amongst the substantive protections of the 2003 Investment Law.[42] In any event, the Respondent asserts that the Claimants could not have had any legitimate expectation that the State would not seek to enforce the provisions of the Subsoil Law;[43] nor was it reasonable for the Claimants to rely on any of the representations allegedly made by the head of the Respondent's Development Fund, Mr. Eliseev, given the factual circumstances and the presence of numerous "red flags".[44] Likewise, the Respondent denies that it acted arbitrarily and considers that the Claimants' complaints are without merit.[45]

20.      The Respondent further asserts that, should the Tribunal find that there has been an expropriation, any damages should be calculated in accordance with Article 6(2) of the 2003 Investment Law,[46] which does not differentiate between lawful and unlawful expropriations.[47] According to the Respondent, the Claimants did not suffer any damages because (1) the Licenses were worthless; (2) the Claimants would not have been able to raise the necessary funds to pursue mining; and (3) the Licenses were liable to termination due to the Claimants' persistent breaches of the License agreements' terms.[48] The value of the investment is to be assessed as at the date of

---

[39]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 636.
[40]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 669-670.
[41]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 688-689.
[42]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 704.
[43]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 720-724.
[44]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 725-726.
[45]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 733.
[46]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 752.
[47]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 755.
[48]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 767.

the alleged expropriation decision, 16 October 2014 (the day before the SAGMR terminated the Licenses).[49]

21.     In contrast, the Respondent considers that the share price of Stans Energy bore no relationship to the value of the Licenses, so the only reliable way to value the Licenses is to develop a discounted cash flow ("**DCF**") analysis.[50] Should the Tribunal reject that methodology, the Respondent requests that the Claimants be awarded no damages or, in the alternative, be awarded only the amounts actually spent on developing the Licenses.[51] Pursuant to Article 6(3) of the 2003 Investment Law, the appropriate interest rate would be a twelve-month LIBOR,[52] and would accrue on a simple basis.[53]

22.     Finally, the Respondent contends that any award on damages should be reduced because (1) the Licenses were liable to be terminated; and (2) the Claimants engaged in wilful or negligent acts or omissions amounting to contributory fault.[54] This calls for a reduction of any damages awarded by 75%.[55]

## E.    THE SCOPE OF THE PRESENT AWARD

23.     By its Request for Bifurcation of Jurisdiction and Merits, the Respondent requested bifurcation of the proceedings and raised four objections to the Tribunal's jurisdiction: (1) objection regarding the alleged absence of consent; (2) objection regarding the alleged absence of a protected investor and investment; (3) objection regarding Kutisay Mining LLC's alleged non-compliance with the consultation period imposed under the 2003 Investment Law; and (4) objection regarding the alleged unlawfulness of the acquisition of the Claimants' investment.

24.     In Procedural Order No. 2, the Tribunal bifurcated the proceedings such that it would hear the first and third objections (above (1) and (3)) in a preliminary phase and that the other two objections would be heard in conjunction with the merits.

---

[49]     Rejoinder on the Merits and Reply on Jurisdiction, at paras 596, 607-608.
[50]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 750-751.
[51]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 681.
[52]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 816.
[53]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 825.
[54]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 813.
[55]     Respondent's Post-Hearing Brief, at para. 175.

25.      In the jurisdictional phase, the Parties discussed a number of further jurisdictional objections identified only after the adoption of Procedural Order No. 2. As a result, in its Award Regarding Bifurcated Objections to Jurisdiction ("**Award on Jurisdiction**"), the Tribunal addressed five of these new objections[56] in conjunction with the two objections identified in Procedural No. 2, and deferred the remaining jurisdictional issues until the merits phase.[57] The Tribunal also decided to defer its decision on the costs of the jurisdictional phase to a later stage.[58]

26.      In Procedural Order No. 6, the Tribunal accepted a joint proposal by the Parties for a procedural timetable, pursuant to which the Respondent would be entitled to "raise any remaining objections to the jurisdiction of the Tribunal" in its first written pleading on the merits phase. The Respondent accordingly submitted several new jurisdictional objections in its Statement of Defence on the Merits and Memorial on Jurisdiction.[59]

27.      In the present award, therefore, the Tribunal addresses not only the merits of the Parties' dispute, but also such jurisdictional issues that were not addressed in the Award on Jurisdiction as well as the costs of arbitration.

## II.   PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THE ARBITRATION

28.      On 13 May 2015, pursuant to Article 11 of the Moscow Convention, Article 18 of the 2003 Investment Law, and Article 3 of the Arbitration Rules of the United Nations Commission

---

[56]   Award on Jurisdiction, at p. 53. Specifically, the Tribunal decided the following jurisdictional questions: (1) whether the 2003 Investment Law contains the Respondent's consent to arbitrate; (2) whether that legislation must be interpreted in such a way that one of the Claimants, Kutisay Mining LLC, would not have satisfied the consultation requirement of that legislation; (3) whether that legislation contains a so-called "fork-in-the-road" clause and, if so, whether it has been triggered; (4) whether the Kyrgyz Republic (as opposed to one of its "authorised government bodies") is the right respondent in arbitration proceedings; and (5) whether "investment disputes" pursuant to that legislation are limited to disagreements "arising in the course of the sale" of an investment.

[57]   Award on Jurisdiction, at p. 53. The Tribunal dismissed the jurisdictional objections raised by the Respondent subject to the exception that "*[t]he question whether the Claimants qualify as "investors" holding "investments" under the relevant Kyrgyz legislation will be considered in conjunction with the merits of the case*".

[58]   Award on Jurisdiction, at p. 53. The Tribunal decided that "*[a]ny decision regarding the costs of the procedure on jurisdiction is deferred to a later stage of the proceedings*".

[59]   Statement of Defence on the Merits and Memorial on Jurisdiction, at Sections X, XI and XII(B). The Respondent raised the following issues: (1) whether the claims should be dismissed because the Claimants acquired their investments through corruption; (2) whether the claims should be dismissed because the Claimants acquired their investments in breach of Kyrgyz law; (3) whether the claims should be dismissed because the Claimants pursued them in bad faith; and (4) whether Article 3(1) of the 2003 Investment Law limits the Tribunal's jurisdiction to claims brought on the basis of the substantive provisions of the 2003 Investment Law.

on International Trade Law, adopted in 1976 ( "**UNCITRAL Rules**"), the Claimants served a Notice of Arbitration on the Respondent ("**Notice of Arbitration**").

29.　　　On 11 June 2015, the Respondent served on the Claimants its Response to the Notice of Arbitration, in which it indicated that it objected to the jurisdiction of the Tribunal and declared its intention to apply for bifurcation of the proceedings ("**Response to the Notice of Arbitration**").[60]

## B.　CONSTITUTION OF THE ARBITRAL TRIBUNAL

30.　　　In the Notice of Arbitration, the Claimants appointed the Honourable Colin L. Campbell, Q.C., as co-arbitrator.

31.　　　In the Response to the Notice of Arbitration, the Respondent appointed Mr. Stephen Jagusch, Q.C., as co-arbitrator.

32.　　　On 12 October 2015, the Parties jointly informed the co-arbitrators that they recommended that Professor Böckstiegel be selected as presiding arbitrator. On 23 October 2015, the co-arbitrators advised the Parties that they endorsed the appointment of Professor Böckstiegel.

## C.　WRITTEN AND ORAL PLEADINGS ON JURISDICTION

33.　　　Following the constitution of the Tribunal, by letter dated 11 November 2015, the Tribunal invited the Parties to comment on a draft Agenda for a first procedural meeting.

34.　　　On 17 December 2015, both sides submitted proposals for a procedural timetable and explained their respective positions in respect of the issue of bifurcation. The Respondent requested that the proceedings be bifurcated without any written exchanges between the Parties on the issue.[61] The Claimants submitted that the Tribunal should consider the question of whether bifurcation would be in the interest of procedural economy only after the Claimants had filed their Statement of Claim.[62]

---

[60]　Respondent's Response to the Notice of Arbitration, at para. 14.
[61]　Respondent's Comments on the Tribunal's Draft Agenda, at para. 8.
[62]　Claimants' Comments on the Tribunal's Draft Agenda, at p. 2.

35.      By letter of the same date, the Respondent indicated that "the Parties have agreed to the removal of a pre-prescribed production of documents phase for jurisdictional arguments, in the event of bifurcation, with a view to expediting the first stage of the bifurcated proceedings".

36.      Following exchanges between the Tribunal and the Parties, by letter dated 11 January 2016, the Tribunal informed the Parties that in light of the extent of the agreement reached between the Parties it had decided not to hold a first procedural meeting. Instead, the Tribunal issued Procedural Order No. 1, which included the procedural timetable for the initial phase of the proceedings.

37.      On 29 January 2016 the Claimants submitted their Statement of Claim ("**Statement of Claim**").

38.      In accordance with the timetable set out in Procedural Order No. 1, on 13 February 2016 the Respondent filed its Request for Bifurcation of Jurisdiction and Merits ("**Respondent's Request for Bifurcation**") and on 28 February 2016 the Claimants submitted their Response to the Kyrgyz Republic's Request for Bifurcation ("**Claimants' Response**").

39.      By e-mail of 2 March 2016, the Respondent expressed disagreement with the substance of the Claimants' Response, and conveyed its wish to provide a reply within the framework of the procedural schedule if invited to do so by the Tribunal. By e-mail of 3 March 2016, the Claimants objected to the Respondent's request, submitting that Procedural Order No. 1 only provided for a single exchange on the question of bifurcation, and that any additional round would cause delay. On the same date, the Respondent responded by e-mail to clarify its position.

40.      By e-mail dated 7 March 2016, the Tribunal informed the Parties that, having reviewed the Parties' correspondence and submissions, it did not regard further briefing on the question of bifurcation as necessary.

41.      On 14 March 2016, the Tribunal issued Procedural Order No. 2, in which the Tribunal decided, *inter alia*, that the proceedings would be bifurcated and identified the jurisdictional objections that would be heard in a preliminary phase.

42.      By letter dated 1 April 2016, the Respondent, having become aware that the Claimants relied on third party funding in the context of the present arbitration, invited the Claimants to provide either "adequate security for costs" or evidence of "available assets that [would] enable

10

the Respondent to pursue a costs award" and, in any event, to disclose the Litigation Funding Agreement between the Claimants and Calunius Capital LLP relating to their claim in this arbitration ("**Funding Agreement**"). The Respondent noted that it would make an application to the Tribunal without further notice should its invitation be rejected or no satisfactory response be provided by 6 April 2016.

43.      On 5 April 2016, the Tribunal issued Procedural Order No. 3, in which it fixed the procedural timetable for the jurisdictional phase.

44.      By letter dated 6 April 2016, the Claimants informed the Respondent that they were not prepared to provide security for costs or evidence of available assets, nor to disclose the Funding Agreement.

45.      On 25 April 2016, the Respondent submitted its Application for Security for Costs and Disclosure of the Claimants' Litigation Funding Agreement ("**Respondent's Application for Security**"), seeking "an order from the Tribunal directing that the proceedings continue subject to the Claimants furnishing suitable security for the Respondent's costs, and disclosing the Funding Agreement".

46.      On 13 May 2016, the Respondent filed its Statement of Defence on Jurisdiction in Bifurcated Proceedings ("**Respondent's Submission on Jurisdiction**").

47.      On 20 May 2016, the Claimants submitted their Response to the Respondent's Application for Security for Costs and Disclosure of the Litigation Funding Agreement ("**Response**").

48.      By letter dated 3 June 2016, the Claimants requested a two-day extension for their submission on jurisdiction. By letter of the same date, the Respondent requested the Tribunal, if it were to grant the requested extension, to revise the procedural timetable so that it reflected an appropriate extension of the due date for the Respondent's reply.

49.      By letter dated 6 June 2016, after considering the Parties' requests, the Tribunal modified the procedural schedule, granting the extension requested by the Claimants and extending the due date for the Respondent's reply accordingly.

50.      In accordance with the modified timetable, on 10 June 2016, the Claimants submitted their Submission on Jurisdiction ("**Claimants' Submission on Jurisdiction**").

51.      On 3 July 2016, the Tribunal issued Procedural Order No. 4, in which it denied the Respondent's Application for Security, and deferred the decision regarding the costs related to this Application to a later stage of the proceedings.

52.      On 5 July 2016, the Respondent submitted its Reply on Jurisdiction in Bifurcated Proceedings ("**Respondent's Reply on Jurisdiction**").

53.      On 29 July 2016, the Claimants submitted their Rejoinder on Jurisdiction in Bifurcated Proceedings ("**Claimants' Rejoinder on Jurisdiction in Bifurcated Proceedings**").

54.      On 2 August 2016, the Tribunal issued Procedural Order No. 5 regarding the Hearing on Jurisdiction on 23 September 2016, determining certain particulars in preparation of the hearing.

55.      By letter to the Tribunal dated 2 September 2016, the Respondent contended that it had not had an opportunity to respond to an issue that was pleaded for the first time by the Claimants in their Rejoinder on Jurisdiction in Bifurcated Proceedings. Accordingly, the Respondent requested the Tribunal to strike specific paragraphs of the Claimants' Rejoinder on Jurisdiction in Bifurcated Proceedings from the record or, in the alternative, to grant the Respondent leave, pursuant to paragraph 3.1 of Procedural Order No. 5, to submit certain additional documents into evidence.

56.      By letter to the Tribunal dated 5 September 2016, the Claimants argued that the relevant paragraphs of their Rejoinder on Jurisdiction were in fact responsive to arguments developed by the Kyrgyz Republic in its Reply on Jurisdiction. The Claimants noted that, in any event, they did not object to the submission of limited new exhibits, subject to the Claimants' right to introduce rebuttal evidence.

57.      On 7 September 2016, the Tribunal advised the Parties that the Respondent's request that the Tribunal strike certain paragraphs of the Claimants' Rejoinder on Jurisdiction in Bifurcated Proceedings was denied. However, the Respondent was granted leave to introduce certain new exhibits into the record, and the Claimants were invited to submit pertinent rebuttal evidence, if they so wished, by 14 September 2016.

12

58.     By letter dated 16 September 2016, the Respondent sought the Tribunal's leave to introduce a certain number of new exhibits into the record. By letter to the Tribunal dated 20 September 2016, the Claimants stated that they did not object to the submission of the Respondent's new exhibits. At the same time, the Claimants also requested the Tribunal's leave to introduce a number of new exhibits into the record. By letter to the Tribunal dated 21 September 2016, the Respondent objected to the submission of all but one of the Claimants' new exhibits.

59.     On 22 September 2016, the Tribunal admitted all of the Respondent's new exhibits into the record. It also admitted certain new exhibits submitted by the Claimants into the record while rejecting the remaining exhibits.

60.     On 23 September 2016, a Hearing on Jurisdiction was held in Paris.

61.     By letter dated 2 October 2016, and further to the Tribunal's request during the Hearing, the Respondent made certain clarifications in respect of its argument related to Article 6(3) of the Law of the Kyrgyz Republic No. 241 On Normative Legal Acts of the Kyrgyz Republic, dated 20 July 2009 ("**Law On Normative Legal Acts**"), accompanied by additional legal authorities.

62.     By letter dated 6 October 2016, the Claimants submitted comments on parts of the Respondent's letter dated 2 October 2016. At the same time, the Claimants requested the Tribunal to disregard other paragraphs in the said letter and not to admit some of the accompanying exhibits (Exhibits RLA-124 to RLA-126). Alternatively, the Claimants requested, in the event that the Tribunal decided otherwise, to be granted an additional opportunity to respond more fully to the Respondent's letter.

63.     On 10 October 2016, the Tribunal advised the Parties that it had decided to admit in full the Respondent's letter of 2 October 2016. Similarly, the accompanying legal authorities, RLA-124 to RLA-128, were admitted into the record. The Claimants were accordingly invited to respond to the remaining paragraphs of the Respondent's letter of 2 October 2016 (as well as Exhibits RLA-124 to RLA-126) by 13 October 2016.

64.     By letter dated 13 October 2016, the Claimants provided their comments on the Respondent's letter of 2 October 2016, and submitted additional exhibits and legal authorities.

65.     By letter dated 14 October 2016, the Respondent responded to the Claimants' letter of 13 October 2016.

66.        By letter dated 16 October 2016, the Tribunal invited the Claimants to submit any final comments they might have in reply to the Respondent's letter of 14 October 2016.

67.        By letter dated 17 October 2016, the Claimants reiterated their disagreement with the Respondent's position, and referred to their prior submissions.

## D.    AWARD ON JURISDICTION

68.        On 25 January 2017, the Tribunal issued the Award on Jurisdiction, the dispositive part of which provides:

> In light of the foregoing discussion, the Tribunal unanimously decides:
>
> a.    The objections raised by the Respondent against the jurisdiction of the present Tribunal are dismissed subject to the following exception.
>
> b.    The question whether the Claimants qualify as "investors" holding "investments" under the relevant Kyrgyz legislation will be considered in conjunction with the merits of the case.
>
> c.    Any decision regarding the costs of the procedure on jurisdiction is deferred to a later stage of the proceedings.[63]

69.        On 22 February 2017, the Respondent applied to the High Court in London pursuant to Section 67 of the Arbitration Act 1996, requesting that paragraphs 75-80 and 217-236 and Section VI of the Award on Jurisdiction be set aside and/or varied such that the variation takes effect as part of the Award so as to provide that the Tribunal has no substantive jurisdiction ("**Set-Aside Claim**"). The Respondent informed the Tribunal about the Set-Aside Claim by letter of 23 February 2017.

70.        By letter dated 9 March 2017, the Respondent applied for a stay of the present arbitral proceedings pending the outcome of the Set-Aside Claim ("**Respondent's Application for Stay of Arbitral Proceedings**"), arguing, among others, that significant costs of the arbitral proceedings could be wasted if the Tribunal continued the proceedings.[64]

71.        By letter dated 10 March 2017, the Claimants requested that the Tribunal refuse to order a stay of the proceedings and accept the Joint Proposal for a Procedural Timetable, arguing,

---

[63]        Award on Jurisdiction, at p. 53.
[64]        Respondent's letter of 9 March 2017, at para. 7(a).

among others, that the High Court would issue a judgment at the end of 2017 at the earliest and that a further delay of the arbitral proceedings caused by a stay was unjustifiable.[65]

72.      By letter dated 15 March 2017, the Respondent maintained that a stay was appropriate pending the outcome of the Set-Aside Claim, stating, among others, that the English High Court was likely to issue a judgment in September 2017, rather than at the end of 2017.[66]

73.      On 15 March 2017, the Tribunal issued Procedural Order No. 6, whereby the Tribunal denied the Respondent's Application to Stay the Proceedings.

74.      By letter dated 9 November 2017, the Claimants informed the Tribunal that the Respondent's Set-Aside Claim had been dismissed by the High Court of England and Wales on 13 October 2017, enclosing a copy of the decision.

**E.      WRITTEN PLEADINGS ON THE MERITS AND ANY REMAINING OBJECTIONS TO JURISDICTION**

75.      By letter dated 25 January 2017, the Tribunal invited the Parties to confer with each other with a view to reaching agreement on a joint proposal for a procedural timetable up to, and including, the Hearing on the Merits and Any Remaining Objections to Jurisdiction ("**Hearing**"), and circulated the Draft Timetable for the Proceedings on the Merits and Any Remaining Objections to Jurisdiction ("**Draft Timetable**") in order to facilitate such discussion between the Parties.

76.      By e-mail dated 10 February 2017, the Respondent informed the Tribunal that the Parties had reached agreement on the Draft Timetable up to the Hearing, which could be held in March 2018 ("**Joint Proposal for a Procedural Timetable**"). The Claimants confirmed their agreement by e-mail of the same date.

77.      By letter dated 22 February 2017, the Tribunal informed the Parties that the Joint Proposal for a Procedural Timetable was accepted but suggested that the Hearing be set for the period from 9 to 13 April 2018 in either London, Paris or Sydney; invited the Parties (1) to confirm their availability for the suggested period and (2) to indicate their preference regarding the venue of the Hearing.

---

[65]     Claimants' letter of 10 March 2017, at p. 2.
[66]     Respondent's letter of 15 March 2017, at p. 2.

78.      By letter dated 10 March 2017, in response to the Tribunal's letter dated 22 February 2017, the Claimants confirmed their availability for the Hearing during the proposed period from 9 to 13 April 2018 in either Paris or London, and suggested that the Hearing be held in Paris.[67]

79.      By letter dated 15 March 2017, the Respondent confirmed its availability for the Hearing during the period from 9 to 13 April 2018 in Paris, London or Sydney.[68]

80.      On 15 March 2017, the Tribunal issued Procedural Order No. 6, whereby the Tribunal established a procedural timetable on the basis of the Parties' Joint Proposal for a Procedural Timetable and decided that the Hearing was to be held from 9 to 13 April 2018 in Paris.

81.      By letter dated 24 May 2017, the Respondent requested a two-week extension of the deadlines set out in the procedural timetable, and the Claimants confirmed their agreement to this extension by e-mail of the same date.

82.      By letter dated 31 May 2017, the Tribunal granted the requested extension and reproduced the revised procedural timetable in the attachment to its letter dated 1 June 2017 ("**Procedural Timetable**").

83.      On 14 June 2017, the Respondent filed its Statement of Defence on the Merits and Memorial on Jurisdiction ("**Statement of Defence on the Merits and Memorial on Jurisdiction**").

84.      Pursuant to the Procedural Timetable, each side submitted to the other side a reasoned request for disclosure of documents ("**Request to Produce**"); and each side produced part of the requested documents while making reasoned objections with regard to the remainder of documents.

85.      On 17 August 2017, pursuant to the Procedural Timetable, the Parties submitted their applications to the Tribunal in the form of two separate Redfern Schedules, setting out any requests for the production of the documents that they maintained despite the other side's objections ("**Applications to Order Production**").

---

[67]      Claimants' letter of 10 March 2017, at p. 2.
[68]      Respondent's letter of 15 March 2017, at p. 1.

86.     On 31 August 2017, pursuant to the Procedural Timetable, the Parties submitted to the Tribunal their responses to the Applications to Order Production.

87.     By letter dated 6 September 2017, the Respondent submitted additional comments on the Claimants' Application to Order Production, alleging that the Claimants had submitted a new objection in relation to Nos 1, 2, 4, 7, 8, 9, 10, 11, 13, 16 and 34 of the Respondent's Request to Produce, and that the Claimants had apparently withdrawn their agreement to produce documents Nos 28(a) and (b) of the Respondent's Request to Produce.

88.     By e-mail dated 8 September 2017, the Tribunal invited the Claimants to provide any comments that they might have on the Respondent's letter of 6 September 2017. By letter of the same date, the Claimants provided their comments on the Respondent's letter, stating that the Claimants had previously raised the same objection in relation to Nos 1, 2, 4, 7, 8, 9, 10, 11, 13, 16 and 34 of the Respondent's Request to Produce, and that the Claimants' request to limit the scope of production regarding Nos 28(a) and (b) of the Respondent's Request to Produce was intended to avoid an unreasonable and disproportionate search.

89.     On 18 September 2017, the Tribunal issued Procedural Order No. 7 regarding the Parties' Applications for the Production of Documents.

90.     On 19 September 2017, the Claimants noted that the Tribunal did not indicate its decision on Request to Produce No 31 and requested the supplement of Annex B to Procedural Order No. 7 in this regard.

91.     On 22 September 2017, the Tribunal issued a revised version of Annex B to Procedural Order No. 7 including the Tribunal's decision in respect of Request to Produce No 31.

92.     On 10 October 2017, the Parties informed the Tribunal that they had agreed on a one-week extension of the deadline for the filing of Claimants' Reply to the Respondent's Statement of Defence on the Merits and Counter-Memorial on Jurisdiction to 9 November 2017, and on a corresponding extension of the filing of Respondent's Rejoinder on the Merits and Reply on Jurisdiction to 22 January 2018; as well as on the adjustment of the deadlines for the Claimants' Rejoinder on Jurisdiction and the submission of the notifications of witnesses and experts. On the same date, the Tribunal confirmed its agreement with the new Procedural Timetable.

93.      On 9 November 2017, the Claimants filed their Reply to the Respondent's Statement of Defence on the Merits and Counter-Memorial on Jurisdiction (**"Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction**").

94.      On 18 January 2018, the Parties informed the Tribunal that they had agreed to a one-week extension of the due date for the filing of the Respondent's Rejoinder on the Merits and Reply on Jurisdiction, to 29 January 2018, with corresponding adjustments to subsequent deadlines. On the same date, the PCA acknowledged receipt of the Parties' communications.

95.      On 24 January 2018, the Tribunal approved the Procedural Calendar as adjusted.

96.      On 29 January 2018, the Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction ("**Rejoinder on the Merits and Reply on Jurisdiction**").

97.      By letter dated 31 January 2018, the Claimants requested that the Tribunal exclude from the record of the arbitration the Expert Witness Statement of Mr. Evgenii Shilov, submitted together with the Rejoinder on the Merits and Reply on Jurisdiction.

98.      On 1 February 2018, the Tribunal acknowledged receipt of the Claimants' letter of 31 January 2018, and invited the Respondent to provide any comments that it might have by 6 February 2018.

99.      By letter dated 6 February 2018, the Respondent requested that the Tribunal dismiss the Claimants' application to exclude the Expert Witness Statement of Mr. Evgenii Shilov from the record.

100.      By letter dated 9 February 2018, the Tribunal informed the Parties that the Expert Witness Statement of Mr. Shilov was admissible and invited the Claimants to submit any comments and rebuttal evidence by 5 March 2018.

101.      On 26 February 2018, the Claimants filed their Rejoinder on Jurisdiction ("**Rejoinder on Jurisdiction**").

102.      By letter dated 26 February 2018, the Respondent enclosed the Witness Statement of Mr. Dmitry Antonenko and requested the Tribunal to admit it into evidence. The Respondent acknowledged that the Witness Statement was submitted after the deadline for production of

evidence in these proceedings but asserted that Mr. Antonenko's testimony had only been available to the Respondent since the previous week.

103.     On the same date, the Claimants requested the Tribunal to disregard the Respondent's new evidence and its accompanying letter.

104.     By letter dated 27 February 2018, in view of the nature of the alleged new evidence and the Respondent's contention that it became aware of this evidence only the previous week, the Tribunal (1) provisionally admitted into the record the Witness Statement of Mr. Antonenko, subject to a later decision by the Tribunal; (2) invited the Claimants to submit any comments and rebuttal evidence which they might have by 5 March 2018; and (3) indicated that it would take a final decision as soon as practicable thereafter.

105.     On 5 March 2018, each side submitted notifications of the witnesses and experts whom they wished to examine at the Hearing and a chronological list of all exhibits with indications where the respective documents could be found in the file.

106.     On the same date, the Claimants submitted a letter with six enclosures pursuant to the Tribunal's invitation to the Claimants, by letter dated 9 February 2018, to provide comments on and rebuttal evidence to the Expert Witness Statement of Mr. Evgenii Shilov; and a second letter submitted pursuant to the Tribunal's invitation to the Claimants, by letter dated 27 February 2018, to provide comments on and rebuttal evidence to the Witness Statement of Mr. Dmitry Antonenko.

107.     By letter dated 6 March 2018, the Tribunal conveyed certain decisions to the Parties concerning matters raised in the Claimants' letters of 5 March 2018. Regarding the Claimants' letter providing comments on and rebuttal evidence to Mr. Shilov's Expert Witness Statement, the Tribunal (1) invited the Claimants to explain, in no more than two pages, in support of which facts they had submitted the six documents enclosed to such letter (C-318 to C-323) and/or the relevance of these documents to their case; and (2) invited the Respondent to provide any comments it might have on the Claimants' request of an order for the production of two documents by the Respondent and/or to provide the requested documents. Regarding the Claimants' letter providing comments on and rebuttal evidence to Mr. Antonenko's Witness Statement, the Tribunal (1) admitted such Witness Statement into the record, taking note of the Claimants' confirmation that they "do not object to the submission of the evidence"; (2) directed

the Respondent to provide an unredacted version of Mr. Antonenko's Witness Statement to Claimants' counsel, on the conditions that access to the unredacted document would be restricted to Claimants' counsel at Freshfields Bruckhaus Deringer and any such information would not be disclosed to anybody beyond Claimants' counsel; and (3) invited the Respondent to provide any comments it might have on the Claimants' statement that they did not intend to call Mr. Antonenko for cross-examination if the Respondent provided that certain information identified in their letter be provided.

108.    By letter dated 9 March 2018, the Claimants explained the relevance of Exhibits C-318 to C-323 to their case.

109.    By letter of the same date, the Respondent objected to the Claimants' request of an order for production of the "USSR norms" applied by Mr. Shilov, of Mr. Shilov's "Labour Journal", and of Mr. Shilov's *curriculum vitae, inter alia* contending that the Claimants should have made a prompt reasoned document request before their comments and rebuttal evidence were due on 5 March 2018. Nevertheless, the Respondent indicated it would produce certain relevant USSR norms which, in any event, were publicly available. Regarding the Claimants' Exhibits submitted on 5 March 2018 (C-318 to C-323), the Respondent indicated that it would object to the Claimants making new arguments at the final hearing that had not been made in the various submissions that they had been ordered to file in this arbitration. Regarding the Claimants' request for the provision of certain information concerning Mr. Antonenko as a condition not to call him for cross-examination, the Respondent averred that there was no basis for the Claimants to issue interrogatories to the Respondent.

110.    By the same letter, the Respondent also requested that the Tribunal exclude from record Exhibits C-316 and C-317, submitted by the Claimants with their Rejoinder on Jurisdiction, on the basis that these documents did not concern any jurisdictional issue.

111.    On 12 March 2018, the Claimants submitted a letter in response to the Respondent's letter dated 9 March 2018. The Claimants asserted that their request for the production of the USSR norms and Mr. Shilov's Labour Journal were timely, noted that the documents provided by the Respondent were irrelevant and untranslated. The Claimants argued that their requests for information in relation to Mr. Antonenko were entirely reasonable questions and would alleviate the need to call him from cross-examination. Finally, the Claimants contended that Exhibits C-

316 and C-317 formed part of an email chain already submitted as evidence by the Respondent as Exhibits R-408 to R-414.

112.     By letter dated 12 March 2018, the Respondent noted the Parties' inability to reach an agreement in connection with certain differences in translations submitted by the Parties. The Respondent requested that the Tribunal confirm its entitlement to challenge and make submissions in respect of the Claimants' translations at the final hearing. The Respondent also requested leave to admit into the record Exhibit R-498, consisting in a Russian-English dictionary entry for the term of "проект" ("project").

113.     On 12 March 2018, the Tribunal provided the Parties with a draft of Procedural Order No. 8 regarding details of the Hearing, inviting comments from the Parties by 19 March 2018.

114.     By letter dated 13 March 2018, the Respondent requested that the Tribunal exclude Exhibits C-318 to C-323 from the record, arguing that the Claimants had failed, in their letter dated 9 March 2018, properly to explain the relevance of these new Exhibits to the Claimants' allegations, and on what basis they would constitute a rebuttal of the Shilov Report.

115.     By letter dated 15 March 2018, the Claimants requested that all outstanding procedural issues be resolved by the Tribunal at the outset of the Hearing on 9 April or at a short pre-hearing conference, if necessary. As regards to the contested translations, the Claimants pointed out that this issue only became disputed after the Respondent's Rejoinder on the Merits and Reply on Jurisdiction was submitted, and that they had never disputed the Respondent's right to challenge the accuracy of the translations in accordance with Article 16.4 of Procedural Order No. 1. The Claimants objected to the Respondent's attempt to introduce Exhibit R-498 into the record. In the event that the Tribunal were to admit this Exhibit, the Claimants announced that they would request permission to submit new evidence in response. With regard to Exhibits C-318 to C-323, the Claimants averred that all of these Exhibits were relevant to the Shilov Report, as well as to the points that the Respondent would likely develop at the Hearing based on that Report. The Claimants also noted that one of the witnesses called for cross-examination by the Respondent, Mr. Rodney Irwin, had recently undergone neurosurgery and would be seeking on 23 March 2018 an specialist's opinion as to whether we was fit to travel and/or to be cross-examined. Finally, the Claimants sought the Tribunal's leave to submit as evidence a letter from Mr. Savchenko explaining his reasons for declining to participate in these proceedings as a witness.

116.     On 16 March 2018, the Claimants submitted a letter from clinical neuropsychologist Dr. Rees assessing Mr. Rodney Irwin's cognitive ability to testify as a witness during the Hearing.

117.     By letter dated 16 March 2018, the Respondent objected to the Claimants' application for leave to introduce a letter by Mr. Savchenko into the record. In the event that the Tribunal were to admit the letter, the Respondent requested permission to submit evidence in response.

118.     By letter dated 19 March 2018, the Tribunal conveyed to the Parties its decisions regarding the outstanding procedural issues. The Tribunal decided as follows: (1) Exhibits C-316 and C-317 were admitted into the record; (2) Exhibits C-318 to C-323 could be used at the Hearing only in relation to issues touched upon by the Shilov Report; (3) the Claimants' request of an order for the production of the USSR norms and Mr. Shilov's Labour Journal was denied; (4) the Tribunal decided not to formally order the Respondent to disclose the information requested by the Claimants in relation to Mr. Antonenko's Witness Statement, and invited the Claimants to indicate whether they still wished to call Mr. Antonenko for cross-examination by 21 March 2018; (5) the Tribunal confirmed that it remained open to the Parties to comment on the appropriateness of different translations at the Hearing as foreseen in Procedural Order No. 1, decided to admit Exhibit R-498 into the record, and, while it did not order the preparation of a certified translation, it reserved the right to do so, including if it would find at or after the Hearing that the differences in translation should be further clarified; (6) the Tribunal invited the Respondent to provide any comments on the Claimants' information concerning the availability of Mr. Irwin for cross-examination at the Hearing; and (7) the Tribunal noted the Parties' positions regarding the Claimants' request of leave to introduce into the record a letter from Mr. Savchenko, and announced that it would shortly revert to the Parties with a decision in this regard.

119.     On 19 March 2018, the Parties submitted their comments with regard to draft Procedural Order No. 8 regarding details of the Hearing. Taking the Parties' comments into account, the Tribunal issued Procedural Order No. 8 in its final form on 20 March 2018.

120.     By letter dated 21 March 2018, the Respondent provided its comments on the availability of Mr. Irwin for cross-examination at the Hearing.

121.     On 22 March 2018, pursuant to section 5.6 of Procedural Order No. 8, the Parties provided an agreed scheduling proposal indicating the order of appearance of witnesses and

experts, the date and approximate time at which each witness or expert will be presented, and the approximate timing of breaks.

122.    By letter of 26 March 2018, the Claimants provided an updated chronological index of the Claimants' Factual Exhibits.

123.    By letter dated 28 March 2018, the Claimants confirmed that Mr. Irwin was able to attend the Hearing.

124.    By letter dated 28 March 2018, the Tribunal conveyed to the Parties, *inter alia*, that the Claimants' request for leave to introduce into the record a letter from Mr. Savchenko was denied.

125.    On 28 March 2018, the PCA invited the Parties to confirm whether, pursuant to section 15.4 of Procedural Order No. 1, interpretation services which might be required at the Hearing had been arranged by the Parties. On the same date, the Respondent confirmed that the Parties had arranged interpretation services for the Hearing. On 29 March 2018, the Claimants confirmed the Parties' arrangement in this regard.

126.    By letter of the same date, the Claimants requested permission to introduce two new Exhibits (C-324 and C-325) into the record in response to the filing by the Respondent of Exhibit R-498.

127.    By letter of 30 March 2018, the Claimants disclosed that they had entered into a new litigation funding agreement with Gillham LLC and Lucille Investments LLC, both entities within the Burford Capital Group.

128.    On 2 April 2018, the Tribunal admitted Exhibits C-324 and C-325 into the record.

129.    On 4 April 2018, the Claimants submitted copies of Exhibits C-324 and C-325, together with an updated Consolidated Index of the Claimants' Factual Exhibits and an updated Chronological Consolidated Index of the Claimants' Factual Exhibits.

130.    On 7 April 2018, both sides provided updates to their respective lists of Hearing attendees.

F.    **HEARING ON THE MERITS AND ANY REMAINING OBJECTIONS TO JURISDICTION**

131.    The Hearing on the Merits and Any Remaining Objections to Jurisdiction took place between 9 and 13 April 2018 in Paris.

132.    The Claimants were represented at the Hearing by the following representatives and counsel:

Mr. Noah Rubins
Dr. Daniel Müller
Ms. Mariia Puchyna
Ms. Shirin Chua
Mr. Joshua Kelly
Ms. Anna Lanshakova
Ms. Francesca Lionetti
*Freshfields Bruckhaus Deringer*

Mr. Boris Aryev
Mr. Rodney Irwin
*Stans Energy Corp*

133.    The Respondent was represented at the Hearing by the following representatives and counsel:

Dr. Andrei Yakovlev
Mr. Wilson Antoon
Mr. Marco Toracca
Ms. Dina Suliman
Ms. Viktoriya Krasyuk
*King & Wood Mallesons*

Mr. Mirlan Dordoev
*Centre for Court Representation for the Government of the Kyrgyz Republic*

Mr. Eldiyar Mukanov

*State Agency for Geology and Mineral Resources*

134.     The following witnesses and experts gave oral evidence during the Hearing:

Mr. Boris Aryev

Mr. Rodney Irwin

*Stans Energy Corp*

*as Fact Witnesses*

Mr. Ermek Beysheyev

*as Fact Witness*

Mr. Evgenii Shilov

*as Mining Expert*

Mr. Santiago Dellepiane Avellaneda

*Compass Lexecon*

*as Valuation Expert*

Mr. Simon Maxwell Ziff

*Ziff-Ivan Associates*

*as Valuation Expert*

135.     On 11 April 2018, the Claimants provided electronic copies of Exhibits C-212, C-245, and C-250 containing a corrected Russian version of the respective documents.

136.     On the same date, the Respondent provided an electronic copy of the updated Exhibit R-141.

137.     On 17 April 2018, pursuant to section 3.4 of Procedural Order No. 8, the Respondent dispatched to the Tribunal members, the PCA, and Claimants' counsel, an electronic copy of the Respondent's Hearing Binder, witness and expert bundles, and demonstrative exhibits and presentations.

138.    On the same date, the Respondent also provided updated versions of the Respondent's Consolidated Index of Factual Exhibits and Chronological List of Factual Exhibits.

139.    On the same date, the Claimants, pursuant to section 3.4 of Procedural Order No. 8, submitted an electronic copy of the Claimants' Hearing Binder, and all witness and expert bundles, as well as electronic copies of updated Exhibits C-212, C-245, and C-250.

140.    On 19 April 2018, the Tribunal issued Procedural Order No. 9, Regarding Post-Hearing Procedures. Among other things, the Tribunal put the following questions to the Parties, which they might address in their post-hearing briefs:

**Jurisdiction**

1.   Assuming that the Tribunal accepts the scheme described by Mr. Beysheyev in his witness testimony as true, what is the evidence on the record that the Claimants (i) were aware or (ii) could have been expected to be aware of it? Based on that evidence, what are the legal consequences for the Claimants' claims in these proceedings?

2.   Assuming that the Tribunal concludes that the 29 December 2009 auction at the Central Asian Stock Exchange was contrary to Kyrgyz law, what is the evidence on the record that the Claimants (i) were aware or (ii) could have been expected to be aware of such unlawfulness? What would be the legal consequence if the auction was contrary to Kyrgyz law but the Claimants were unaware of it?

**Merits**

3.   Was the Government legally entitled to revoke License No. 3, as a result of Kutisay Mining LLC's failure to comply with the terms of the Kutessay II License Agreement No. 3? Assuming that the Government was legally entitled to revoke the License, does there remain scope for compensation claims under the 2003 Investment Law in view of the work completed by the Claimants since 2009?

4.   Assuming that the Tribunal adopts a market capitalization approach on damages (consistently with the Claimants' submission), what would be the amount of damages on the following hypothetical valuation dates: (i) 25 June 2012; (ii) 14 April 2013; (iii) 16 October 2014.

5.   Assuming that the Tribunal adopts an income approach on damages based on DCF analysis (consistently with the Respondent's primary submission), what would be the amount of damages on the following hypothetical valuation dates: (i) 25 June 2012; (ii) 14 April 2013; (iii) 16 October 2014. To demonstrate the sensitivity of their models to particular parameters, the Parties are requested to indicate a value range for each valuation date, explaining how the results would change if the following inputs are used:

| *Parameter* | *<= Range =>* | |
|---|---|---|
| Extraction rate | 62.56% | 72% (accounting for new processes that might have been introduced following VNIIHT studies) |
| Operating expenditures | As in AsiaRud reports | 25% lower (accounting for new processes that might have been introduced following VNIIHT studies) |

26

| Capital expenditures | As in AsiaRud reports | | 25% higher (accounting for investments made to improve efficiency) |
|---|---|---|---|
| WACC | 15.5% | | 20% |
| Forecast REE prices | Visor Capital | VisionGain | Byron Capital |

Should additional inputs be required, the Parties are requested to base their assessment on the information described in the AsiaRud reports.

6.   Assuming that the Tribunal adopts a sunk costs approach on damages (consistently with the Respondent's submission in the alternative), what are the amounts expended by the Claimants by (i) 14 April 2013 and (ii) 16 October 2014? What is the evidence on the record that such expenditures were incurred?

7.   The Parties' experts have conceded that each of them had less then optimal information for valuation purposes, which seems to have been a main reason for rejecting the methodology of the opposing side's expert (namely that the opposing methodology was inappropriate given the lack of information). If the Tribunal were to consider that in this case there is insufficient information for conventional valuation methodologies, what principles, if any, exist in international law to award damages for the loss of the investment and the chance to achieve its objective that a claimant has suffered as a result of a taking? If there are any such principles, how are they to be applied, and is there a difference in measurement of damages between lawful expropriation and unlawful expropriation?

141.   By letter dated 18 May 2018, pursuant to section 2.3 of Procedural Order No. 9, the Claimants requested leave to submit new documents into the record.

142.   On 21 May 2018, the Respondent informed the Tribunal that, in order to properly consider the Claimants' application, the Respondent had requested copies of the new documents, following the receipt of which, the Respondent requested to be afforded an opportunity to consider and, if necessary, comment on the Claimants' application.

143.   On 22 May 2018, in order to provide the Respondent with a meaningful opportunity to comment on the Claimants' request for leave to introduce new documents into the record, the Tribunal invited the Claimants to share the documents in question with the Respondent, and requested the Respondent to submit any comments it may have within three days after the receipt of the documents. In case a decision from the Tribunal were to be required, the Claimants were requested to share the documents in question with the Tribunal to enable the latter to appreciate the Respondent's comments.

144.   On the same date, the Claimants informed the Tribunal that they had shared copies of the documents referred to in the Claimants' request for leave and which were already in their possession with the Respondent, and had also informed the Respondent that they were in the process of collating documents which they would share as soon as they were received.

145.     By letter dated 25 May 2018, the Respondent provided comments in response to the Claimants' request, enclosing copies of the new documents and other documents.

146.     By letter dated 28 May 2018, the Tribunal decided that: "1) All documents mentioned in the Claimants' application are admitted into the record; 2) The Respondent is given leave to submit, with its Post-Hearing Brief, any new documents it considers relevant in rebuttal to the Claimants' new documents or to the questions of the Tribunal in the Annex to Procedural Order No. 9; 3) The Parties may comment on the new documents submitted by the other side in their second-round Post-Hearing Briefs, due by 13 July 2018."

147.     On 7 June 2018, the Parties informed the Tribunal that they had reached agreement on the extension of the deadlines set out in Procedural Order No. 9. On the same date, the Tribunal confirmed that the requested extensions were approved.

148.     On 29 June 2018, both sides simultaneously submitted their Post-Hearing Briefs with enclosures.

149.     On 17 August 2018, both sides simultaneously submitted their Reply Post-Hearing Briefs with enclosures.

150.     By letter dated 21 August 2018, the Respondent objected to portions of the Claimants' Reply Post-Hearing Brief, notably in respect of a new argument on estoppel presented by the Claimants therein, and certain new evidence and requested that these be struck from the record.

151.     On 29 August 2018, the Tribunal indicated that it took the Respondent's objection to portions of the Claimants' Reply Post-Hearing Brief and certain evidence relied upon by the Claimants under advisement. The Tribunal would consider and take a decision on the admissibility of these materials in the context of its deliberations in respect of the Award in the present proceedings.

152.     On 26 September 2018, the Parties conveyed their agreement to extend the deadlines for the Submissions on Costs and the Comments on opposing side's Submissions on Costs. On 27 September 2018, the Tribunal approved the extension requested by the Parties.

153.     On 5 October 2018, both sides simultaneously filed their Submissions on Costs.

154. On 2 November 2018, both sides simultaneously submitted their comments on the opposing side's Submission on Costs.

## III. THE PARTIES' REQUESTS

### A. THE CLAIMANTS' REQUESTS

155. The Claimants, in their Statement of Claim, requested that the Tribunal:

(a) DECLARE that:

(i) The Kyrgyz Republic has breached its obligations toward Claimants under the Kyrgyz Investment Law, the Moscow Convention, the Investment Protection Decree and international law by expropriating the Claimants' investments in the Kyrgyz Republic; and

(ii) The Kyrgyz Republic has breached its obligations toward Claimants under the Kyrgyz Investment Law, the Moscow Convention, the Investment Protection Decree and international law by failing to accord the Claimants' investments fair and equitable treatment, and full protection and security;[69]

(b) ORDER the Kyrgyz Republic to pay the Claimants compensation for the injury caused by its breaches of the Kyrgyz Investment Law, the Moscow Convention, the Investment Protection Decree and international law in the amount of US$128.23 million;

(c) ORDER the Kyrgyz Republic to pay pre-award interest on (b) above, calculated from 25 June 2012 at the rate of 15.5%, accruing on a compounded basis until the date of the Tribunal's Award or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(d) ORDER the Kyrgyz Republic to pay post-award interest on (b) and (c) above, at a rate of 15.5% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(e) DECLARE that:

(i) The award of damages and interest in (b), (c) and (d) is made net of applicable Kyrgyz taxes; and

(ii) The Kyrgyz Republic may not deduct taxes in respect of the payment of the award of damages and interest in (b), (c) or (d);

(f) ORDER the Kyrgyz Republic to compensate the Claimants in respect of any double taxation liability that would arise in Canada or elsewhere that would not have arisen but for the Kyrgyz Republic's adverse measures;

(g) AWARD such other relief as the Tribunal considers appropriate; and

---

69 See Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 744-745: "*In their prayers for relief, the Claimants seek a declaration that the full protection and security standard has been breached. Nowhere in the Statement of Claim do the Claimants even attempt to explain: 774.1 the legal basis on which they would be entitled to bring such a claim; or 744.2 how this standard was breached. 745. The Claimants bear the burden of proof in establishing their claims, which burden the Claimants have clearly not met. Such a claim should therefore be dismissed*". [footnotes omitted]

     (h)     ORDER the Kyrgyz Republic to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA.[70]

156.     In their Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, the Claimants requested that the Tribunal:

     (a)     REJECT the objections to jurisdiction and admissibility made by the Kyrgyz Republic;

     (b)     DECLARE that:

          (i)     The Kyrgyz Republic has breached its obligations toward Claimants under the 2003 Investment Law and international law by expropriating the Claimants' investments in the Kyrgyz Republic; and

          (ii)     The Kyrgyz Republic has breached its obligations toward Claimants under the 2003 Investment Law and international law by failing to accord the Claimants' investments fair and equitable treatment;[71]

     (c)     ORDER the Kyrgyz Republic to pay the Claimants compensation for the injury caused by its breaches of the 2003 Investment Law and international law in the amount of US$128.23 million;

     (d)     ORDER the Kyrgyz Republic to pay pre-award interest on (c) above, calculated from 25 June 2012 at the rate of 15.5% per annum, accruing on a compounded basis until the date of the Tribunal's Award or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

     (e)     ORDER the Kyrgyz Republic to pay post-award interest on (c) and (d) above, at a rate of 15.5% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

     (f)     DECLARE that:

          (i)     The award of damages and interest in (c), (d) and (e) is made net of applicable Kyrgyz taxes; and

          (ii)     The Kyrgyz Republic may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) or (e);

     (g)     ORDER the Kyrgyz Republic to compensate the Claimants in respect of any double taxation liability that would arise in Canada or elsewhere that would not have arisen but for the Kyrgyz Republic's adverse measures;

     (h)     AWARD such other relief as the Tribunal considers appropriate; and

     (i)     ORDER the Kyrgyz Republic to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA.[72]

157.     In their Rejoinder on Jurisdiction, the Claimants requested that the Tribunal:

---

[70]     Statement of Claim, at para. 316.
[71]     The Claimants did not explicitly include their prior request for a declaration regarding full protection and security.
[72]     Reply to the Respondent's Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 363.

(a)   REJECT the objections to jurisdiction and admissibility made by the Kyrgyz Republic;

(b)   DECLARE that:

(i)   The Kyrgyz Republic has breached its obligations toward Claimants under the 2003 Investment Law and international law by expropriating the Claimants' investments in the Kyrgyz Republic; and

(ii)   The Kyrgyz Republic has breached its obligations toward Claimants under the 2003 Investment Law and international law by failing to accord the Claimants' investments fair and equitable treatment;

(c)   ORDER the Kyrgyz Republic to pay the Claimants compensation for the injury caused by its breaches of the 2003 Investment Law and international law in the amount of US\$128.23 million;

(d)   ORDER the Kyrgyz Republic to pay pre-award interest on (c) above, calculated from 25 June 2012 at the rate of 15.5% per annum, accruing on a compounded basis until the date of the Tribunal's Award or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(e)   ORDER the Kyrgyz Republic to pay post-award interest on (c) and (d) above, at a rate of 15.5% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(f)   DECLARE that:

(i)   The award of damages and interest in (c), (d) and (e) is made net of applicable Kyrgyz taxes; and

(ii)   The Kyrgyz Republic may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) or (e);

(g)   ORDER the Kyrgyz Republic to compensate the Claimants in respect of any double taxation liability that would arise in Canada or elsewhere that would not have arisen but for the Kyrgyz Republic's adverse measures;

(h)   AWARD such other relief as the Tribunal considers appropriate; and

(i)   ORDER the Kyrgyz Republic to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA.[73]

158.      In their Post-Hearing Brief, the Claimants requested that the Tribunal:

(a)   REJECT the objections to jurisdiction and admissibility made by the Kyrgyz Republic;

(b)   DECLARE that:

(i)   The Kyrgyz Republic breached its obligations toward the Claimants under the 2003 Investment Law and international law by expropriating the Claimants' investments in the Kyrgyz Republic; and

---

[73]     Rejoinder on Jurisdiction, at para. 90.

    (ii)    The Kyrgyz Republic breached its obligations toward the Claimants under the 2003 Investment Law and international law by failing to accord the Claimants' investments fair and equitable treatment;

(c)    ORDER the Kyrgyz Republic to pay the Claimants compensation for the injury caused by its breaches of the 2003 Investment Law and international law in the amount of US$128.23 million;

(d)    ORDER the Kyrgyz Republic to pay pre-award interest on (c) above, calculated from 25 June 2012 at the rate of 15.5% per annum, accruing on a compounded basis until the date of the Tribunal's Award or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(e)    ORDER the Kyrgyz Republic to pay post-award interest on (c) and (d) above, at a rate of 15.5% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(f)    DECLARE that:

    (i)    The award of damages and interest in (c), (d) and (e) is made net of applicable Kyrgyz taxes; and

    (ii)    The Kyrgyz Republic may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) or (e);

(g)    ORDER the Kyrgyz Republic to indemnify the Claimants in respect of any tax imposed on the Tribunal's award;

(h)    AWARD such other relief as the Tribunal considers appropriate; and

(i)    ORDER the Kyrgyz Republic to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA.[74]

159.    In their Reply Post-Hearing Brief, the Claimants requested that the Tribunal:

(a)    REJECT the objections to jurisdiction and admissibility made by the Kyrgyz Republic;

(b)    DECLARE that:

(i) The Kyrgyz Republic breached its obligations toward the Claimants under the 2003 Investment Law and international law by expropriating the Claimants' investments in the Kyrgyz Republic; and

(ii) The Kyrgyz Republic breached its obligations toward the Claimants under the 2003 Investment Law and international law by failing to accord the Claimants' investments fair and equitable treatment;

(c)    ORDER the Kyrgyz Republic to pay the Claimants compensation for the injury caused by its breaches of the 2003 Investment Law and international law in the amount of US$128.23 million;

(d)    ORDER the Kyrgyz Republic to pay pre-award interest on (c) above, calculated from 25 June 2012 at the rate of 15.5% per annum, accruing on a compounded basis until

---

[74]    Claimants' Post-Hearing Brief, at para. 101.

the date of the Tribunal's Award or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(e)   ORDER the Kyrgyz Republic to pay post-award interest on (c) and (d) above, at a rate of 15.5% per annum from the date of the Tribunal's Award, compounded semi-annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(f)   DECLARE that:

   (i)   The award of damages and interest in (c), (d) and (e) is made net of applicable Kyrgyz taxes; and

   (ii)   The Kyrgyz Republic may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) or (e);

(g)   ORDER the Kyrgyz Republic to indemnify the Claimants in respect of any tax imposed on the Tribunal's award;

(h)   AWARD such other relief as the Tribunal considers appropriate; and

(i)   ORDER the Kyrgyz Republic to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA[75].

## B.   THE RESPONDENT'S REQUESTS

160.   In its Statement of Defence on the Merits and Memorial on Jurisdiction, the Respondent requested the following relief:

830.1   a declaration and order that the Tribunal lacks jurisdiction over the Claimants' claims;

830.2   further or in the alternative, a declaration and order that the Claimants' claims are inadmissible;

830.3   further or in the alternative, an order that the Claimants' claims be dismissed on the merits;

830.4   an order awarding the Respondent the costs associated with this arbitration, including, but not limited to, fees and expenses of the arbitral tribunal, costs of expert advice, costs of legal representation, fees and expenses of the appointing authority and expenses of the Secretary General of the Permanent Court of Arbitration, and all other professional fees, disbursements and expenses, plus interest thereon;

830.5   an order apportioning any remaining costs of arbitration in a manner such that one hundred per cent of such costs are borne by the Claimants; and

830.6   such further and other relief as the Tribunal sees fit.[76]

---

[75]   Claimants' Reply Post-Hearing Brief, at para. 58.
[76]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 830.

161.　　In its Rejoinder on the Merits and Reply on Jurisdiction, the Respondent requested the following relief:

>　702.1　　a declaration and order that the Tribunal lacks jurisdiction over the Claimants' claims;
>
>　702.2　　further or in the alternative, a declaration and order that the Claimants' claims are inadmissible;
>
>　702.3　　further or in the alternative, an order that the Claimants' claims be dismissed on the merits;
>
>　702.4　　an order awarding the Respondent the costs associated with this arbitration, including, but not limited to, fees and expenses of the arbitral tribunal, costs of expert advice, costs of legal representation, fees and expenses of the appointing authority and expenses of the Secretary General of the Permanent Court of Arbitration, and all other professional fees, disbursements and expenses, plus interest thereon;
>
>　702.5　　an order apportioning any remaining costs of arbitration in a manner such that one hundred per cent of such costs are borne by the Claimants; and
>
>　702.6　　 such further and other relief as the Tribunal sees fit.[77]

162.　　In its Post-Hearing Brief, the Respondent "respectfully request[ed] the relief stated in paragraph 702 of R[espondent]'s Rejoinder dated 29 January 2018."[78]

## IV.　SUMMARY OF RELEVANT FACTS

163.　　The Parties' dispute arises from efforts by Stans Energy to invest in two mines for the extraction of so-called rare earth elements in the Kyrgyz Republic. Both sides have described the factual background in great detail. In the following, the Tribunal shall summarize these facts only insofar as the Tribunal regards it as necessary for its decision.

## A.　RARE EARTH ELEMENTS MARKETS

164.　　Rare earth elements ("**REEs**") are comprised of chemical elements, which are useful in a wide variety of applications including batteries, catalysts, magnets, and phosphors.[79] There are two categories of REEs: (1) light rare-earth elements ("**LREEs**") and (2) heavy rare-earth

---

[77]　　Rejoinder on the Merits and Reply on Jurisdiction, at para. 702.
[78]　　Respondent's Post-Hearing Brief, at para. 176.
[79]　　Statement of Claim, at para. 18, referring to J Gambogi, United States Department of the Interior, United States Geological Survey, "2012 Minerals Yearbook – Rare Earths", February 2015, at p. 60.1. (**Exhibit C-153**).

elements ("**HREEs**").[80] As the word "rare" indicates, it is difficult to find ore deposits containing sufficient amounts of REEs for commercial exploitation.[81]

165.      The global production of REEs started increasing in the 1950s and 1960s.[82] According to the US Geological Survey Factsheet 087-02,[83] at that time, countries other than the United States and China dominantly supplied REEs produced from Monazite-placers.[84] In the mid-1960s, Mountain Pass, mine in California, the United States, began REEs production and remained as the largest REEs mine until the mid-1980s, when China began increasing its REEs production.[85] China became the largest REEs supplier in the early 1990s, and established its dominant position in the early 2000s.[86]

---

[80]     Statement of Claim, at para. 18, referring to J Gambogi, United States Department of the Interior, United States Geological Survey, "2012 Minerals Yearbook – Rare Earths", February 2015, at p. 60.1. (**Exhibit C-153**): "*The LREEs are lanthanum, cerium, praseodymium, neodymium, promethium, samarium, europium, and gadolinium. The HREEs include terbium, dysprosium, holmium, erbium, thulium, ytterbium, and lutetium. The properties of scandium do not allow it to be classified as either a LREE or a HREE*".

[81]     Statement of Claim, para. 20; Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 23.

[82]     Statement of Claim, para. 21; United States Department of Interior, "Rare Earth Elements – Critical Resources for High Technology", *US Geological Survey Factsheet 087-02*, 2002, Figure 1 (**Exhibit C-160**).

[83]     United States Department of Interior, "Rare Earth Elements – Critical Resources for High Technology", *US Geological Survey Factsheet 087-02*, 2002, Figure 1 (**Exhibit C-160**).

[84]     See United States Department of Interior, "Rare Earth Elements – Critical Resources for High Technology", *US Geological Survey Factsheet 087-02*, 2002, Figure 1 (**Exhibit C-160**).

[85]     Statement of Claim, at paras 21-22; United States Department of Interior, "Rare Earth Elements – Critical Resources for High Technology", *US Geological Survey Factsheet 087-02*, 2002, Figure 1 (**Exhibit C-160**).

[86]     Statement of Claim, at para. 22; United States Department of Interior, "Rare Earth Elements – Critical Resources for High Technology", *US Geological Survey Factsheet 087-02*, 2002, Figure 1 (**Exhibit C-160**).



*Source: Statement of Claim, after para. 22.*

166.      REEs prices remained low until 2009, when China introduced an export quota on its REEs exports.[87] REEs prices rose significantly from 2010, and peaked in April 2011.[88] Since then, however, REEs prices have dropped significantly, once Chinese export restrictions were eased.[89]

---

[87]   Statement of Claim, at paras 23-24; Kaiser Bottom-Fish table included in "Digging In", The Economist, 2 September 2010, at p. 1 (**Exhibit C-74**).

[88]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 24-25, referring to *"The poster child for what was once a 'can't lose' investment is filing for bankruptcy"*, Business Insider UK, dated 25 June 2015 (**Exhibit R-162**).

[89]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 26, referring to *"Analysis: Rare earth prices to erode on fresh supply, China"*, dated 19 September 2012, Reuters (**Exhibit R-136**).



*Source: Statement of Defence on the Merits and Memorial on Jurisdiction, after para. 26.*

167.     The Parties have different views regarding the prospect of REEs business of today. The Claimants allege that, because China dominates the worldwide REEs supply, "there continues to be significant strategic value in non-Chinese deposits capable of commercial production of REEs".[90] The Respondent, on the contrary, alleges that the REEs business is no longer profitable as the global REEs market is expected to continue to decline until at least 2018.[91]

**B.     THE KYRGYZ REPUBLIC**

168.     The Kyrgyz Republic is a country in Central Asia. It formed part of the Union of Soviet Socialist Republics ("**USSR**") together with other 14 republics until 1991.[92] On 25 December 1991, following the disestablishment of the USSR, the Kyrgyz Republic declared independence.[93]

---

[90]     Statement of Claim, at para. 28, referring to Stormcrow, "Industry Coverage: Rare Earths – Update Note – Chinese Export Quotas on Rare Earths are abolished", 6 January 2015, at p. 4 (**Exhibit C-151**).
[91]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 27-31, referring to, *inter alia*, *"The Rare Earths Market 2012-2022"*, VisionGain, dated 25 June 2012, at p. 37 (**Exhibit R-131**).
[92]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 46-47.
[93]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 48.

169.     The first president of the Kyrgyz Republic was Askar Akayev, whose presidency continued until the Tulip Revolution of 2005.[94] The successor of Mr. Akayev was Kurmanbek Bakiev.[95] Mr. Bakiev was in office until April 2010, when protests against his presidency spread throughout the country and opposition leaders established an interim government.[96] On 15 April 2010, Mr. Bakiev resigned and fled to Belarus.[97]

170.     In June 2010, a new Constitution was approved in a national referendum. Pursuant to this new Constitution, parliamentary elections were held in October 2010 and a new government was formed in December 2010.[98]

171.     The Respondent alleges that the Bakiev regime was corrupt.[99] According to the Respondent, bribes were laundered through AsiaUniversalBank ("**AUB**"),[100] a Kyrgyz bank incorporated in August 1997, and the Claimants obtained their mining licenses through this money laundering scheme.[101] The Claimants, however, deny any involvement in corruption.[102]

## C.     STANS ENERGY'S INVESTMENTS IN THE KYRGYZ REES SECTOR

172.     Beginning in 2005, the Claimants made various investments in the Kyrgyz Republic. Following initial investments by the Claimants in the uranium sector, they proceeded to acquire investments in the REEs sector. It is the alleged expropriation of these latter investments that forms the basis of the present dispute.

### 1.     Stans Energy's Investments in the Kyrgyz Uranium Sector

173.     Stans Energy's activities in the Kyrgyz Republic began with its investments in the uranium sector.[103] In 2005, Mr. Boris Aryev, founder and COO of Stans Energy, and his business

---

[94]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 50.
[95]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 50.
[96]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 97-101.
[97]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 102.
[98]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 104.
[99]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 50-67.
[100]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 91-93; Witness Statement of E. Beysheyev, 14 June 2017, at paras 95-97.
[101]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 68-108.
[102]    Reply to Statement of Defence and Counter-Memorial on Jurisdiction, at Section II C.
[103]    Statement of Claim, at para. 34.

38

partner, Mr. Albert Grenke, decided to invest in the Kyrgyz uranium sector.[104] In July 2005, they identified three potential uranium properties: (1) Shaltin, (2) Kyzyluraan; and (3) Kapkatash.[105] According to the First Witness Statement of Mr. Aryev, in the fall of 2005, they obtained prospecting licenses for the three uranium properties from the SAGMR through Viol Grand Ltd, a Kyrgyz company that Mr. Aryev and Mr. Grenke had acquired.[106]

174.    On 26 September 2005, Stans Energy was incorporated under the laws of Ontario, Canada, for the purpose of investing the Kyrgyz uranium sector.[107] According to the First Witness Statement of Mr. Aryev, the founding directors were Mr. Aryev and Mr. Robert Mackay, a Toronto-based financier.[108]

175.    In March 2006, Stans Energy incorporated its local subsidiary in the Kyrgyz Republic, Stans KG, to hold its assets, including the licenses which had been previously acquired by Viol Grand Ltd.[109] According to the First Witness Statement of Mr. Aryev, under Kyrgyz law only Kyrgyz companies may hold licenses and assets, and conduct business in the Kyrgyz Republic.[110]

176.    In 2006 and 2007, Stans Energy added four further licenses for uranium properties at Alamudun, Alabuga,[111] Baetov and Koshdube.[112] In late 2007, Stans Energy participated in the tender for the Kara-Balty uranium processing facility held by the Kyrgyz State Property Management Fund but its US$ 5 million bid was unsuccessful.[113] In December 2008, Stans Energy listed on the Toronto Stock Venture Exchange ("**TSXV**") through a reverse takeover, merging with JM Capital Corp.[114] The Claimants indicate that, by the end of 2008, Stans Energy had invested approximately C$ 5 million in the Kyrgyz uranium sector.[115]

---

[104]    Statement of Claim, at para. 35, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 16.
[105]    Statement of Claim, at para. 35, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 16.
[106]    First Witness Statement of B. Aryev, 29 January 2016, at para. 16.
[107]    Statement of Claim, at para. 36; First Witness Statement of B. Aryev, 29 January 2016, at para. 18.
[108]    First Witness Statement of B. Aryev, 29 January 2016, at paras 17-19.
[109]    Statement of Claim, at para. 37, referring to "Stans Energy Corp, Decision on establishment of legal entity in the Kyrgyz Republic", 10 February 2006 (**Exhibit C-36**). See also, First Witness Statement of B. Aryev, 29 January 2016, at para. 24; Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 11 (**Exhibit C-111**).
[110]    First Witness Statement of B. Aryev, 29 January 2016, at para. 20.
[111]    The Tribunal notes that in some documents the alternative spelling "Alabugin" is used.
[112]    Statement of Claim, at para. 39, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 12 (**Exhibit C-111**).
[113]    Statement of Claim, at para. 39, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 21.
[114]    Statement of Claim, at para. 41, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 22.
[115]    Statement of Claim, at para. 40, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 15 (**Exhibit C-111**).

177.    In June 2009, Stans Energy returned the Kapkatash and Shaltin properties to the Kyrgyz State Geological Agency.[116] In 2011, Stans Energy relinquished its rights to the Alabuga, Baetov and Koshdube properties.[117] Since then, Stans Energy has held only one uranium licence in the Kyrgyz Republic, known as Kargysh, which was part of the original Kyzyluraan license and is currently in the process of being relinquished.[118]

178.    The Parties hold different views of Stans Energy's investments in the uranium sector. The Claimants state that their investments were initially promising but "a combination of falling uranium prices and the 2008 global financial crisis impeded Stans' prospects of raising the financing needed to advance development."[119] The Respondent, on the other hand, observes that the uranium properties were "loss-making" from the beginning, considering that "at the time the Claimants decided to invest between 2006 and 2007, uranium mining in the Kyrgyz Republic was not the most promising area of investment".[120]

## 2.    Acquisition of the Licenses for Kutessay II and Kalesay

179.    Retreating from the uranium sector, Stans Energy was looking for another investment target in the Kyrgyz Republic.[121] The Claimants aver that, being aware that the REEs prices were increasing, and following advice from Dr. Savchenko, Former Deputy Director of the Geology and Investment Department of the Kyrgyz State Agency for Geology and Mineral Reserves, Stans began to review the potential for rare earth exploration of the Aktyuz Ore Field, where Kutessay II rare earth deposit ("**Kutessay II**") and Kalesay beryllium deposit ("**Kalesay**") were located.[122] In contrast, the Respondent defines the Claimants' activity as "speculative license grabbing"[123] and asserts that Stans Energy:

> never constructed, developed or operated a mine in the Kyrgyz Republic or anywhere else in the world. It has also received no revenue to date from exploration or development […] if the Claimants are awarded even a small fraction of this sum [of their damages request], this arbitration will represent the only successful business venture in Stans Energy's corporate

---

[116]    Statement of Claim, at para. 41, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at pp. 14-15 (**Exhibit C-111**).
[117]    Statement of Claim, at para. 41, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at pp. 14-15 (**Exhibit C-111**).
[118]    Statement of Claim, at para. 41, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 25.
[119]    Statement of Claim, para. 41.
[120]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 42-43.
[121]    Statement of Claim, para. 42 *cf.* Rejoinder on the Merits and Reply on Jurisdiction, at paras 16-17.
[122]    Statement of Claim, para. 44, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 31.
[123]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 5.

history.[124]

180.    Kutessay II was discovered in 1953 and put into operation in 1958.[125] Since then, the mine had produced 80% of the USSR's REEs until 1992.[126]

181.    After the dissolution of the USSR, Kutessay II was abandoned for approximately 15 years.[127] In 2006, the Kyrgyz Republic opened a public bidding process for the Kutessay II and Kalesay deposits, and Central Asia Metals Group LLC ("CAMG") won the tender with a bid of approximately US$ 50,000.[128] On 15 November 2006, the Kyrgyz Republic issued its licence to CAMG.[129]

182.    On 30 December 2008, the Kyrgyz government issued Resolution No 736 On Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic (amended by Resolution No 410 of 25 June 2009; "**Resolution No 736**"), which stipulated a list of (1) known mineral deposits for tender in the Kyrgyz Republic and (2) tariffs for each deposit.[130] This Resolution listed tariff rates for Kutessay II and Kalesay as US$ 392,220 and US$ 35,103, respectively.[131]

183.    Stans Energy learned about an investment opportunity in Kutessay II in June 2009, when Mr. Aryev met with the then Minister of Natural Resources of the Kyrgyz Republic, Mr. Kapar Kurmanaliev.[132] During the meeting, Mr. Aryev expressed his interest in the REEs sector, and Mr. Kurmanaliev explained that CAMG had not fulfilled its license obligations regarding Kutessay II and Kalesay and that the Kyrgyz Republic was seeking a new investor for these

---

[124]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 16-17, 19, 23.
[125]    Statement of Claim, at para. 31, referring to Asiarudproject Mining Planning-Production Company CJSC, "Technical and economic assessment of Kutessay-II rare earth deposit development", July 2011, at p. 13 (**Exhibit C-86**).
[126]    Statement of Claim, at para. 31, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 18 (**Exhibit C-111**).
[127]    Statement of Claim, at para. 31, referring to Asiarudproject Mining Planning-Production Company CJSC, "Technical and economic assessment of Kutessay-II rare earth deposit development", July 2011, at p. 13 (**Exhibit C-86**).
[128]    Statement of Claim, at para. 32, referring to Note from the Office of the Prime Minister of the Kyrgyz Republic (Mr. Zubkov) confirming payment by Central Asia Metals Group LLC of Kalesay and Kutessay II bonuses, 11 December 2006 (**Exhibit C-39**).
[129]    Statement of Claim, at para. 32, referring to License No 823 ME issued to Central Asia Metals Group LLC for Kutessay II, 15 November 2006 (**Exhibit C-1**).
[130]    Statement of Claim, at para. 33, referring to Resolution No 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution No 410 of 25 June 2009 (**Authority CLA-99**).
[131]    Statement of Claim, at footnote 26, referring to Resolution No 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution No 410 of 25 June 2009, Nos. 21 and 23 on the list (**Authority CLA-99**).
[132]    Statement of Claim, at para. 45, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 32.

deposits.[133] According to the meeting minutes of the Board of Directors of Stans Energy, Stans Energy was "offered to acquire Kutessay II for US$432,000 as per Kyrgyz Law."[134]

184.     According to the meeting minutes of the Board of Directors of Stans Energy on 9 October 2009, the Board of Directors of Stans Energy resolved that it "desires to acquire Kutessay II and approve raising of US$ 600,000".[135] According to the exhibits submitted by the Claimants, on 15 October 2009, Stans Energy's Chairman of the Board of Directors, Ambassador Rodney Irwin, sent a letter to Minister Kurmanaliev stating that "we would like to ask you to consider issuance to our subsidiary «Stans Energy Kg» licenses to develop Kutessay II and Kalesay deposits *without tender* with the bonus payment in the abovementioned amount [of US$ 427,323 (392,220+35,103)]."[136] This amount of US$ 427,323 corresponded to the sum of the tariff rates for Kutessay II (US$ 392,220) and Kalesay (US$ 35,103) stipulated in Resolution No. 736.[137] Stans Energy eventually paid double this amount, as described below.[138]

185.     In November 2009, Stans Energy's management travelled to the Kyrgyz Republic to finalize the license deal.[139] They met with Minister Kurmanaliev and Dr. Alexei Eliseev, the head of Kyrgyz Republic Development Fund ("**Development Fund**").[140] The Development Fund is a State-owned closed joint-stock company established in August 2008 by Resolution No. 469 for the purposes of developing and stimulating the priority and strategic sectors of the Kyrgyz Republic.[141]

186.     The Parties are in disagreement as to the relationship of Mr. Eliseev with the Kyrgyz Government. The Respondent argues that Mr. Eliseev did not hold any post with the Respondent.[142] On the other hand, the Claimants deem the Respondent's denial at the Hearing of Mr. Eliseev's status as a State official as "an attempt to downplay the assurances provided" by

---

[133]   Statement of Claim, at para. 45, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 32-33.
[134]   Minutes of Meeting of the Board of Directors of Stans Energy Corp, 9 October 2009, at p. 2 (**Exhibit C-11**).
[135]   Minutes of Meeting of the Board of Directors of Stans Energy Corp, 9 October 2009, at p. 2 (**Exhibit C-11**).
[136]   Statement of Claim, at para. 46, referring to Letter from Stans Energy Corp (Mr. Irwin) and Stans Energy KG (Mr. Savchenko) to the head of the State Geology and Mineral Resources Agency (Mr. Kurmanaliev), 15 October 2009, at p. 2 (**Exhibit C-47**) [emphasis added].
[137]   See Resolution No 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution No 410 of 25 June 2009, Nos. 21 and 23 on the list (**Authority CLA-99**).
[138]   Statement of Claim, at para. 50, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 37.
[139]   Statement of Claim, at para. 47, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 34.
[140]   Statement of Claim, at para. 47, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 34-36.
[141]   Statement of Claim, at para. 47, referring to Resolution No 469 of 25 August 2008 of the Government of the Kyrgyz Republic on the Creation of Closed Joint Stock Company "Kyrgyz Republic Development Fund", as amended on 20 March 2009, at p. 1 (**Exhibit C-15**).
[142]   Respondent's Post-Hearing Brief, at para. 118.

tab

him.[143] The Claimants also note that the Respondent's position throughout these proceedings had been that Mr. Eliseev was a "public official" in connection with bribery allegations.[144] According to the Claimants, the acts of the Development Fund as well as the statements made by Mr. Eliseev are attributable to the Respondent.[145]

187.     The Claimants aver that Mr. Eliseev assured Mr. Aryev "that the procedure for issuing the licenses was lawful and that Stans' licenses would be secure".[146] According to Mr. Aryev's First Witness Statement, Mr. Eliseev told them that the licenses would be issued through a "bullet-proof" process and that no one would be able to challenge Stans Energy's rights in the future.[147] According to Mr. Aryev's First Witness Statement, at another meeting, Mr. Eliseev informed him that his team had figured out how to set up such a "bullet-proof" procedure for Stans Energy to obtain the Licenses.[148] According to the Respondent, on the other hand, "Stans Energy and several corrupt members of the Bakiev regime concocted an ad-hoc, convoluted and illegal scheme which they (quite remarkably) referred to as *'bullet-proof'* scheme which was designed to ensure that the Claimants obtained the Licenses without the required competitive tender".[149]

188.     According to the Claimants, after the final meeting, Minister Kurmanaliev telephoned Mr. Aryev, and demanded double the tariff rates stipulated in Resolution No. 736.[150] The Minister purportedly described that the additional payment would be used for the activities of the Development Fund.[151] According to Mr. Aryev's First Witness Statement, he replied to the Minister that Stans Energy would discuss this matter at the Board and inform the Minister of the result in due course.[152] After Mr. Aryev's return to Canada, Stans Energy discussed this matter internally, and consulted with Novadan Capital, a Toronto-based investment fund providing

---

[143]   Claimants' Post-Hearing Brief, at para. 24, referring to Hearing Transcript, Day 1, p. 159:6-7. See also, Hearing Transcript, Day 1, p. 139:15-17.
[144]   Claimants' Post-Hearing Brief, at para. 24, referring to Respondent's Rejoinder, at para. 433.2 *cf.* Respondent's Reply Post-Hearing Brief, at para. 63 and footnote 91.
[145]   Claimants' Post-Hearing Brief, at para. 25, referring to International Law Commission, "Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries" [2001-II(2)] Yearbook of the International Law Commission 26, Articles 5 and 8 (**Authority CLA-5**).
[146]   Statement of Claim, at para. 49.
[147]   First Witness Statement of B. Aryev, 29 January 2016, at para. 35.
[148]   First Witness Statement of B. Aryev, 29 January 2016, at para. 36.
[149]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 126.
[150]   Statement of Claim, at para. 50, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 37.
[151]   Statement of Claim, at para. 50, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 37.
[152]   First Witness Statement of B. Aryev, 29 January 2016, at paras 37-38.

financial support for Stans Energy.[153] According to Mr. Aryev's First Witness Statement, Stans Energy then decided to accept Minister Kurmanaliev's invitation to pay double the tariff rates.[154]

189.    The Subsoil Law of the Kyrgyz Republic of 24 June 1997, as in effect in December 2009 ("**Subsoil Law**"), established two possible procedures for granting subsoil licenses: (1) tenders; and (2) direct negotiations.[155] Article 16 of the Subsoil Law provided:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **Article 16. Procedure for Granting Subsoil Use Rights** | **Article 16. Procedure for Granting Subsoil Use Rights** |
| Subsoil use rights shall be granted by holding tenders and direct negotiations. | Subsoil use rights shall be granted by holding tenders and direct negotiations. |
| Tenders shall be announced and held for gold ore, oil, gas and other sites of national significance by decision of the Government of the Kyrgyz Republic. The terms and conditions of the tender and the winning bidder shall be determined by the tender committee of the Government of the Kyrgyz Republic to be appointed for each particular site. | Tenders shall be announced and held for gold ore, oil, gas and other sites of national significance by decision of the Government of the Kyrgyz Republic. The terms and conditions of the tender and the winning bidder shall be determined by the tender committee of the Government of the Kyrgyz Republic to be appointed for each particular site. |
| Subsoil use rights by way of direct negotiations shall be granted on application by natural persons and legal entities by the state subsoil use authority to be determined by the Government of the Kyrgyz Republic. The application must contain information about the applicant, and the location and type of subsoil use. The following documents shall be annexed to the application: | Subsoil use rights by way of direct negotiations shall be granted on application by natural persons and legal entities by the state subsoil use authority to be determined by the Government of the Kyrgyz Republic. The application must contain information about the applicant, and the location and type of subsoil use. The following documents shall be annexed to the application: |
| - copies of the constitutive documents and charter for legal entities, or registration documents for natural persons; | - copies of the constitutive documents and charter for legal entities, or registration documents for natural persons; |
| - geological survey or development program or program of construction and operation of underground structures not connected with the extraction of minerals at the site in question, with consolidated technical and economic | - geological survey or development project or project of construction and operation of underground structures not connected with the extraction of minerals at the site in question, with consolidated technical and economic |

---

[153]    Statement of Claim, at para. 51, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 38-39.
[154]    Statement of Claim, at para. 51, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 38-39; Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 152.
[155]    See Law on Subsoil of 24 June 1997, as amended on 17 October 2008, Article 16 (**Authority CLA-97B**).

assessment of capital investments, operating expenses, revenues and project profitability;

- statement of availability of financing for the works envisaged at the subsoil site in question pursuant to the submitted development program.

The application for the right to use the subsoil site and materials annexed thereto shall be considered by the state subsoil use authority within a period of up to one month.

The right to use the subsoil or the right to participate in a tender may be denied if the applicant:

- provides false information about itself;

- does not have the required financial resources for the efficient and technically and environmentally safe development of the subsoil site.

Licensing of subsoil use and preparation of license agreements for work design between licensor and licensee shall be performed by the state subsoil use authority on the basis of a decision taken by the tender committee of the Government of the Kyrgyz Republic with respect to the sites subject to tender and approved by the Government of the Kyrgyz Republic, or on the basis of the minutes issued by the state subsoil use authority.

Within the time limits stipulated by the license agreement, the licensee shall submit to the state subsoil use authority an engineering design for the works together with expert opinions on the technical and environmental safety, subsoil protection, and certificate(s) for the right for temporary use of the land plot during development of the mineral deposits or a written consent to geological survey from the owner of the land rights.

Conducting works that entail breaching the subsoil integrity before the engineering design is approved shall be prohibited.

Regulations on the procedure for licensing of subsoil use and the lists

assessment of capital investments, operating expenses, revenues and project profitability;

- statement of availability of financing for the works envisaged at the subsoil site in question pursuant to the submitted development project.

The application for the right to use the subsoil site and materials annexed thereto shall be considered by the state subsoil use authority within a period of up to one month.

The right to use the subsoil or the right to participate in a tender may be denied if the applicant:

- provides false information about itself;

- does not have the required financial resources for the efficient and technically and environmentally safe development of the subsoil site.

Licensing of subsoil use and preparation of license agreements for work design between licensor and licensee shall be performed by the state subsoil use authority on the basis of a decision taken by the tender committee of the Government of the Kyrgyz Republic with respect to the sites subject to tender and approved by the Government of the Kyrgyz Republic, or on the basis of the minutes issued by the state subsoil use authority.

Within the time limits stipulated by the license agreement, the licensee shall submit to the state subsoil use authority a technical project for the works together with expert opinions on the technical and environmental safety, subsoil protection, and certificate(s) for the right of temporary use of the land plot during development of the mineral deposits or a written consent to geological survey from the owner of the land rights.

Conducting works that entail breaching the subsoil integrity before the a technical project is approved shall be prohibited.

Regulations on the procedure for licensing of subsoil use and the lists

|  |  |
|---|---|
| of common mineral deposits and deposits of local significance shall be approved by the Government of the Kyrgyz Republic. [156] | of common mineral deposits and deposits of local significance shall be approved by the Government of the Kyrgyz Republic. [157] |

190.    Paragraph 2 of Article 16 of the Subsoil Law provided that tender procedures must be held for granting subsoil rights regarding "gold ore, oil, gas and other sites of national significance".[158] According to the Respondent, such "other sites of national significance" were specified by Resolution No. 736, which provided a list of mineral deposits to be allocated by tender, including Kutessay II and Kalesay.[159] Paragraph 3 of Article 16 required, with regard to direct negotiations, that an applicant submit certain documentations upon its application. [160]

191.    On 1 December 2009, the Kyrgyz Government issued Resolution No 725 of 1 December 2009 on the Development of Competitive Procedures for Granting Subsoil Use Rights ("**Resolution No 725**"), which permitted the Ministry of Natural Resources to issue mining licenses without a tender to entities wholly managed by the Development Fund, for subsequent sale of these entities by auction at stock exchange.[161] According to the Claimants, Stans Energy obtained the Kutessay II and Kalesay Licenses in accordance with this process, without a tender procedure, by purchasing Kutisay Mining JSC.[162]

192.    As regards the first step of the process, on 9 December 2009, Kutisay Mining Open Joint Stock Company ("**Kutisay Mining OJSC**") was incorporated by Vesatel United Limited ("**Vesatel (NZ)**"), a New Zealand company.[163] Kutisay Mining OJSC issued 19 million shares at incorporation, the value of which was KGS 1 per share.[164] On the same day, an individual named

---

[156]   Translation as provided by the Claimants in Law on Subsoil of 24 June 1997, as amended on 17 October 2008 (with English translation of extracts) (**Authority CLA-97B**).

[157]   Translation as provided by the Respondent in Subsoil Law of 24 June 1997, as amended on 17 October 2008 (including comparison to Claimants' translation of CLA-97B) (**Authority RLA-296**).

[158]   Law on Subsoil of 24 June 1997, as amended on 17 October 2008, Article 16 (**Authority CLA-97B**).

[159]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 111 *cf.* Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 191-193; Rejoinder on Jurisdiction, at para. 69. See also, Resolution No 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution No 410 of 25 June 2009, Nos. 21 and 23 on the list (**Authority CLA-99**).

[160]   Law on Subsoil of 24 June 1997, as amended on 17 October 2008, Article 16 (**Authority CLA-97B**).

[161]   Statement of Claim, at para. 53, referring to Resolution No 725 of 1 December 2009 on the Development of Competitive Procedures for Granting Subsoil Use Rights, section 2 (**Authority CLA-100**); Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 133-135.

[162]   Statement of Claim, at para. 57.

[163]   Statement of Claim, at para. 55, referring to, *inter alia*, Certificate of legal entity State registration of Kutisay Mining OJSC, issued by the Ministry of Justice, 9 December 2009 (**Exhibit C-48**); and Decision No 1 of the sole participant of the Kutisay Mining OJSC, 9 December 2009 (**Exhibit C-49**).

[164]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 139. See also, Decision No 1 of the sole participant of the Kutisay Mining OJSC, 9 December 2009 (**Exhibit C-49**).

Mr. Khalil Akylbekov deposited KGS 19 million in cash to Kutisay Mining OJSC's bank account at AUB to satisfy the mandatory capital requirement under Kyrgyz corporate law.[165] On 16 December 2009, Vesatel (NZ) transferred all of its 19 million common shares in Kutisay Mining OJSC to the Development Fund to be held in trust.[166]

193.      According to the exhibits submitted by the Claimants, Kutisay Mining OJSC filed applications requesting the issuance of subsoil licenses for Kutessay II and Kalesay (File No 1349 and 1350 dated 21 December 2009).[167] After discussion, on 21 December 2009, the SAGMR and Kutisay Mining OJSC agreed that the SAGMR would issue the Kutessay II License and the Kalesay License to Kutisay Mining OJSC for a period of 20 years (until 21 December 2029) in return for payment of statutory tariffs amounting to US$392,220 for Kutessay II and US$35,103 for Kalesay, and subject to certain conditions which would have to be fulfilled by Kutisay Mining OJSC.[168] This agreement is recorded in the Minutes No 1736-N-09 ("**21 December 2009 Minutes**").[169] On the same day, the SAGMR and Kutisay Mining OJSC entered into license agreements with regard to Kutessay II and Kalesay (respectively, "**Kutessay II License Agreement No. 1**" and "**Kalesay License Agreement No. 1**"; and collectively "**License Agreements No. 1**"), which set out the conditions for the mining activities under the Licences.[170]

194.      As regards the second step of the process, on 29 December 2009, the Central Asian Stock Exchange ("**CASE**") held an auction for all of the 19 million shares of Kutisay Mining OJSC.[171]

---

[165]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 140, referring to "AUB Account Statements for JSC Kutisay Mining" (**Exhibit R-54**).

[166]    Statement of Claim, at para. 55, referring to Extract from Trust Management Agreement No 2/09-DU between Vesatel United Limited and Kyrgyz Republic Development Fund CJSC, 16 December 2009 (**Exhibit C-51**); and Instrument of share transfer between Vesatel United Limited and Kyrgyz Republic Development Fund CJSC, 16 December 2009 (**Exhibit C-52**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 142.

[167]    See Minutes No 1736-N-09 of negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC, 21 December 2009, at p. 1 (**Exhibit C-12**).

[168]    See Minutes No 1736-N-09 of negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC, 21 December 2009, at p. 2 (**Exhibit C-12**). See also, Statement of Claim, at para. 55.

[169]    See  Minutes No 1736-N-09 of negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC, 21 December 2009 (**Exhibit C-12**).

[170]    Statement of Claim, at para 55, referring to License No 2488 ME issued to Kutisay Mining OJSC for Kutessay II, 21 December 2009 (**Exhibit C-3**); License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II, 21 December 2009 (**Exhibit C-5**); License No 2489 ME issued to Kutisay Mining OJSC for Kalesay, 21 December 2009, (**Exhibit C-2**); and License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kalesay, 21 December 2009 (**Exhibit C-4**).

[171]    Statement of Claim, at para. 56.

195.     While the Claimants allege that "the Development Fund and other State agencies organised the process,"[172] the Respondent argues that CASE is "a commercial entity unrelated to the State," and the seller was Vesatel, "a company incorporated in New Zealand and not owned by the State."[173] The Respondent contends that the Claimants knew that the seller was Vesatel before the auction took place or, alternatively, "at the absolute latest before the transaction completed on 19 January 2010." [174] According to the Respondent, Vesatel was "readily identifiable" in the basic transaction documents in the possession of the Claimants,[175] and "it defies credibility that a serious publicly-listed company would engage in this transaction without knowing the identity of the actual seller and registered owner of the target company[.]"[176] In any event, the Respondent asserts that the Claimants should have known the identity of the seller pursuant to their duty to conduct due diligence.[177]

196.     On the other hand, the Claimants argue that they had no opportunity to discover the identity of Kutisay Mining OJSC's shareholder, Vesatel (NZ), until after the acquisition of the company.[178] They allege that "[t]he corporate structures used by the Development Fund were within its discretion, and Stans Energy sought and received an explanation from Mr Eliseev about the Fund's use of a New Zealand entity[.]"[179] The Claimants also contend that their additional due diligence conducted after the acquisition of the Licenses did not reveal any concern over the legitimacy of the Licenses and its purchasing process.[180]

197.     According to the Respondent, at the auction there was another bidder, Gremar Assets SA ("**Gremar**"), a Panama-registered company, which ultimately did not bid. [181] Stans KG

---

[172]   Claimants' Post-Hearing Brief, at para. 28.
[173]   Respondent's Post-Hearing Brief, at para. 8. See also, Respondent's Reply Post-Hearing Brief, at para. 10.
[174]   Respondent's Post-Hearing Brief, at para. 9. See also, Respondent's Post-Hearing Brief, at para. 112, referring to Extract No 2953 from shareholder register of Kutisay Mining OJSC, 19 January 2010 (**Exhibit C-58**).
[175]   Respondent's Post-Hearing Brief, at para. 108, referring to Decision No 1 of the sole participant of the Kutisay Mining OJSC, 9 December 2009 (**Exhibit C-49**); Extract from Trust Management Agreement No 2/09-DU between Vesatel United Limited and Kyrgyz Republic Development Fund CJSC, 16 December 2009 (**Exhibit C-51**); Instrument of share transfer between Vesatel United Limited and Kyrgyz Republic Development Fund CJSC, 16 December 2009 (**Exhibit C-52**).
[176]   Respondent's Post-Hearing Brief, at paras 109-115. See also, Hearing Transcript, Day 2, pp 287:23-288:2, 288:10-20, 292:2-4, 294:6-8, 309:19-22, 451:2-24.
[177]   Respondent's Post-Hearing Brief, at para. 9.
[178]   Claimants' Post-Hearing Brief, at para. 10(b), referring to Hearing Transcript, Day 2, pp 287:16-22, 288:13-14, 289:5-10.
[179]   Claimants' Post-Hearing Brief, at para. 10(b), referring to Hearing Transcript, Day 2, p. 451:17-24.
[180]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 38-39.
[181]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 197.2; Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 186, referring to, *inter alia*, First Witness Statement of B. Aryev, 29 January 2016, at para. 42; and Second Witness Statement of B. Aryev, 9 November 2017, at para. 10.

successfully bid KGS 37,620,000[182] (recorded in Stans Energy's financial statements as US$ 863,550).[183] This amount was approximately double the sum of the tariff rates for Kutessay II and Kalesay stipulated in Resolution No. 736. Stans KG paid this amount to the CASE on the same day.[184] As a result, Stans Energy, through Stans KG, became a sole owner of Kutisay Mining OSJC, which owned the Licenses and the License Agreements No. 1.

198.     The Respondent alleges that Stans Energy obtained the Licenses in breach of Kyrgyz law through a bribe.[185]

199.     The Respondent contends that Stans Energy violated the tender requirement of Article 16 of the Subsoil Law, by obtaining the Licenses through auction instead of tender.[186] According to the Respondent, Stans Energy and corrupt members of the Bakiev regime agreed to establish the "bullet-proof scheme" designed to ensure that Stans Energy obtained the Licenses without the required tender process.[187] The Respondent emphasizes that this agreement is notably apparent from (1) Stans Energy's letter dated 15 October 2009 stating that "we would like to ask you to consider issuance to our subsidiary «Stans Energy Kg» licenses to develop Kutessay II and Kalesay deposits *without tender* with the bonus payment in the abovementioned amount"; and (2) Mr. Eliseev's statement during the meeting in November 2009 that Stans Energy's Licenses would be secured through a "bullet-proof scheme".[188]

200.     On the contrary, the Claimants contend that "[t]here is no basis to read Stans Energy's letter as prompting impropriety[.]"[189] Rather, the Claimants consider that through such letter "the Kyrgyz authorities were put on notice that they should take all necessary steps to ensure legality. This was in any event entirely within their control."[190]

---

[182]   Statement of Claim, at para. 56.
[183]   Statement of Claim, at para. 56, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 13 (**Exhibit C-111**).
[184]   Statement of Claim, at para. 56, referring to Payment order No 38 from Stans Energy KG LLC to Central Asian Stock Exchange CJSC, 29 December 2009 (payment of 35,720,000 Kyrgyz som) (**Exhibit C-55**).
[185]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 150, 152-193.
[186]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 109-125 *cf.* Claimants' Post-Hearing Brief, at para. 20, referring to Hearing Transcript, Day 2, pp 272:15-19, 273:13-22.
[187]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 126-132.
[188]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 126-132 [emphasis added by the Respondent], referring to Letter from Stans Energy Corp (Mr. Irwin) and Stans Energy KG (Mr. Savchenko) to the head of the State Geology and Mineral Resources Agency (Mr. Kurmanaliev) (**Exhibit C-47**); and First Witness Statement of B. Aryev, 29 January 2016, at para. 35. See also, Respondent's Post-Hearing Brief, at paras 116-117.
[189]   Claimants' Post-Hearing Brief, at para. 21.
[190]   Claimants' Post-Hearing Brief, at para. 21.

201.     The Respondent argues that Resolution No 725, through which Stans Energy obtained the Licenses, was invalid because it circumvented the fundamental provisions of the Subsoil law by replacing a tender with an auction.[191] The Respondent further contends that, even if the Licenses had been issued through the alternative direct negotiations procedure, Stans Energy would have failed to comply with the requirements of Section V.A(1)(b) of the Subsoil Law.[192] The Claimants deny these allegations, claiming that at that time there were no tender regulations.[193] The Claimants contend that they followed the Resolution No 725 procedure, instead of the direct negotiations process.[194]

202.     The Respondent also argues that Stans Energy paid a bribe to acquire the Licenses.[195] According to the Respondent, none of the KGS 37.62 million paid by Stans Energy at the auction was transferred to the State budget.[196] The Respondent contends that the Development Fund retained KGS 8.379 million, instead of half of the KGS 37.62 million as described by Mr. Aryev, and transferred 28.31 million to Vesatel (NZ).[197] In the Respondent's view, this KGS 28.31 million constituted a bribe, and was laundered through several AUB accounts held by Vesatel (NZ), Avatroniks LLP (UK), Ostencomm LLP (UK), Velcona Limited (UK), Wenden LLP (UK) and Sorento Resources Ltd (UK).[198] The Respondent argues that none of these companies appears to have any genuine economic activity.[199]

203.     The Respondent further alleges that the CASE auction was rigged.[200] According to the Respondent, the Kyrgyz Civil Code provided strict requirements, the breach of which invalided the auction results, namely: (1) 30-day advance notice; and (2) participation of more than one bidder.[201] However, CASE gave notice only one week in advance.[202] In addition, the Respondent alleges that Gremar's participation was fictitious and that Stans Energy was *de facto* the one and

---

[191]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 133-137.
[192]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 144-145.
[193]     Claimants' Post-Hearing Brief, at para. 20, referring to Hearing Transcript, Day 2, pp 272:15-19, 273:13-22.
[194]     Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 20-22; Claimants' Post-Hearing Brief, at para. 26, referring to Hearing Transcript, Day 2, p. 449:20-25.
[195]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 151-156.
[196]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 159.
[197]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 157-160.
[198]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 160-193. See also, Witness Statement of E. Beysheyev, 14 June 2017, at paras 65-66, 88-90, 92-93, Annex A.
[199]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 160-193.
[200]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 194-198; Rejoinder on the Merits and Reply on Jurisdiction, at paras 86-90.
[201]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 194-196.
[202]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 199-203.

only bidder.[203] In this regard, the Respondent argues that Gremar's auction bond payment of KGS 1.9 million (approximately US$ 50,000) on 28 December 2009 was a fiction.[204] In support of this contention, *inter alia,* the Respondent submitted a Witness Statement of Mr. Dmitry Antonenko, purported attorney in fact, ultimate beneficial owner and bank account signatory of Gremar, in which Mr. Antonenko avers that he had no knowledge whatsoever of Gremar or AUB and that his signatures on AUB's bank account documents for Gremar are not his and had apparently been forged.[205]

204.     The Respondent also contends that the KGS 19 million, deposited in Kutisay OJSC's account on 9 December 2009, was the product of financial fraud and money laundering through a series of suspicious transactions among offshore companies using their AUB accounts.[206] In the Respondent's view, this is supported by the fact that the amount was deposited in cash by Mr. Khalil Akylbekov, instead of being paid either by Vesatel (NZ), Kutisay Mining OJSC's shareholder, or by the Development Fund, which was intended to control Kutisay Mining OJSC.[207]

205.     Furthermore, according to the Respondent, the Claimants knew or should have known that they acquired the Licenses in breach of Kyrgyz law through corruption.[208] The Respondent argues that the Kyrgyz Republic was recognized as one of the most corrupt countries.[209] The Respondent also claims that it was publicly known that the Subsoil Law laid out a tender requirement and that the Licenses were indeed first issued to CAMG through a tender procedure. [210] According to the Respondent, the Claimants' participation in corruption is corroborated by the fact that Stans Energy knowingly paid double the sum of the tariff rates for Kutessay II and Kalesay stipulated in Resolution No. 736; and the Claimants were aware of the

---

[203]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 204-211.
[204]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 209-221. According to the Respondent, while AUB's internal accounting system shows that on 28 December 2009 Gremar received US$ 1 million to pay the auction deposit, SWIFT archive records indicate that this US$ 1 million had already exited from AUB weeks or months earlier than that date (see *ibid*, at paras 214, 217-218). See also, Summary of late payments prepared by Ermek Beysheyev of the National Bank (**Exhibit R-214**); Witness Statement of E. Beysheyev, 14 June 2017, at para. 80.
[205]   See Witness Statement of D. Antonenko, 24 February 2018, at para. 11.
[206]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 230-256.
[207]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 230-233. According to the Respondent, this KGS 19 million cash was part of KGS 20 million cash withdrawn on the same date from AUS accounts of three offshore companies: UK-registered Benestoy LLP, Panama-registered Alberay S.A. and Belize-registered Willitower Ltd, and was the product of a money laundering scheme within AUB. See Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 234-250. See also, Rejoinder on the Merits and Reply on Jurisdiction, at paras 117-118.
[208]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 257.
[209]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 258-259.
[210]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 260-265.

involvement of Vesatel (NZ), an offshore company.[211] The Respondent further contends that the Claimants knew that the CASE auction was rigged, because Stans KG participated in the auction despite the late notice and the lack of another bidder, and paid double the starting price even if it was *de facto* the only one bidder.[212]

206.     The Claimants strongly oppose to these allegations contending that Stans Energy obtained the Licenses in accordance with Kyrgyz law, including that Resolution 725 validly established the licensing procedure.[213]

207.     The Claimants also deny any involvement in the alleged corruption.[214] The Claimants argue that the Respondent's allegations of illegality are "a *post hoc* construct".[215] They maintain that the Respondent has failed to demonstrate that corruption was reasonably discoverable,[216] and criticize the Respondent's suggestion that the Claimants "should have known of the State's "buried" wrongdoing, although the State itself apparently had no suspicions for years".[217] According to the Claimants, the Respondent has not shown that investors could be aware of the specific risk of corruption prior to 2010.[218] The Claimants contend that the Kyrgyz government hid the wrongdoing of AUB and the Development Fund from investors by controlling the outflow of information.[219]

208.     The Claimants also aver that they conducted sufficient due diligence prior to their acquisition of Kutisay Mining OJSC and its Licenses,[220] which is contested by the Respondent.[221] As regards the auction price paid, the Claimants contend that it was reasonable to trust Minister

---

[211]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 266-272.
[212]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 273-282; Respondent's Post-Hearing Brief, at paras 120-125.
[213]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 20-22.
[214]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 23-26; Rejoinder on Jurisdiction, at paras 9-15.
[215]   Rejoinder on Jurisdiction, at paras 3, 8, 24-29; Claimants' Post-Hearing Brief, at para. 14.
[216]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 32.
[217]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 26 *cf.* Rejoinder on the Merits and Reply on Jurisdiction, at paras 34, 43-46.
[218]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 27-29; Claimants' Post-Hearing Brief, at paras 8-9.
[219]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 30-32; Claimants' Post-Hearing Brief, at paras 10(d), 12, referring to, *inter alia,* Hearing Transcript, Day 2, pp 290:22-24, 291:6-15.
[220]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 33, referring to Witness Statement of R. Irwin, 29 January 2016, at para. 19; First Witness Statement of B. Aryev, 29 January 2016, at para. 33; Second Witness Statement of B. Aryev, 9 November 2017, at para. 5. See also, Rejoinder on Jurisdiction, at paras 17-19; Claimants' Post-Hearing Brief, at paras 11-12; Legal Due Diligence Summary Report of the "Kutisay Mining" Limited Liability Company, "Kaiberen" LLC, 16 February 2011 (**Exhibit R-122**).
[221]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 106-121.

Kurmanaliev's explanation that an additional payment was necessary for the Development Fund to finance its projects, because the recipient was an official agency and the stated purposes were "almost universal in natural resources projects in less-developed countries".[222] Accordingly, they claim that there was no reason to expect that State officials would misappropriate the consideration paid at the auction.[223]

209.     Likewise, the Claimants assert that there was no reason to believe that the amount of KGS 19 million in Kutisay Mining OJSC's account was the product of money laundering.[224] The Claimants aver that this sum corresponded to the fee necessary to obtain the Licenses and that it was indeed spent in March and April 2010 to pay the statutory fees for the Licenses to the State treasury.[225]

210.     The Claimants further contend that the Kyrgyz Republic ratified the transaction.[226] The Claimants argue that when Kutisay Mining OJSC was reorganized as Kutisay Mining LLC, the Kyrgyz government re-issued the Licenses in accordance with Kyrgyz law.[227] In the Claimants' view, although this process was an opportunity for the Respondent to re-consider the legality of the Licenses and the transaction underlying them, the Government failed to point out any concern over the Licenses and re-issued them. The Claimants further aver that the Respondent did not raise any suggestion of corruption until it was notified of the Claimants' intent to pursue international arbitration.[228]

211.     This contention is strongly opposed by the Respondent,[229] noting that the Claimants have not submitted any authority to support "their bizarre assertion that an illegal act can be legitimised in this manner".[230] The Respondent also contests that the legal authorities submitted by the Claimants in their Post-Hearing Brief are apposite.[231] According to the Respondent, the September 2010 re-issuance was an automatic administrative process which applies when a

---

[222]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 34-37.
[223]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 38.
[224]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 40-41, 43.
[225]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 42-43.
[226]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 44; Rejoinder on Jurisdiction, at paras 20-23; Claimants' Post-Hearing Brief, at para. 33.
[227]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 45-46.
[228]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 44; Rejoinder on Jurisdiction, at para. 24.
[229]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 122-128.
[230]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 123.
[231]   Respondent's Reply Post-Hearing Brief, at paras 43-44.

license holder changes its corporate form.[232] The SAGMR did not have the legal power to investigate the legality of the Licenses or cancel them; such power resided within the GPO and the courts, respectively, and was exercised in due course.[233] The Respondent also rejects the Claimants' assertion that it did not raise the illegality of the Licenses until after a notice of arbitration was filed with the MCCI on 23 March 2013, noting that investigations concerning this issue had been started by the GPO already in August 2011 and continued during the following years.[234] However, the Claimants note that the Respondent has not submitted any official investigative report on corruption or bribery, and deny the relevance of the documents put forward to purportedly support the existence of investigations prior to March 2013.[235]

212.    The Claimants contend that the Respondent's position that it re-issued the Licenses as a gesture of generosity "begs credulity".[236] On the other hand, the Respondent contends that the granting of such extensions in circumstances in which the Licenses were subject to automatic termination pursuant to Article 18 of the Subsoil Law was contrary to Kyrgyz law and resulted in the criminal conviction of the SAGMR employees that granted them.[237] Article 18 of the Subsoil Law provided as follows:

| [Claimants' translation] | [Respondent's translation] |
| --- | --- |
| **Article 18. Suspension and Termination of Subsoil Use Rights** | **Article 18. Suspension and Termination of Subsoil Use Rights** |
| Subsoil use right may be suspended for a period of up to three months in the following cases: | Subsoil use right may be suspended for a period of up to three months in the following cases: |
| 1) use of the subsoil for a purpose other than that for which it is granted; | 1) use of the subsoil for a purpose other than that for which it is granted; |
| 2) breach of the terms and conditions of the license agreement; | 2) breach of the terms and conditions of the license agreement; |
| 3) occurrence of force-majeure. | 3) occurrence of force-majeure. |
| Subsoil use right shall terminate by withdrawal/cancellation of the relevant | Subsoil use right shall terminate by withdrawal/cancellation of the relevant |

---

[232]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 124 *cf.* Rejoinder on Jurisdiction, at para. 22. See also, Respondent's Reply Post-Hearing Brief, at para. 45.
[233]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 125.
[234]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 32-42, 126-128. See also, Respondent's Post-Hearing Brief, at para. 145, referring to, *inter alia,* Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 389-391; Hearing Transcript, Day 2, p. 402:18-21.
[235]   Rejoinder on Jurisdiction, at paras 25-29.
[236]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 47, referring to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 296, 806.
[237]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 132.

54

license in the following cases:

1) completion of geological exploration, depletion of mineral reserves and/or liquidation of the relevant enterprise;

2) use of technologies in development of the subsoil create a threat to the health and safety of employees and the population, as well as a threat of irreparable harm to the natural environment and of loss of mineral reserves;

3) where during the term agreed in the license agreement no technical plan for carrying out the works, approved by the state authorities responsible for subsoil protection, the natural environment and technical safety and by the owners of land rights, has been provided;

4) where during a period of more than one year after obtaining the license the user fails to start development of the subsoil to the extent stipulated by the terms and conditions of such license;

5) voluntary refusal to use the subsoil or expiry of the term of the relevant license.[238]

---

license in the following cases:

1) completion of geological exploration, depletion of mineral reserves and/or liquidation of the relevant enterprise;

2) use of technologies in development of the subsoil create a threat to the health and safety of employees and the population, as well as a threat of irreparable harm to the natural environment and of loss of mineral reserves;

3) where during the term agreed in the license agreement no technical plan for carrying out the works, approved by the state authorities responsible for subsoil protection, the natural environment and technical safety and by the owners of land rights, has been provided;

4) where during a period of more than one year after obtaining the license the user fails to start development of the subsoil to the extent stipulated by the terms and conditions of such license;

5) voluntary refusal to use the subsoil or expiry of the term of the relevant license.[239]

## 3. Operation Under the License Agreements

### a. License Agreements No. 1

213.    While Kutisay Mining OJSC held the Licenses, its activities had to be conducted in accordance with the conditions set out in the License Agreements No. 1.

214.    Kutessay II License Agreement No.1, signed on 21 December 2009 and valid until 31 December 2010, set out four key requirements for activities under the Kutessay II License providing, in relevant part:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| 1.    Kutisay Mining shall pay a bonus in the amount of US$392,220 to | 1.    Kutisay Mining shall pay a bonus in the amount of US$392,220 to |

---

[238]    Translation as provided by the Claimants in Law on Subsoil of 24 June 1997, as amended on 17 October 2008 (with English translation of extracts) (**Authority CLA-97B**).

[239]    Translation as provided by the Respondent in Subsoil Law of 24 June 1997, as amended on 17 October 2008 (including comparison to Claimants' translation of CLA-97B) (**Authority RLA-296**).

| | |
|---|---|
| the tax authorities at its place of registration before 21 January 2010. | the tax authorities at its place of registration before 21 January 2010. |
| **2.** **Before the expiration of this License Agreement the Licensee shall submit the following:** | **2.** **Before the expiration of this License Agreement the Licensee shall submit the following:** |
| **2.1.** **The Kutessay II mine development plan** | **2.1.** **Project for the development of the Kutessay II deposit** |
| **2.2.** **Expert opinions with respect to the following aspects of the project:** | **2.2.** **Expert opinions with respect to the following aspects of the project:** |
| a)   Environmental safety | a)   Environmental safety |
| b)   Technical safety | b)   Technical safety |
| c)   Subsoil protection and use | c)   Subsoil protection and use |
| **2.3.** **Land allotment** | **2.3.** **Land allotment** |
| […] | […] |
| **4.** **License Agreement validity period:** _Until 31 December 2010_[240] | **4.** **License Agreement validity period:** _Until 31 December 2010_[241] |

215.     The first requirement was the payment of US$ 392,220 to the tax authority by 21 January 2010. Kutisay Mining OJSC paid this fee two months late in three tranches on 23 March 2010, 31 March 2010 and 1 April 2010.[242]

216.     The second requirement was the submission of a "mine development plan"/ "project" by 31 December 2010.[243] The Parties have different understandings as to which document was required as "mine development plan"/ "project", and which is the appropriate English translation of this term.

---

[240]   Translation as provided by the Claimants in License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (with English translation), 21 December 2009 (**Exhibit C-5**). See also, Statement of Claim, at para. 58.

[241]   Translation as provided by the Respondent in "Licence Agreement No. 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (including comparison to Claimants' translation of C-5)" (**Exhibit R-446**).

[242]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 292, referring to Payment order No 2 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department dated 23 March 2010 (**Exhibit C-63**); Payment order No 3 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department dated 31 March 2010 (**Exhibit C-64**); Payment order No 4 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department dated 1 April 2010 (**Exhibit C-65**).

[243]   Statement of Claim, at para. 58, referring to License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (with English translation), 21 December 2009 (**Exhibit C-5**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 291.2.1.; Licence Agreement No. 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (including comparison to Claimants' translation of C-5), 21 December 2009 (**Exhibit R-446**).

217.     The Respondent contends that this purported "mine development plan", which it translates as "project", was a technical plan required by the Subsoil Law,[244] and avers that the Claimants' denials in their Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction of their obligation to provide a technical plan are based on their inconsistent translation of the same terms used in the Subsoil Law and Kutessay II License Agreement No 1.[245] The Respondent avers that the Claimants' interpretation that the Licenses refer to some other "mine development plan" is unsustainable, relying on the Expert Witness Statement of Mr. Shilov, a Kyrgyz mining expert.[246] The Respondent adds that all the license agreements issued by the SAGMR in 2010 and 2011, including the Licenses at issue, contained the requirement to submit a technical project or technical plan.[247] That requirement was accepted by the Claimants, as evidenced by contemporaneous statements.[248] The Respondent describes the Claimants' position as an attempt to escape the conclusion that their Licenses were subject to termination due to their failure to provide the "technical plan" pursuant to Article 18 of the Subsoil Law.[249]

218.     The Claimants, on the other hand, allege in their submissions that this "mine development plan" was different from such a technical plan.[250] According to the Claimants, a failure to submit a "mine development plan" could not have resulted in termination of the Licenses pursuant to Article 18 of the Subsoil Law.[251] In contrast, the Respondent notes that Mr. Aryev

---

[244]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 286.1, 291.2.1.
[245]  Rejoinder on the Merits and Reply on Jurisdiction, at paras 135-138.
[246]  Rejoinder on the Merits and Reply on Jurisdiction, at para 141, referring to Expert Witness Statement of E. Shilov, 29 January 2018, at paras 16-17: *"So far as a "mine development plan" (I can only translate it into Russian as "план развития рудника") is concerned, in my 35 years' mining sector experience, I have never come across such a term in my practice in the Kyrgyz mining industry or, as far as I am aware, in the Kyrgyz laws. It may be either an incorrect reference to a WDP ("work development plan" – "план развития работ") or a TP ("technical plan" – "технический проект")."*
[247]  Rejoinder on the Merits and Reply on Jurisdiction, at para. 142.
[248]  Rejoinder on the Merits and Reply on Jurisdiction, at paras 145-149, referring to, *inter alia*, Letter from Dr. Savchenko of Kutisay to the Minister of Natural Resources dated 30 June 2010 (**Exhibit C-215**); Letter from Kutisay to the SAGMR (including comparison to Claimants' translation of C-141), dated 19 March 2013 (**Exhibit R-453**); Letter from Kutisay to the SAGMR dated 12 December 2011, at p. 2 (**Exhibit C-95**); Statement made in court of Dr. Savchenko in the Pervomaysky District Court of the City of Bishkek (including comparison to Claimants' translation of C-245), dated 25 September 2013, at p. 3 (**Exhibit R-456**); Information Report on works performed in 2012 and program of work for 2013 at the Kutessay II field, dated January 2013, at. p. 10 (**Exhibit C-234**).
[249]  Rejoinder on the Merits and Reply on Jurisdiction, at paras 143-144. See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 286.1, referring to Article 18 of the Subsoil Law (as amended on 17 October 2008), which provided in relevant part as follows: "*Subsoil use rights shall terminate by withdrawal (cancellation) of the relevant licence in the following cases: […] 3) where during the term provided for in the license agreement, no technical plan for carrying out the works […] has been provided*" [emphasis added] (**Authority CLA-97B**).
[250]  Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 61.
[251]  Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 62, referring to Article 18 of the Law on Subsoil of 24 June 1997, as amended on 17 October 2008 (**Authority CLA-97B**).

testified at the Hearing that each of Kutisay's License Agreements required the submission of a TP [technical plan]. [252]

219.     The third requirement was the submission of expert reports, by 31 December 2010, on (1) environmental safety; (2) technical safety; and (3) subsoil protection and use.[253] As of 2009, the Ministry of Natural Resources, the SAGMR's predecessor, was the governmental body to issue these reports.[254] According to the Respondent, pursuant to Article 18 of the Subsoil Law, a failure to submit these expert reports would result in termination of a license.[255]

220.     The fourth requirement was the submission of a land allotment by 31 December 2010.[256] This is a certificate issued by the local authority evidencing the licensee's right to use a land plot, and a failure to comply this requirement would result in termination of a license.[257]

221.     Kalesay License Agreement No. 1, signed on 21 December 2009 and valid until 31 December 2010, set out the same requirements as those of Kutessay II License Agreement No.1, except that the initial payment to the tax authority was US\$ 35,103.[258]

---

[252]     Respondent's Post-Hearing Brief, at paras 131-132. referring to, *inter alia,* Hearing Transcript, Day 2, pp 331:12-15. 338:16-339:1.

[253]     Statement of Claim, at para. 58, referring to License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (with English translation), 21 December 2009 (**Exhibit C-5**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 291.2.2.; Licence Agreement No. 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (including comparison to Claimants' translation of C-5), 21 December 2009 (**Exhibit R-446**).

[254]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 286.2.

[255]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 286.2, referring to Article 18 of the Subsoil Law (as amended on 17 October 2008), which provided in relevant part as follows: "*Subsoil use rights shall terminate by withdrawal (cancellation) of the relevant licence in the following cases: […] 3) where during the term provided for in the license agreement, no [TP] for carrying out the works, <u>approved by the state</u> <u>authorities responsible for subsoil protection, the natural environment and [industrial] safety and by the owners</u> <u>of land rights,</u> has been provide*d" [emphasis added] (**Authority CLA-97B**). The Respondent states that "[*t*]*he term "approval" in the article means approval through the issuance of the relevant Expert Reports.*"

[256]     Statement of Claim, at para. 58, referring to License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (with English translation), 21 December 2009 (**Exhibit C-5**); and First Witness Statement of B. Aryev, 29 January 2016, at para. 46. See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 291.2.3; Licence Agreement No. 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II (including comparison to Claimants' translation of C-5), 21 December 2009 (**Exhibit R-446**).

[257]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 286.3, 288.

[258]     Statement of Claim, at para. 59, referring to License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kalesay (with English translation), 21 December 2009 (**Exhibit C-4**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para 345; Licence Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kalesay (including comparison to Claimants' translation of C-4), 21 December 2009 (**Exhibit R-445**).

222.      After the conclusion of the License Agreements No. 1, Stans Energy proceeded with its preparations for the operation of the mines which, according to the Claimants, included:

(1).    Stans Energy added three REE experts in its advisory board: Mr. James Hedrick and Mr., James Allan in January 2010;[259] and Dr. Valey Kosynkin in April 2010.[260]

(2).    In February 2010, Stans Energy raised C$ 1.5 million by a private placement.[261]

(3).    In February 2010, Stans Energy entered into an exclusive option agreement with the Kyrgyz Chemical and Metallurgical Plant ("**KCMP**") to purchase the processing plants and the railway terminal at Kashka.[262]

(4).    From February 2010, Stans Energy engaged a number of contractors to verify the existing data from the Soviet era.[263]

(5).    By the end of April 2010, Stans Energy announced its plant of the summer geophysical drilling program.[264]

223.      In April 2010, President Bakiyev was replaced after a brief uprising, and personnel changes in the government followed.[265]

224.      In June 2010, Kutisay Mining OJSC was re-organized into a limited liability company, and re-registered as Kutisay Mining LLC.[266]

225.      The Parties disagree on whether Kutisay Mining complied with the requirements under the License Agreements No. 1.[267] The Claimants consider that the Respondent's allegations that they were in breach of the License Agreements terms fails in light of "the complete absence of

---

[259]    Statement of Claim, at para. 60, referring to Stans Energy Corp, Press release "Stans Energy Corp announces the additions of James Hedrick and James Allan to its advisory board", 14 January 2010 (**Exhibit C-57**).

[260]    Statement of Claim, at para. 60, referring to Stans Energy Corp, Press release "Stans Energy Corp appoints renowned rare earth metallurgist, Doctor Valery D Kosynkin, to its advisory board", 27 April 2010 (**Exhibit C-67**); and First Witness Statement of B. Aryev, 29 January 2016, at para. 44.

[261]    Statement of Claim, at para. 61, referring to Stans Energy Corp, Press release "Stans Energy Corp announces the additions of James Hedrick and James Allan to its advisory board", 14 January 2010 (**Exhibit C-57**).

[262]    Statement of Claim, at para. 62, referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 18 (**Exhibit C-111**).

[263]    Statement of Claim, at para. 63, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the Minister of Natural Resources (Mr. Esenamanov), 12 December 2011 (**Exhibit C-95**); First Witness Statement of B. Aryev, 29 January 2016, at para. 50; and Stans Energy Corp, Press release "Stans Energy Corp Initiates Preparation of a JORC Compliant Resource Estimate for Kutessay II", 8 March 2010 (**Exhibit C-62**).

[264]    Statement of Claim, at para. 64, referring to Stans Energy Corp, Press release "Rare Earth project updates for Kutessay II Mining and the Aktyuz Ore Field", 30 April 2010 (**Exhibit C-68**).

[265]    Statement of Claim, at para. 64, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 51-52.

[266]    Statement of Claim, at para. 65, referring to Order No 2379 of the Ministry of Justice on State re-registration of Kutisay Mining OJSC into Kutisay Mining LLC, 17 June 2010 (**Exhibit C-71**); and Legal entity state re-registration certificate of Kutisay Mining LLC, 17 June 2010 (**Exhibit C-70**).

[267]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 292; Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 83-85.

any complaint by the regulatory authorities at the time about how the projects were being handled".[268]

226.      The Claimants also argue that they never had the opportunity to challenge such allegations at the time nor to invoke Article 356(1) of the Kyrgyz Civil Code:

> which excuses non-compliance with a contractual obligation where the breaching party can show that he or she took "all necessary measures for proper performance of the obligation with the degree of care and prudence required by the nature of the obligation and by the conditions of the transaction[.]"[269]

The Respondent denies that Article 356(1) of the Civil Code could have been invoked. According to the Respondent, the Civil Code "does not apply to subsoil licensing, including license agreements granted under the Subsoil Law." Rather, the termination of a subsoil license is regulated only by the Subsoil Law.[270]

227.      In any event, the Claimants argue that the alleged breaches were "ratified" when the Kyrgyz government granted the new License Agreements No. 2.[271] The Respondent, on the other hand, asserts that "it is not the function or the role of SAGMR or the Government at large to 'complain' about the licensee's breaches. When a licensee fails to submit the required documents, SAGMR is entitled to terminate the license. There is no requirement to 'complain'".[272]

228.      First, the Respondent points out that the License fee was paid two months late in three tranches.[273] In response, the Claimants observe that the delay was because Stans Energy had to comply with a number of formal requirements to gain control over Kutisay Mining OJSC's account and the National Bank of the Kyrgyz Republic did not accept their initial attempt to make a full payment of the license fee.[274] The Respondent considers that the reasons alleged for the delay are not sufficiently explained and are unsupported by evidence.[275] The Claimants continue

---

[268]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 4; Claimants' Post-Hearing Brief, at para. 37.

[269]  Claimants' Post-Hearing Brief, at para. 37, referring to  Civil Code of the Kyrgyz Republic of 8 May 1996 No 15 (as amended on 16 December 2016), Article 356(1) (**Authority CLA-332**). See also, Claimants' Reply Post-Hearing Brief, at para. 26.

[270]  Respondent's Reply Post-Hearing Brief, at para. 18.

[271]  Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 57, 63, 65. See also, Claimants' Post-Hearing Brief, at para. 38.

[272]  Rejoinder on the Merits and Reply on Jurisdiction, at para. 152.

[273]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 292.1.

[274]  Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 60, referring to Second Witness Statement of B. Aryev, 9 November 2017, at para. 14.

[275]  Rejoinder on the Merits and Reply on Jurisdiction, at para. 134.

that in any event such a delay should not have invalidated the Licenses, because the Kyrgyz Republic had accepted the late payments.[276]

229.     Second, the Respondent points out that Kutisay Mining OJSC failed to submit the technical plan, expert reports, and land allotment.[277] In response, the Claimants contend, as described above, that the License Agreements No. 1 did not require a technical plan but a development plan, and that a failure to submit such a development plan could not have resulted in termination of the License.[278]

230.     The Claimants further contend that the Minister of Natural Resources assured them that the one-year timeline for the license agreement's requirements would not be enforced as long as they would submit a report before the end of the year requesting more time.[279] The Respondent disputes the existence of such assurances, considering that it is implausible that assurances contrary to the express terms of the License Agreements were made and noting that, despite the Tribunal's order for document production, the Claimants have failed to produce any document relating to them.[280] Moreover, the Respondent points out that Mr. Aryev testified at the Hearing that he was never assured by the Minister that the period for compliance with License Agreements No. 1 would be extended if the Claimants asked for more time.[281] According to the Respondent, he also admitted that the Claimants did not place any reliance on alleged assurances in respect of any extension,[282] which he recognised were given after the Claimants had acquired the Licenses.[283]

231.     The Claimants also allege that the uprising in April 2010 impacted their ability to progress work over several months.[284] The Claimants add that the deadlines for the submission, set in less than a year from the conclusion of the License Agreements, were "ambitious".[285] The Respondent disputes that the uprising in April 2010 provided any excuses for the Claimants' non-

---

[276]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 60.
[277]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 292.2.
[278]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 61-63.
[279]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 63, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 48 and footnote 21. See also, Claimants' Post-Hearing Brief, at para. 38.
[280]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 157.
[281]   Respondent's Post-Hearing Brief, at para. 133, referring to Hearing Transcript, Day 2, pp 340:15-341:3 .
[282]   Respondent's Post-Hearing Brief, at para. 133, referring to Hearing Transcript, Day 2, pp 340:9-341:22.
[283]   Respondent's Post-Hearing Brief, at para. 133, referring to Hearing Transcript, Day 2, p. 340:2-5.
[284]   Statement of Claim, at para. 64; Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 64-65.
[285]   Statement of Claim, at para. 65, and footnote 106.

compliance, stating that the uprising lasted only a few days, and that most work would have been possible regardless of the uprising. [286] The Respondent also alleges that the deadlines set out in the License Agreements were in line with the SAGMR's practice at the relevant time. [287]

### b.   License Agreements No. 2

232.    In August 2010, Stans Energy met with the new Minister of Natural Resources. [288] During the meeting, the Minister agreed to re-issue the Kutessay II and Kalesay Licenses to the newly registered entity, Kutisay Mining LLC, and to conclude new License Agreements with Kutisay Mining LLC. [289]

233.    On 20 September 2010, the Ministry of Natural Resources re-issued the Kutessay II and Kalesay Licenses to Kutisay Mining LLC, for 20 years, until 21 December 2029. [290] On the same day, the Ministry and Kutisay Mining LLC entered into a License Agreement for Kutessay II ("**Kutessay II License Agreement No. 2**") [291] and Kalesay ("**Kalesay License Agreement No. 2**", [292] together with Kutessay II License Agreement No. 2, "**License Agreements No. 2**").

234.    Kutessay II License Agreement No. 2 set out the key requirements for Kutisay Mining LLC to exercise its Kutessay II License, providing that, in relevant part:

| [Claimants' translation] | [Respondent's translation] |
| --- | --- |
| 1.    Before the expiration of this License Agreement the Licensee shall submit the following: | 1.    Before the expiration of this License Agreement the Licensee shall submit the following: |
| 1.1.    Drafts of | 1.1.    Projects for: |
| -  The Kutessay II mine development | -  The development of the Kutessay II deposit |
| -  The Mill Plant, tailings pond | -  The Mill Plant, tailings pond |

---

[286]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 293; Rejoinder on the Merits and Reply on Jurisdiction, at paras 158-159.

[287]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 293.2; Rejoinder on the Merits and Reply on Jurisdiction, at paras 153-156.

[288]    Statement of Claim, at para. 65, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 53.

[289]    Statement of Claim, at para. 65, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 53.

[290]    Statement of Claim, at para. 66, referring to License No 2488 ME issued by the Ministry of Natural Resources to Kutisay Mining LLC for Kutessay II, 20 September 2010 (**Exhibit C-7**); and License No 2489 ME issued by the Ministry of Natural Resources to Kutisay Mining LLC for Kalesay, 20 September 2010 (**Exhibit C-6**).

[291]    Statement of Claim, at para. 67, referring to License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II (with English translation), 20 September 2010 (**Exhibit C-9**).

[292]    Statement of Claim, at para. 67, referring to License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kalesay (with English translation), 20 September 2010 (**Exhibit C-8**).

| | |
|---|---|
| and other infrastructure facilities | and other infrastructure facilities |
| **1.2. Expert opinions with respect to the following aspects of the project:** | **1.2. Expert opinions with respect to the following aspects of the project:** |
| a) Environmental safety | a) Environmental safety |
| b) Technical safety | b) Technical safety |
| c) Subsoil protection and use | c) Subsoil protection and use |
| **1.3. Land allotment** | **1.3. Land allotment** |
| **2. Additional conditions:** | **2. Additional conditions:** |
| During the preparation of the feasibility study and mine development plan the following activities are permissible: control sampling and sample collection; construction of infrastructure and communications facilities after approval of individual plans with respective state agencies; engineering and geological as well as hydrogeological and environmental surveys; geological and prospecting works in the licensed area on a project that has received necessary expert approvals. | During the preparation of the technical and economic assessment and mine development plan the following activities are permissible: control sampling and sample collection; construction of infrastructure and communications facilities after approval of individual plans with respective state agencies; engineering and geological as well as hydrogeological and environmental surveys; geological and prospecting works in the licensed area on a project that has received necessary expert approvals. |
| […] | […] |
| **4. License Agreement validity period:** _Until 31 December 2011_[293] | **4. License Agreement validity period:** Until 31 December 2011[294] |

235.     The Parties interpret provision 1.1 of License Agreement No. 2 differently. The Respondent alleges that it requires the submission of a technical plan pursuant to the Subsoil Law. The Respondent asserts that such a technical plan should have contained two parts: (1) technical plan for the mine; and (2) technical plan for the plant, tailing facility and infrastructure.[295] On the other hand, the Claimants contend that they were required to provide two separate documents: (1)

---

[293]   Translation as provided by the Claimants in License Agreement No 2 entered into by the Ministry of Natural Resources and Kutessay Mining LLC for Kutessay II (with English translation), 20 September 2010 (**Exhibit C-9**). See also, Statement of Claim, at para. 67.

[294]   Translation as provided by the Respondent in Licence Agreement No. 2 entered into by the Ministry of Natural Resources and Kutessay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-9), 20 September 2010 (**Exhibit R-448**).

[295]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 296, and footnote 288.

a mine development plan; and (2) a plan for a mill plant, a tailings pond and other infrastructure facilities.[296] In the Claimants' view, the submission of a technical plan was unnecessary.[297]

236.     The Agreement required the submission of expert reports on environmental safety, technical safety and subsoil protection and use by 31 December 2011.[298]

237.     The Agreement required Kutisay Mining LLC to submit a land allotment by 31 December 2011.[299]

238.     The key requirements set out by Kalesay License Agreement No. 2 were identical to those of the Kutessay II License Agreement No. 2.[300]

239.     After the conclusion of the License Agreements No. 2 on 20 September 2010, Stans Energy continued preparing for mining.[301] In January 2011, Stans Energy exercised its option under the February 2010 agreement to purchase the KCMP processing plants and the rail terminal.[302] While the original complex was constituted by four plants, Stans Energy only purchased three of them and planned to build a new plant, because the fourth plant was not in

---

[296]     Statement of Claim, at para. 67.

[297]     Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 61-62, 68 *cf.* Respondent's Post-Hearing Brief, at paras 131-132, referring to, *inter alia,* Hearing Transcript, Day 2, pp 331:12-15, 338:16-339:1.

[298]     Statement of Claim, at para. 67, referring to License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II, 20 September 2010 (**Exhibit C-9**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 296; Licence Agreement No. 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-9), 20 September 2010 (**Exhibit R-448**).

[299]     Statement of Claim, at para. 67, referring to License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II, 20 September 2010 (**Exhibit C-9**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 296; Licence Agreement No. 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-9), 20 September 2010(**Exhibit R-448**).

[300]     Statement of Claim, at para. 67, referring to License Agreement No 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kalesay, 20 September 2010 (**Exhibit C-8**). See also, Licence Agreement No. 2 entered into by the Ministry of Natural Resources and Kutisay Mining LLC for Kalesay (including comparison to Claimants' translation of C-8), 20 September 2010 (**Exhibit R-447**).

[301]     Statement of Claim, at para. 72.

[302]     Statement of Claim, at para 68, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 56; and Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 18 (**Exhibit C-111**).

good condition.[303] In addition, because the facilities were outdated, Stans Energy needed to make substantive investment for renovation.[304]

240.      On 20 January 2011, the Ministry of Natural Resources issued an order that temporarily suspended access to the State's geological data for the following six months pending the introduction of new funding mechanisms.[305] Nevertheless, the Respondent points out that Stans KG successfully requested permission for transfer of library materials on 16 February 2010, and received them on 3 March 2010.[306] Moreover, the Respondent argues that, by letter dated 15 October 2010, Stans KG requested a six-month extension to use the data, which was granted on the same day.[307]

241.      According to the Claimants, in March 2011, Stans Energy received a technical report from Kazakhstan Mineral Company on Kutessay II, which provided similar results to the Soviet data and outlined a US$ 9.3 million recommended work program.[308] In April 2011, Stans Energy received another report from Ms. Natalia Malyukova on the distribution of individual rare earth elements in Kutessay II, which confirmed the existence of critical HREEs in the Kutessay II deposit, including dysprosium, yttrium, terbium, neodymium and europium.[309]

---

[303]   Statement of Claim, at para. 68, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 57. Four plants were designed to function in different steps in processing rare earth concentrate. Plant 1 'cracked' and cleaned the raw rare earth concentrate from the mill to remove radioactivity and other impurities and to upgrade it into clean higher-grade concentrate, Plant 2 separated the rare earth concentrate into three groups: light, middle and heavy concentrate, Plant 3 separated the middle and heavy concentrate into final oxides, metals and alloys, Plant 4 separated concentrate of light rare earth concentrate from Plant 2 into individual oxides. Stans Energy purchased Plants 1, 2 and 3.

[304]   Statement of Claim, at para. 71, referring to Witness Statement of Mr. R. Irwin, 29 January 2016, at para. 28.

[305]   Statement of Claim, at para. 78, referring to Order No 4 of the Ministry of Natural Resources, 20 January 2011 (**Exhibit C-16**).

[306]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 303.4.2, referring to Letter from Stans KG to SAGMR's Deputy Minister, Mr. Oseledko, dated 16 February 2010 requesting access to geological data, with a handwritten approval note by Mr. Oseledko reading "*The handing over of data for a term of 6 months with a subsequent release to you of an electronic version [signature] 25.02.10*" (**Exhibit R-103**); and Excerpt from 2010-2011 Geological Data Register with an entry dated 3 March 2010 showing OS Stans Energy KG as the recipient with the note "*temporary up to 3 September 2010…*" (**Exhibit R-104**).

[307]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 303.4.2, referring to Letter from Stans KG to SAGMR's Deputy Minister, Mr. Oseledko, dated 15 October 2010 requesting a six-month extension to access geological data, with a handwritten approval note by Mr. Oseledko reading "*I permit until 1.05.2011 [signature]*" (**Exhibit R-118**).

[308]   Statement of Claim, at para. 72, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 60; and VV Danilov, Kazakhstan Mineral Company, "Technical Report on the Kutessay II Rare Earth Property, Kemin District, Kyrgyzstan, with Rare Earth Resource Estimate – JORC Report", 21 March 2011, at p. 129 (**Exhibit C-76**).

[309]   Statement of Claim, at para 72, referring to NN Malyukova, Kyrgyz-Russian Slavic University (at the instruction of Stans Energy KG LLC), "Distribution of Mineral Ore Types and Grades of Rare Earth Elements in the Kutessay II Deposit", 2011, at pp. 58-59 (**Exhibit C-99**).

242.     In the same month, according to the Claimants, Stans Energy raised C$ 28 million via a private placement.[310] With this money, Stans Energy closed the US$ 5.5 million acquisition of KCMP plant and the railway terminal at Kashka.[311] Stans Energy renamed the KCMP plant as Kashka REE Plant ("**KRP**").[312] The Claimants aver that these facilities were fundamental for their production plan especially because "the railroad ensured that supplies (including chemicals and explosives) necessary to extract rare metals and oxides could be shipped to the site".[313]

243.     In April 2011, Stans Energy commissioned Asiarudproject Mining Planning-Production Company CJSC ("**AsiaRud**") to complete a technical and economic assessment of Kutessay II.[314] In July 2011, AsiaRud completed its assessment report ("**AsiaRud 2011 Report**"), and recommended an open pit mining to restart production at the rate of one million tons of ore per year.[315] According to the Claimants, on the basis of this conclusion, Stans Energy decided to design its mining operation to process one million tons of ore per year.[316] This necessitated the construction of a new mill and tailings pond, and the upgrade of the processing facilities.[317]

244.     In August 2011, Stans Energy requested AsiaRud to produce a mine development plan "Production Complex Plan for the Kutessay II Deposit with Phase I Works at the Kalesay Deposit" in line with the July report recommendations.[318]

245.     The Claimants aver that in the second half of 2011, Stans Energy had negotiations with industry players for technical and financial partnerships.[319] In July 2011, Stans Energy entered into three non-disclosure agreements.[320] Stans Energy had discussions with Japanese and Korean

---

[310]     Statement of Claim, at para. 76, referring to Stans Energy Corp, Press release "Stans Energy Corp Closes $28,000,000 Private Placement", 28 April 2011 (**Exhibit C-80**).
[311]     Statement of Claim, at para 77, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 56.
[312]     Statement of Claim, at para 68, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 56.
[313]     Statement of Claim, at para. 70, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 58.
[314]     Statement of Claim, at para. 78, referring to Contract No 02/2011km between Kutisay Mining LLC and Asiarudproject Mining Planning-Production Company CJSC, 14 April 2011 (**Exhibit C-79**).
[315]     Statement of Claim, at para. 80, referring to Asiarudproject Mining Planning-Production Company CJSC, "Technical and economic assessment of Kutessay-II rare earth deposit development", July 2011, at Sections 1.5 and 7.7 (**Exhibit C-86**).
[316]     Statement of Claim, at para. 81, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 67.
[317]     Statement of Claim, at para. 81, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 68.
[318]     Statement of Claim, at para. 82, referring to Contract No 09/2011km between Kutisay Mining LLC and Asiarudproject Mining Planning-Production Company CJSC, 10 August 2011 (**Exhibit C-87**).
[319]     Statement of Claim, at paras 83-84, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 73.
[320]     Statement of Claim, at para. 84, referring to Stans Energy Corp, Press release "Stans Energy Provides an Update on its Kutessay II Mine, Aktyuz Ore Field and Kashka Rare Earth Processing Plant", 14 July 2011 (**Exhibit C-84**); Confidentiality Agreement between Stans Energy Corp and the European Bank for Reconstruction and Development (redacted), 25 July 2011 (**Exhibit C-85**); and Non-Disclosure Agreement between Stans Energy Corp and Osram GmbH and Siemens AG (redacted), 6 July 2011 (**Exhibit C-83**).

companies regarding potential partnerships, [321] and also conducted site visits with the representatives of various potential strategic partners in April, July, August and October 2011. [322]

246.     On 27 September and 13 December 2011, the Kyrgyz Republic State Administration of the Kemin District granted Kutisay Mining LLC land leases for the licensed areas of Kalesay and Kutessay II for the entire terms of the Licenses. [323]

247.     On 12 December 2011, Kutisay Mining LLC sent letters to the Ministry of Natural Resources, requesting the extensions of the License Agreements No. 2 or the conclusion of new License Agreements No. 3 until 31 December 2012. [324] The Respondent denies that this letter was the start of negotiations regarding the conclusion of a third license agreement and notes that it was a request for another extension of the term to comply with License Agreements No. 2. [325] In the abovementioned letter, Kutisay Mining LLC alleged that its delay to satisfy the conditions of the License Agreements was due to *inter alia* (1) the "run-down state" of the related infrastructures; (2) the different ownerships of these infrastructures; (3) "the significant time lost in relation to the events of April 2010"; and (4) "the half-year restriction by the Kyrgyz Republic Ministry of Natural Resources on access to information in 2011". [326] This letter also enclosed numerous documents including "Draft technological scheme for rehabilitation of the enrichment plant". [327]

248.     On 30 December 2011, Kutisay Mining LLC sent another letter to the Ministry of Natural Resources, enclosing the "Production Complex Plan for the Kutessay II Deposit with

---

[321]   Statement of Claim, at para. 84, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 73.
[322]   Statement of Claim, at para. 84, referring to Stans Energy Corp, Press release "Stans Energy Announces progress refurbishment, formalization, exploration activities and development project", 25 October 2011 (**Exhibit C-91**).
[323]   Statement of Claim, at para. 87, referring to Certificate No 048390 for the Right of Temporary Use of the Kutessay II Land Plot in the Kemin District for the period until 21 December 2029, issued to Kutisay Mining LLC by the Administration of Land Management and Registration of Rights for Immovable Property, 13 December 2011; and Decree No 436-r of the State Administration of the Kemin District on Allocation of the Land Plot from the Lands of Aktyuz Rural District (for use in accordance with License No 2489 ME), 27 September 2011 (**Exhibit C-89**); and Certificate No 048389 Right of Temporary Use of the Kalesay Land Plot in the Kemin District for the period until 21 December 2029, issued to Kutisay Mining LLC by the Administration of Land Management and Registration of Rights for Immovable Property, 13 December 2011; and Decree No 437-r of the State Administration of the Kemin District on Allocation of the Land Plot from the Lands of Aktyuz Rural District (for use in accordance with License No 2489 ME), 27 September 2011 (**Exhibit C-90**).
[324]   Statement of Claim, at para. 86, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the Minister of Natural Resources (Mr. Esenamanov), 12 December 2011 (**Exhibit C-95**).
[325]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 200.
[326]   See Letter from Kutisay Mining LLC (Mr. Savchenko) to the Minister of Natural Resources (Mr. Esenamanov), 12 December 2011 (**Exhibit C-95**).
[327]   See Letter from Kutisay Mining LLC (Mr. Savchenko) to the Minister of Natural Resources (Mr. Esenamanov), 12 December 2011 (**Exhibit C-95**).

Phase I Works at the Kalesay Deposit".[328] In this letter, Kutisay Mining LLC described that it planned to carry out its design works in two stages: (1) a design of regeneration of the existing mill with 300,000 tons per year capacity at the first stage (end of 2011 – beginning of 2012); and (2) a design of a new mill with the one million tons per year capacity at the second stage (before the end of 2012).[329] The enclosed Plan corresponded to the first stage.[330]

249.    The Parties disagree on whether Kutisay Mining LLC complied with the requirements of the License Agreements No. 2.[331]

250.    The Respondent contends that Kutisay Mining failed to submit a technical plan and the expert reports.[332] According to the Respondent, the "draft technological scheme for rehabilitation of the enrichment plant" enclosed in the 12 December 2011 letter was not qualified as a technical plan because it "was a tiny portion of what needed to be included in the required TP".[333] Also, the "Production Complex Plan for the Kutessay II Deposit with Phase I Works at the Kalesay Deposit" enclosed in the 30 December 2011 letter was insufficient as a technical plan, because it only covered the operation of 300,000 tons per year despite that Kutisay Mining LLC envisaged the processing capability of one million tons per year, and because it failed to cover the mine itself.[334]

251.    In response, the Claimants allege that the Respondent's position that the Claimants breached the License Agreements is contradicted by the sworn testimony of Mr. Ryskulov.[335] According to the Claimants, the License Agreement No. 2 did not require a technical plan but a mine development plan.[336] The Claimants contend that the Plan enclosed in the 30 December letter was sufficient as a mine development plan, alleging that nothing in the License Agreements No. 2 required a mine development plan for any particular processing capacity and that the Plan

---

[328]    See Letter from Kutisay Mining LLC (Mr. Savchenko) to the Ministry of Natural Resources (Mr. Esenamanov), 30 December 2011 (**Exhibit C-98**).
[329]    See Letter from Kutisay Mining LLC (Mr. Savchenko) to the Ministry of Natural Resources (Mr. Esenamanov), 30 December 2011 (**Exhibit C-98**).
[330]    See Letter from Kutisay Mining LLC (Mr. Savchenko) to the Ministry of Natural Resources (Mr. Esenamanov), 30 December 2011 (**Exhibit C-98**).
[331]    Statement of Claim, at paras 5-8 *cf.* Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 301-302, 306.
[332]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 302; Rejoinder on the Merits and Reply on Jurisdiction, at paras 170-176.
[333]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 305.1.
[334]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 305.2.
[335]    Claimants' Post-Hearing Brief, at para. 38, referring to, *inter alia*, Witness Statement of Mr Ryskulov, 7 May 2014 (**Exhibit C-250**); Hearing Transcript, Day 1, p. 50:6-20.
[336]    Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 68 *cf.* Respondent's Post-Hearing Brief, at paras 131-132, referring to, *inter alia*, Hearing Transcript, Day 2, pp 331:12-15, 338:16-339:1.

covered the mine itself and, *inter alia,* considered the geology of the deposit.[337] However, in this regard the Respondent maintains the same position as concerning License Agreement No. 1 and asserts that Claimants had to submit a technical plan and points to contemporaneous evidence which would confirm that Claimants were aware about this requirement.[338]

252.      The Claimants further contend that, with regard to Kutessay II, the Respondent ratified the Claimants' work by entering into a third license agreement.[339] The Respondent strongly opposes this argument, asserting that Kutessay License Agreement's No. 3 was granted unlawfully and the SAGMR's employees involved were investigated and criminally convicted.[340]

253.      The Claimants assert that their delay to comply with the deadlines was caused by factors beyond their control, as described in their letter dated 12 December 2011.[341] In response, the Respondent alleges that none of these factors could have justified the Claimants' failure to provide the required submissions, claiming that they did not substantively affect the Claimants' work.[342]

254.      The Claimants allege that non-compliance with the license agreement conditions was not cited amongst the reasons for termination of the project at the relevant time and argue that only after these arbitral proceedings started did the Respondent contend that the Claimants were in "chronic breach" of the License Agreements terms.[343] The Claimants consider that these are allegations constructed *post hoc* solely to justify the Respondent's actions in the context of this arbitration.[344]

---

[337]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 70-71.

[338]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 168-169, referring to Letter from Dr. Savchenko of Kutisay to the Minister of Natural Resources (including comparison to Claimants' translation of C-95), dated 12 December 2011, at pp 1 and 3 (**Exhibit R-450**); Letter from Dr. Savchenko of Kutisay to the Minister for Natural Resources (including comparison to Claimants' translation of C-97), dated 16 December 2011, at p. 3 (**Exhibit R-451**); Letter from Dr. Savchenko of Kutisay to the Ministry of Natural Resources (including comparison to Claimants' translation of C-98), dated 30 December 2011 (**Exhibit R- 452**).

[339]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 74.

[340]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 180-183, 185-186, 190-191. See also, Indictment Order in relation to Uchkunbek Azizbekovich Tashbayev, dated 15 March 2013, at p. 1 (**Exhibit R-389**): *"on June 14, 2011 the Commission for Regulation of the Subsoil Use Rights of the State Agency presided by U.A. Tashbayev* <u>*without legal grounds, in violation of the current legislation,*</u> *decided to conclude a third license agreement to license No. 2488 […] Kutessay-2 […] However, the specified company [Kutisay Mining] did not comply with the terms of the first and second license agreements."*

[341]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 72-73.

[342]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 303; Rejoinder on the Merits and Reply on Jurisdiction, at para. 179.

[343]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 49; Claimants' Post-Hearing Brief, at paras 37; 45.

[344]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 4, 49, 88; Claimants' Post-Hearing Brief, at para. 14.

255.     The Claimants also contend that Kyrgyz law would not have permitted such termination without first granting the Claimants the opportunity to argue that any failure to perform might be excused pursuant to Article 356(1) of the Civil Code.[345] As noted above, the Respondent denies that Article 356(1) of the Civil Code could have been invoked because, according to the Respondent, the Civil Code does not apply to subsoil licensing.

256.     Moreover, the Claimants contend that the Respondent's mining expert, Mr. Shilov, "testified [at the Hearing] that the Claimants had completed almost all their obligations under the License Agreement No 2, to a high standard."[346]

257.     This position is contested by the Respondent, which submits that Kutisay Mining LLC persistently failed to comply with the License Agreements and argues that the non-compliance with the License Agreements requirements was documented in contemporaneous evidence.[347]

## 4.     Conclusion of the Kutessay II License Agreement No. 3

258.     Following presidential elections held in December 2011, Kyrgyzstan's new president, Mr. Almazbek Atambayev, appointed Mr. Omurbek Babanov as the new Prime Minister and Mr. Uchkumbek Tashbayev as the new Minister of Natural Resources.[348]

259.     According to the Claimants, in January 2012, Stans Energy met separately with Mr. Babanov and Mr. Tashbayev.[349] During the meetings, they discussed the possibility of entering into a partnership between Stans Energy and the Kyrgyz Republic.[350] It is unclear, however, which side first proposed such a partnership.[351] The Claimants allege that Prime Minister Babanov surprised Stans Energy, by stating that Stans Energy needed to enter into a partnership

---

[345]   Claimants' Post-Hearing Brief, at para. 49, referring to Civil Code of the Kyrgyz Republic of 8 May 1996 No 15 (as amended on 16 December 2016), Article 356(1) (**Authority CLA-332**).

[346]   Claimants' Reply Post-Hearing Brief, at para. 30 *cf.* Respondent's Reply Post-Hearing Brief, at para. 49.

[347]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 129-133, 187-188, referring to Letter from the Ministry of Economy of the Kyrgyz Republic to the Office of the Government of the Kyrgyz Republic, dated 22 June 2013 (**Exhibit R-403**); *"When money talks, are conscience and law silent?"*, Kyrgyz Code, dated 7 August 2012, http://kgcode.akipress.org/unews/un_post:1390. (**Exhibit R-377**); Letter from "Aktyuz Platinum" to the Prime Minister of the Kyrgyz Republic, dated 14 September 2012, at p. 2 (**Exhibit R-379**).

[348]   Statement of Claim, at para. 89.

[349]   Statement of Claim, at para 90, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 80.

[350]   First Witness Statement of B. Aryev, 29 January 2016, at para. 80.

[351]   The Claimants allege that Prime Minister Babanov surprised Stans Energy, by stating that Stans Energy needed to enter into a partnership with the State if it wished to continue its Kutessay II work (see Statement of Claim, at para. 90; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 80). The Respondent, on the other hand, claims that the Stans Energy voluntary made such a proposal (see Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 309, referring to Interrogation report of Mr. Tashbayev, former Director of SAGMR, dated 4 February 2013 (**Exhibit R-141**)).

with the State if it wished to continue its Kutessay II work.[352] The Respondent, on the other hand, claims that Stans Energy voluntarily made such a proposal.[353]

260.    While it had not entered into new license agreements, Stans Energy continued to prepare for mining operation.[354] On 9 February 2012, Stans Energy reported that it had discovered a new mining zone at Kutessay II.[355] On 17 February 2012, Stans Energy appointed the Russian Research Institute of Chemical Technology ("**VNIIHT**"), a division of the State Atomic Energy Corporation of Russia, as the lead engineering firm for the design build process at Kutessay II.[356]

261.    On 15 February 2012, the Prime Minister changed the boundaries of Chon Kemin State Natural National Park ("**National Park**") by issuing Resolution No 93 to repeal Kyrgyz Republic Government Resolution No 374 issued on 13 June 2009 "On changing the Boundaries of Chon Kemin State National Park" ("**Decree No 93**").[357] According to the Decree No 93, it adopted "[f]or the purposes of preserving the unique natural habitats, biological and landscape variety, and to preserve species of flora and fauna which are entered in the Red Book of the Kyrgyz Republic".[358] According to the Claimants, the new territory of the National Park covered substantial portions of Stans Energy's open-pit infrastructures for Kutessay II.[359] As a result, the Claimants assert that the open-pit mining plan became impossible to implement.[360]

262.    On 1 and 19 March 2012, Stans KG sent letters to the SAGMR describing the impacts of Decree No. 93 on the Kutessay II and Kalesay projects, and requesting to amend the Decree

---

[352]   Statement of Claim, at para. 90; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 80.
[353]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 309, referring to Interrogation report of Mr. Tashbayev, former Director of SAGMR, dated 4 February 2013 (**Exhibit R-141**); Rejoinder on the Merits and Reply on Jurisdiction, at paras 47-49. See also, Rejoinder on the Merits and Reply on Jurisdiction, at paras 201-202.
[354]   Statement of Claim, at para. 92.
[355]   Statement of Claim, at para. 92, referring to Stans Energy Corp, Press release "Stans Energy Discovers New Mineralized Zone at Kutessay II", 9 February 2012 (**Exhibit C-101**).
[356]   Statement of Claim, at para. 92, referring to Stans Energy Corp, Press release "Stans Energy Appoints VNIIHT to Oversee design Build Process at Kutessay II", 17 February 2012 (**Exhibit C-102**).
[357]   Statement of Claim, at para. 93, referring to Resolution No 93 to repeal Kyrgyz Republic Government Resolution No 374 issued on 13 June 2009 "On changing the Boundaries of Chon Kemin State National Park", 15 February 2012 (**Exhibit C-17**).
[358]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 340, referring to Resolution No 93 to repeal Kyrgyz Republic Government Resolution No 374 issued on 13 June 2009 "On changing the Boundaries of Chon Kemin State National Park", 15 February 2012, at p. 1 (**Exhibit C-17**).
[359]   Statement of Claim, at para. 93, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 83.
[360]   Statement of Claim, at paras 93-94. See also, Letter No 17/2012km from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), 29 March 2012 (**Exhibit C-109**).

No 93 so that the licensed areas would be excluded from the National Park.[361] On 24 May 2012, the SAGMR informed the Claimants that the Inter-District Court of Bishkek had declared the Decree No 93 invalid; that court decision was being examined by the Appellate Instance of the Bishkek City Court.[362] On 9 July 2012, SAGMR sent another letter informing that an inter-agency working group would be set up to resolve the issues regarding the mining deposits and the natural habitat protection.[363]

263.     According to the Claimants, after consulting with Kyrgyz and Canadian experts, Stans Energy amended its mining plan to introduce two-phase mining: (1) open-pit mining of 300,000 tons per year outside the boundaries of the National Park at Phase I; and (2) underground mining of one million tons per year at Phase II.[364] This new plan, however, required Stans Energy to design a new mining complex.[365]

264.     The Respondent explains that the change in the National Park boundaries was declared invalid and reversed by the Respondent's courts on 4 April 2012. The Respondent alleges that this became known to Kutisay Mining LLC on 24 May 2012 at the latest so that "the short-lived change in national park boundaries (during the 1.5 month period from 15 February 2012 to 4 April 2012, when Kutisay Mining LLC did not even have a valid license agreement in place) had no effect on the Claimants".[366] The Respondent further argues that even Mr. Aryev admits that the reasons for Kutisay Mining LLC changing its plans from open pit mining to combined open pit and underground mining "was completely unrelated to the temporary change in the national park boundaries or any other State actions".[367]

265.     On 29 March 2012, Kutisay Mining LLC requested the SAGMR to enter into revised Kutessay II and Kalesay License Agreements No. 3 reflecting the change of mining plan.[368]

---

[361]   Statement of Claim, at para. 97, referring to, *inter alia*, Letter from Stans Energy KG LLC (Mr. Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr. Babanov), 1 March 2012 (**Exhibit C-104**); Letter from Stans Energy Kg LLC (Mr. Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr. Babanov), 19 March 2012 (**Exhibit C-106**).
[362]   Statement of Claim, at para. 97, referring to Letter from the State Agency of Geology and Mineral Resources (Mr. Eshnazarov) to Stans Energy KG LLC, 24 May 2012 (**Exhibit C-113**).
[363]   Statement of Claim, at para. 97, referring to Letter from the Ministry of Economy and Antimonopoly Policy (Mr. Mukanbetov) to Stans Energy KG LLC (Mr. Savchenko), 9 July 2012 (**Exhibit C-117**).
[364]   Statement of Claim, at para. 98.
[365]   Statement of Claim, at para. 98, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 86.
[366]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 205.1.
[367]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 205.1, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 85-86.
[368]   Statement of Claim, at para 99, referring to Letter No 17/2012km from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), 29 March 2012 (**Exhibit C-109**).

266.     On 14 April 2012, Mr. Aryev met with Mr. Tashbayev to discuss the conclusion of License Agreements No. 3 for Kutessay II and Kalesay.[369] According to Kutisay Mining LLC's letter of 17 April 2012, Mr. Tashbayev "offered to consider creating a public-private partnership by way of transfer of part of the share capital of Kutisay Mining LLC to the Kyrgyz Republic and to submit new drafts of License Agreements No 3."[370] On this letter, Kutisay Mining LLC enclosed a revised draft License Agreement No. 3 for Kutessay II.[371]

267.     On 15 June 2012, the SAGMR, Stans KG and Kutisay Mining LLC entered into License Agreement No. 3 for Kutessay II ("**Kutessay II License Agreement No. 3**"), valid until 31 December 2014.[372] According to the Respondent, far from being a "ratification" of the Claimants' performance, the granting of this license agreement was illegal and the SAGMR officials involved were later prosecuted.[373]

268.     License Agreement No. 3 set out the requirements for Stans KG and Kutisay Mining LLC to exercise the Kutessay II License and provides, in relevant part, as follows:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **1.     The Licensee is granted the right to develop a mining development plan for the Kutessay II deposit located in the Kyrgyz Republic, Chui Oblast, Kemin Region,** within the boundaries of a geological land allotment with the following land corner coordinates: […] | **1.     The Licensee is granted the right to prepare a project for the development of the Kutessay II deposit located in the Kyrgyz Republic, Chui Oblast, Kemin Region,** within the boundaries of a geological land allotment with the following land corner coordinates: […] |
| **2.     The Licensee's Founder undertakes:** | **2.     The Licensee's Founder undertakes:** |
| **2.1.**     Before 31 July 2012 to reach a preliminary agreement with the Kyrgyz Republic, represented by State Property Management Fund of the Government of the Kyrgyz Republic (or authorized state body or entity) (hereinafter – the "Fund"), for the free | **2.1.**     Before 31 July 2012 to reach a preliminary agreement with the Kyrgyz Republic, represented by State Property Management Fund of the Government of the Kyrgyz Republic (or authorized state body or entity) (hereinafter – the "Fund"), for the free |

---

[369]     Statement of Claim, at para 99, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 87.
[370]     See Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), attaching a draft of License Agreement No 3 for Kutessay II, 17 April 2012 (**Exhibit C-110**) *cf.* Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 309.
[371]     Statement of Claim, at para. 101, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), attaching a draft of License Agreement No 3 for Kutessay II, 17 April 2012 (**Exhibit C-110**).
[372]     Statement of Claim, at para. 102, referring to License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II, 15 June 2012 (**Exhibit C-10**).
[373]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 192.

transfer of shares in the charter capital of the Licensee, in accordance with the laws of the Kyrgyz Republic.

**2.2.** The precise share to be transferred to the Fund will be determined and agreed by the Parties after economic analysis and calculations with respect to the Kutessay II deposit during negotiations between the parties before 30 September 2012.

[…]

**3.** **The Licensee undertakes to:**

**3.1.** Perform the following works within the following timeframe:

[…]

**3.2.** Perform works complying with effective regulations, rules regarding environmental and ecological safety, subsoil protection and technical safety.

**3.3.** Before 31 March 2013 submit the following to the Licensor:

1) A draft of the new feasibility study of conditions with reserves re-estimated for combined mining of the deposit and with programs: phase I program for the development of the deposit with an open pit mining with a 300,000 ton annual production capacity; phase II program for the development of the deposit with the underground mining of remaining reserves with a 1 million ton annual production capacity;

2) A plan of the mine site with combined deposit mining: phase I program for the development of the deposit with an open pit mining with 300,000 ton annual production capacity to be processed at the existing mill under construction; phase II program for the development of the deposit with underground production with a 1 million ton annual production capacity to be processed at the newly built mill.

3) A reconstruction plan for the existing mill, tailings pond, and other infrastructure facilities (provided they are purchased by the Licensee) of phase I development of the deposit with an

transfer of shares in the charter capital of the Licensee, in accordance with the laws of the Kyrgyz Republic.

**2.2.** The precise share to be transferred to the Fund will be determined and agreed by the Parties after economic analysis and calculations with respect to the Kutessay II deposit during negotiations between the parties before 30 September 2012.

[…]

**3.** **The Licensee undertakes to:**

**3.1.** Perform the following works within the following timeframe:

[…]

**3.2.** Perform works complying with effective regulations, rules regarding environmental and ecological safety, subsoil protection and technical safety.

**3.3.** Before 31 March 2013 submit the following to the Licensor:

1) A draft of the new technical and economic assessment of conditions with reserves reestimated for combined mining of the deposit and with projects: phase I project for the development of the deposit with an open pit mining with a 300,000 ton annual production capacity; phase II project for the development of the deposit with the underground mining of remaining reserves with a 1 million ton annual production capacity;

2) A project of the mine site with combined deposit mining: phase I project for the development of the deposit with an open pit mining with 300,000 ton annual production capacity to be processed at the existing mill under construction; phase II project for the development of the deposit with underground production with a 1 million ton annual production capacity to be processed at the newly built mill.

3) A reconstruction project for the existing mill, tailings pond, and other infrastructure facilities (provided they are purchased by the Licensee) of phase I development of the deposit with an

74

annual production capacity of the refining mill of 300,000 tons.

4) Expert opinions with respect to the following aspects of the project:

- Environmental safety;

- Technical safety;

- Subsoil protection and use.

**3.4.** By 1 January 2014 submit to the Licensor designs of a new mill plant, tailings pond and infrastructure facilities of phase II of the development of the deposit with the annual production capacity of the refining mill of 1 million ton.

**3.5.** All deposit development works shall be performed in accordance with the "Technical plan for the production complex with combined mining of the Kutessay II deposit", the "Technical plan for reconstruction of the existing refining mill", the "Technical plan for the construction of tailing pond No 5", and the "Designs of infrastructure facilities".

 […]

**6. License Agreement validity period:** _Until 31 December 2014_ [374]

annual production capacity of the refining mill of 300,000 tons.

4)      Expert opinions with respect to the following aspects of the project:

- Environmental safety;

- Technical safety;

- Subsoil protection and use.

**3.4.** By 1 January 2014 submit to the Licensor designs of a new mill plant, tailings pond and infrastructure facilities of phase II of the development of the deposit with the annual production capacity of the refining mill of 1 million ton.

**3.5.** All deposit development works shall be performed in accordance with the "Technical project for the production complex with combined mining of the Kutessay II deposit", the "Technical project for reconstruction of the existing refining mill", the "Technical project for the construction of tailing pond No 5", and the "Designs of infrastructure facilities".

[…]

**6.      License Agreement validity period:** _Until 31 December 2014_[375]

269.      The Agreement required Stans KG to reach a preliminary agreement for the transfer of shares in Kutisay Mining to the State Property Management Fund by 31 July 2012.[376]

---

[374]   Translation as provided by the Claimants in License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (with English translation), 15 June 2012 (**Exhibit C-10**).

[375]   Translation as provided by the Respondent in Licence Agreement No. 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-10), 15 June 2012 (**Exhibit R-449**).

[376]   See License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (with English translation), 15 June 2012, at clauses 2.1. and 2.2. (**Exhibit C-10**); Licence Agreement No. 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-10), 15 June 2012, at clauses 2.1. and 2.2. (**Exhibit R-449**).

270.     Kutisay Mining LLC had to perform infrastructural works within set timeframes in accordance with Clause 3.1 of the Agreement.[377]

271.     Kutisay Mining LLC had to submit a series of documents by 31 March 2013;[378] and others by 1 January 2014.[379] The Parties disagree on the meaning and translation of such documents.

272.     The Respondent alleges that the Kutisay II License Agreement No. 3 required a technical plan in accordance with the Subsoil Law.[380] According to the Respondent:

> [t]he original TP [Technical Plan] was split into four parts: (i) a TP for the mine with a capacity of 300,000 tpa; (ii) a TP for the mine with 1 million tpa capacity; (iii) a TP to refurbish the existing plant, tailing facility and related infrastructure, which were to be submitted to SAGMR by 31 March 2013; and (iv) a TP to build a new processing plant, tailing facility and related infrastructure, which was to be submitted by 1 January 2014.[381]

273.     The Respondent further points out that the "feasibility study" (Clause 3.3(1)) was meant to be a technical and economic assessment as defined by Article 3 of the Subsoil Law.[382]

274.     The Respondent asserts that the Claimants failed to comply with the conditions set forth in the Kutessay II License Agreement No. 3, including by failing to provide the technical plan, the expert reports and the technical and economic assessment ("**TEA**") by the deadline.[383] Accordingly, the License was due to automatically terminate, and Kutisay Mining LLC had no right to any further license agreement or extension thereof. This leads the Respondent to conclude

---

[377]   See License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (with English translation), 15 June 2012, at clause 3.1. (**Exhibit C-10**); Licence Agreement No. 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-10), 15 June 2012 (**Exhibit R-449**).

[378]   License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II, 15 June 2012, at clause 3.3. (**Exhibit C-10**) *cf.* Licence Agreement No. 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-10), 15 June 2012, at clause 3.3. (**Exhibit R-449**).

[379]   License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II, 15 June 2012, at clause 3.4. (**Exhibit C-10**); Licence Agreement No. 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II (including comparison to Claimants' translation of C-10), 15 June 2012, at clause 3.4. (**Exhibit R-449**).

[380]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 286.1; 319.1.

[381]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 319.1, referring to License Agreement No 3 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining LLC for Kutessay II, 15 June 2012 (**Exhibit C-10**) [footnotes omitted]

[382]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 286.1, footnote 264, 320.1. According to the Respondent, while the Claimants translate it as "feasibility study", the correct translation is "technical and economic assessment".

[383]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 321-322; Rejoinder on the Merits and Reply on Jurisdiction, at paras 196, 204.

that the Claimants do not have any rights of value and the Kutessay II License was worthless.[384] On the other hand, the Claimants argue that any failure to perform their obligations under License Agreement No. 3 would be the result of the Respondent's expropriatory and arbitrary measures against the Claimants.[385] According to the Claimants, "[i]f the Kyrgyz Republic had not engaged in any wrongful conduct then it must be assumed that the Claimants would have completed their obligations under License Agreement No 3[.]"[386]

275.     On 20 June 2012, Kutisay Mining LLC sent the SAGMR a draft License Agreement No. 3 with regard to Kalesay.[387] That License Agreement was however never concluded. The Respondent contends that, since no further license was granted, the Kalesay License automatically terminated as at 1 January 2012 pursuant to Article 18(3) of the Subsoil Law and, with no further right to an extension, the Kalesay License was lost and worthless.[388]

## D.   THE RESPONDENT'S MEASURES IN RESPECT OF THE LICENSES

276.     Beginning in March 2012, the Respondent adopted various measures in respect of the Licenses whose impact on the Claimants' investments is disputed between the Parties.

### 1.   26 June 2012 Resolution

277.     On 19 March 2012, three months prior to the conclusion of the Kutisay II License Agreement No. 3, Stans Energy's then President and CEO, Mr. Robert Mackay, received an unsolicited e-mail entitled "Kyrghyzstan Kutesay II Mining Cooperation" [sic] from Mr. Liu Jiangang, the President and CEO of a Chinese REEs company, Baotou Hongbo Technology LLC ("**Baotou**").[389] In this e-mail, Mr. Jiangang expressed Baotou's interest to cooperate with Stans Energy in developing Kutessay II, noting that Baotou owned CAMG, the previous holder of the Kutessay II and Kalesay Licenses.[390]

---

[384]     Rejoinder on the Merits and Reply on Jurisdiction, at paras 208-209.
[385]     Claimants' Post-Hearing Brief, at para. 51.
[386]     Claimants' Post-Hearing Brief, at para. 48.
[387]     See Statement of Claim, at para. 130, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), resubmitting the 29 March 2012 request to conclude Kalesay License Agreement No 3, 20 June 2012 (**Exhibit C-114**).
[388]     Rejoinder on the Merits and Reply on Jurisdiction, at paras 212-217.
[389]     Statement of Claim, at para. 104, referring to Email from Baotou (Mr. Liu) to Stans Energy Corp (Mr. Mackay), 19 March 2012 (**Exhibit C-105**).
[390]     Statement of Claim, at para. 104, referring to Email from Baotou (Mr. Liu) to Stans Energy Corp (Mr. Mackay), 19 March 2012 (**Exhibit C-105**).

278.    Mr. Jiangang continued that "[a]t present, we have attend versteigern about licence (maybe only your company and mine). If we can have cooperation before this versteigern, it can reduce cost and get benefit for us."[391] [sic] In this regard, the Claimants observe that, because "versteigern" is a German term referring to auction, Mr. Jiangang appeared to suggest that an auction for Kutessay II License was expected to be held despite the fact that Kutisay Mining LLC held the same License valid until 2029.[392] The Respondent, however, points out that Mr. Jiangang did not refer to any specific mine.[393]

279.    In May 2012, Stans Energy's Kyrgyz management and local representatives of Baotou had an introductory meeting in Kyrgyzstan.[394] A further meeting between the top level management was arranged.[395] In e-mail exchanges arranging the meeting, Mr. Jiangang stated that Baotou "have contacted with [KCMP (the previous owner of KRP)] many times and reached a cooperative frame agreement".[396] The Claimants allege that this statement was incorrect, noting that Stans Energy had owned KRP since 2011.[397] The Respondent, however, points out that the e-mail is unclear and that Baotou could have entered into such an agreement with KCMP prior to Stans Energy's acquisition of KRP.[398]

280.    On or about 18 June 2012, Mr. Aryev and Mr. Mackay of Stans Energy met with Mr. Jiangang and other representatives of Baotou in Bishkek.[399] According to the Claimants, Baotou offered US$ 6 million to purchase 60% of stake in the Kutessay project.[400] The Claimants allege that this offer was unworthy of consideration, claiming that the market capitalization of Stans Energy exceeded US$ 100 million even without a control premium.[401]

---

[391]    Statement of Claim, at para. 104, referring to Email from Baotou (Mr. Liu) to Stans Energy Corp (Mr. Mackay), 19 March 2012 (**Exhibit C-105**).
[392]    Statement of Claim, at paras 104-105.
[393]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 422.1.
[394]    Statement of Claim, at para. 106.
[395]    Statement of Claim, at para. 106, referring to Email exchange between Stans Energy Corp (Mr. Mackay) and Baotou (Mr. Liu) between 2 and 25 May 2012 (**Exhibit C-112**).
[396]    Statement of Claim, at para. 106, referring to Email exchange between Stans Energy Corp (Mr. Mackay) and Baotou (Mr. Liu) between 2 and 25 May 2012 (**Exhibit C-112**).
[397]    Statement of Claim, at para. 106.
[398]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 422.2.
[399]    Statement of Claim, at para. 107.
[400]    Statement of Claim, at para. 107.
[401]    Statement of Claim, at para. 107, referring to Bloomberg, "Market capital for Stans Energy Corp – Daily", 27 January 2016 (**Exhibit C-40**).

281.     On 21 June 2012, six days after the conclusion of Kutessay II License Agreement No. 3, Deputy Badykeyeva raised the issue of whether Kutessay II Agreement No. 3 had been concluded legally at a session of the Jogorku Kenesh (Parliament).[402]

282.     On 26 June 2012, a Parliamentary Committee for the Development of Industries of the Economy issued a resolution ordering the SAGMR (1) to cancel the Kutessay II License Agreement No. 3; (2) to announce a tender for Kutessay II in accordance with the Subsoil Law; and (3) to inform the Committee of the results by 10 September 2012 ("**26 June 2012 Resolution**").[403] The Resolution explained that the SAGMR had concluded the Kutessay II License Agreement No. 3 in breach of Article 18 of the Subsoil Law and that Kutisay Mining LLC had failed to comply with the terms and conditions under the Kutessay II License Agreements No. 1 and 2.[404]

283.     On the same day, Stans Energy received an e-mail from Mr. Liangang requesting that it cooperate with Baotou in developing Kutessay II.[405] In this e-mail, Mr. Liangang further noted that "[sic] [o]ur company have get Chinese government support, if you are not cooperate with us for next step, we will search National large listed enterprises to cooperate to develop this project."[406]

284.     On 24 July 2012, Kutisay Mining LLC filed a Statement of Claim in the Inter-District Court of Bishkek requesting the Court to declare invalid the 26 June 2012 Resolution.[407]

---

[402]   Statement of Claim, at para. 108, referring to Resolution of the Committee of the Kyrgyz Republic Jogorku Kenesh for Development of Industries of the Economy "On the Protocol Instruction of the Kyrgyz Republic Jogorku Kenesh II No 242-V dated 21 June 2012", 26 June 2012 (**Exhibit C-18**).

[403]   Statement of Claim, at para. 109, referring to Resolution of the Committee of the Kyrgyz Republic Jogorku Kenesh for Development of Industries of the Economy "On the Protocol Instruction of the Kyrgyz Republic Jogorku Kenesh II No 242-V dated 21 June 2012", 26 June 2012 (**Exhibit C-18**).

[404]   See Resolution of the Committee of the Kyrgyz Republic Jogorku Kenesh for Development of Industries of the Economy "On the Protocol Instruction of the Kyrgyz Republic Jogorku Kenesh II No 242-V dated 21 June 2012", 26 June 2012 (**Exhibit C-18**).

[405]   Statement of Claim, at para. 112, referring to Email from Baotou (Mr. Liu) to Stans Energy Corp (Mr. Mackay), 26 June 2012 (**Exhibit C-116**).

[406]   Statement of Claim, at para. 112, referring to Email from Baotou (Mr. Liu) to Stans Energy Corp (Mr. Mackay), 26 June 2012 (**Exhibit C-116**).

[407]   Statement of Claim, at para. 113, referring to Statement of Claim by Kutisay Mining LLC for a declaration of invalidity of the Resolution of the Committee of the Kyrgyz Republic Jogorku Kenesh for Development of Industries of the Economy dated 26 June 2012 "On the Protocol Instruction of the Kyrgyz Republic Jogorku Kenesh II No 242-V dated 21 June 2012", 24 July 2012 (**Exhibit C-20**).

285.    By press release of 30 July 2012, Stans Energy announced that it had initiated legal action.[408] According to the exhibits submitted by the Claimants, the market reacted to this release and Stans Energy's market capitalization dropped from US$ 76.8 million (30 July) to 65.9 million (31 July).[409]

286.    The Claimants contend that Baotou appeared to have affiliates within the Kyrgyz government that backed up Baotou's take-over of the Kutessay II project.[410] In this regard, the Claimants submit that there was a personal relationship between Deputy Badykeeva and Baotou: Ms. Badykeeva's family had owned or controlled a significant share in CAMG, in which Baotou had purchased a stake in 2008.[411] The Respondent denies such a potential conspiracy, alleging that Baotou was a private foreign party unrelated to the Kyrgyz government and that Baotou's approach to Stans Energy was nothing more than an offer of cooperation or joint-venture.[412] The Respondent also adds that the SAGMR, a governmental authority, supported Kutisay Mining LLC in the court proceedings in which Baotou sought invalidation of Stans Energy's Licenses.[413]

287.    The Respondent contends that the 26 June 2012 Resolution was not implemented and is irrelevant to the ultimate termination of the Licenses.[414] In support of this contention, the Respondent argues that the Resolution was not binding, the SAGMR actually did not follow it, and the Resolution was ultimately invalidated by Kyrgyz courts.[415] In response, the Claimants contend that these facts do not undermine the importance of the Resolution, alleging that it significantly impacted on Stans Energy's market capitalization.[416]

---

[408]  Statement of Claim, at para. 113, referring to Stans Energy Corp, Press release "Stans Energy Disputes Jogorku Kenesh Committee Decision", 30 July 2012 (**Exhibit C-120**).
[409]  Statement of Claim, at para. 113, referring to Bloomberg, "Market capital for Stans Energy Corp – Daily", 27 January 2016 (**Exhibit C-40**).
[410]  Statement of Claim, at para. 111; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 95.
[411]  Statement of Claim, at para. 111.
[412]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 417-418, 420-422.
[413]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 423-426. The Claimants, in response, claim that the fact that the SAGMR supported Kutisay Mining LLC in the court proceedings does not clear the possibility of other agencies' involvements. See Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 96. See also, Respondent's Post-Hearing Brief, at para. 155.
[414]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 410, 419.
[415]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 410.
[416]  Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 91-94.

PCA 278376

## 2.   Thirty-days' Work Suspension Order of the Kutessay II License Agreement No. 3

288.     As described above, the Kutessay II License Agreement No. 3 required Stans KG to enter into a preliminary and main agreements with the Kyrgyz Republic regarding the transfer of shares in Kutisay Mining LLC to the State Property Management Fund.[417]

289.     In this regard, on 16 July 2012, two weeks before the deadline set out in Clause 2.1 of Kutessay II License Agreement No. 3, Stans Energy sent the SAGMR a draft preliminary agreement.[418] The Claimants assert that they obtained no response, so Stans Energy wrote follow-up letters to SAGMR on 27 July 2012, and to the State Property Management Fund on 31 July 2012, without receiving any response either.[419] The Respondent, on the other hand, avers that the SAGMR was not the appropriate counterparty to receive such letters as "SAGMR did not have the authority to enter into any such agreement – only the State Property Management Fund did".[420] The Respondent notes that the Claimants submitted their draft to the State Property Management Fund only on 31 July 2012, the deadline date, in order to leave the Fund with insufficient time to review and approve it, especially because its general practice was to provide an answer within 30 calendar days of any request.[421]

290.     On 29 August 2012, Stans Energy wrote to the State Property Management Fund attaching a sealed and stamped version of the preliminary agreement, and noting that there was little time remaining until 30 September, the deadline for the main agreement on the share transfer to the Fund.[422]

291.     On 30 August 2012, the Subsoil Use Licensing Commission of the SAGMR decided on a suspension and subsequent stop-work order concerning the Kutessay II License Agreement No. 3 for thirty days until 30 September 2012.[423] According to the Commission's minutes, these

---

[417]   See Statement of Claim, at para. 102.

[418]   Statement of Claim, at para. 115, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), attaching a draft preliminary agreement on the terms and conditions of State participation in the charter capital of Kutisay Mining LLC, 16 July 2012 (**Exhibit C-118**).

[419]   Statement of Claim, at para. 115, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Tashbayev), 27 July 2012 (**Exhibit C-119**); and Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Property Management Fund (Mr. Primov), 31 July 2012 (**Exhibit C-121**).

[420]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 331.

[421]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 331, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Property Management Fund (Mr. Primov), 31 July 2012 (**Exhibit C-121**).

[422]   Statement of Claim, at para. 116, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Property Management Fund (Mr. Osmonaliyev), 29 August 2012 (**Exhibit C-122**).

[423]   Statement of Claim, at para 117. See also, Extract from Minutes No 77-N-12 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 6 September 2012, 30 August 2012 (**Exhibit C-13**).

measures were taken due to the failure of Stans KG (the founder of the licensee) to reach a preliminary agreement on the free transfer of shares in Kutisay Mining LLC to the State Property Management Fund by 31 July 2012. [424]

292.    On 10 September 2012, Kutisay Mining LLC filed a Statement of Claim against the SAGMR (the defendant) and the State Property Management Fund (a third party) before the Bishkek Inter-District Court, requesting a declaration that the Commission's meeting minutes of 30 August 2012 were invalid to the extent that the Commission suspended Kutessay II License Agreement No. 3.[425]

293.    On 12 September 2012, Kutisay Mining LLC sent a letter to First Deputy Prime Minister D. K. Otorbayev requesting to resolve this matter.[426]

294.    On 24 September 2012, Stans KG wrote the State Property Management Fund, emphasizing that the Fund had not responded to Stans KG's proposal for the preliminary agreement, and proposing to have negotiations in this regard.[427]

295.    On 28 September 2012, the SAGMR replied to Stans KG's letter of 24 September 2012, noting that the Fund had not received any letter from Stans KG but Kutisay Mining LLC before 24 September 2012, and informing that the Fund suspended its consideration of entering into the preliminary agreement until the Bishkek Inter-District Court delivered its decision regarding the validity of the suspension order.[428]

296.    After the suspension order expired on 30 September 2012, Stans Energy resumed its work on the Kutessay II project and announced that it had produced dysprosium, terbium and gadolinium metals at the KRP.[429]

---

[424] See Extract from Minutes No 77-N-12 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 6 September 2012, 30 August 2012 (**Exhibit C-13**).

[425] Statement of Claim, at para. 118, referring to Statement of Claim by Kutisay Mining LLC for a declaration that Minutes of the meeting of the Subsoil Use Licensing Commission of the State Agency of Geology and Mineral Resources No 77-N-12 dated 30 August 2012 are invalid, 10 September 2012 (**Exhibit C-21**).

[426] Statement of Claim, at para. 118, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the First Deputy Prime Minister of the Kyrgyz Republic (Mr. Otorbayev), 12 September 2012 (**Exhibit C-125**).

[427] See Letter from Stans Energy KG LLC (Mr. Savchenko) to the State Property Management Fund (Mr. Osmonaliyev), 24 September 2012 (**Exhibit C-126**).

[428] Statement of Claim, at para. 118, referring to Letter from the State Property Management Fund (Mr. Osmonaliyev) to Stans Energy KG, 28 September 2012 (**Exhibit C-127**).

[429] Statement of Claim, at para. 121, referring to Stans Energy Corp, Press release "Stans Energy Produces Dysprosium, Terbium and Gadolinium Metals", 4 October 2012 (**Exhibit C-128**).

297.     On 8 October 2012, the Inter-District Court of Bishkek ruled in favour of Kutisay Mining LLC, invalidating the Parliamentary Committee's Resolution of 26 June 2012.[430] The Court reasoned that the power to allocate subsoil rights was vested to the Government, instead of the Parliament.[431]

298.     On 16 October 2012, the Inter-District Court of Bishkek ruled in Kutisay Mining LLC's favour, invalidating the work suspension order.[432] According to the Court, Kutisay Mining "took all of the steps within its power in order to conclude the preliminary agreement with the Fund."[433]

299.     On 16 October 2012, the State Property Management Fund wrote a letter to the SAGMR.[434] In this letter, the Fund advised the SAGMR that it would not decide to conclude the preliminary and main agreements before obtaining opinions from other governmental entities.[435]

300.     According to the Respondent, the Minister of Economy and Antimonopoly Police (the "**Minister of Economy Order**") established an interdepartmental committee to investigate the issuance of Kutessay License Agreement No. 3 by order dated 20 December 2012.[436] Pursuant to this order, in January 2013, the General Prosecutor's Office ("**GPO**") carried out an inspection regarding the extensions of Kutessay II License Agreements, which led to the conviction of the SAGMR's Director and the other members of the Commission who granted the Agreements.[437] The Respondent contends that it was during this inspection that it emerged that the Licenses had been granted through direct negotiations, allegedly on the basis of Resolution 725, and in breach

---

[430]   Statement of Claim, at para. 122, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-1286/12mbs3*, 8 October 2012 (**Exhibit C-22**).

[431]   Statement of Claim, at para. 122, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-1286/12mbs3*, 8 October 2012 (**Exhibit C-22**).

[432]   Statement of Claim, at para. 123, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-1529/12mbs7*, 16 October 2012 (**Exhibit C-23**).

[433]   Statement of Claim, at para. 123, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-1529/12mbs7*, 16 October 2012 (**Exhibit C-23**).

[434]   Statement of Claim, at para. 119, referring to Letter from the State Property Management Fund (Mr. Osmonaliyev) to the Director of the State Agency of Geology and Mineral Resources (Mr. Chunuyev), 16 October 2012 (**Exhibit C-129**).

[435]   Statement of Claim, at para. 119, referring to Letter from the State Property Management Fund (Mr. Osmonaliyev) to the Director of the State Agency of Geology and Mineral Resources (Mr. Chunuyev), 16 October 2012 (**Exhibit C-129**).

[436]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 385, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to Deputy Minister of Economy and Antimonopoly Policy (Mr. Kasymaliyev) dated 18 February 2013 (**Exhibit C-135**).

[437]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 386, referring to Statement of Claim by the Prosecutor General's Office for a declaration of invalidity of Minutes No 1736-N-09 of direct negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC dated 21 December 2009, 4 April 2013 (**Exhibit C-24**).

of the requirement set forth by Article 16 of the Subsoil Law that they be granted through a tender.[438]

301.     On 14 January 2013, Kutisay Mining LLC sent to the SAGMR an environmental report titled "the Environmental Safety section of 'Open Pit – Existing Mill' Haul Road Repair Project for Kutessay II" concerning its intended repairs for the road to the pit from the old Aktyuz mill.[439]

302.     On 30 January 2013, Kutisay Mining LLC sent a letter to the SAGMR enclosing an Information Report describing its work in 2012.[440] In the same letter, Kutisay Mining LLC also enclosed its 2013 Work Program, which required approval by the SAGMR.[441]

303.     The Claimants contend that, not having received a response to these letters, concerns about their ability to still fulfil the deadlines set forth in License Agreement No. 3 led Kutisay Mining LLC to request, on 12 February 2013, that the SAGMR consider an addendum to Kutessay II License Agreement No. 3 extending the deadlines for certain tasks.[442] In this letter, Kutisay Mining LLC argued that, due to the one-month suspension order:

> we and our contractors were forced to stop all preparatory and design works on Kutessay II
> […] we were forced to abandon a project that provided for the use of an old mill plant and
> tailings pond in Aktyuz, because […] long-lasting legal proceedings between previous
> owners have led to the loss of the opportunity to purchase the mill plant.[443]

304.     On 19 February 2013, the SAGMR refused to approve the 2013 Work Program, reasoning that Kutisay Mining LLC had not provided an expert-approved design documents required under the Subsoil Law.[444] On 28 February 2013, Kutisay Mining LLC requested the approval of the 2013 Work Program, informing that it would provide the expert opinions by

---

[438]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 387.
[439]    Statement of Claim, at para. 126, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev) dated 14 January 2013 (**Exhibit C-131**).
[440]    Statement of Claim, at para. 126, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev) dated 30 January 2013 (**Exhibit C-133**).
[441]    Statement of Claim, at para. 126, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev) dated 30 January 2013 (**Exhibit C-133**).
[442]    Statement of Claim, at para. 127, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev), attaching draft license attachment No 1 to license No 2488 ME dated 12 February 2013 (**Exhibit C-134**).
[443]    Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev), attaching draft license attachment No 1 to license No 2488 ME dated 12 February 2013 (**Exhibit C-134**).
[444]    Statement of Claim, at para. 128, referring to Letter from the State Agency of Geology and Mineral Resources (Mr. Osmonbetov) to Kutisay Mining LLC (Mr. Savchenko), 19 February 2013 (**Exhibit C-136**).

September 2013.[445] On 11 March 2013, SAGMR declined to approve the Program, noting that the expert opinions should have been submitted by 31 March 2013, instead of September 2013.[446]

305.     On 12 March 2013, the SAGMR informed Kutisay Mining LLC that it had suspended the consideration of the environmental assessment report submitted on 14 January 2013 until the GPO completed its investigation concerning the validity of Resolution No 725.[447]

306.     On 28 March 2013, Stans Energy sent the Kyrgyz Republic a Notice of Initiating Proceedings pursuant to Article 18 of the 2003 Kyrgyz Investment Law concerning alleged breaches of its rights regarding Kutessay II and Kalesay.[448] Stans Energy requested that the SAGMR consider and decide within one month on its request for approval of a Kutessay II license addendum and that Kyrgyz authorities comply with Kyrgyz law.[449] In the absence of progress in that regard, Stans claimed that, pursuant to Article 18 of the Investment Law, after three months it was entitled to submit the dispute to international arbitration.[450]

307.     The Respondent alleges that Kutisay Mining LLC failed to comply with the requirements of the Kutessay II License Agreement No. 3.[451] The Respondent points out that Kutisay Mining LLC submitted none of the required documents under the Agreement.[452] According to the Respondent, the Claimants' assertion that the SAGMR refused to engage with the Claimants was pointless.[453] The SAGMR could not consider the 2013 work program because Kutisay Mining LLC had failed to submit a technical plan and expert reports.[454] The Respondent

---

[445]   Statement of Claim, at para. 128, referring to Letter from Kutisay Mining LLC (Mr. Savchenko) to the State Agency of Geology and Mineral Resources (Mr. Chunuyev), 28 February 2013 (**Exhibit C-137**).

[446]   Statement of Claim, at para. 128, referring to Letter from the State Agency of Geology and Mineral Resources (Mr. Chunuyev ) to Kutisay Mining LLC (Mr. Savchenko), 11 March 2013 (**Exhibit C-138**).

[447]   Statement of Claim, at para. 128, referring to Letter from the State Agency of Geology and Mineral Resources (Mr. Chunuyev) to Kutisay Mining LLC (Mr. Savchenko), 12 March 2013 (**Exhibit C-139**).

[448]   Statement of Claim, at paras 131-134, referring to Notice of Initiating Proceedings in accordance with Article 18 of Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic and Article 46 of Law No 135 of 30 July 2002 on Arbitral Tribunals in the Kyrgyz Republic, 28 March 2013 (**Exhibit C-142**).

[449]   Statement of Claim, at para. 133.

[450]   Statement of Claim, at para. 134, referring to Notice of Initiating Proceedings in accordance with Article 18 of Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic and Article 46 of Law No 135 of 30 July 2002 on Arbitral Tribunals in the Kyrgyz Republic, 28 March 2013 (**Exhibit C-142**).

[451]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 321-322. The Respondent further argues that the Claimants also failed to comply with another license agreement in relation to the Ak-tuz field. The Claimants, however, affirm that the alleged facts regarding the Ak-tuz filed are irrelevant to the present case. See, Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 350-351; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 86-87.

[452]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 321.

[453]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 322; Rejoinder on the Merits and Reply on Jurisdiction, at paras 505-519; Respondent's Post-Hearing Brief, at para. 156, referring to Hearing Transcript, Day 2, p. 389:1-17.

[454]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 323-326.

argues that "[T]he Environmental Safety section of 'Open Pit – Existing Mill' Haul Road Repair Project for Kutessay II" submitted on 14 January 2013 was not an expert report but a part of technical plan.[455] The Respondent notes that the Claimants blame the 30-day suspension imposed on 30 August 2012 for their delays in complying with Kutessay II License Agreement No. 3.[456] Nevertheless, the Respondent points out that such suspension only affected the Claimants' work for one month, that Claimants have failed to specify which works they were unable to complete due to the suspension and further contends that the suspension "did not and could not have a material or any impact on the project deliverables that Kutisay was required to achieve under the terms of Kutessay LA 3".[457] Thus, the SAGMR did not agree to extend the deadlines of the Kutessay II License Agreement No. 3 because it considered that Kutisay Mining LLC had not shown justifiable reasons for its delay.[458]

308.      The Claimants, in response, argue that Kutisay Mining LLC's failure to comply with the requirements was due to the SAGMR's disengagement with the Claimants.[459] The Claimants assert that"[t]he Environmental Safety section of 'Open Pit – Existing Mill' Haul Road Repair Project for Kutessay II" submitted on 14 January 2013 was an independent expert report, and that in any event this report was unrelated to the deliverables under Kutessay II License Agreement No. 3.[460] The Claimants further allege that the SAGMR refused to agree on the extension of the deadlines under the Agreement despite the fact that the Kyrgyz government had created the obstacles for the Claimants' work.[461] Moreover, the Claimants argue that the Respondent's mining expert, Mr. Shilov, "firmly rejected the contention that the Claimants' interactions with SAGMR had been unnecessary[.]"[462] Rather, his view was that such exchanges were necessary as the Subsoil Law only provided general concepts.[463] According to the Claimants, Mr. Shilov's opinion was that "the Claimants had acted precisely as he advises his own clients to do in circumstances where 'something [is] forced upon [them]' by SAGMR."[464]

---

[455]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 327.
[456]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 329.
[457]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 330.
[458]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 336-341.
[459]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 101-110; Claimants' Post-Hearing Brief, at para. 56.
[460]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 106-108.
[461]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 109-110; Claimants' Post-Hearing Brief, at paras 43, 47-48.
[462]   Claimants' Post-Hearing Brief, at para. 39, referring to Hearing Transcript, Day 3, pp 599:24-600:9.
[463]   Claimants' Post-Hearing Brief, at para. 39, referring to Hearing Transcript, Day 3, p. 594:20-21.
[464]   Claimants' Post-Hearing Brief, at para. 39, referring to Hearing Transcript, Day 3, p. 591:5-18.

E.    ASIARUD REPORTS AND STANS ENERGY'S DISCLOSURE

309.    On 21 December 2012, approximately three months after the expiration of the suspension order, AsiaRud, which Kutisay Mining had commissioned to complete a technical and economic assessment required under Clause 3.3(1) of the Kutessay II Licence Agreement No. 3, sent a letter to Kutisay Mining LLC.[465] In this letter, AsiaRud concluded that it "considers that there is no point at present time to work on the [TEA] of conditions and of the project of the underground mine",[466] describing that "the current price of REE (as at November 2012) and the calculated amount of REE in the concentrate is significantly lower than the critical amount which points out that the development of REE deposit Kutessay II at the current price is already loss-making and the reserves are off-balance".[467]

310.    On 10 January 2013, Kutisay Mining LLC instructed AsiaRud to employ the price of US$ 128.75/kg for the feasibility calculations in its TEA.[468]

311.    By letter of 4 April 2013, AsiaRud informed Kutisay Mining LLC that it had concluded that "due to no-provision of the information, required for the development of the Feasibility conditions […] and receipt of negative economic effectiveness arrival, based on preliminary calculations, at a negative economic efficiency […] for the work on the conditions for Feasibility should be deemed to be pointless".[469]

312.    In its letter dated 24 April 2013, Kutisay Mining LLC notified that it had accepted the then-current concentrate price of US$ 18.45/kg for the feasibility calculation.[470] In the same letter, Kutisay Mining LLC asked AsiaRud to indicate the concentrate price at which the project would be profitable with an IRR of 12%.[471]

---

[465]    Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 354-356, referring to Letter from Asiarud to Kutisay dated 21 December 2012 (**Exhibit R-46**).

[466]    Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 356, referring to Letter from Asiarud to Kutisay dated 21 December 2012 (**Exhibit R-46**).

[467]    See Letter from Asiarud to Kutisay dated 21 December 2012 (**Exhibit R-46**).

[468]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 358, referring to Letter from Kutisay to AsiaRud dated 10 January 2013 (**Exhibit R-140**).

[469]    Letter from AsiaRud to Kutisay dated 4 April 2013 (**Exhibit R-143**). See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 359.

[470]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 360, referring to Letter from Kutisay to AsiaRud dated 24 April 2013 (**Exhibit R-145**).

[471]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 360, referring to Letter from Kutisay to AsiaRud dated 24 April 2013 (**Exhibit R-145**).

313.      In July 2013, AsiaRud issued a report ("**AsiaRud 2013 Report**").[472] In this Report, AsiaRud described that "[a]t present time, the REE concentrate price at the processing plant and in the market of rare earth does not allow to implement profitable development of Kutessay II. Because of this, at [Kutisay's] instructions all project solutions were developed for the version with the assumed price for REE concentrate of 74$/kg which provides for the floor of profitability of the project at 12% IRR."[473] AsiaRud also mentioned in the Report that "[t]he calculated reserves in this report are referred to as 'balance' [reserves] conditionally because they are not in line with the real economics of the project due to a lower price for them at present time".[474]

314.      In this regard, the Respondent alleges that Stans Energy failed to disclose the AsiaRud 2013 Report in breach of Toronto Stock Exchange ("**TSX**") Rules ("**TSX Rules**").[475] According to the Respondent, this Report constituted "Material Information" which should be timely disclosed pursuant to the TSX Rules.[476] The Respondent continues that Stans Energy also failed to timely-disclose other "Material Information".[477]

315.      The Claimants, in response, allege that Stans Energy complied with the TSX Rules.[478] The Claimants emphasize that Stans Energy's decisions to disclose or not to disclose information were fully in compliance with Ontario Securities Act and the National Instrument 43-101 on Standards of Disclosure for Mineral Projects ("**NI 43-101**"), under which the AsiaRud Reports were not required to be disclosed as a report prepared by a "qualified person".[479] The Claimants also contend that their decisions on disclosure were made in accordance with expert legal advice,

---

[472]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 16, 361.
[473]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 361, referring to AsiaRud 2013 Report (**Exhibit R-45**).
[474]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 361, referring to AsiaRud 2013 Report (**Exhibit R-45**).
[475]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 363-373. See also, Respondent's Post-Hearing Brief, at para. 166.
[476]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 363-367.
[477]   Respondent lists: breaches of the License Agreements, the AsiaRud 2011 Report, the boundary change of Chon Kemin National Park, the 26 June 2012 Resolution, the Kyrgyz court decision voiding the cancelation of CAMG's licenses, and Kyrgyz court decisions concerning SAGMR's minutes terminating Kutisay Mining LLC's Licenses. See, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 374.
[478]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 118-119.
[479]   Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 120-123, referring to, inter alia, National Instrument 43-101: Standards of Disclosure for Mineral Projects (24 June 2011) (2011) 34 OSCB 7043, at Section 2.1. (**Authority CLA-304**). See also, Claimants' Post-Hearing Brief, at para. 81, referring to, *inter alia*, Letter from Ontario Securities Commission to Stans Energy Corp (Mr Irwin), 21 January 2014 (**Exhibit C-247**); Letter from Stans Energy Corp (Mr Irwin) to Ontario Securities Commission, 24 January 2014 (**Exhibit C-248**); Letter from Ontario Securities Commission to Stans Energy Corp (Mr Irwin), 27 January 2014 (**Exhibit C-249**).

and that in any event most of the information listed by the Respondent was in the public domain accessible to the market.[480]

**F.    JUDICIAL PROCEEDINGS REGARDING THE VALIDITY OF THE GRANTING OF THE LICENSES**

316.    After the measures described above, several judicial proceedings took place before the Respondent's national courts concerning the validity of the process through which the Licenses had been granted to the Claimants. These judicial proceedings, the relevance of which is disputed between the Parties, are described in the following paragraphs.

**1.    Proceedings Brought by the Prosecutor General Before the Inter-District Court of Bishkek Asking to Invalidate the 21 December Minutes (No 736-N-09)**

317.    After concluding that the issuance of the Licenses without tender had been illegal through its January 2013 inspection, on 4 April 2013, the GPO filed its Statement of Claim against the SAGMR (defendant) and Kutisay Mining OJSC (third party) before the Inter-District Court of Bishkek, requesting that the Court invalidate the 21 December 2009 Minutes (the "**GPO Claim**").[481] The GPO claimed that the 21 December 2009 Minutes should be declared invalid because, *inter alia,* (1) Resolution No 725 contradicted Article 16 of the Subsoil Law, and Article 32 of the Law on Normative Acts provides that in case of conflict between normative legal acts, entities shall be guided by the normative act with the highest rank in the hierarchy of norms; and (2) Resolution No 725 was not in force when the Licenses were granted to Kutisay because it had not yet been officially published.[482]

318.    On 9 April 2013, the Council of the Coalition of the Parliamentary Majority recommended that the Kyrgyz Republic cancel the Licenses and that the GPO "take measures to

---

[480]    Reply to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 124-125.

[481]    Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 389, referring to Statement of Claim by the Prosecutor General's Office for a declaration of invalidity of Minutes No 1736-N-09 of direct negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC dated 21 December 2009 (**Exhibit C-24**). See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 111.

[482]    Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 389, referring to Statement of Claim by the Prosecutor General's Office for a declaration of invalidity of Minutes No 1736-N-09 of direct negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC dated 21 December 2009 (**Exhibit C-24**).

prevent the disposal by Kutisay Mining LLC of the licenses for the development of the Kutessay II Deposit and the Kalesay Deposit."[483]

319.       On 15 April 2013, the Inter-District Court of Bishkek granted the GPO's request for an injunction prohibiting anyone, including Kutisay Mining LLC and the SAGMR, from taking any action with respect to the Licenses.[484]

320.       In response, Kutisay Mining, along with the Aktyuz town council appealed the Court's order of 15 April 2013.[485] On 29 May 2013, the Court declined the appeal arguing that revoking the interim measures may complicate the execution of the Court's decision on the merits.[486] The Claimants contend that, since then, they have not conducted any work at Kutessay II and Kalesay.[487]

321.       The Inter-District Court of Bishkek held the hearing on 13 February 2014.[488] On 19 March 2014, the Court rendered its decision sustaining the GPO's claim and invalidating the 21 December 2009 Minutes.[489]

322.       This decision was upheld by the Bishkek City Court on 30 July 2014[490] and by the Supreme Court of Kyrgyzstan on 24 March 2015.[491] Following a detailed exposition of relevant provisions of Kyrgyz law, the Supreme Court explained, *inter alia*:

---

[483]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 393, referring to Decision of the Council of the Coalition of the Parliamentary Majority Yrys Aldy in Jogorku Kenesh of the Kyrgyz Republic "On Specific Breaches of the Law of the Kyrgyz Republic when the State Agency of Geology and Mineral Resources of the Government of the Kyrgyz Republic Issued Licenses for the Development of the Kutessay II Deposit and the Kalesay Deposit" dated 9 April 2013, at p. 2. (**Exhibit C-19**).

[484]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 392, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-659/13mbs4* dated 15 April 2013 (**Exhibit C-25**). See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 111.

[485]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 397.

[486]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 397, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-659/13mbs4* dated 29 May 2013, at p. 2 (**Exhibit C-26**).

[487]   Statement of Claim, at para. 138.

[488]   Statement of Claim, at para. 145, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-149/14mbs4*, 22 January 2014, postponing the hearing to 13 February 2014 at 4pm (**Exhibit C-29**).

[489]   Statement of Claim, at para. 145, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-149/14mbs4*, 19 March 2014 (**Exhibit C-30**). See also, Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 401; and Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 113.

[490]   Statement of Claim, at para. 147, referring to Decision of the Appellate Instance of the Bishkek City Court, *Case No AB-311/14-AD*, 30 July 2014, at p. 9 (**Exhibit C-31**). See also, Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 402; and Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 113.

[491]   Statement of Claim, at para. 148, referring to Decision of the Kyrgyz Republic Supreme Court, *Case No AD-149/14mbs4*, 24 March 2015 (**Exhibit C-34**). See also, Statement of Defence on the Merits and Counter-Memorial on

[…] the judicial panel has reached a conclusion that the decisions of the trial court and the appellate court invalidating Minutes No 1736-N-09 of direct negotiations between the State Agency of Geology and Mineral Resources of the Government of the Kyrgyz Republic and Kutisay Mining OJSC dated 21 December 2009 were well founded.

[…]

The judicial panel agrees with court findings that the Kyrgyz Republic Government Resolution [No. 725] was not in force as of the date of license issue as it was officially published in Erkin-Too newspaper only on 25 December 2009. Pursuant to Article 30 of the Law of the Kyrgyz Republic "On Regulatory Legal Acts of the Kyrgyz Republic", the official publication of regulatory legal acts is a mandatory condition for acts to come into force. Pursuant to Part 3 Article 30 of the Law of the Kyrgyz Republic "On Regulatory Legal Acts of the Kyrgyz Republic", regulatory legal acts shall come into force 15 days after the official publication, unless otherwise provided by the relevant act itself. Kyrgyz Republic Government Resolution No 725 dated 1 December 2009 does not provide for specific effective date and, therefore, pursuant to the above-mentioned Law, the Resolution came into force on 9 January 2010, i.e. the license was issued 19 days before the effective date of Kyrgyz Republic Government Resolution No 725 dated 1 December 2009.

[…]

Based on above, the judicial panel of the supervisory instance is of opinion that courts reasonably reached a conclusion that the State Agency of Geology and Mineral Resources of the Government of the Kyrgyz Republic had violated the law in force in the Kyrgyz Republic by issuing licenses Nos. 2488ME and 2489ME for Kutessay and Kalesay, respectively, through direct negotiations, as indicated in the Minutes No. 1736-H-09 dated 21 December 2009 […][492]

323.    While the Claimants argue that the Respondent's courts considered "the SAGMR's acceptance of the claim dispositive as a matter of Kyrgyz civil procedure and effectively ignored Kutisay Mining's rights in a clear breach of due process";[493] the Respondent contends that its courts "did not merely dismiss the claims by treating SAGMR's acceptance of the claim as dispositive [but] considered the merits of the claims in detail".[494]

---

Jurisdiction, at para. 403; and Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 113.

[492]    Statement of Claim, at para. 148, referring to Decision of the Kyrgyz Republic Supreme Court, *Case No AD-149/14mbs4*, 24 March 2015 (**Exhibit C-34**). See also, Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 403; and Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 113.

[493]    Statement of Claim, at paras 146-148; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 115.

[494]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 400.

## 2.    Proceedings Brought by Baotou Before the Bishkek City Court Asking to Invalidate the SAGMR's 2009 Decisions

324.    In January 2013, Baotou purchased the remaining shares in, and became the sole owner of, CAMG.[495]

325.    Baotou then filed its claim against the SAGMR before the Inter-District Court of Bishkek, requesting the Court to invalidate SAGMR's 2009 decisions (1) to terminate CAMG's licenses to Kutessay II and Kalesay; and (2) to award these Licenses to Kutisay Mining OJSC.[496]

326.    On 11 June 2013, the Inter-District Court of Bishkek decided in favour of Baotou, invalidating the 2009 decisions, and ordering the SAGMR to reinstate Baotou's supposed rights.[497]

327.    On 29 August 2013, however, the Bishkek City Court overturned the Inter-District Court's decision, holding that (1) Baotou did not have standing because the license holder was CAMG instead of Baotou; (2) the claim was time-barred; and (3) CAMG had failed to comply with its license agreements.[498]

## G.    THE CLAIMANTS' ARBITRATION BEFORE THE MCCI

328.    On 30 October 2013, Stans Energy and Kutisay Mining LLC filed their Statement of Claim in an international arbitration before the Moscow Chamber of Commerce and Industry ("MCCI") against the Kyrgyz Republic ("MCCI Arbitration"), pursuant to the Moscow Convention.[499]

329.    The Respondent considers that the Claimants initiated international arbitration before the Moscow Chamber of Industry and Commerce because they acknowledged that the Kutessay

---

[495]  Statement of Claim, at para. 140, referring to the summary of facts in the Decision of the judicial panel for administrative and economic cases of the Bishkek City Court, *Case No AB-277/13-AD*, 29 August 2013 (**Exhibit C-28**).
[496]  Statement of Claim, at para. 140, referring to the summary of facts in the Decision of the judicial panel for administrative and economic cases of the Bishkek City Court, *Case No AB-277/13-AD*, 29 August 2013 (**Exhibit C-28**).
[497]  Statement of Claim, at para. 141, referring to Decision of the Inter-District Court of Bishkek, Case No AD 756/13mbs3, 11 June 2013 (**Exhibit C-27**).
[498]  Statement of Claim, at para. 142, referring to Decision of the judicial panel for administrative and economic cases of the Bishkek City Court, *Case No AB-277/13-AD*, 29 August 2013 (**Exhibit C-28**).
[499]  Statement of Claim, at para. 144, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 127.

II project would not be profitable.[500] In contrast, the Claimants assert that the Respondent's version of their motivations is "distorted and unsupported by the evidence […] makes no attempt to prove the irrelevant allegation that the Claimants were reckless and interested only in a quick exit".[501]

330.     In April 2014, the tribunal in the MCCI Arbitration issued an award ordering the Kyrgyz Republic to pay in excess of US$ 118 million.[502]

331.     The Respondent criticizes the Claimants' choice of MCCI Arbitration, asserting that such system "has long been heavily criticised: the practice of setting up arbitral institutions to serve the interests of Russian industrial groups (known as '*pocket arbitrations*') was endemic".[503] The Respondent points out that Ms. Kuranova, former CFO of Stans Energy, explains "that the valuation report filed in the MCCI Arbitration […] materially overstated prices for REEs and thus materially overstated the value of the Kutessay II project".[504] The Respondent also notes with concern that the daughter of one of the arbitrators in the MCCI Arbitration was a partner in the law firm of one of the Claimants' representatives.[505]

332.     The Claimants argue that the allegations put forward by Ms. Kuranova in an unrelated litigation were never established in a court of law (as the parties reached a confidential settlement), are an impermissible attempt to adduce facts through untested argument from an unrelated case and are, in any event, untrue.[506]

333.     On 25 May 2015, the Moscow Arbitrazh Court set aside the MCCI award, accepting the Kyrgyz Republic's argument that the tribunal in the MCCI Arbitration had no jurisdiction

---

[500]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 375-383.
[501]   Reply to the Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 10.
[502]   Statement of Claim, at para. 152.
[503]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 376, referring to Vasily Kuznetsov, *Russia*, Global Arbitration Review (2015, Law Business Research), at p. 4 (**Exhibit R-155**).
[504]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 381, referring to Statement of Claim in the case of *Anna Kuranova v. Stans Energy Corporation and Boris Aryev* (Superior Court of Justice, Ontario), 28 February 2014, at para. 34 (**Exhibit R-152**).
[505]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 383, referring to Printout from the Interlex branch 29 webpage containing Ms. Smirnova's and Mr. Zenkin's profiles (**Exhibit R-181**).
[506]   Reply to the Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 126, referring to Anna Kuranova's Statement of Claim in *Anna Kuranova v. Stans Energy Corporation and Boris Aryev* (**Exhibit R-152**); Statement of Defence by Stans Energy Corp in *Anna Kuranova v. Stans Energy Corp & Boris Aryev*, filed 27 August 2015 (**Exhibit C-255**); Email from David Vinokurov to Anna Kuranova and its attachment, 3 January 2013 (**Exhibit C-235**); Email from Anna Kuranova to Robert Mackay and Boris Aryev and its attachment, 4 June 2013 (**Exhibit C-243**); and Email from Anna Kuranova to Boris Aryev and its attachment, 13 September 2013 (**Exhibit C-244**).

under the Moscow Convention.[507] On 11 January 2016, the Russian Supreme Court (the last instance of review) rejected Stans Energy's application for review.[508]

## H.   FORMAL TERMINATION OF THE LICENSES BY THE SAGMR

334.      On 17 October 2014, the SAGMR's Subsoil Use Licensing Commission decided to terminate Kutisay Mining LLC's Licenses, referring to the decisions of the Kyrgyz courts in favour of the GPO.[509] According to the extract of the minutes provided by the Claimants ("**17 October 2014 Minutes**"), the SAGMR decided as follows:

> **Having exchanged opinions, the Committee DECIDES:**
>
> **To take note of the decision of the Inter-District Court of Bishkek dated 14 March 2014 that has entered into force and been upheld by the decision of the Bishkek City Court dated 30 July 2014 and to deem the subsoil use rights under Licenses Nos 2488 ME and 2489 ME terminated pursuant to Article 27, Part 5, of the Kyrgyz Republic Law "On Subsoil", and to deliver to Kutisay Mining LLC a relevant notice of termination of subsoil use rights under:**
>
> - Subsoil License No 2488 ME issued to Kutisay Mining LLC on 20 September 2010 for a term until 21 December 2029 for the right of subsoil use at the Kutessay II deposit for the purpose of development of rare earth elements, bismuth, molybdenum and silver. *Decision is carried unanimously. U.D. Ryskulov and K.K. Zhumabekov were absent.*
>
> - Subsoil License No 2489 ME issued on 20 September 2010 for a term until 21 December 2029 for the right of subsoil use at the Kalesay deposit for the purpose of development of beryllium and lead. *Decision is carried unanimously. U.D. Ryskulov and K.K. Zhumabekov were absent.*[510]

335.      Kutisay Mining LLC filed a claim with the Inter-District Court of Bishkek seeking invalidation of the 17 October 2014 Minutes.[511] On 8 December 2014, the Inter-District Court of Bishkek dismissed this claim, referring to the court decisions of 19 March 2014 and 30 July 2014 which invalidated the 21 December 2009 Minutes.[512]

---

[507]   Statement of Claim, at para. 152.
[508]   Statement of Claim, at para. 152.
[509]   Statement of Claim, at para. 149, referring to Extract from Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 31 October 2014, 17 October 2014 (**Exhibit C-14**). See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 116.
[510]   Extract from Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 31 October 2014 (**Exhibit C-14**).
[511]   Statement of Claim, at para. 150.
[512]   Statement of Claim, at para. 150, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-2290/14mbs7*, 8 December 2014 (**Exhibit C-32**).

336.    The Bishkek City Court and the Supreme Court of Kyrgyzstan averred this decision on 27 January 2015 and 15 October 2015, respectively. [513]

337.    On 22 January 2016, the Kyrgyz Government announced a tender for the Kutessay II and Kalesay deposits.[514] A repetition of the bidding process was announced in September 2017.[515] The tender conditions provided for a minimum bidding price of US$ 10 million.[516] According to the Claimants, such amount comprises a statutory fee and a bonus, as was the case with the purchase by Kutisay Mining OJSC in December 2009.[517] Furthermore, the Claimants contend that the minimum bid was determined "on the basis of a valuation commissioned by the government that reflected a project value of more than US$ 110 million – in stark contrast to the Respondent's assertion in these proceedings that the licenses were worth nothing."[518] As evidence of the above-mentioned valuation, the Claimants submitted a spreadsheet which, they consider, reflects a post-tax valuation by the Respondent of the Kutessay II deposit in an amount of over US$ 110 million.[519] In contrast, the Respondent argues that the said spreadsheet merely contains two models with hypothetical assumptions, which do not amount to a valuation and which, in any case, show a range of mostly negative NPVs.[520] The above-referenced tenders were unsuccessful. The Respondent points out that the mining rights over the Kutessay II and Kalesay deposits remain unallocated until the date of this arbitration.[521]

---

[513]    Statement of Claim, at para. 150, referring to Decision of the Appellate Instance of the Bishkek City Court, *Case No AB-79/15-AD*, 27 January 2015 (**Exhibit C-33**); Decision of the Kyrgyz Republic Supreme Court, *Case No AD-2290/14 mbs7*, 15 October 2015 (**Exhibit C-35**).

[514]    Statement of Claim, at para. 155, referring to Announcement on conducting a tender for the right to use subsoil for the purpose of development of Kutissay II rare earth elements deposit and Kalesay beryllium deposit, Erkin-Too, 22 January 2016 (**Exhibit C-38**).

[515]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 117, referring to State Committee of Industry, Energy and Subsoil Use of the Kyrgyz Republic, Press Release, "According to the Law of the Kyrgyz Republic 'On Subsoil' the Government of the Kyrgyz Republic announces a repeated bidding for the right to use subsoil for the development of the deposit of the rare elements Kutessay II and the beryllium deposit Kalesay" (**Exhibit C-259**).

[516]    Statement of Claim, at para. 155, referring to Conditions of and procedure for conducting a tender for the right to use subsoil for the purpose of development of Kutessay II rare earth elements deposit and Kalesay beryllium deposit and criteria for determining the winner, published in January 2016, at Article V(22)(1) (**Exhibit C-156**). See also, Tender document for the Kutessay II and Kalesay licenses, 25 December 2015 (**Exhibit R-166**).

[517]    Statement of Claim, at para. 155; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 117.

[518]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 117, 309. See also, Economic Model of Development of REE deposit Kutessay II, 2016 (**Exhibit C-256**).

[519]    See Economic Model of Development of REE deposit Kutessay II, 2016 (**Exhibit C-256**).

[520]    Respondent's Reply Post-Hearing Brief, at para. 37.

[521]    Respondent's Reply Post-Hearing Brief, footnote 48: "[…] The mining rights remain unallocated to this day."

# V.    JURISDICTION AND ADMISSIBILITY

338.      The Claimants assert that the Tribunal has jurisdiction on the basis of Article 18 of the 2003 Investment Law.[522] They further argue that they qualify as foreign investors, that their investments are protected pursuant to the 2003 Investment Law, and that the Parties have validly consented to arbitration of the dispute.[523]

339.      The Respondent contends that, in order to rely on the protections of the 2003 Investment Law, an entity must be an "investor" which has made a "direct investment".[524] Stans Energy's indirect shareholding in Kutisay Mining LLC, however, is not a "direct investment",[525] while Kutisay Mining LLC is not a "foreign investor" nor an "investor" with a qualifying "direct investment".[526] Moreover, the Respondent argues that the Claimants' claims must be dismissed due to illegality.[527]

340.      In addition, the Parties disagree as to the scope of the Tribunal's jurisdiction under the 2003 Investment Law.

## A.    MATERIAL SCOPE OF JURISDICTION UNDER THE 2003 INVESTMENT LAW

341.      Specifically, the Respondent disputes that all of the legal bases or causes of action invoked by the Claimants in the present arbitration fall within the jurisdiction of the present Tribunal pursuant to Article 18 of the 2003 Investment Law. The Respondent also disputes the relevance of international law in claims pursuant to Article 18.

342.      Article 18 of the 2003 Investment Law provides:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **Article 18. Settlement of Investment Disputes** | **Article 18** |
| 1. An investment dispute shall be settled | (1) An investment dispute shall be resolved   in   accordance   with   any |

---

[522]    Statement of Claim, at para. 156; Reply to the Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 127.
[523]    Statement of Claim, at para. 156.
[524]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 428; Rejoinder on the Merits and Reply on Jurisdiction, at para. 358.1.
[525]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 431; Rejoinder on the Merits and Reply on Jurisdiction, at para. 358.1.
[526]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 465; Rejoinder on the Merits and Reply on Jurisdiction, at para. 358.2.
[527]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 358.3.

in accordance with any applicable procedure preliminarily agreed upon by the investor and the authorized government bodies of the Kyrgyz Republic, which does not preclude the investor from seeking other legal remedies in accordance with Kyrgyz laws.

2. In the absence of such agreement, the investment dispute between the authorized government bodies of the Kyrgyz Republic and the investor shall, to the extent possible, be settled by consultations between the parties. If the parties do not reach an amicable settlement within a 3-month period from the day of the first written request for such consultation, any investment dispute between the investor and the government bodies of the Kyrgyz Republic shall be settled by judicial bodies of the Kyrgyz Republic, unless in case of a dispute between a foreign investor and a government body one of the parties requests the dispute to be considered in accordance with one of the following procedures by applying to:

a) the International Center for Settlement of Investment Disputes (ICSID) under the Convention on the Settlement of Investment Disputes between States and Citizens of Other States or the rules regulating the use of additional remedies for conducting the hearings by the Secretariat of the Center; or

b) arbitration or an international temporary arbitral tribunal (commercial court) formed in accordance with the arbitration rules of the United Nations Commission on International Trade Law.

3. In the event that an investment dispute is submitted to arbitration mentioned in subparagraphs "a" and "b" of paragraph 2 of this Article, the Kyrgyz Republic shall waive its right to request that all domestic administrative or judicial procedures be first utilized before submitting the dispute to international arbitration.

applicable procedure agreed in advance between the investor and the state agencies of the Kyrgyz Republic, which shall not exclude the use by the investor of other legal remedies in accordance with the legislation of the Kyrgyz Republic.

(2) In the absence of such an agreement, an investment dispute between authorized state agencies of the Kyrgyz Republic and an investor shall be settled, if possible, through consultations between the parties. If the parties do not reach an amicable settlement of the dispute within three months from the day of the initial written request for such consultations, any investment dispute between an investor and state agencies of the Kyrgyz Republic shall be resolved in the judicial authorities of the Kyrgyz Republic, unless, in the case of a dispute between a foreign investor and a state agency, one of the parties asks for the dispute to be considered in accordance with one of the following procedures, by applying to:

(a) to the International Centre for Settlement of Investment Disputes (ICSID) based on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States or Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre; or

(b) to arbitration or an international ad hoc arbitral tribunal (commercial court) formed in accordance with the arbitration rules of the United Nations Commission on International Trade Law.

(3) If an investment dispute is referred to arbitration in sub-paragraphs (a) and (b) of paragraph 2 of this article, the Kyrgyz Republic shall waive the right to demand the prior exhaustion of all internal administrative or judicial procedures before referring the dispute

4. Any investment dispute between foreign and domestic investors shall be considered by the judicial bodies of the Kyrgyz Republic unless the parties agree on any other dispute settlement procedure, including national and international arbitration.

5. Disputes between foreign investors and individuals and legal entities of the Kyrgyz Republic may be settled by an arbitral tribunal of the Kyrgyz Republic, as well as a foreign arbitral tribunal, by agreement of the parties. Failing such agreement, the disputes will be settled in a manner provided by Kyrgyz laws.[528]

to international arbitration.[529]

## 1.    Whether Article 3(1) of the 2003 Investment Law Limits the Tribunal's Jurisdiction to Claims Under the Substantive Provisions of the 2003 Investment Law

343.    The Claimants argue that Article 18 of the 2003 Investment Law contains the Respondent's consent to submit to international arbitration all "investment disputes" with foreign investors (as defined in Article 1(6) of the same instrument).[530] That consent is not limited to disputes based on the substantive provisions of the 2003 Investment Law. Therefore, the scope of the Tribunal's jurisdiction would encompass claims for breaches of the Moscow Convention and general international law.

344.    The Respondent argues that the material scope of jurisdiction of tribunals under the 2003 Investment Law is limited to breaches of the substantive provisions of that Law. Accordingly, any claims that an investor may file must be strictly limited to breaches of the provisions of the 2003 Investment Law. This jurisdictional objection is based on Article 3(1) of the 2003 Investment Law, which provides:

---

[528]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[529]    Translation as provided by the Respondent in Law of the Kyrgyz Republic No. 66 'On Investment in the Kyrgyz Republic' dated 27 March 2003 (with English translation and original Kyrgyz language) (**Authority RLA-30**).

[530]    Article 1(6) of the 2003 Investment Law provides: ""*Investment dispute" means any dispute between an investor and government bodies, officials of the Kyrgyz Republic and other participants of investment activity, arising in the process of investment.*" [translation as provided by the Claimants in **Authority CLA-98**] / "*Investment dispute ... a dispute between an investor and state bodies, officials of the Kyrgyz Republic and other participants in investment activity arising in the course of the implementation of investments.*" [translation as provided by the Respondent in **Authority RLA-30**].

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **Article 3. Scope of the Law** | **Article 3** |
| 1. The relations in the field of direct investment in the Kyrgyz Republic shall be regulated by this Law and other normative legal acts of the Kyrgyz Republic enacted in accordance with this Law.[531] | (1) Relations connected with direct investment in the Kyrgyz Republic shall be regulated by this Law and other normative legal acts of the Kyrgyz Republic adopted in accordance with this Law.[532] |

### a.   The Claimants' Position

345.      The Claimants disagree with the Respondent's view that Article 3(1) of the 2003 Investment Law limits the Tribunal's jurisdiction to breaches of the substantive provisions of the 2003 Investment Law. Rather, the Claimants assert that the Tribunal's jurisdiction is circumscribed only by Article 18 of the 2003 Investment Law and that Article 3(1) is irrelevant in this regard.[533]

346.      Article 18 of the 2003 Investment Law contains the Respondent's consent to submit to international arbitration all "investment disputes" with foreign investors. The term "investment dispute" is defined in Article 1(6) of the 2003 Investment Law, and none of these provisions are limited to disputes based on the substantive provisions of the 2003 Investment Law.[534]

347.      Article 18(2) of the 2003 Investment Law codifies the Respondent's consent to arbitration of "any dispute […] arising in the process of investment" and does not make distinctions as to the legal basis of the investor's position.[535] In support of a broad definition of the term "disputes", the Claimants rely on the decision in *Philip Morris v. Uruguay*, where the Tribunal concluded that "[t]he term "disputes" […] is to be interpreted broadly as concerning the subject matter and facts at issue and not as limited to particular legal claims, including specifically BIT claims".[536] Likewise, the Tribunal in *SGS v. Philippines* considered that "[t]he term "disputes

---

[531]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).
[532]    Translation as provided by the Respondent in Law of the Kyrgyz Republic No. 66 'On Investment in the Kyrgyz Republic' dated 27 March 2003 (with English translation and original Kyrgyz language) (**Authority RLA-30**).
[533]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 238-239.
[534]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 239.
[535]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 240.
[536]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 240, referring to *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products SA (Switzerland) and Abal Hermanos SA (Uruguay) v. Oriental Republic of Uruguay* (ICSID Case No ARB/10/7) Decision on Jurisdiction, 2 July 2013, at para. 113 (**Authority CLA-281**).

with respect to investments" […] is not limited by reference to the legal classification of the claim that is made".[537]

348.     They also deny the Respondent's contention that the Claimants attempt to use an applicable law clause to expand the Tribunal's jurisdiction (an approach that, according to the Respondent, had been rejected by the tribunals in the *Eurotunnel Arbitration* and the *OSPAR Convention arbitration*).[538] The Claimants argue that the Respondent's reliance on the *Eurotunnel* case is inappropriate because in that case the applicable Concession Agreement specifically limited the jurisdiction of the arbitral tribunal to disputes relating to such agreement.[539] Similarly, the Claimants criticize the Respondent's reference to the *OSPAR Arbitration* given that the dispute resolution clause in the underlying treaty limited arbitration to "[a]ny disputes between Contracting Parties relating to the interpretation or application of the Convention";[540] while no comparable limitation is found in Article 18 of the 2003 Investment Law.

349.     The Claimants contend that, pursuant to Article 18 of the 2003 Investment Law, the scope of the Tribunal's jurisdiction therefore includes claims for breaches of the Moscow Convention and general international law. [541]

### b.     The Respondent's Position

350.     The Respondent argues that Article 3(1) of the 2003 Investment Law limits the Tribunal's jurisdiction to breaches of the substantive provisions of the 2003 Investment Law.[542] Accordingly, any claims that an investor can bring in the present proceedings are strictly limited to breaches of the provisions of the 2003 Investment Law.

---

[537]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 240, referring to *SGS Société Générale de Surveillance SA v. Republic of the Philippines* (ICSID Case No ARB/02/6) Decision on Jurisdiction, 29 January 2004, at para. 131 (**Authority CLA-274**).

[538]   For a more detailed account of the Respondent's arguments, see section immediately below.

[539]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 241, referring to *(1) The Channel Tunnel Group Limited and (2) France-Manche SA v. (1) The Secretary of State for Transport of the Government of the United Kingdom of Great Britain and Northern Ireland and (2) Le Ministre de l'Équipement, des Transports, De l'Aménagement du territoire, Du Tourisme et de la Mer du Gouvernement de la République française* (PCA Case No 2003-06) Partial Award, 30 January 2007, at para. 97 (**Authority RLA-179**).

[540]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 242, referring to Convention on the Protection of the Marine Environment of the North-East Atlantic, signed on 22 September 1992; entered into force on 25 March 1998, Article 32(1) (**Authority CLA-269**).

[541]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 245.

[542]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 578, 585-589; Rejoinder on the Merits and Reply on Jurisdiction, at paras 337-338.

351.     In ascertaining the contents of the 2003 Investment Law, the Respondent contends that the Tribunal must refer to Kyrgyz law principles of statutory interpretation.[543] It argues that, pursuant to those principles, there is no justification for interpreting the term "investment dispute" broadly.[544] While the Respondent accepts that the Tribunal may have to incidentally consider other Kyrgyz laws, like the Subsoil Law and the Law on Normative Legal Acts, which might pertain to the relations between the Kyrgyz Republic and investors, such laws are outside the scope of relationships regulated by the 2003 Investment Law "and cannot provide a basis for a claim brought based on the offer to arbitrate in the 2003 Investment Law". [545]

352.     On the contrary, pursuant to Article 18(2) of the 2003 Investment Law, an investor can only commence international arbitration if it has made a "direct investment" and Article 3(1) of the same law defines the scope of the relations in this field. According to the Respondent, the claims that an investor may file are necessarily limited by the scope of those relations as defined in Article 3(1) ("this Law and other normative legal acts of the Kyrgyz Republic enacted in accordance with this Law"). [546] The Respondent notes that the Claimants mistakenly aver that Article 2(1) of the 2003 Investment Law is an "applicable law" clause, and a basis for them to bring claims based on international law. [547] According to the Respondent, this interpretation renders Article 3(1) devoid of meaning, as the only plausible interpretation for Article 3(1) is that it defines the claims which may be brought under the 2003 Investment Law. [548]

353.     The Respondent argues that international tribunals have recognised that there is a "cardinal distinction" between the questions of jurisdiction and applicable law, which the Claimants attempt to deliberately intertwine. [549] In this regard, the Respondent points out that Article 3(1) of the 2003 Investment Law is very similar to the relevant clause in the *Eurotunnel Arbitration*, where the Tribunal rejected the Claimants attempt to use the "applicable law" clause to expand the jurisdiction of the Tribunal.[550] Similarly, the tribunal in the *OSPAR Convention*

---

[543]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 578; Rejoinder on the Merits and Reply on Jurisdiction, at para. 340.2.
[544]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 340.1-340.2.
[545]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 579-580, 587; Rejoinder on the Merits and Reply on Jurisdiction, at para. 335.
[546]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 586.
[547]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589.
[548]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589.3.
[549]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 577.
[550]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 581-583, referring to *(1) The Channel Tunnel Group Limited and (2) France-Manche S.A. v. (1) The Secretary of State for Transport of the Government of the United Kingdom of Great Britain and Northern Ireland and (2) Le Ministre de L'Équipement, des Transports, De*

rejected an attempt by the claimant to use an applicable law clause to expand the jurisdiction of an arbitral tribunal.[551] Moreover, the Respondent alleges that consent to arbitration under Article 18(2) of the 2003 Investment Law is a unilateral declaration which, according to Article 8 of the ILC Guiding Principles, entails obligations only if it is stated in clear and specific terms, and which must be interpreted in a restrictive manner.[552] In this regard, the Respondent avers that the definition of "investment dispute" in Article 1(6) cannot be interpreted as a "clear and specific" undertaking to arbitrate disputes based on any normative source.[553]

354.     Finally, the Respondent submits that it would be unreasonable to conclude that the Respondent had intended to offer an "unqualified jurisdictional regime" to investors by enacting the 2003 Investment Law.[554] It notes that accepting the Claimants' broad interpretation of that clause would go against the restrictive interpretation predicable of unilateral declarations.[555] Furthermore, the Respondent rejects the Claimants' contention that by only establishing certain substantive protections under the 2003 Investment Law, the State would be abrogating its international obligations through national legislation.[556] In this respect, the Respondent underscores that:

> [l]imiting the claims that an investor can bring to specific causes of action does not in any way infringe this principle. A State may be under an obligation not to breach the customary international standards on investment protection. However, a State is not under an obligation to consent to arbitrate all investment disputes […] Such a limited consent to jurisdiction is perfectly consistent with international law.[557]

### c.     The Tribunal's Analysis

355.     At the outset, the Tribunal recalls that the *dispositif* of its Award on Jurisdiction of 25 January 2017 decided as follows:

> a.        The objections raised by the Respondent against the jurisdiction of the present Tribunal are dismissed subject to the following exception.

---

*L'Aménagement du Territoire, Du Tourisme et de la Mer du Gouvernement de la République Française*, PCA Case No. 2003-06, Partial Award dated 30 January 2007, at paras 86, 151 (**Authority RLA-179**).

[551] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 609, referring to *Ireland v. United Kingdom of Great Britain and Northern Ireland (OSPAR Arbitration)*, PCA Case No. 2001-03, Final Award dated 2 July 2003, at paras 6(a), 85 (**Authority RLA-182**).

[552] Rejoinder on the Merits and Reply on Jurisdiction, at para. 340.3, referring to the Award on Jurisdiction, at para. 79.

[553] Rejoinder on the Merits and Reply on Jurisdiction, at para. 340.3.

[554] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 610.

[555] Rejoinder on the Merits and Reply on Jurisdiction, at para. 341.

[556] Rejoinder on the Merits and Reply on Jurisdiction, at para. 342, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 244.

[557] Rejoinder on the Merits and Reply on Jurisdiction, at para. 342.

      b.      The question whether the Claimants qualify as "investors" holding "investments" under the relevant Kyrgyz legislation will be considered in conjunction with the merits of the case.

356.    The Tribunal notes that, in this *dispositif,* the Tribunal accepted jurisdiction subject only to the notions of "investors" and "investments", which will be examined below in this Award, but not to any limit to the substantive provisions of the 2003 Investment Law.[558]

357.    Irrespective thereof, in the view of the Tribunal, the wording of Article 18 of the 2003 Investment Law is clear as it provides in the Respondent's own translation:

> Article 18
>
> (1) An investment dispute shall be resolved in accordance with any applicable procedure agreed in advance between the investor and the state agencies of the Kyrgyz Republic, which shall not exclude the use by the investor of other legal remedies in accordance with the legislation of the Kyrgyz Republic.
>
> (2) In the absence of such an agreement, an investment dispute between authorized state agencies of the Kyrgyz Republic and an investor shall be settled, if possible, through consultations between the parties. If the parties do not reach an amicable settlement of the dispute within three months from the day of the initial written request for such consultations, any investment dispute between an investor and state agencies of the Kyrgyz Republic shall be resolved in the judicial authorities of the Kyrgyz Republic, unless, in the case of a dispute between a foreign investor and a state agency, one of the parties asks for the dispute to be considered in accordance with one of the following procedures, by applying to:
>
> (a) to the International Centre for Settlement of Investment Disputes (ICSID) based on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States or Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre; or
>
> (b) to arbitration or an international ad hoc arbitral tribunal (commercial court) formed in accordance with the arbitration rules of the United Nations Commission on International Trade Law.
>
> (3) If an investment dispute is referred to arbitration in sub-paragraphs (a) and (b) of paragraph 2 of this article, the Kyrgyz Republic shall waive the right to demand the prior exhaustion of all internal administrative or judicial procedures before referring the dispute to international arbitration.[559]

358.    And subparagraph (4) of Article 18 (of which only a translation by the Claimants has been provided), provides:

> 4. Any investment dispute between foreign and domestic investors shall be considered by the judicial bodies of the Kyrgyz Republic unless the parties agree on any other dispute

---

[558]   Pursuant to the procedural timetable set out in Procedural Order No. 6, it was nonetheless open to the Respondent to "raise any remaining objections to the jurisdiction of the Tribunal" with its Statement of Defence on the Merits".

[559]   Translation as provided by the Respondent in Law of the Kyrgyz Republic No. 66 'On Investment in the Kyrgyz Republic' dated 27 March 2003 (with English translation and original Kyrgyz language) (**Authority RLA-30**).

settlement procedure, including national and international arbitration.[560]

359.    The Tribunal notes that, in the above provisions, the terms *"an investment dispute"* and *"any investment dispute"* are used. Article 1(6) of the 2003 Investment Law provides the following definition of the term: *"Investment dispute" means any dispute between an investor and government bodies, officials of the Kyrgyz Republic and other participants of investment activity, arising in the process of investment.*[561]

360.    As the wording of neither of the above provisions in the 2003 Investment Law makes the limitation suggested by the Respondent (by relying on Article 3(1) of the 2003 Investment Law), and particularly the above definition in Article 1(6) refers to *"Any dispute"*, the Tribunal sees no ground for restricting its jurisdiction to only disputes under the substantive provisions of the 2003 Investment Law on the basis of its Article 3(1), but rather concludes that, indeed, any investment dispute between the Parties is under its jurisdiction, subject to the further examination of the Respondent's other jurisdictional objections in the following sections.

## 2.    Whether International Treaties and General International Law Form Part of the Applicable Law Pursuant to Article 2(1) of the 2003 Investment Law

361.    The Parties are also in disagreement as to the law that the Tribunal shall apply in resolving their dispute. The Claimants consider that international law should at least be relevant to determine the content of the obligations assumed by the Respondent. The Respondent avers that, in determining the content of the 2003 Investment Law, the Tribunal must refer to Kyrgyz law principles of statutory interpretation.

362.    The Parties' discussions regarding the applicable law in the present arbitration centre on Article 2 of the 2003 Investment Law, which provides:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **Article 2. Legislation of the Kyrgyz Republic on Investments** | **Article 2** |
| 1.  The legislation regulating the investment regime consists of the Constitution of the Kyrgyz Republic, this Law, other laws and normative | (1)  Legislation governing the investment regime consists of the Constitution of the Kyrgyz Republic, this Law, other laws and normative legal acts of the Kyrgyz Republic. |

---

[560] Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[561] Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

legal acts of the Kyrgyz Republic.

2. If any amendments or additions are made to investment, tax, customs legislation of the Kyrgyz Republic except for the Constitution of the Kyrgyz Republic, and the legislation in the field of state security, public health and environmental protection, investors shall be allowed to choose the most favorable conditions during ten years (or other term provided in the investment agreement) from the date of starting their investment activity.

3. In case of contradiction between the provisions of this Law and international agreements to which the Kyrgyz Republic is a signatory, the provisions of the international agreements shall apply.[562]

[…]

(3) In case of contradiction between the provisions of this Law and international agreements to which the Kyrgyz Republic is a signatory, the provisions of the international agreements shall apply.[563]

363.     The Respondent denies that Article 2(1) of the 2003 Investment Law constitutes an applicable law clause with the purported effect that international treaties and general international law become applicable to the present arbitration.

### a.   The Claimants' Position

364.     The Claimants argue that the law to be applied by the Tribunal comprises the 2003 Investment Law and other relevant rules of Kyrgyz law and international law, including the Moscow Convention. [564] The Claimants allege that, even if they could file claims only for breaches of the 2003 Investment Law, this would not exclude a role for international law in determining the content and scope of the obligations assumed by the Respondent.[565]

365.     The Claimants assert that Article 2(1) is the applicable law clause, through which international treaties and general international law become applicable.[566] The Claimants further

---

[562]  Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).
[563]  Translation as provided by the Respondent in Law of the Kyrgyz Republic No. 66 'On Investment in the Kyrgyz Republic' dated 27 March 2003 (with English translation and original Kyrgyz language) (**Authority RLA-30**).
[564]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 236.
[565]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 247.
[566]  Statement of Claim, at paras 181-182; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 249.

aver that Article 6(3) of the Constitution of the Kyrgyz Republic incorporates international treaties and general international law as part of the Kyrgyz legal system. This Article provides as follows:

> International treaties to which the Kyrgyz Republic is a party that have entered into force under the established legal procedure and also the universally recognized principles and norms of international law shall be the constituent part of the legal system of the Kyrgyz Republic.
>
> The provisions of international treaties on human rights shall have direct action and be of priority in respect of provisions of other international treaties. [567]

366.     The Claimants rely on the decision in the *Wena Hotels v. Egypt* annulment proceedings where a similar constitutional provision, according to the *ad hoc* Committee:

> 42. […] amount[ed] to a kind of *renvoi* to international law by the very law of the host state
>
> […]
>
> 44. […] when a tribunal applies the law embodied in a treaty to which Egypt is a party it is not applying rules alien to the domestic legal system of this country. This might also be true of other sources of international law […][568]

367.     Hence, the Claimants argue that in accordance with the 2003 Investment Law and the Constitution of the Kyrgyz Republic, the law to be applied by the Tribunal "is comprised of the Kyrgyz Investment Law and other relevant rules of Kyrgyz law, international conventions and treaties to which the Kyrgyz Republic is a party and general international law". [569]

368.     The Claimants refer to Article 2(3) of the 2003 Investment Law, which provides that in case of contradiction between the provisions of such law and international agreements, the latter shall apply. This is taken as a confirmation that international law is integrated into the legal regime governing investments; it necessarily follows, according to the Claimants, that international law must be part of the applicable law relevant to the application of the 2003 Investment Law.[570]

---

[567] Statement of Claim, at para. 182, referring to Article 6 of the Constitution of the Kyrgyz Republic of 27 June 2010 (with English translation) (**Authority CLA-102**). The Tribunal notes that the Respondent translates this provision as follows: *"3. International treaties to which the Kyrgyz Republic is a party that have entered into force under the established legal procedure and also the universally recognized principles and norms of international law shall be the constituent part of the legal system of the Kyrgyz Republic. The provisions of international treaties on human rights shall have direct action and be of priority in respect of provisions of other international treaties."* in Constitution of the Kyrgyz Republic (with English translation) (**Authority RLA-28**).

[568] Statement of Claim, at para. 183, referring to *Wena Hotels Ltd v. Arab Republic of Egypt* (ICSID Case No ARB/98/4), Decision on Annulment, 5 February 2002, at paras. 42, 44 (**Authority CLA-23**).

[569] Statement of Claim, at para. 184. See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 251.

[570] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 250.

369.     The Claimants contend that, as the Respondent has ratified the Moscow Convention, its substantive protections are relevant and part of the law applicable to the present arbitration. [571] The Claimants contest the Respondent's objection that the Moscow Convention would only protect the direct investments of foreign investors as unsupported.[572] According to the Claimants, they qualify as protected investors[573] under the Moscow Convention and have made investments as defined under the Convention,[574] thus bringing them within its scope of application as defined under its Article 2(2). [575]

370.     The Claimants argue that the relevance and applicability of international instruments and general international law has been expressly confirmed by the Decree of the Provisional Government of the Kyrgyz Republic about Protection of Investments issued on 26 April 2010 ("**2010 Investment Protection Decree**").[576] The Claimants aver that such decree was a unilateral act, made public by the Head of Government and addressed to the international community, which binds the Kyrgyz Republic and creates binding international obligations. [577]

371.     The Claimants address the Respondent's contention that it could not have intended to offer an "unqualified jurisdictional regime" to investors under the 2003 Investment Law by arguing that Article 18 of the 2003 Investment Law allows a foreign investor to submit to arbitration any dispute arising during the implementation of its investment—a notion that is not limited in scope, and in line with the stated goal of attracting foreign investment. [578]

372.     Likewise, the Claimants disagree that allowing investors to arbitrate customary international law claims would undermine "the deliberate decision by the Kyrgyz legislature to

---

[571]   Statement of Claim, at para. 187; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 252, 255.
[572]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 252.
[573]   Statement of Claim, at para. 187, referring to Article 1 of the Moscow Convention (**Authority CLA-3**), which provides in relevant part: *"the investor shall mean the state, legal or physical person investing their own, borrowed or attracted resources in the form of investments"*. See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 253.
[574]   Statement of Claim, at para. 187, referring to Article 1 of the Moscow Convention (**Authority CLA-3**), which provides in relevant part: *"investments shall mean financial and material resources invested by the investor into different objects of activities as well as transferred rights to property and intellectual property for the purpose of obtaining profit (income) or achieving a social effect if they are not withdrawn from circulation or are not limited in circulation in accordance with the national legislation of the Parties"*. See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 254.
[575]   Statement of Claim, at para. 187, referring to Article 2 of the Moscow Convention (**Authority CLA-3**), which provides in relevant part: *"The norms and rules defined by this Convention shall be applied in case when the process of investment involves subjects of legal relations of two or more states"*.
[576]   Statement of Claim, at para. 185.
[577]   Statement of Claim, at para. 186.
[578]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 243.

omit certain investment protection standards [and…] to bypass the specific standards of protection provided for by Kyrgyz law". The Claimants argue that a State cannot abrogate its international law obligations by means of municipal law.[579] Article 2(3) of the 2003 Investment Law expressly gives priority to international treaties over the provisions of the Law.[580]

### b.   The Respondent's Position

373.     The Respondent alleges that Article 2(1) is not an applicable law clause.[581] Read within the context of the entirety of Article 2, Article 2(1) must be understood as simply a definitional section, whose purpose is limited to the application of the specific investment protection standard of regulatory stability. It merely enumerates the normative sources which comprise the Kyrgyz "investment regime".[582]

374.     The Respondent also rejects the Claimants' argument that Article 2(3) of the 2003 Investment Law confirms that international law is integrated in the Kyrgyz investment regime and takes priority over the 2003 Investment Law.[583] The Respondent states that the interpretation of Article 2 put forward by the Claimants would render Article 3(1) devoid of meaning, as the only plausible interpretation of the latter is that it defines the claims which may be brought under the 2003 Investment Law.[584]

375.     The Respondent adds that, even if Article 2(1) were an applicable law clause, it would not make international treaties and general international law applicable to the present arbitration.[585] The Respondent points out that Article 2(1) defines "[t]he legislation regulating the investment regime", which includes "laws and normative legal acts of the Kyrgyz Republic".[586] In turn, "normative legal acts" is exhaustively defined by Article 4(1) of the Law on Normative Legal Acts, a provision that does not enumerate international treaties or customary international law.[587]

---

[579]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 244.
[580]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 244.
[581]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589; Rejoinder on the Merits and Reply on Jurisdiction, at paras 347-348.
[582]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589.
[583]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 349-351.
[584]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 589.
[585]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 590-591.
[586]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 592.
[587]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 594-595.

376.      The Respondent further argues that, as explained by its expert, Ms. Jorupbekova, Kyrgyz legislative practice demonstrates that, where international law is intended to form part of a particular regime, the law specifically provides so.[588] In this regard, the Respondent notes that neither Article 3(1) nor Article 2(1) of the 2003 Investment Law refer to international treaties or customary international law.[589]

377.      The Respondent contends that Article 6(3) of the Constitution makes international treaties or customary international law part of the Respondent's legal system but it does not make it part of "[t]he legislation regulating the investment regime" nor part of directly applicable Kyrgyz law.[590] The Respondent clarifies that the only exception is with regard to international human rights treaties which pursuant to Article 6(3) have "direct action".[591] Accordingly, there is no provision of direct enforceability of other international treaties or customary international law.[592] The Respondent notes that it has relied on international law conventions and precedents only to rebut the Claimants' submissions under international law, or in the alternative. [593]

378.      The Respondent criticizes as misplaced the reliance by the Claimants on *Wena Hotels v. Egypt* (Decision on Annulment), arguing that the applicability of international law in a domestic legal system is a matter of the State's constitutional structure.[594]

379.      The Respondent also alleges that the interpretation of Article 2(1) of the 2003 Investment Law set forth by the Claimants would lead to absurd results. [595] It would mean that the jurisdiction of a tribunal established under the 2003 Investment Law would be capable of almost unlimited expansion.[596] The Respondent notes that similar attempts to use an applicable law clause to expand the jurisdiction of an international tribunal have been rejected,[597] and contends that it would be unreasonable to conclude that the Respondent intended to offer an

---

[588]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 596, referring to First A. Jorupbekova Report, 13 May 2016, at para. 23.
[589]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 597.
[590]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 598.
[591]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 601.
[592]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 602.
[593]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 346.
[594]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 603-606.
[595]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 607.
[596]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 608.
[597]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 609, referring to *Ireland v. United Kingdom of Great Britain and Northern Ireland (OSPAR Arbitration)*, PCA Case No. 2001-03, *Final Award* dated 2 July 2003, at para. 6(a) (**Authority RLA-182**).

"unqualified jurisdictional regime to investors" whereby they could file a claim for the breach of any international treaty or custom, from the WTO Agreements to the laws of war.[598]

380.     Moreover, the Respondent asserts that such interpretation would also render the 2003 Investment Law protections redundant to the extent that they may be equivalent to international standards of protection; and would also render pointless the decision of the Kyrgyz legislature to include only certain standards of protection and omit others if it were the case that an investor could bypass the specific standards provided for in the law by invoking customary international law. [599]

381.     The Respondent also argues that the 2010 Investment Protection Decree was issued in the aftermath of a popular uprising by the interim government to address the civil and political unrest which threatened the investment climate.[600] The Decree merely confirmed that pre-existing laws continued to apply and "is not an independent legal basis of investment protections and guarantees".[601] The Respondent denies that it may amount to a unilateral declaration because "it manifests no intention by the Kyrgyz Republic to enter into legal obligations on the international plane".[602]

382.     The Respondent claims that, in the event that the 2003 Investment Law were to allow investors to bring claims for breaches of international treaties (which the Respondent denies), the Moscow Convention would still not apply to either of the Claimants.[603] The Respondent notes that the Moscow Convention can only be invoked by foreign investors and it does not contain any provision allowing a domestic investor to be treated as a foreign investor in certain circumstances; accordingly Kutisay cannot rely on such instrument.[604]

383.     The Respondent also argues that, consistently with the general position under international law, the Moscow Convention does not protect indirect investments. The Convention contains no provision that would derogate from the general rule under international law.[605]

---

[598]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 608, 610.
[599]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 611.
[600]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 615-618.
[601]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 614, 619.
[602]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 620-622.
[603]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 623; Rejoinder on the Merits and Reply on Jurisdiction, at para. 352.
[604]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 624-626, 628; Rejoinder on the Merits and Reply on Jurisdiction, at para. 353.
[605]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 629-631; Rejoinder on the Merits and Reply on Jurisdiction, at paras 355-356.

According to the Respondent, in the absence of any clause within the Moscow Convention that would authorise limited claims by controlling shareholders, the interpretation favoured by the Claimants would lead to the "highly unlikely" conclusion that the Convention applies even to indirect portfolio investments.[606]

384.     The Respondent further rejects the Claimants' argument that, where the Moscow Convention protects certain types of assets it must also protect them when they are indirectly held.[607] The Respondent rejects such implication and contends that investment treaty tribunals have concluded that shareholders can bring claims for damage suffered by indirectly held subsidiaries on the basis of (1) the inclusion of "shares" in the definition of investment, or (2) an express reference to investment covering "directly or indirectly" held investments. [608] No similar clauses are included in the Moscow Convention, which provides for a very narrow definition of investment. [609]

385.     The Respondent notes that, in their prayers for relief in their Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction (and subsequent submissions), the Claimants no longer seek a declaration that the Respondent has breached the Moscow Convention. [610]

c.     The Tribunal's Analysis

386.     In the previous section, the Tribunal already averred that it sees no ground for restricting its jurisdiction to only disputes under the substantive provisions of the 2003 Investment Law, although, as will become apparent below, the Tribunal considers that the claims in the present arbitration in fact turn on, and are to be resolved on the basis of, provisions of the 2003 Investment Law.

387.     In any event, the question of jurisdiction must be distinguished from the question of the law to be applied by the Tribunal in the exercise of its jurisdiction. In relation to the applicable law, the Tribunal is of the view that international treaties and general international law may in appropriate circumstances form part of the applicable law. That said, as will become apparent

---

[606]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 632-633.
[607]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 356, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 254.
[608]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 356.
[609]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 356.
[610]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 357.

below, the interpretation and application of provisions of the 2003 Investment Law and other Kyrgyz legislation are at the core of the present arbitration.

**B.    WHETHER STANS ENERGY QUALIFIES AS "INVESTOR" HOLDING AN "INVESTMENT" UNDER THE 2003 INVESTMENT LAW**

388.    The Respondent argues that Kyrgyz law only protects direct investments and that the "indirect ownership by Stans Energy of an interest in Kutisay through an ownership of interest in Stans KG does not comply with the requirement that an investor must "possess" the relevant interest".[611]

389.    The Claimants assert that Stans Energy, a company incorporated in Canada, has made substantial contributions which qualify as direct investments, *inter alia*, by purchasing all of the shares in Kutisay Mining OJSC through its wholly owned subsidiary Stans KG.[612] Hence, Stans Energy qualifies as a foreign investor for the purposes of Article 1(3)(2), first alternative, of the 2003 Investment Law.[613]

390.    This jurisdictional objection concerns Article 1 of the 2003 Investment Law, which provides, in relevant part, as follows:

| [Claimants' translation] | [Respondent's translation] |
|---|---|
| **Article 1. Terminology Used in this Law** | **Article 1(1)** |
| 1. "Investments" means tangible and intangible contributions of all kinds of assets, owned or controlled directly or indirectly by an investor, into objects of economic activity with the aim of deriving a profit and (or) achieving another beneficial result in the form of: | … <br><br> Investment ... tangible and intangible contributions of all kinds of assets owned or controlled whether directly or indirectly, by an investor into economic operations or facilities with a view to deriving a profit and/or other benefit. |
| - money; | **Article 1(2)** |
| - movable and immovable property; | … |
| - property rights (mortgages, liens, pledges and others); | Direct investment … possession and acquisition by an investor of not less than one third of shares or shareholders' votes in joint stock companies existing or newly established in the territory of |
| - stock and other forms of participation in a legal entity; | |

---

[611]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 441. See also, Respondent's Post-Hearing Brief, at paras 139-142.

[612]    Statement of Claim, at para. 159.

[613]    Statement of Claim, at para. 159.

- bonds and other debt obligations;

- non-property rights (including intellectual property rights including goodwill, copyrights, patents, trade marks, industrial designs, technological processes, trade names and know-how);

- any right to engage in activity based on a license or other permit issued by government bodies of the Kyrgyz Republic;

- concessions based on laws of the Kyrgyz Republic including concessions to prospect for, explore, develop or exploit natural resources of the Kyrgyz Republic;

- profit or income derived from investments and re-invested in the territory of the Kyrgyz Republic;

- other forms of investment not prohibited by the laws of the Kyrgyz Republic.

The form in which assets are invested, or any change in this form shall not influence their nature of investment.

2. "Direct investments" means holding, acquisition by an investor of not less than one-third of stock or stockholders' votes in joint-stock companies established or being newly established in the territory of the Kyrgyz Republic, or the equivalent of such participation in business enterprises of other legal forms and all subsequent operations between the investor and the investee enterprise, investment of capital into fixed assets of a branch or representative office of a legal entity that is to be established in the territory of the Kyrgyz Republic.

3. "Investor" means a party to investment activity providing its own, borrowed or attracted funds in the form of direct investment.

"Domestic investor" means Kyrgyz individuals and legal entities and foreign nationals (or stateless persons) having a status of the resident of the Kyrgyz Republic and carrying out

the Kyrgyz Republic or equivalent of such participation in other legal entity forms of business entities and all subsequent transactions between the investor and the investee enterprise, capital investment in fixed assets of a branch, representative offices of the legal entity established on the territory of the Kyrgyz Republic.

**Article 1(3)**

…

Investor … an entity pursuing investment operations and contributing its own, borrowed, or otherwise attracted funds in the form of direct investments.

Foreign investor … an individual or legal entity, other than a domestic investor, investing in the economy of the Kyrgyz Republic, including:

1) an individual being a foreign citizen or stateless person, permanently residing outside the Kyrgyz Republic;

2) a legal entity

established and registered under the legislation of a foreign state; or

established with foreign participation, i.e. formed under the legislation of the Kyrgyz Republic and:

a) fully owned by one or more foreign individuals, legal entities…; or

b) controlled and managed by one or more foreign individuals, legal entities pursuant to a written contract, right to sell majority of shares, right to appoint majority of members of the executive or supervisory bodies; or

c) in which not less than one third shares or shareholders' votes are in the ownership of foreign individuals, stateless persons permanently residing outside the Kyrgyz Republic or legal entities mentioned in this article; …[615]

---

[615] Translation as provided by the Respondent in Law of the Kyrgyz Republic No. 66 'On Investment in the Kyrgyz Republic' dated 27 March 2003 (with English translation and original Kyrgyz language) (**Authority RLA-30**).

investment activity in the territory of the Kyrgyz Republic.

"Foreign investor" means any individual or legal entity, other than domestic investor, investing in the economy of the Kyrgyz Republic, including:

1) an individual being a foreign national (or stateless person) permanently residing outside the Kyrgyz Republic;

2) a legal entity that is:

formed and registered under the laws of a foreign State; or

formed with foreign participation, i.e. established under the laws of the Kyrgyz Republic, and:

a) fully owned by one or more foreign individuals or legal entities; or

b) controlled and managed by one or more foreign individuals or legal entities pursuant to a written contract, a right to sell the majority of shares, a right to appoint the majority of members to its executive or supervisory bodies; or

c) in which not less than one-third of shares or shareholders' votes is owned by foreign individuals, or stateless persons permanently residing abroad, or by legal entities referred to in this clause;

3) a legal entity that is founded by an inter-governmental treaty of the Kyrgyz Republic;

4) a foreign organization which is not a legal entity;

5) an international organization. […][614]

## 1.     Whether the 2003 Investment Law Protects Only "Direct Investments"

391.      As they are interlinked, the Tribunal will consider the issues addressed by the Parties in sub-sections 1 to 3 below together at the end of this section.

---

[614]     Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

### a.    The Respondent's Position

392.    The Respondent contends that the definition of "direct investments" under Kyrgyz law does not include indirect ownership. [616] The Respondent notes that under Kyrgyz law an "investor" will only have a "direct investment" if they "possess" or "acquire" the relevant interest; and the possessor and acquirer is the legal title holder while, where the law intends to cover indirect ownership, it clearly says so. [617] Substantive provisions of the 2003 Investment Law refer to "investors", which is an expressly defined term in Article 1(3) of such law to include only investors with "direct investments". [618] Accordingly, the Respondent submits that Article 18(2) and the definition of "investment dispute" only cover "investors" with "direct investments". [619]

393.    The Respondent argues that the definition of "direct investment" under Article 1(2) of the 2003 Investment Law does not include indirectly-owned investments, [620] notes that the Claimants do not provide any expert evidence to support their contention that the definition of "direct investments" extends to indirect ownership, and suggests that the evidence provided by its expert should be accepted. [621] The Respondent contends that the purpose of providing State support and protection to investors and investments is to attract direct investments, so "the law requires direct ownership of an interest in a Kyrgyz entity". [622]

394.    The Respondent contends that the 2008 amendment of the definition of "investments" to cover "contributions of all kind of assets owned or controlled whether directly or indirectly" does not alter the definition of "direct investments" and does not confirm that possession and ownership can be direct or indirect, because such an interpretation would render otiose the very purpose of distinguishing between "investments" and "direct investments". [623]

395.    The Respondent notes that Claimants' attempt to rely on definitions of foreign direct investment contained in various international publications, including an article of the International

---

[616]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 434; Rejoinder on the Merits and Reply on Jurisdiction, at paras 360-361.
[617]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 434-435, referring to First A. Jorupbekova Report, 13 May 2016, at paras 35-36; Rejoinder on the Merits and Reply on Jurisdiction, at para. 365.
[618]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 362, 372-374.
[619]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 362.
[620]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 365.
[621]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 437.
[622]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 441; Rejoinder on the Merits and Reply on Jurisdiction, at para. 370.
[623]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 447; Rejoinder on the Merits and Reply on Jurisdiction, at para. 368.

Monetary Fund, an OECD publication and some international case-law. In the Respondent's view, all of these are irrelevant for the purposes of interpreting the term "direct investments" in the 2003 Investment Law.[624]

### b.   The Claimants' Position

396.   The Claimants argue that the 2003 Investment Law also protects indirectly-owned investments.[625]

397.   The Claimants contend that Article 1(1) of the 2003 Investment Law makes this clear by defining "investment" as assets "owned or controlled directly or indirectly by an investor".[626] The Claimants note that this was a specific clarification made by the Kyrgyz Parliament in 2008.[627] The Claimants underscore that the Respondent no longer disputes the inclusion of both directly and indirectly owned and controlled investments under the definition of the term "investment" under Article 1(1) of the 2003 Investment Law,[628] and rather argues that the only relevant defined term is "investor" which refers in turn to the defined term of "direct investment".[629]

398.   The Claimants deny the Respondent's contention that the protection of the 2003 Investment Law only extends to "direct investments".[630] According to the Claimants, the Respondent's position ignores the use of the term "investment" in the 2003 Investment Law, as "ignoring the statutory text is the only way the Respondent can construct an interpretation of the 2003 Investment Law that excludes from protection all investments owned through intermediate companies".[631] Rather, the Claimants submit that Article 1(2) excludes *portfolio investments,* not indirect investments; and that Article 1(1) and Article 1(2) do not offer conflicting definitions of a single concept ("investment").[632]

---

[624]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 453-455.
[625]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 132-137.
[626]   Reply to the Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 132; Rejoinder on Jurisdiction, at para. 31.
[627]   Reply to the Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 132, referring to Law No 127 amending Law of the Kyrgyz Republic "On Investments in the Kyrgyz Republic", 23 June 2008, Article 1(1) (**Authority CLA-204**).
[628]   Rejoinder on Jurisdiction, at para. 31, referring to Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 443, 447.
[629]   Rejoinder on Jurisdiction, at para. 32, referring to Rejoinder on the Merits and Reply on Jurisdiction, at para. 368.
[630]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 135.
[631]   Rejoinder on Jurisdiction, at para. 32.
[632]   Rejoinder on Jurisdiction, at para. 33.

399.     The Claimants note that neither the Preamble nor any of the substantive provisions of the 2003 Investment Law limit their application to direct investments only,[633] and further claim that through the 2008 clarification of the definition of "investment", Parliament confirmed its intention regarding which investments would be protected by the 2003 Investment Law.[634]

**2.     Whether Stans Energy's Participation in Kutisay Mining LLC Qualifies as a "Direct Investment"**

     **a.     The Respondent's Position**

400.     The Respondent asserts that Stans Energy's indirect shareholding in Kutisay Mining LLC is not a "direct investment" within Article 1(2) of the 2003 Investment Law as it does not include indirectly held investments.[635]

401.     The Respondent avers that the 2003 Investment Law does not allow an investor to bring a claim for injuries suffered by a company of which it is an indirect shareholder, and Stans Energy cannot bring a claim with respect to damage allegedly suffered by Kutisay Mining LLC.[636] The Respondent contends that the scope of the 2003 Investment Law is limited to protecting "direct investments" which are defined by reference to an investor's participation in a particular legal entity requiring "possession and acquisition […] of not less than one third of the shares".[637]

402.     Ms. Jorupbekova asserts that "possession" and "acquisition" are legal concepts under Kyrgyz law which refer to the "legal title holder of the participating interest in a company, whose name appears in the company register".[638] Stans Energy does not have a participating interest in Kutisay Mining LLC.[639]

---

[633]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 135, referring to Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation)(**Authority CLA-98**).
[634]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 136; Rejoinder on Jurisdiction, at para. 34.
[635]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 431; Rejoinder on the Merits and Reply on Jurisdiction, at para. 375. See also, Respondent's Post-Hearing Brief, at paras 141-142.
[636]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 457.
[637]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 460.
[638]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 460, referring to First A. Jorupbekova Report, 13 May 2016, at para. 30.
[639]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 376, referring to Second A. Jorupbekova Report, 5 July 2016, at paras 37-38.

403.    Regarding the Claimants' contention that Stans Energy's indirect "assets and contributions" to Kutisay Mining LLC would qualify as "investments" pursuant to Article 1(1) of the 2003 Investment Law, the Respondent notes that, regardless of whether or not this is the case, such involvement is insufficient to satisfy "the separate and distinct requirement, for the purposes of Article 18(2), that Stans Energy has a "direct investment" within the meaning of Article 1(2)".[640]

### b.    The Claimants' Position

404.    The Claimants note that Stans Energy holds, through its wholly owned and controlled Kyrgyz subsidiary, Stans KG, 100% of the share capital in Kutisay Mining LLC.[641] The Claimants contend that this shareholding satisfies the general and specific criteria of the investment definition under Article 1(1) of the 2003 Investment Law and constitutes an "asset" while also qualifies as "stock and other forms of participation in a legal entity".[642]

405.    According to the Claimants, Stans Energy's participation in Kutisay Mining LLC meets the requirements laid out in Article 1(2) for a "direct investment".[643] The Claimants aver that the Respondent has not contested that Stans Energy has a participation of "not less than one-third … in business enterprises of other legal forms" in Kutisay Mining LLC.[644] The Claimants contend that the fact that this participation is owned indirectly through the shareholding of Stans KG is immaterial.[645]

406.    The Claimants point out that the Respondent accepts that Stans Energy is a foreign investor.[646] The Claimants consider that "Article 1(3) does not preclude the participating interest in Kutisay Mining from being held through Stans KG; indeed, Article 1(1) expressly envisages such a situation".[647] Hence, Stans Energy satisfies the provisions of Article 1(1) to (3) of the 2003 Investment Law and is a foreign investor with an investment protected under this law.[648]

---

[640]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 377.
[641]    Rejoinder on Jurisdiction, at para. 35.
[642]    Statement of Claim, at para. 166.
[643]    Statement of Claim, at para. 167; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 138-139.
[644]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 138.
[645]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 138.
[646]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 139.
[647]    Rejoinder on Jurisdiction, at para. 35.
[648]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 139.

### 3.    Whether Stans Energy's Participation in Stans KG Qualifies As a "Direct Investment"

#### a.    The Respondent's Position

407.    The Respondent criticizes the Claimants' interpretation of "direct investments" and avers that it would lead to "potentially absurd results […] that a qualifying 'direct investment' by an 'investor' in company A, will automatically make it an 'investor' with regard to a non-qualifying investment in company B".[649]

408.    The Respondent rejects the Claimants' argument that "Stans Energy's investment in Stans KG is 'closely related to the present dispute' [a]s irrelevant" claiming that Kyrgyz law is specific about the rights and obligations of shareholders in relation to an entity in which it owns shares and that such rights "do not extend towards shareholders of shareholders".[650] The Respondent contends that "Stans Energy allegedly qualifying shares in Stans KG (the 'direct investment', according to the Claimants' submission), are therefore irrelevant".[651]

409.    The Respondent rejects the Claimants' contention that, even if the 2003 Investment Law were to protect only directly-owned investments, the Tribunal would still have jurisdiction regarding the alleged loss of "100% interest in the capital of Stans KG".[652] The Respondent points out that the Claimants rely on two ICSID cases based on bilateral investment treaties, which are irrelevant for interpreting the jurisdictional preconditions of the 2003 Investment Law.[653]

410.    In any case, the subject matter of the dispute concerns the purported expropriation of the Kutisay Mining LLC's Licenses, so Stans KG's rights were unaffected by the Respondent's measures, and none of the cases invoked by the Claimants allow them to pierce the corporate veil to the extent the Claimants purport to do in these proceedings.[654] Hence, even if Stans Energy were able to establish jurisdiction on the basis of its shareholding in Stans KG, it would have no

---

[649]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 462.

[650]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 463; Rejoinder on the Merits and Reply on Jurisdiction, at para. 379, referring to Second A. Jorupbekova Report, 5 July 2016, at para. 34. See also, Respondent's Post-Hearing Brief, at para. 142.

[651]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 464; Rejoinder on the Merits and Reply on Jurisdiction, at para. 378.

[652]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 379, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 142.

[653]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 379.

[654]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 379.

standing to bring a claim for damages suffered by an indirect subsidiary. The claim should thus in any event be dismissed as inadmissible.[655]

### b.    The Claimants' Position

411.    The Claimants argue that, even accepting *arguendo* the Respondent's position that the 2003 Investment Law only protects directly-owned investments, Stans Energy's participation in Stans KG qualifies as a "direct investment".[656]

412.    Stans Energy directly owned 100% of the capital of Stans KG (a Kyrgyz company),[657] and it made capital investments in the assets of Stans KG and Kutisay Mining LLC, both of which qualify as investments under the 2003 Investment Law.[658]

413.    The Claimants argue that the Respondent's contention that Stans Energy cannot bring a claim with respect to damage suffered by Kutisay Mining LLC because the 2003 Investment Law would not allow an investor to file claims for injuries suffered by a company of which it is an indirect shareholder is unfounded.[659] The Claimants note that this law grants an investor rights with regard to investments "owned or controlled directly or indirectly by an investor".[660]

414.    Nevertheless, even accepting the Respondent's position, the Claimants aver that the Tribunal would still have jurisdiction over Stans Energy's claims regarding its shareholding in Stans KG.[661] Independently of any damage suffered by Kutisay Mining LLC, "Stans Energy has the right to claim for any damage caused to its directly owned investments, including its 100% interest in the capital of Stans KG".[662]

---

[655]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 380.
[656]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 140-146; Rejoinder on Jurisdiction, at para. 35.
[657]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 140, referring to Extract from the Legal Entities Register of the Ministry of Justice of the Kyrgyz Republic with regard to Stans Energy KG LLC, 21 November 2013 (**Exhibit C-148**).
[658]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 140
[659]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 141-142.
[660]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 142.
[661]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 142, referring to, *inter alia, Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic* (ICSID Case No ARB/13/8) Award, 9 April 2015, at para. 245 (**Authority CLA-283**). See also, Rejoinder on Jurisdiction, at para. 36.
[662]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 143 *cf.* Rejoinder on the Merits and Reply on Jurisdiction, at para. 379.

415.     The Claimants note the Respondent's allegation that Stans Energy's direct investments are not the assets which are the subject of these proceedings.[663] In contrast, the Claimants sustain that Stans Energy's shareholding in Stans KG and its capital investments:

> are part of the investment project concerning the exploration and development of the Kutessay II and Kalesay mines […] The expropriation of the mining licenses and the rights attached to them "directly caused a concomitant reduction in the value of Stans KG's shareholding in Kutisay Mining. And, this caused an equal reduction in the value of Stans Energy's shareholding in Stans KG.[664]

416.     Accordingly, Stans Energy is an investor protected by the 2003 Investment Law and, even disregarding its indirect ownership in Kutisay Mining LLC, is entitled under the 2003 Investment Law to claim compensation for the damage caused by the Respondent to its shareholding in Stans KG and to its directly-owned investments.[665]

## 4.     The Tribunal's Analysis

417.     As mentioned above, the Tribunal considers the issues addressed by the Parties in the above sections 1 to 3 together, as they are interlinked.

418.     Article 1(1) of the 2003 Investment Law provides a particularly wide definition of "investment". In particular, its very first introductory phrase expressly mentions that it includes *"contributions of all kinds of assets, owned or controlled directly or indirectly by an investor"*.[666] Since neither the Preamble nor any of the substantive provisions of the 2003 Investment Law relevant in this case limit their application to direct investments only, the definition of "direct investment" in subparagraph 2 of Article 1 is not relevant in this context. Therefore the Tribunal has no doubt that in application of the specific definition of "investment" in subparagraph 1 of Article 1, it has jurisdiction, and claims are admissible over such substantive provisions as those that will be examined later in this award irrespective of whether the Claimants' investments in the Kyrgyz Republic are direct or indirect investments.

419.     With regard to the Respondent's reasoning, the Tribunal agrees with the Claimants that Articles 1(1) and 1(2) serve entirely different purposes. Indeed this is even clearer in view of the

---

[663]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 144, referring to Respondent's Reply on Jurisdiction, at paras 193, 195.

[664]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 144 [footnotes omitted].

[665]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 145-146.

[666]   Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

2008 modification of Article 1(1) of the 2003 Investment Law[667] by which the Kyrgyz Parliament clarified that "investment" includes not only assets owned directly, but also those "owned or controlled directly or indirectly" by an investor. Meanwhile, the legislator left Article 1(2) untouched, because this provision *did not deal with the issue of ownership*. The Parliament thus confirmed that "direct investment" does not mean a directly-owned investment, and does not exclude investments owned or controlled through intermediate companies.[668]

420.        As the Tribunal has found above that it has jurisdiction over both direct and indirect investments, it is not relevant whether Stans Energy's participation in Kutisay Mining LLC and in Stans KG qualify as a "Direct Investment".

## C.   WHETHER KUTISAY MINING LLC QUALIFIES AS AN "INVESTOR" HOLDING AN "INVESTMENT" UNDER THE 2003 INVESTMENT LAW

421.        The Respondent argues that Kutisay Mining LLC does not qualify as a "foreign investor" nor as an "investor" with a qualifying "direct investment".[669] The Claimants, on the other hand, assert that Kutisay Mining LLC qualifies as a foreign investor under Article 1(3)(2), second alternative of the 2003 Investment Law.[670]

### 1.     Whether Kutisay Mining LLC Qualifies as an "Investor"

#### a.     The Respondent's Position

422.        The Respondent argues that only an "investor" with a "direct investment" can commence arbitration under Article 18(2) of the 2003 Investment Law.[671]

423.        The Respondent rejects the Claimants' argument that the mining licenses held by Kutisay Mining LLC and the rights they represent to develop and exploit REEs are assets that qualify as investments under Article 1(1) of the 2003 Investment Law.[672] The Respondent

---

[667]   See Law No 127 amending Law of the Kyrgyz Republic "On Investments in the Kyrgyz Republic", 23 June 2008 (**Authority CLA-204**).
[668]   Rejoinder on Jurisdiction, at para. 34.
[669]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 465; Rejoinder on the Merits and Reply on Jurisdiction, at para. 381.
[670]   Statement of Claim, at para. 160.
[671]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 509; Rejoinder on the Merits and Reply on Jurisdiction, at para. 395.
[672]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 512, 517. See also, Respondent's Post-Hearing Brief, at paras 135-137.

considers that the Licenses do not fall within the definition of "direct investment" under Article 1(2) of the 2003 Investment Law,[673] and criticizes that the Claimants seek to eliminate the words "direct investment" from the definition of "investor" precisely because it is the jurisdictional requirement which Kutisay Mining LLC is unable to fulfil.[674]

424.    The Respondent reiterates that Article 18(2) of the 2003 Investment Law and the definition of "investment dispute" only cover "investors" with "direct investments".[675] The Licenses do not fall within the definition of "direct investment" under Article 1(2) of the 2003 Investment Law and the Tribunal lacks jurisdiction over Kutisay's claims.[676]

### b.    The Claimants' Position

425.    The Claimants argue that Kutisay Mining LLC qualifies as "investor".[677] In this regard, the Claimants assert that Kutisay Mining LLC held Licenses, granted by the SAGMR, under which it had the right to develop and exploit rare earth deposits of the Kutessay II mine and beryllium and lead deposits of the Kalesay mine for the period from December 2009 to December 2029. These Licenses and the rights they represent are assets which qualify as investments under the general provision of Article 1(1) of the 2003 Investment Law.[678]

426.    Moreover, the Claimants aver that they have held the "right to engage in activity based on a license of other permit issued by government bodies of the Kyrgyz Republic" and "concessions based on laws of the Kyrgyz Republic including concessions to prospect for, explore, develop or exploit natural resources of the Kyrgyz Republic"—categories specifically listed as protected investments in Article 1(1).[679]

427.    The Claimants also maintain that they expended considerable amounts to develop the mining project, acquired transformation and transportation facilities and conducted extensive studies concerning the feasibility of the project, all of which would qualify as investments under Article 1(1) of the 2003 Investment Law as "money", "movable and immovable property",

---

[673]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 513.
[674]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 518-520; Rejoinder on the Merits and Reply on Jurisdiction, at paras 396-397.
[675]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 398.2.
[676]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 399.
[677]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 147-152.
[678]    Statement of Claim, at para. 164; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 149; Rejoinder on Jurisdiction, at para. 38.
[679]    Statement of Claim, at para. 164.

"property rights (mortgages, liens, pledges and others)", and "non-property rights (including intellectual property rights including goodwill, copyrights, patents, trademarks, industrial designs, technological processes, trade names and know-how)".[680]

428.     The Claimants recall the Respondent's position that none of these investments are protected by the 2003 Investment Law "because the law only protects shareholder rights or "capital investments in fixed assets of its "branch" or "representative office"… of a legal entity". It would follow from that view that Kutisay Mining LLC could only have been protected if it had created an *additional* subsidiary".[681] The Claimants note that this argument is directly contrary to the Respondent's own contention that the 2003 Investment Law does not protect indirect investments.[682] It would also render Article 1(1) ineffective insofar it defines investments broadly (including shares and also hard assets and concession rights) as, pursuant to the Respondent's construction, only a subcategory of those would actually be protected. The Claimants contend that this could not have been the legislator's intent.[683]

429.     The Claimants consider that their interpretation is confirmed by the substantive provisions of the 2003 Investment Law which refer to "investments" rather than to "direct investments".[684] They also point out that Article 18(2) does not refer to "direct investment" but to "investment dispute", the definition of which in turn refers to that of "investment". The phrase "foreign investor" is not defined by reference to "direct investment".[685]

430.     In conclusion, Kutisay Mining LLC had an investment in the form of its Licenses and other assets related to the development of the Kutessay II and Kalesay mines, which were protected by the 2003 Investment Law, and constitute a firm basis for the Tribunal's jurisdiction.[686]

---

[680]   Statement of Claim, at para. 165; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 149.

[681]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 150, referring to Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 510-511.

[682]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 150; Rejoinder on Jurisdiction, at para. 39.

[683]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 151; Rejoinder on Jurisdiction, at paras 40-41.

[684]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 152; Rejoinder on Jurisdiction, at para. 42.

[685]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 152; Rejoinder on Jurisdiction, at para. 42.

[686]   Rejoinder on Jurisdiction, at para. 43.

### c.    The Tribunal's Analysis

431.    Article 1(3) of the 2003 Investment Law provides: "'Investor' means a party to investment activity providing its own, borrowed or attracted funds in the form of direct investment".[687]

432.    The Claimants correctly point out that Kutisay Mining LLC held Licenses, granted by the SAGMR, under which it had the right to develop and exploit rare earth deposits of the Kutessay II mine and beryllium and lead deposits of the Kalesay mine for the period from December 2009 to December 2029. Indeed, these Licenses and the rights they represent are assets which qualify as investments under the general provision of Article 1(1) of the 2003 Investment Law. In this context, the Tribunal refers to its conclusions above regarding what is an investment according to Article 1(1) and in particular that this provision expressly includes "tangible and intangible contributions of all kinds of assets, owned or controlled directly or indirectly by an investor, into objects of economic activity" and then also expressly includes "- any right to engage in activity based on a license or other permit issued by government bodies of the Kyrgyz Republic".[688]

433.    In view of the above express provisions the Tribunal has no doubt that Kutisay Mining LLC qualifies as an "investor".

## 2.    Whether Kutisay Mining LLC Qualifies as a "Foreign Investor"

### a.    The Respondent's Position

434.    The Respondent argues that Kutisay Mining LLC does not qualify as a foreign investor because it is a locally incorporated company which was established with the participation of another locally incorporated company, Stans KG; and does not meet any of the additional requirements in subparagraphs (a), (b) or (c) of Article 1(3)(2).[689]

---

[687]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[688]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[689]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 466-468; Rejoinder on the Merits and Reply on Jurisdiction, at paras 382-383. See also, Respondent's Post-Hearing Brief, at para. 138.

435.     The Respondent rejects the Claimants' interpretation that subparagraphs (a), (b) and (c) of Article 1(3)(2) merely clarify what constitutes foreign participation. In the Respondent's view, nothing in those subparagraphs suggests that indirect foreign participation is permissible.[690]

436.     The Respondent underscores that, under the law of the Kyrgyz Republic, Kutisay Mining is established with participating interest of Stans KG (a locally incorporated limited liability company), and Dr. Savchenko (a Kyrgyz citizen).[691] It further argues that "participation" in a legal entity has a specific meaning under Kyrgyz law, referring only to direct participation in such entity.[692] Accordingly, the indirect interest of Stans Energy in Kutisay Mining LLC does not satisfy the requirement of "foreign participation".[693]

437.     Regarding the additional requirements put forward in subparagraphs (a), (b) and (c) of Article 1(3)(2), the Respondent notes that the Claimants only rely on (b) and (c) to establish the Tribunal's jurisdiction.[694] The Respondent contends that the Claimants have not provided evidence showing that Stans Energy "controlled and managed" Kutisay pursuant to "a written contract, right to sell majority of shares, right to appoint majority of members of the executive or supervisory bodies".[695] Regarding subparagraph (c), which requires that "not less than one third of the shares or shareholders' votes are in the ownership of foreign individuals […]", the Respondent claims that it only applies to joint stock companies, which Kutisay Mining LLC is not. Since Kutisay Mining LLC has no shares or shareholders votes, it is automatically outside the scope of subparagraph (c).[696] The Respondent avers that the Claimants are inviting the Tribunal to ignore the legislative text. In the Respondent's submission, limited liability companies may only qualify as foreign investors under subparagraphs (a) and (b) of Article 1(3)(2).[697] Subparagraph (c) is clear in that it only applies to joint stock companies, which Kutisay Mining LLC is not.[698] It is inconsequential that the Claimants consider that the Kyrgyz legislature has no basis to distinguish between different types of corporate forms, since different treatment is

---

[690]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 471-478.
[691]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 479; Rejoinder on the Merits and Reply on Jurisdiction, at para. 383.
[692]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 480.
[693]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 479.
[694]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 485; Rejoinder on the Merits and Reply on Jurisdiction, at para. 384.
[695]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 486-487, 492; Rejoinder on the Merits and Reply on Jurisdiction, at paras 385-387.
[696]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 499-500, 502-503; Rejoinder on the Merits and Reply on Jurisdiction, at paras 388-389.
[697]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 391.
[698]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 391.

frequently given to different corporate forms, and there is no valid principle of interpretation which would lead to an interpretation contrary to the literal meaning of the text.[699]

**b.     The Claimants' Position**

438.     The Claimants contend that Kutisay Mining LLC qualifies as a "foreign investor".[700] The Claimants aver that, although Kutisay Mining LLC is established under the laws of the Kyrgyz Republic, it is wholly owned by Stans Energy—a foreign legal entity—through its wholly owned subsidiary Stans KG.[701] Thus, Kutisay Mining LLC qualifies as a foreign investor under Article 1(3)(2), second alternative of the 2003 Investment Law.[702]

439.     The Claimants argue that Article 1(3)(2) of the 2003 Investment Law identifies the kind of Kyrgyz companies which similarly benefit from the protections of a "foreign investor" and clearly includes "a local company 'formed with foreign participation'".[703] The Claimants point out that the law sets forth three conditions and that any company which satisfies any of them qualifies as a company "formed with foreign participation" and, thus, as a "foreign investor".[704]

440.     The Claimants argue that Kutisay Mining LLC corresponds to both subparagraphs (b) and (c) as it was at all relevant times managed and controlled by Stans Energy as the sole participant in Stans KG.[705]

441.     The Claimants recall that the Respondent denies that Kutisay Mining LLC may meet the criteria of Article 1(3)(2)(b) arguing that only Stans KG had any rights vis-à-vis Kutisay Mining LLC. The Claimants consider this argument as "overly formalistic" as Stans KG was wholly owned by Stans Energy, and all decisions taken by Stans KG as the shareholder of Kutisay

---

[699]     Rejoinder on the Merits and Reply on Jurisdiction, at paras 392-394.
[700]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 153-160; Rejoinder on Jurisdiction, at para. 45.
[701]     Statement of Claim, at para. 160.
[702]     Statement of Claim, at para. 160.
[703]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 153-155.
[704]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 155; Rejoinder on Jurisdiction, at para. 46.
[705]     Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 156, referring to Claimants' Rejoinder on Jurisdiction in Bifurcated Proceedings, at para. 124. See also, Rejoinder on Jurisdiction, at para. 47.

PCA 278376

Mining LLC were first adopted and authorised by Stans Energy.[706] Moreover, Article 1(3)(2)(b) does not require that control must be direct.[707]

442.     Regarding the fulfilment of the criteria set forth in Article 1(3)(2)(c), the Claimants note that there is no indication that this provision intended to exclude limited liability companies and other entities with forms of capital ownership other than shares, and consider such interpretation as illogical and pointless from a policy viewpoint.[708]

### c.     The Tribunal's Analysis

443.     The Tribunal recalls the definition of "foreign investor" in Article 1(3) of the 2003 Investment Law:

> "Foreign investor" means any individual or legal entity, other than domestic investor, investing in the economy of the Kyrgyz Republic, including:
>
> 1) an individual being a foreign national (or stateless person) permanently residing outside the Kyrgyz Republic;
>
> 2) a legal entity that is:
>
> formed and registered under the laws of a foreign State; or
>
> formed with foreign participation, i.e. established under the laws of the Kyrgyz Republic,
>
> and:
>
> a) fully owned by one or more foreign individuals or legal entities; or
>
> b) controlled and managed by one or more foreign individuals or legal entities pursuant to a written contract, a right to sell the majority of shares, a right to appoint the majority of members to its executive or supervisory bodies; or
>
> c) in which not less than one-third of shares or shareholders' votes is owned by foreign individuals, or stateless persons permanently residing abroad, or by legal entities referred to in this clause;
>
> 3) a legal entity that is founded by an inter-governmental treaty of the Kyrgyz Republic;
>
> 4) a foreign organization which is not a legal entity;
>
> 5) an international organization.[709]

---

[706]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 158, referring to Stans Energy Corp, "Decision of the Company 'Stans Energy Corp', the sole Participant of 'Stans Energy Kg' Limited Liability Company", 21 January 2010 (**Exhibit C-59**); Decision of the sole shareholder of Kutisay Mining OJSC, 25 January 2010 (**Exhibit C-60**); Decision of Stans Energy Corp on the transfer of shares from Stans Energy KG to Stans Energy Corp, 17 February 2016 (**Exhibit C-207**).

[707]    Rejoinder on Jurisdiction, at para. 48.

[708]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 159-160; Rejoinder on Jurisdiction, at para. 49.

[709]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

444.     Kutisay Mining LLC is established under the laws of the Kyrgyz Republic, but is wholly owned by Stans Energy—a foreign legal entity—through its wholly owned subsidiary Stans KG.

445.     With regard to the criteria of Article 1(3)(2)(b) the Tribunal notes that Stans KG was wholly owned by Stans Energy, and all decisions taken by Stans KG as the shareholder of Kutisay Mining LLC were first adopted and authorised by Stans Energy and that Article 1(3)(2)(b) does not require that control must be direct. Rather, as concluded above, the definition of "investment" in Article 1(1) expressly includes "indirect" ownership and control.

446.     The Tribunal cannot agree with the Respondent's argument that subparagraph (c) is clear in that it only applies to joint stock companies. The definition of "foreign investor" in Article 1(3) is very wide which is in line with the primary intention of the 2003 Investment Law as referred to in its Preamble: "*This Law sets forth the main principles of the national investment policy aiming at improving the investment climate in the republic and promoting the flow of local and foreign investment by providing investors with a fair and equitable legal regime and guaranteeing protection of their investments made into the economy of the Kyrgyz Republic.*"[710] In view of this express intention of the 2003 Investment Law, and as there is no indication otherwise, the Tribunal considers that Article 1(3)(2) is not intended to exclude limited liability companies from subparagraph (c), so that these could qualify as foreign investors only under subparagraphs (a) and (b).

447.     Therefore, the Tribunal concludes that Kutisay Mining LLC qualifies as a "foreign investor".

**D.     WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS ACQUIRED THEIR INVESTMENTS THROUGH CORRUPTION**

448.     The Respondent further contends that the claims should be dismissed on the basis that the investments were obtained through corruption. The Claimants reject these allegations.

---

[710]     Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

1.      **The Respondent's Position**

449.     The Respondent argues that the Claimants' claims should be dismissed because they obtained their Licenses through corruption.[711] According to the Respondent, this illegality permeates the acquisition of the Licenses. The Respondent concludes that, regardless of whether this objection goes to jurisdiction or to admissibility, the Tribunal must dismiss a claim tainted with such illegality, and notes that investment tribunals have consistently dismissed claims where serious wrongdoing has tainted the investment.[712]

450.     The Respondent alleges that the Claimants paid a bribe in breach of Kyrgyz, Canadian, and international law in order to acquire the Licenses and bypass the legal requirement that they be allocated through a tender.[713]

451.     The Respondent contests that there is, as argued by the Claimants, any heightened standard of proof regarding corruption allegations,[714] noting that tribunals have accepted that such allegations can be proven through circumstantial evidence,[715] and may also be "inferred from objective factual circumstances."[716] The Respondent also argues that tribunals may draw adverse inferences from the failure of a party to produce documentation[717] and shift the burden of proof to the allegedly corrupt party where there is a reasonable indication of corruption.[718] The Respondent relies on the decision in *Spentex v. Uzbekistan*, which held that "elements of bribery are made out *'even if the final recipients of the bribe payments were not known'*."[719]

452.     Accordingly, the Respondent submits that it is not necessary to prove the Claimants' knowledge of the ultimate recipient of the bribe nor their knowledge of "(a) each and every

---

[711]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 521-523; Rejoinder on the Merits and Reply on Jurisdiction, at paras 86-90; Respondent's Post-Hearing Brief, at paras 11-12.

[712]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 522-525.

[713]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 521. See also, Respondent's Post-Hearing Brief, at para. 13.

[714]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 535; Rejoinder on the Merits and Reply on Jurisdiction, at para. 419.

[715]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 536; Rejoinder on the Merits and Reply on Jurisdiction, at para. 421; Respondent's Post-Hearing Brief, at para. 13.

[716]   Respondent's Post-Hearing Brief, at para. 13, referring to United Nations Convention Against Corruption, 31 October 2003, Article 28 (**Authority RLA-170**).

[717]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 422; Respondent's Post-Hearing Brief, at para. 13.

[718]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 537-538; Rejoinder on the Merits and Reply on Jurisdiction, at para. 423.

[719]   Respondent's Post-Hearing Brief, at para. 14 [emphasis in original], referring to Kathrin Betz, Proving Bribery, Fraud and Money Laundering in International Arbitration, (Cambridge University Press, 2017), p. 135, citing *Spentex Netherlands, B.V. v. Republic of Uzbekistan*, ICSID Case No. ARB/13/26, Award, 27 December 2016 (**Authority RLA-232**).

intermediary used to siphon the illicit payment to the ultimate recipient; or (b) the actual transfers that took place between the offshore company client accounts of AUB following the payment to Vesatel."[720] Furthermore, the Respondent claims that it is not necessary to prove that the investor actually engaged in corruption. Quoting the tribunal in *Minotte v. Poland,* the Respondent asserts that in some circumstances *"the deliberate closing of eyes to evidence of serious misconduct or crime [...] would indeed vitiate a claim".*[721]

453.     The Respondent contends that the Claimants' explanation for their overpayment (namely that such payment "could be retained by the Development Fund to finance its own activities") lacks credibility: the payment was solicited during a telephone call.[722] Moreover, the tariffs payable for acquiring the Licenses were expressly stipulated by law, and the Development Fund had no role in the allocation of mining licenses. Finally, Stans Energy must have known that the Licenses had to be allocated through a competitive tender.[723] The Respondent also underscores the particular circumstances in which the payment was made—as part of a "sham" auction where Stans KG paid nearly double the starting price despite being the only bidder.[724]

454.     The Respondent argues that the Claimants' failure to disclose, *inter alia*, documents related to their meetings with Mr. Eliseev, as ordered by the Tribunal pursuant to a request from the Respondent in the document production phase, must lead to the drawing of adverse inferences by the Tribunal.[725] According to the Respondent, the only plausible explanation is that Stans Energy made a corrupt payment in order to procure the Licenses, thereby bypassing the legal requirement of a tender.[726] Furthermore, the Respondent submits that the ultimate recipients of the bribe in this case were clearly "the Minister who *secretly* asked Mr Aryev for the double payment and Mr Eliseev [...] who promised his assistance[.]"[727]

455.     The Respondent asserts that it has provided extensive evidence that the Claimants obtained their Licenses through bribery.[728] Nevertheless, even if the Tribunal does not find "proof

---

[720]     Respondent's Post-Hearing Brief, at para. 14.
[721]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 526 [emphasis in original].
[722]     Respondent's Post-Hearing Brief, at paras 104,106.
[723]     Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 553-554.
[724]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 555; Respondent's Post-Hearing Brief, at paras 122-125.
[725]     Rejoinder on the Merits and Reply on Jurisdiction, at paras 426-428; Respondent's Post-Hearing Brief, at para. 128.
[726]     Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 557; Rejoinder on the Merits and Reply on Jurisdiction, at para. 416.
[727]     Respondent's Post-Hearing Brief, at para. 15 [emphasis in original].
[728]     Rejoinder on the Merits and Reply on Jurisdiction, at para. 429.

of actual knowledge, C[laimant]s at best engaged in wilful blindness. This is sufficient to vitiate the claim."[729] The Claimants' conduct, the Respondent contends, amounts to corruption under the two main international treaties which address it: (1) the 2003 United Nations Convention against Corruption ("**Merida Convention**") and (2) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("**OECD Convention**").[730] The Claimants' conduct would amount to bribery under both treaties as the Claimants provided an undue advantage (i.e. the double payment), and they obtained an undue advantage in return through the creation of an *ad hoc* scheme for the allocation of the Licenses.[731] The Respondent notes in this regard that bribery in international law extends to indirect payments.[732]

456.      The Respondent contends that the "defences" put forward by the Claimants do not exonerate them.[733] The Claimants' explanation for the overpayment—that the Claimants were not bidding for the Licenses but for the shares of a State-owned company, and that only the price of the former was fixed by law—is disputed by the Respondent. As the Respondent argues, the Licenses were the only asset of Kutisay, so the value of that company at the time of the auction "was equal only to the license fees due in their respect".[734] The Respondent also denies the Claimants' contention that they did not receive any undue advantage. That contention, the Respondent argues, is contradicted by Claimants themselves, who have admitted that "the total purchase price … reflected … substantially less than the market value of the projects at the time".[735] Finally, the Respondent contends that "even if the Claimants genuinely believed that their overpayment would be used to fund the Development Fund's projects, it would still amount to a bribe".[736]

457.      The Respondent submits that a tribunal should decline to exercise jurisdiction where a transaction has been entered into in violation of public policy norms, such as the Merida Convention and the OECD Convention.[737] The Claimants also paid a bribe under Kyrgyz law.

---

[729]   Respondent's Post-Hearing Brief, at para. 16, referring to *David Minnotte and Robert Lewis v. Republic of Poland*, ICSID Case No. ARB(AF)/10/1, Award, 16 May 2014, at para. 163 (**Authority RLA-149**); *Churchill Mining and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, 6 December 2016, at paras 501-504, 506, 508, 516-517 (**Authority RLA-150**).  See also, Respondent's Post-Hearing Brief, at paras 99-102.
[730]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 431-433.
[731]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 439.
[732]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 433.2.
[733]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 440.
[734]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 441-444.
[735]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 452-453, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 214.
[736]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 446.
[737]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 435.

The Respondent argues that the fact that the Kyrgyz Criminal Code applied only to individuals, and not to corporations, is not relevant here, since the matter at issue in this arbitration is not the individual criminal liability of the Claimants or their officers.[738]

458.    The Respondent argues that the fact that the bribe was allegedly requested by public officials cannot exonerate the Claimants from responsibility for the following reasons: (1) the Tribunal should not accept the Claimants' statement that it was public officials who requested the bribe when, despite the Tribunal's order for disclosure, the Claimants have produced no documentary evidence; (2) there was no "extortion" involved; (3) even if an official "extorted" money from them, Article 314(3) of the Kyrgyz Criminal Code, while relevant for criminal liability, does not address the question whether an investor can file a claim for breach of the 2003 Investment Law; and (4) not only Kyrgyz law was violated but also Canadian law, international law and international public policy, and the Claimants have not explained how any purported solicitation from public officials would relieve them from responsibility under these legal norms.[739]

459.    In any event, the Respondent contends that it is not sufficient for the Claimants to plead ignorance, because the Claimants failed to carry out any due diligence concerning the legality of the scheme. When confronted with the various warning signs, they were not entitled simply to put their "head in the sand".[740] The Respondent contends that "it is clear" that the Claimants conducted no appropriate due diligence before acquiring the Licenses.[741] The assertion that "the results of the legal due diligence '*were relayed orally because* [Stans] *did not need a written report*' is ludicrous."[742]

---

[738]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 436-437.
[739]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 456.
[740]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 558; Rejoinder on the Merits and Reply on Jurisdiction, at paras 101, 103-104, 106-114; Respondent's Post-Hearing Brief, at paras 10-11, referring to, *inter alia*, Printout of the New Zealand Companies Office register of directors, 2 November 2013 (**Exhibit R-435**); Decision No 1 of the sole participant of the Kutisay Mining OJSC, 9 December 2009 (**Exhibit C-49**); Decision No 13-1/2414 of the State Department for Regulation and Supervision of Financial Markets under the Government of the Kyrgyz Republic on the State registration of constitutive issue of shares of Kutisay Mining OJSC, 10 December 2009 (**Exhibit C-50**); Extract from Trust Management Agreement No 2/09-DU between Vesatel United Limited and Kyrgyz Republic Development Fund CJSC, 16 December 2009 (**Exhibit C-51**).
[741]    Respondent's Reply Post-Hearing Brief, at para. 39.
[742]    Respondent's Reply Post-Hearing Brief, at para. 40.

## 2.   The Claimants' Position

460.     The Claimants allege that the Respondent has failed to establish that the Claimants obtained their Licenses through corruption.[743] Furthermore, the Claimants contend that, in any event, the Respondent's own culpability would exonerate the Claimants.[744]

461.     The Claimants accept that, as a principle of law, the establishment of bribery may bar a tribunal's jurisdiction or admissibility of claims; however, they contend that the Respondent has failed to prove that the Claimants paid a bribe.[745]

462.     In this regard, the Claimants aver that, according to the prevailing view, allegations of criminal activity in international arbitration "are subject to a heightened standard of proof, resting squarely on the accusing party".[746] They argue that there "is no basis to lower the standard of proof" as the Respondent contends.[747]

463.     The Respondent, so the Claimants allege, operate on "on the false premise that the Claimants have withheld documents", and that the Tribunal may therefore "draw adverse inferences". According to the Claimants, "the Kyrgyz Republic seeks to achieve the dismissal of the arbitration on a mere *prima facie* case of bribery".[748] The Claimants deny having withheld any documents as they were unable, after a reasonable search, to identify responsive material.[749] The drawing of an adverse inference is a last resort for cases where:

> (1) the party seeking the inference has produced all available evidence corroborating the inference sought; (2) the party requesting the adverse inference has established that the party against whom the inference is sought has access to the evidence sought; (3) the inference is reasonable, consistent with facts in the record, and logically related to the probable nature of the evidence withheld; (4) the party seeking the adverse inference has produced *prima facie* evidence; and (5) the tribunal has afforded the party against whom the adverse inference is sought sufficient opportunity to produce evidence prior to drawing adverse inferences against it.[750]

---

[743]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 205-221; Rejoinder on Jurisdiction, at para. 75; Claimants' Post-Hearing Brief, at paras 9-10.
[744]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 222-225.
[745]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 206; Claimants' Post-Hearing Brief, at paras 9-10.
[746]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 207.
[747]   Claimants' Reply Post-Hearing Brief, at para. 9.
[748]   Rejoinder on Jurisdiction, at para. 76.
[749]   Rejoinder on Jurisdiction, at para. 77, referring to Letter from Freshfields Bruckhaus Deringer to King & Wood Mallesons, 5 October 2017 (**Exhibit R-430**).
[750]   Rejoinder on Jurisdiction, at para. 78, referring to J Sharpe, "Drawing Averse Inferences from the Non-production of Evidence" (2006) 22(4) *Arbitration International* 549, at p. 551 (**Authority CLA-321**).

464.     According to the Claimants, the Respondent has not addressed these elements. The drawing of adverse inferences is not justified, the Claimants contend, in circumstances where "not all of the evidence available to the Respondent on its allegations of bribery has been produced, where its allegations are inconsistent with its own evidence, and where the Respondent has not met even the lightest burden of proof".[751]

465.     The Claimants disagree with the Respondent's proposition that a showing of indicia of corruption suffices to shift the burden of proof to the Claimants, who would then have to "*disprove its allegations of corruption*".[752] The Claimants note that it is a general principle of law that a party bears the burden of establishing each element of its claim or defence and further argue that, with regard to allegations of corruption, there is consensus that the evidence should inspire "reasonable certainty".[753]

466.     The Claimants consider that the Respondent has failed to prove any wrongdoing by any standard and, in particular, has failed to demonstrate any of the key elements of the crime alleged, namely: (1) that the Claimants made an improper payment to the Respondent's representatives; (2) that such payment gave the Claimants an improper advantage; and (3) that the Claimants knew that the Respondent's representatives had improperly appropriated funds.[754]

467.     First, the Claimants deny having engaged in bribe-giving and having offered anything to any official to induce him or her to act or to refrain from acting in the exercise of official duties.[755] They note that no evidentiary link has been established to the effect that payments were made to any public official.[756] In particular, the Claimants were not involved in any of the subsequent transfers alleged by the Respondent.[757]

---

[751] Rejoinder on Jurisdiction, at paras 79-82.
[752] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 207 [emphasis in original].
[753] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 208, referring to *Vladislav Kim v. Republic of Uzbekistan* (ICSID Case No ARB/13/6) Decision on Jurisdiction, 8 March 2017, at para. 544 (**Authority CLA-289**).
[754] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 210-212; Rejoinder on Jurisdiction, at paras 85-86.
[755] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 213; Claimants' Post-Hearing Brief, at para. 13, referring to, *inter alia,* Hearing Transcript, Day 2, pp 434:21-435:16, 448:13-22, Day 3, pp 483:4-484:1, 489:11-16.
[756] Rejoinder on Jurisdiction, at para. 88.
[757] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 218.

468.     Regarding the contention that Stans paid more for the Licenses than required by law, the Claimants aver that, even if overpayment were proven, it should not be regarded as a bribe.[758] The Claimants aver that their conviction that they were engaged in a legitimate transaction is proven by the fact that the entire amount paid was recorded and publicly disclosed.[759]

469.     Second, the Claimants contend that even if they had paid more than required, they did not obtain any undue advantage as a result. Hence, there could be no link between the payment and the allocation of the Licenses,[760] and the higher payment could not have been a "red flag".[761] The Claimants add that, had an investor acquired the Licenses by tender or direct negotiations, it "would necessarily have paid more".[762]

470.     Third, the Claimants aver that, like many of the Respondent's own authorities at the time, they had no reason to believe that the Development Fund or the AUB were engaged in any kind of illegal conduct.[763] In the Claimants' view, Minister Kurmanaliev's "position in the Kyrgyz government and the circumstances of the request… confirmed that he was acting within the scope of his official capacity and in the name of the Kyrgyz State".[764] Moreover, the allegedly suspicious "circumstances" of the payment, the Claimants contend, were within the Respondent's "exclusive knowledge and control […] Claimants were entirely in the dark about the auction process".[765]

471.     The Claimants also deny the Respondent's contention that they could have been guilty of bribery even if they "genuinely believed" that the Development Fund would use their payment appropriately.[766] According to the Claimants, there can be no bribery if Stans Energy had no intention of giving a benefit in order to receive an improper favour from an official, and intent has not been proven.[767]

---

[758]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 215; Rejoinder on Jurisdiction, at para. 84; Claimants' Post-Hearing Brief, at para. 13.
[759]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 216-217.
[760]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 219.
[761]   Claimants' Reply Post-Hearing Brief, at para. 18.
[762]   Claimants' Reply Post-Hearing Brief, at para. 18.
[763]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 217; Rejoinder on Jurisdiction, at para. 84; Claimants' Post-Hearing Brief, at para. 8.
[764]   Claimants' Reply Post-Hearing Brief, at para. 12.
[765]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 220 *cf.* Rejoinder on the Merits and Reply on Jurisdiction, at paras 50-57. See also, Claimants' Post-Hearing Brief, at para. 10(b).
[766]   Rejoinder on Jurisdiction, at para. 87.
[767]   Rejoinder on Jurisdiction, at para. 87.

472.      In sum, the Claimants contend that it is possible, although not proven, that public officials may have stolen money from their payment but this would amount to embezzlement and not to bribery.[768] As the Respondent has failed to establish the Claimants' involvement in any improper activity, the Tribunal should uphold its jurisdiction.[769]

473.      In any event, the Claimants further argue that, should their payment be considered a bribe, it would have been then solicited by the Kyrgyz authorities[770] and, as a matter of Kyrgyz law, this would exonerate the Claimants.[771]

### 3.      The Tribunal's Analysis

474.      From its Procedural Order No. 9 regarding Post-Hearing Procedures, the Tribunal recalls its Questions 1 and 2:

> **Jurisdiction**
>
> 1. Assuming that the Tribunal accepts the scheme described by Mr. Beysheyev in his witness testimony as true, what is the evidence on the record that the Claimants (i) were aware or (ii) could have been expected to be aware of it? Based on that evidence, what are the legal consequences for the Claimants' claims in these proceedings?
>
> 2. Assuming that the Tribunal concludes that the 29 December 2009 auction at the Central Asian Stock Exchange was contrary to Kyrgyz law, what is the evidence on the record that the Claimants (i) were aware or (ii) could have been expected to be aware of such unlawfulness? What would be the legal consequence if the auction was contrary to Kyrgyz law but the Claimants were unaware of it?

475.      Further, the Tribunal points out that the Respondent has the burden of proof regarding its allegation that the Claimants acquired their investment through corruption.

476.      As the Parties have argued the issue of corruption referring to the issues addressed both in the above Questions 1 and 2, the Tribunal will also address both in conjunction. The first issue is whether the circumstances under which the Claimants made payments and received their Licenses are proven to show corruption. In this context, the Tribunal first focusses on evidence

---

[768]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 221; Rejoinder on Jurisdiction, at para. 15; Claimants' Post-Hearing Brief, at para. 9.

[769]   Rejoinder on Jurisdiction, at para. 89; Claimants' Post-Hearing Brief, at para. 9.

[770]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 222, referring to Statement of Defence, at para. 554.1 (*"The additional payment was solicited in a phone call after the conclusion of the meetings between Stans Energy and SAGMR"*).

[771]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 222-223, referring to Criminal Code of the Kyrgyz Republic No 68 of 1 October 1997 (as amended on 17 December 2009), Article 314(3) (**Authority CLA-293**): *"A person who has given a bribe shall be released from criminal liability if the official extorted the bribe […]"*

for corruption and will, should it not find that corruption is proven, only thereafter in Section V.E of this Award examine whether, even without corruption, a breach of Kyrgyz law would have the effect of depriving the Tribunal of jurisdiction or rendering the Claimants' claims inadmissible.

477.      As summarized above, the Respondent contends that the Claimants' explanation for their overpayment (namely that such payment "could be retained by the Development Fund to finance its own activities") lacks credibility: the payment was solicited during a telephone call.[772] Moreover, the tariffs payable for acquiring the Licenses were expressly stipulated by law, and the Development Fund had no role in the allocation of mining licenses. Finally, Stans Energy must have known that the Licenses had to be allocated through a competitive tender.[773] The Respondent also underscores the particular circumstances in which the payment was made—as part of a "sham" auction where Stans KG paid nearly double the starting price despite being the only bidder.[774]

478.      In this context, the Tribunal accepts as plausible the Claimants' argument that, like many of the Respondent's own authorities at the time, they had no reason to believe that the Development Fund or the AUB were engaged in any kind of illegal conduct.[775] In the Claimants' view, Minister Kurmanaliev's position in the Kyrgyz Government and the circumstances of his request for a higher payment could indeed be taken as showing that he was acting within the scope of his official capacity and in the name of the Kyrgyz Republic. The allegedly suspicious "circumstances" of the payment were within the Respondent's exclusive knowledge and control and the Claimants were neither acquainted nor in control of the auction process. Among other circumstances, the Tribunal regards it as significant that the Claimants made the entirety of the requested payment to the official bank account of the Development Fund, in a regular transaction recorded in the Claimants' books—this situation differs markedly from a scenario in which part of a payment is made in cash or to the bank account of a third party. Therefore, the Tribunal also does not find that the Respondent, which has the burden of proof, has provided sufficient evidence that the Claimants engaged in wilful blindness.

---

[772]   Respondent's Post-Hearing Brief, at paras 104, 106.
[773]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 553-554.
[774]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 555; Respondent's Post-Hearing Brief, at paras 122-125.
[775]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 217; Rejoinder on Jurisdiction, at para. 84; Claimants' Post-Hearing Brief, at para. 8.

479.     On the other hand, from the evidence provided, the Tribunal accepts the scheme described by Mr. Beysheyev in his witness testimony and confirmed in his oral testimony at the hearing as proven and accepts that, indeed, after the Claimants had paid, this evidence seems to show that the further processing of the payment was suspicious. But all of this processing occurred within the Respondent's system and control. And even in reply to the Tribunal's Question No. 1 quoted above, no evidence has been provided by the Respondent that the indeed suspicious details of the scheme described by Mr. Beysheyev were known to the Claimants. They can therefore not be attributed to the Claimants.

480.     Regarding the Respondent's allegation that the Claimants have withheld documents, and that the Tribunal may therefore draw adverse inferences, the Tribunal sees no reason to doubt the Claimants' assurance that they were unable, after a reasonable search, to identify further responsive material.

481.     In conclusion, therefore, the Tribunal finds that the Respondent has not provided evidence that is sufficient to show that the Claimants have obtained the investment by corruption or at least must have recognized corruption to be involved.

E.     WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS ACQUIRED THEIR INVESTMENTS IN BREACH OF KYRGYZ LAW

482.     The Respondent alleges that the Claimants' claims should be dismissed because they obtained their Licenses in breach of various provisions of Kyrgyz law: (1) Article 183 of the Kyrgyz Criminal Code, which prohibits money laundering; (2) Article 16 of the Subsoil Law, which sets out requirements for public tenders; and (3) Articles 408 and 409 of the Kyrgyz Civil Code, which lay out requirements for auctions.[776]

483.     The Claimants assert that the 2003 Investment Law "does not prevent disputes arising out of 'illegal' investments from being adjudicated",[777] and even if the 2003 Investment Law provided for such a legality requirement, it would not set "an absolute bar to jurisdiction".[778] In

---

[776]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 559-560; Respondent's Post-Hearing Brief, at para. 126.
[777]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 162; Rejoinder on Jurisdiction, at para. 50.
[778]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 168.

any event, the Claimants contend, the Respondent has failed to establish the Claimants' breaches of Kyrgyz law that could bar the Tribunal's jurisdiction.[779]

484.     Since they are interlinked, the Tribunal will examine the issues addressed under subsections 1 to 4 hereafter together at the end of this section.

## 1.     Whether and to What Extent the 2003 Investment Law Contains a Legality Requirement

### a.     The Respondent's Position

485.     The Respondent avers that claims by investors are to be dismissed when the investment has been made in breach of the law of the host State and alleges that the requirement that investments be lawful is both explicit and implicit in the instruments relied upon by the Claimants.[780] Specifically, the Respondent refers to Article 20(1) of the 2003 Investment Law, which provides that in carrying out their economic activity investors shall comply with the legislation of the Kyrgyz Republic, and to Article 4 of the Moscow Convention, which provides that investors shall have the right to make investments by any method not prohibited by the legislation of the recipient State.[781]

486.     The Respondent alleges that considerations relevant in the context of investment treaty arbitrations are equally applicable in the context of an arbitration based on an investment law.[782] This is so because an offer to arbitrate amounting to a unilateral declaration (within a national investment law) cannot be interpreted more expansively than a comparable offer within an investment treaty.[783]

487.     The Respondent argues that even in the absence of express "legality" requirements, investment tribunals have confirmed that there is an implicit limitation on their jurisdiction whenever claims are based on illegal investments.[784] The Respondent rejects the Claimants' contention that there is no support for the possibility to imply a legality requirement, arguing that there are numerous authorities which favour the existence such obligation,[785] and quoting, *inter*

---

[779]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 173-174.
[780]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 528-529.
[781]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 529.
[782]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 407.
[783]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 410 *cf.* Rejoinder on Jurisdiction, at para. 51.
[784]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 404.2.
[785]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 411.

*alia*, the *Fraport II* tribunal which stated that *"[…] there is an increasingly well-established international principle which makes international legal remedies unavailable with respect to illegal investments"*.[786]

488.      The Respondent strongly opposes the Claimants' contention that through its conduct it confirmed the legality of the Licenses.[787] According to the Respondent, the Claimants have not relied on estoppel, waiver, acquiescence or some other legal doctrine, which are not applicable under Kyrgyz law.[788] Even if the alleged conduct is correct, it does not demonstrate any "confirmation" by the Respondent of the Licenses' validity.[789]

489.      According to the Respondent, the principle of good faith is a principle under both international law and Kyrgyz law that prevents an individual from bringing proceedings in circumstances in which they have committed an "abuse". The principle is consistent with the practice of international tribunals to deny protection to an investor if it has "unclean hands" or acquired its investment in bad faith.[790] The Respondent contends that the Claimants were aware that they were making a corrupt payment, which is reinforced by their apparent lack of development of due diligence despite numerous red flags.[791] Bribery, corruption and money laundering are also contrary to international public policy.[792] Moreover, the alleged breaches of Kyrgyz law are serious breaches, which justify that the Tribunal declines to exercise jurisdiction over the merits.[793]

490.      The Respondent also rejects the appropriateness of following, as alleged by the Claimants, the balancing approach advocated in *Kim v. Uzbekistan* for the following reasons: (1) Article 31 of the VCLT and the preamble of a BIT played a central role in that tribunal's conclusions; (2) these considerations are inapplicable in this case, as proportionality is not a general principle of Kyrgyz law; (3) this reasoning has not been accepted in any subsequent

---

[786]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 530; Rejoinder on the Merits and Reply on Jurisdiction, at para. 409.
[787]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 481-483.
[788]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 482.
[789]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 483.
[790]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 404.3.
[791]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 531; Rejoinder on the Merits and Reply on Jurisdiction, at paras 98-100. See also, Respondent's Post-Hearing Brief, at para. 150.
[792]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 404.1, 414.
[793]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 412.

decision; and (4) even if a balancing exercise were applicable in this case, the breaches by the Claimants would be sufficiently serious to bar the Tribunal's jurisdiction.[794]

### b.    The Claimants' Position

491.    The Claimants assert that regardless of whether there was any illegality (which they deny), the 2003 Investment Law contains no legality requirement and does not prevent disputes arising from "illegal" investments from being adjudicated.[795]

492.    The Claimants argue that nothing in Article 20 of the 2003 Investment Law, which provides for the observance of Kyrgyz laws by investors, establishes such observance as a precondition for protection under the Law or for arbitration under Article 18 of the Law. They further argue that Article 20(1) applies to "investors", who by definition, must already have acquired an investment.[796]

493.    Moreover, the Claimants aver that "there is no indication that breach of the legal compliance obligation in Article 20(1) should result in the exclusion of disputes related to the investments in question from the protections of the Investment Law".[797] Rather, Article 20(2) provides for the consequences of non-compliance with Kyrgyz laws by stating that investors will be subject to normal judicial processes as appropriate for the violation at stake. In contrast with investment laws adopted by other countries,[798] the 2003 Investment Law does not provide for any limitation or abrogation of rights.[799]

494.    The Claimants contend that, in any event, a legality requirement would be limited in scope.[800] Claimants note that the Respondent relies on the decision in *Fraport II,* a case which dealt with a bilateral investment treaty, not a municipal investment law.[801] Moreover, they argue that the Respondent's allegation that its unilateral consent to arbitration in the investment law

---

[794]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 413.
[795]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 162-166; Rejoinder on Jurisdiction, at para. 50; Claimants' Post-Hearing Brief, at para. 16.
[796]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 164.
[797]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 165.
[798]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 166, referring to Tunisia Law No 93-120 of 27 December 1993 promulgating the Investment Incentives Code, at Article 65(1) (**Authority CLA-199**); and Order of the Republic of Guinea No 001/PRG/87, 3 January 1987, at Article 27 (**Authority CLA-234**).
[799]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 166.
[800]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 167-172. See also, Claimants' Post-Hearing Brief, at para. 17.
[801]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 167.

should be treated like a State's consent to arbitration in a bilateral investment treaty[802] "is contrary to the Respondent's previous position that the 2003 Investment Law cannot be interpreted as an international legal instrument".[803]

495.      In any event, even if international law were relevant for the interpretation of the jurisdictional scope of the 2003 Investment Law, "[t]here is no support for the proposition that an absolute bar to jurisdiction is to be implied in an instrument that does not so stipulate".[804] The Claimants note that the tribunal in *Fraport II* was interpreting the express limitation of a treaty clause and "did *not* suggest that absent the language it was interpreting such a limitation could be implied or imported by operation of general legal principles".[805]

496.      The Claimants note that even in cases concerning an express "legality" provision in a treaty, tribunals have been careful in applying such a limitation of jurisdiction and have only dismissed claims on this ground in certain serious instances where the nature of the violation justified such a result.[806] The Claimants invoke the *Quiborax* decision, in which the tribunal held that an expansive interpretation of the legality requirement "would create deleterious incentives, as host States would be in a position to strip investors of treaty protection by finding any minor breach at any time".[807] The Claimants contend that a balanced interpretation must be followed, especially in cases where the legality requirement is implicit (assuming that an implicit requirement can actually exist);[808] and they rely on the *Kim v. Uzbekistan* decision as an example of such a balanced approach, which:

> requires a case-by-case analysis examining both the seriousness of the investor's conduct and the significance of the obligation not complied with so as to ensure that the harshness of the sanction of placing the investment outside of the protections of the BIT is a proportionate

---

[802]   Rejoinder on Jurisdiction, at para. 51, referring to Rejoinder on the Merits and Reply on Jurisdiction, at para. 410.

[803]   Rejoinder on Jurisdiction, at para. 51, referring to Award on Jurisdiction, at paras 56-61.

[804]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 168, referring to *Phoenix Action, Ltd v. Czech Republic* (ICSID Case No ARB/06/5) Award, 15 April 2009, at para. 101 (**Authority RLA-222**); and *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana* (ICSID Case No ARB/07/24) Award, 18 June 2010, at paras 123-128 (**Authority RLA-148**). See also, Rejoinder on Jurisdiction, at para. 52.

[805]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 168 [emphasis in original].

[806]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 169, referring to *Vladislav Kim v. Republic of Uzbekistan* (ICSID Case No ARB/13/6) Decision on Jurisdiction, 8 March 2017, at para. 390 (**Authority CLA-289**).

[807]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 170, referring to *Quiborax SA, Non Metallic Minerals SA and Allan Fosk Kaplún v. Plurinational State of Bolivia* (ICSID Case No ARB/06/2) Decision on Jurisdiction, 27 September 2012, at para. 263 (**Authority CLA-280**).

[808]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 171.

consequence for the violation examined.[809]

497.    The Claimants assert that the consistent practice of investment tribunals shows that only illegal conduct at the time an investment is "made" (and not afterwards) may raise a jurisdictional bar.[810] Furthermore, illegality that results from the State's conduct (rather than the Claimants') cannot deprive the Tribunal of jurisdiction. This follows from the maxim that a party should not be permitted to benefit from its own wrong.[811]

498.    Moreover, the Claimants consider the Respondent's allegations concerning their purported engagement in any illegal activity as groundless and a mere an attempt to avoid liability. As evidence, the Claimants refer to the Respondent's "ratification" of the Claimants' activity through the conclusion of License Agreements No. 2 and 3; allegations of illegality appear for the first time in these proceedings.[812] The Claimants argue that the Respondent repeatedly confirmed the legality of the Claimants' investments through the re-issue of the Licenses in 2010 and the conclusion of new License Agreements in 2010 and 2012.[813]

499.    Even if some illegality could be proven, the Claimants reiterate that substantive protection of, or consent to arbitration under, the 2003 Investment Law are not conditioned by any legality requirement. In any event, even if it there were such conditionality, it could only apply in limited circumstances, which have not been proven by the Respondent "even assuming the breaches of Kyrgyz law as alleged".[814]

---

[809]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 172, referring to *Vladislav Kim v. Republic of Uzbekistan* (ICSID Case No ARB/13/6) Decision on Jurisdiction, 8 March 2017, at para.404 (**Authority CLA-289**).
[810]    Rejoinder on Jurisdiction, at para. 55.
[811]    Rejoinder on Jurisdiction, at para. 56. See also, Claimants' Post-Hearing Brief, at para. 17.
[812]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 173.
[813]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 227-229.
[814]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 174; Rejoinder on Jurisdiction, at para. 54.

### 2.    Whether the Claims Should Be Barred Because the Licenses Were Obtained in Breach of the Prohibition of Money Laundering under the Kyrgyz Criminal Code

#### a.    The Respondent's Position

500.    The Respondent contends that the Claimants breached the prohibitions against money laundering under Kyrgyz law and international law.[815] In particular, the Respondent submits that:

> C[laimant]s knew, or at the very least should have known, that the double payment *secretly* requested by Minister Kurmanaliev in exchange for the "bullet proof procedure" concocted by Mr Eliseev and the Minister constituted a bribe that was destined not for the State budget but for Minister Kurmanaliev, Mr Eliseev and/or their associates. To achieve this, the proceeds needed to be laundered in a manner similar to that described by Mr Beysheyev.[816]

501.    The Respondent underscores that Mr. Beysheyev testified at the Hearing that corruption within the Bakiev regime "was widely perceived by Kyrgyz society at large in 2009, including that AUB and its chairman, Mr Mikhail Nadel, were connected with and even protected by the Bakiev regime."[817]

502.    The Respondent argues that "the proceeds of this rigged auction were then rapidly transferred through a series of offshore bank accounts"[818] in breach of the money laundering prohibition under Article 183 of the Kyrgyz Criminal Code. Specifically:

> they sought to make the ownership of criminal revenue (i.e. the bribe) […] look legitimate through an auction […] their actions involved the transfer of assets […] were undertaken with the knowledge that the funds represented criminal activity revenue; and this was for the purpose of concealing the criminality of the assets[.][819]

503.    According to the Respondent, the sanctions provided under Kyrgyz law for money laundering are irrelevant for determining whether the breach of such law justifies the dismissal of an investment claim.[820] The Respondent also contests the Claimants' argument that the absence of criminal charges would show that the violation of money laundering laws did not affect a significant interest of the Kyrgyz Republic. First, the Respondent argues that the proportionality principle has no role to play in determining whether the Claimants can bring a claim, and is not a

---

[815]    Respondent's Post-Hearing Brief, at para. 17, referring to Criminal Code of the Kyrgyz Republic No 68 of 1 October 1997, Article 183 (**Authority CLA 293**); United Nations Convention Against Corruption, 31 October 2003, Article 13 (**Authority RLA-170**).
[816]    Respondent's Post-Hearing Brief, at para. 7 [emphasis in original].
[817]    Respondent's Post-Hearing Brief, at para. 99, referring to Hearing Transcript, Day 3, pp 551:8-553:7.
[818]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 562. See also, Respondent's Post-Hearing Brief, at para. 6.
[819]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 563 [footnotes omitted].
[820]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 459.

relevant consideration in determining whether a particular transaction was contrary to international public policy.[821] In any event, engaging in money laundering infringes "significant interests" of the Respondent.[822]

504.    The Respondent considers that the fact that some Kyrgyz officials may have been complicit in a corrupt scheme does not prevent the Respondent from raising such illegality as a bar to the Tribunal's jurisdiction.[823]

505.    The Respondent reiterates its position that it is irrelevant that the Kyrgyz Criminal Code only applied to individuals at the relevant time, since the question before this Tribunal is not the individual criminal liability of the Claimants or its officers but a question of jurisdiction in circumstances where an investment has been acquired in violation of such norms.[824]

506.    The Respondent also refuses the Claimants' argument that the Claimants' positive knowledge of money laundering was required. Rather, according to the Respondent, "C[laimant]s' *actual* knowledge of what happened inside AUB is irrelevant. The question is, how likely was that to happen *in the circumstances* (whether in the same or similar manner, whether in AUB or elsewhere)."[825]

507.    Hence, the Respondent argues that the Tribunal should decline jurisdiction because money laundering is contrary to international public policy[826] and any award based upon an investment procured through or tainted by money laundering is liable to be set aside to prevent a party from benefitting from its involvement in such illegality.[827] What Mr. Beysheyev's evidence proved, according to the Respondent, was that "*as a matter of fact* the overpayment went not to the State but was laundered and dissipated."[828]

---

[821]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 460.
[822]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 460.1.
[823]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 461.
[824]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 464-469.
[825]    Respondent's Reply Post-Hearing Brief, at para. 5 [emphasis in original].
[826]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 470-473; Respondent's Post-Hearing Brief, at para. 18.
[827]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 458, referring to Ruling of the Paris Court of Appeal (Division 1, Chamber 1) in Case No 15/01650, *The Kyrgyz Republic v. Mr Valeriy Belokon,* dated 21 February 2017, at pp 8-9 (**Authority RLA-129**).
[828]    Respondent's Reply Post-Hearing Brief, at para. 5 [emphasis in original].

### b.    The Claimants' Position

508.    The Claimants assert that the Respondent has failed to prove any breach by the Claimants of Article 183 of the Kyrgyz Criminal Code.[829] In particular, the Claimants contend that nothing in Mr. Beysheyev's testimony suggests nor substantiates that Stans Energy would have engaged in money laundering.[830] To the contrary, the Claimants argue that Mr. Beysheyev confirmed at the Hearing that "no money laundering took place until after the money received by the Development Fund had been stolen by AUB employees and transferred away."[831]

509.    According to the Claimants, it was confirmed during the Hearing that "his investigation concluded only that employees of AUB stole money from depositors, including the Development Fund, and then moved those funds offshore",[832] while there is no evidence that any government officials or Development Fund employees would have been involved with "any purported malfeasance or wrongdoing".[833] Rather, the Claimants argue that Mr. Beysheyev's testimony "demonstrates that Stans Energy *could not have been* aware of any wrongdoing",[834] as the alleged misconduct of AUB's employees was hidden through "exceptionally complex" schemes,[835] the discovery of which:

> required considerable investigative work over several years by a specialized department drawing on police powers and the resources of the Kyrgyz National Bank, and with full access to AUB's internal records.[836]

510.    According to the Claimants, there is no evidence to support that the mere involvement of AUB in the transaction should have alerted Stans Energy to potential illicit conduct or that Stans Energy was "wilfully blind".[837] On the contrary, the Claimants aver that Mr. Beysheyev's testimony confirmed that before 2010, AUB was the largest private bank in the Kyrgyz Republic,[838] "routinely used by sophisticated international correspondent banks […] and Kyrgyz public authorities",[839] as well as "well-regarded by the public and the banking community at

---

[829]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 178.
[830]    Claimants' Post-Hearing Brief, at para. 6, referring to Hearing Transcript, Day 3, pp 556:15-21, 557:19-17.
[831]    Claimants' Reply Post-Hearing Brief, at para. 19.
[832]    Claimants' Post-Hearing Brief, at para. 6, referring to Hearing Transcript, Day 3, pp 519:25-520:3, 539:10-541:24, 543:7-544:1, 545:23-547:12.
[833]    Claimants' Post-Hearing Brief, at para. 6, referring to Hearing Transcript, Day 3, p. 544:2-20.
[834]    Claimants' Post-Hearing Brief, at para. 7 [emphasis in original], referring to Hearing Transcript, Day 3, p. 548:2-13.
[835]    Claimants' Post-Hearing Brief, at para. 7, referring to Hearing Transcript, Day 3, pp 520:17-22, 539:4-9.
[836]    Claimants' Post-Hearing Brief, at para. 7, referring to Hearing Transcript, Day 3, pp 526:1-9, 539:7-9.
[837]    Claimants' Post-Hearing Brief, at para. 8, Claimants' Reply Post-Hearing Brief, at para. 6.
[838]    Claimants' Post-Hearing Brief, at para. 8, referring to Hearing Transcript, Day 3, p. 524:8-18.
[839]    Claimants' Post-Hearing Brief, at para. 8, referring to Hearing Transcript, Day 3, pp 531:13-532:3, 533:6-19, 533:20-534:15, 535:4-20, 541:8-13; Witness Statement of E. Beysheyev, 14 June 2017, at para. 47; Payment order No. 2 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 23 March 2010 (**Exhibit C-63**); Payment order

large".[840] Therefore, the Claimants consider that the Respondent has not carried its burden of proof with regard to these allegations.[841]

511.     Moreover, the Claimants argue that the Criminal Code in force at the relevant time did not criminalise the conduct of legal entities and for this reason alone the Claimants' conduct could not have breached Article 183.[842] The Claimants also assert that "[k]nowledge that the revenue was criminally obtained and an intent to conceal it are both essential elements of the crime",[843] and note that the Respondent has not provided any evidence with regard to these elements.[844] The Claimants criticize the Respondent's assertion that knowledge of, or intention to conceal, the proceeds of a crime are not elements of the crime in either Kyrgyz law or international law.[845] According to the Claimants, Article 183 of the Kyrgyz Criminal Code unequivocally requires criminal intent as an element of the crime of money laundering.[846] This is also the case for the relevant provisions of the Merida Convention, including the accessorial offence of "participation".[847]

512.     The Claimants also argue that, even if the Respondent could prove a breach of Article 183 of the Criminal Code, this would not deprive the Tribunal of jurisdiction.[848] Pursuant to Article 20(2) of the 2003 Investment Law the consequence would be that investors would be held liable in accordance with Kyrgyz laws and, thus, face the penalties imposed by Article 183.[849] The Claimants underscore that no investigation has been initiated or charges for money laundering brought against Stans Energy or Kutisay Mining LLC. This, they submit, proves that even if there had been a violation it did not affect a "significant interest" of the Respondent and deprivation of protection under the 2003 Investment Law would be disproportionate.[850]

---

No. 3 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 31 March 2010 (**Exhibit C-64**); Payment order No. 4 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 1 April 2010 (**Exhibit C-65**).

[840]   Claimants' Post-Hearing Brief, at para. 8, referring to Hearing Transcript, Day 3, pp 537:5-538:4, 538:5-19; AUB Corporate File 2009 (**Exhibit R-80**).

[841]   Claimants' Post-Hearing Brief, at para. 9.

[842]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 176, referring to Criminal Code of the Kyrgyz Republic No 68 of 1 October 1997 (as amended on 17 December 2009), Article 17 (**Authority CLA-293**).

[843]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 177.

[844]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 178.

[845]   Rejoinder on Jurisdiction, at para. 58.

[846]   Rejoinder on Jurisdiction, at para. 59.

[847]   Rejoinder on Jurisdiction, at paras 60-61.

[848]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 179.

[849]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 179.

[850]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 180.

513.     In any case, the Claimants contend that the purported illegal conduct would be attributable to the Respondent.[851] The Claimants consider that it would be "absurd" if the Respondent could deprive the Tribunal of jurisdiction on the basis of its own illegal activity.[852]

### 3.   Whether the Claims Should Be Barred Because the Licenses Were Obtained in Breach of the Tender Requirement Under the Subsoil Law

#### a.   The Respondent's Position

514.     The Respondent asserts that the Licenses for Kutessay II and Kalesay could only be allocated through tender, as required in Article 16 of the Subsoil Law, because both locations were listed as sites of national significance, and the Claimants' bribe was part of a corrupt scheme to bypass such requirement.[853] The Respondent avers that Resolution No 736 included an appendix with a *"LIST of Mineral Deposits to be Allocated through Tender"* which was accepted to be the list envisaged by Article 16 of the Subsoil Law.[854] The Respondent rejects the Claimants' argument that this was merely a tax resolution, which had no force in other areas, and alleges that it is irrelevant whether this Resolution includes any specific reference to Article 16 because its wording precisely mirrors such Article.[855]

515.     The Respondent notes that Resolution No 725 was passed precisely in an attempt to modify the tender requirement set forth in Resolution No 736.[856] However, the Respondent argues that Resolution No 725 was not in force on 21 December 2009, so it could not provide a legal basis for the Minutes adopted on that date (the invalidity of which has been confirmed by Kyrgyz courts).[857] The Respondent rejects the Claimants' contention that Resolution No 725 was "published" on 4 December 2009, noting that the Claimants are referring to the date of inclusion of the Resolution in the State Register of Laws.[858] In addition, however, there is the requirement

---

[851] Rejoinder on Jurisdiction, at para. 62.
[852] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 181.
[853] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 564; Rejoinder on Merits and Reply on Jurisdiction, at paras 474-475.
[854] Rejoinder on the Merits and Reply on Jurisdiction, at paras 61-62, referring to Resolution No. 736 of 30 December 2008 on Measures for Implementing Requirements of the Tax Code of the Kyrgyz Republic, as amended by Resolution No 410 of 25 June 2009 (**Authority CLA-99**).
[855] Rejoinder on the Merits and Reply on Jurisdiction, at paras 60-61.
[856] Rejoinder on the Merits and Reply on Jurisdiction, at para. 62, referring to Resolution No 725 on the Development of Competitive Procedures for Granting Subsoil Use Rights, dated 1 December 2009 (**Authority CLA-100**).
[857] Rejoinder on the Merits and Reply on Jurisdiction, at paras 64-66.
[858] Rejoinder on the Merits and Reply on Jurisdiction, at para. 67.

of official publication in a gazette, the "Erkin-Too", which must be complied with before a regulation comes into force.[859] Such official publication only occurred on 25 December 2009.[860]

516.    Even if Resolution No 725 had been in force (which is denied), such Resolution was invalid because it stood in conflict with hierarchically superior legal acts.[861] In any event, Kutisay did not satisfy the applicable requirements for direct negotiations under the Subsoil Law.[862] The Respondent argues that there is no proof that the Claimants were even aware of Resolution No 725 when acquiring the Licenses.[863]

517.    The Respondent rejects the contention that any breaches were entirely its fault, claiming that: (1) the Claimants were complicit in the "bullet-proof" scheme; (2) the Claimants have advanced no principled reason why the decisions in the cases they have relied on might be applicable to a claim under the 2003 Investment Law; and (3) even if they were not complicit in the illegalities (which the Respondent denies), they should be denied protection under the 2003 Investment Law as they failed to carry out adequate due diligence and were "wilfully blind".[864]

518.    The Respondent also rejects the Claimants' contention that they can rely on the 2003 Investment Law on the basis that they had "a good faith belief that the 2009 transfer was legal".[865] The Respondent points out that, contrary to the Claimants' suggestion, the Tribunal's position in *Kim v. Uzbekistan* was actually that *"[a]n action in good faith possibly may render an act of noncompliance less serious, but — depending on the seriousness of the law violated — not necessarily"*.[866]

519.    The Respondent denies that the Claimants' agreement to proceed without a tender could have been motivated by *"negative experience with a tender process in the Kyrgyz Republic previously."*[867] If this were true, the Claimants should have ensured that any acquisition complied

---

[859]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 68.
[860]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 69; Respondent's Post-Hearing Brief, at para. 33.
[861]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 136, 565-566; Respondent's Post-Hearing Brief, at para. 34.
[862]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 567; Rejoinder on the Merits and Reply on Jurisdiction, at paras 70-77.
[863]    Respondent's Post-Hearing Brief, at para. 33, referring to Rejoinder on the Merits and Reply on Jurisdiction, at paras 115-116, 584.2.
[864]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 479.
[865]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 480, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 202.
[866]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 480.1, referring to *Vladislav Kim v. Republic of Uzbekistan*, ICSID Case No ARB/13/6, Decision on Jurisdiction, 8 March 2017, at para. 403 (**Authority CLA-289**).
[867]    Respondent's Reply Post-Hearing Brief, at para. 15 [emphasis in original].

with the law. By deciding to proceed without a tender, "Stans chose to accept the risk that the Prosecutor would ultimately discover the illegal grant, and refer it to the court."[868]

### b.     The Claimants' Position

520.     The Claimants aver that the Respondent has failed to prove any breach by the Claimants of the tender requirements for the obtainment of Licenses under the Subsoil law.[869]

521.     The Claimants contend that Article 16 of the Subsoil Law did not preclude direct negotiations insofar Kutessay II and Kalesay were not "sites of national significance".[870] There were no "sites of national significance" in 2009.[871] It was only in 2013 that the Respondent issued a decision which for the first time included a list of such areas with direct reference to the Subsoil Law.[872] On the Claimants' account, the Respondent merely invokes a tax resolution (Resolution No 736), which lists sites accorded particular fiscal treatment but does not refer to the Subsoil Law and has nothing to do with subsoil regulation or licensing.[873] In any event, "Resolution 736 was superseded by the subsequent issuance of Resolution 725: both were instruments of equal ranking in the hierarchy of laws of the Kyrgyz Republic, and Resolution 725 was more specific".[874]

522.     The Claimants also address the Respondent's contention that Resolution No 725 was not in force at the relevant time, contending that such Resolution was published on 4 December 2009[875] and entered in force 15 days after such publication.[876] It was accordingly in force before the transfer of the Licenses to Kutisay Mining.[877] In response to the Respondent's argument that

---

[868]   Respondent's Reply Post-Hearing Brief, at para. 15.
[869]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 190-204.
[870]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 191-193; Rejoinder on Jurisdiction, at para. 69.
[871]   Rejoinder on Jurisdiction, at para. 69.
[872]   Reply on the Merits and Counter-Memorial on Jurisdiction, at para. 193, referring to Decree of the Government of the Kyrgyz Republic No 350 on the State of Affairs in the Mining Industry and Development Prospects, (as amended on13 June 2013) (**Authority CLA-298**). See also, Rejoinder on Jurisdiction, at para. 70.
[873]   Rejoinder on Jurisdiction, at para. 69.
[874]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 193.
[875]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 194, referring to Screenshot from the Kyrgyz Republic Ministry of Justice website, <http://cbd.minjust.gov.kg/act/properties/ru-ru/90363/20>, [Accessed 11 October 2017] (**Exhibit C-210**). See also, Rejoinder on Jurisdiction, at para. 72.
[876]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 194, referring to Law of the Kyrgyz Republic No 241 On Normative Legal Acts of the Kyrgyz Republic, 20 July 2009, Article 30(3): "*Other normative legal acts shall enter into effect fifteen days after their official publication, unless specified otherwise in the normative legal act itself* [...]" (**Authority CLA-297**).
[877]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 194; Rejoinder on Jurisdiction, at para. 73.

the Resolution was not published in the "Erkin-Too" Gazette until 25 December 2009,[878] the Claimants note that it was officially published in the State Register of Laws. In any event:

> it was entirely within the Respondent's power and responsibility to ensure that regulatory formalities were observed in its privatization process. The Respondent has not identified any public interest implicated by the timing of the publication.[879]

523.     Regarding the Respondent's contention that Kutisay Mining OJSC failed to provide the documentation required by law for the issuance of the Licenses, the Claimants note that Kutisay Mining OJSC was a State-owned company, so the quality of its application was a matter within the Respondent's control,[880] and such failure would not have provided a basis for denying its application.[881]

524.     The Claimants assert that from the adoption of Resolution No 725, the whole process of granting of the Licenses was carried out independently by the Respondent, while only illegal conduct created by the Claimants could constitute a bar to jurisdiction.[882] Otherwise, States could easily infect an investment with latent illegalities to avoid responsibility for subsequent breaches of international law.[883] Thus, even if the illegality were to be established, the Claimants did not take part in it and acquired Kutisay Mining OJSC by auction with the understanding, based on the Respondent's assurances, that Kutisay Mining OJSC properly held the Licenses.[884] These representations and the Respondent's subsequent conduct granting subsequent License Agreements are said to confirm the Claimants' good faith belief that the transfer was legal.[885]

525.     The Claimants argue that for these reasons their investments are protected under the 2003 Investment Law and they have the right to bring this dispute to international arbitration.[886]

---

[878]   Rejoinder on Jurisdiction, at para. 72, referring to Rejoinder on the Merits and Reply on Jurisdiction, at para. 69.
[879]   Rejoinder on Jurisdiction, at para. 73.
[880]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 195 *cf.* Rejoinder on the Merits and Reply on Jurisdiction, at para. 56.
[881]   Rejoinder on Jurisdiction, at para. 74.
[882]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 198.
[883]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 198.
[884]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 200.
[885]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 201-203.
[886]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 204.

**4.     Whether the Claims Should Be Barred Because the Licenses Were Not Obtained in a Genuine Auction, Contrary to Requirements of the Kyrgyz Civil Code**

**a.     The Respondent's Position**

526.     The Respondent alleges that Claimants took part in an auction while knowing in advance that it would be rigged.[887] The auction process breached Articles 408 and 409 of the Kyrgyz Civil Code, which require that there should have been at least two bidders in the auction. In the present case the other bidder was not genuine. In addition, the auction should have been advertised at least 30 days in advance, rather than only one week.[888]

527.     The Respondent points out that Mr. Aryev testified at the Hearing that the Claimants' local legal team took part in the auction.[889] In light of this testimony, the Respondent regards it as "astonishing" that the Claimants, despite having allegedly retained legal advisers, did not verify that the auction at which they acquired their purportedly most significant asset complied with Kyrgyz law, and instead relied solely on undocumented assurances from individuals.[890]

528.     The Respondent submits that knowledge of the requirements of the Kyrgyz Civil Code must be imputed to the Claimants.[891] In the circumstances of this case:

> it is inconceivable that C[laimant]s did not check that the auction process, including the notice requirement, was compliant in every respect. That C[laimant]s (allegedly being advised by local lawyers) ignored the lateness of the notice when it posed a risk of invalidity of the auction, can only mean that C[laimant]s took a calculated risk of accepting the Licenses even though they knew that the auction process was irregular.[892]

529.     The Respondent asserts that the lack of another bidder makes the auction unlawful. The payment of the deposit "simply qualifies a participant to take part in the auction. However, it is the *actual participation* in the auction, *i.e.* making a competing bid, which is relevant for validity".[893]

---

[887]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 568; Rejoinder on the Merits and Reply on Jurisdiction, at paras 86-90. See also, Respondent's Post-Hearing Brief, at paras 20, 22.

[888]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 569; Rejoinder on the Merits and Reply on Jurisdiction, at paras 80-83, 474.2; Respondent's Post-Hearing Brief, at para. 29.

[889]   Respondent's Post-Hearing Brief, at para. 21, referring to Hearing Transcript, Day 2, pp 294:6-9, 295:11-13. See also, Respondent's Post-Hearing Brief, at para. 127.

[890]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 83.

[891]   Respondent's Post-Hearing Brief, at para. 21.

[892]   Respondent's Reply Post-Hearing Brief, at para. 9.

[893]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 87-88 [emphasis in original].

530.     The Respondent argues that the Claimants conduct "*before, during and subsequent to*, the auction, evidences that they knew *at all those times* that the auction was a sham and in breach of law[.]"[894] In particular, the Respondent refers to the testimony of Mr. Aryev at the Hearing that the *"other company"* that participated in the auction *"was not qualified to bid and ultimately did not bid."*[895] The Respondent also points out that the maximum bid authorised by Stans Energy "was the exact amount that Stans Energy agreed with the corrupt members of the Bakiev regime in exchange for the 'bullet-proof' scheme [and …] there was no reason for Stans Energy to limit the authorised maximum bid to such a 'modest' amount […] unless Stans Energy knew that the auction was rigged".[896] In any event, the Claimants' knowledge is irrelevant for the question whether there were breaches of Kyrgyz law.[897]

531.     The Respondent argues that, contrary to Claimants' "unevidenced assertion", Kyrgyz law does not allow the withdrawal of the shares during or after the bidding process if a desired "reserve price" is not achieved at the auction.[898] In circumstances in which the starting price was 19 million soms and the bidding process was to last for an hour,[899] the Respondent claims that "unless C[laimant]s were certain that they were the only bidder, it defied the logic of any bidding process to bid all the money the bidder had *as its opening bid*, as Stans KG did[.]"[900] Furthermore, the Respondent alleges that Stans KG would have known from its broker in the auction, Ak-Tilek Investment LLC ("**Ak-Tilek**"), that no one else was taking part in the auction.[901] In such circumstances, the Respondent contends that:

> it defied common sense to bid *double* the amount of the starting price […] where there were no other competitive bids, unless the sole intention of the auction was to give the appearance of legitimacy for C[laimant]s' payment of the amount unprovided for by law but requested in secret by phone by Minister Kurmanaliev.[902]

532.     The Respondent also considers that the breach of the auction requirements was sufficiently serious to justify dismissal of the claims and alleges that not only breaches of the law

---

[894]   Respondent's Post-Hearing Brief, at paras 22, 28 [emphasis in original].
[895]   Respondent's Reply Post-Hearing Brief, at para. 11 [emphasis in original].
[896]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 89-90, referring to, *inter alia*, Decision by Stans Energy Corp., dated 25 December 2009 (**Exhibit C-211**). See also, Respondent's Post-Hearing Brief, at para. 23, referring to Hearing Transcript, Day 2, p. 322:15-25.  See also, Hearing Transcript, Day 3, pp 490:5-491:5.
[897]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 84-85; Respondent's Post-Hearing Brief, at para. 37.
[898]   Respondent's Post-Hearing Brief, at para. 24.
[899]   Respondent's Post-Hearing Brief, at para. 25, referring to Central Asian Stock Exchange CJSC announcement of public auction of shares in Kutisay Mining OJSC (**Exhibit C-155**); Hearing Transcript, Day 2, pp 419:20-420:2.
[900]   Respondent's Post-Hearing Brief, at para. 26 [emphasis in original].
[901]   Respondent's Post-Hearing Brief, at para. 26, referring to Mandate Agreement No 26/12-1 between Stans KG and Ak Tilek, 26 December 2009 (**Exhibit C-212**).
[902]   Respondent's Post-Hearing Brief, at para. 27 [emphasis in original].

which have "automatic nullifying requirements" operate as a bar to the jurisdiction of the Tribunal.[903] To exemplify this, the Respondent notes that corruption is recognized as a bar to jurisdiction, although it does not automatically "nullify" an investment.[904] The Respondent also contends that even if the Claimants did not actually know that the auction was unlawful, the Tribunal still lacks jurisdiction and their claims are inadmissible as "ignorance of the law can never excuse a party from the legal consequences of their actions."[905] Moreover, the Respondent underscores the lack of evidence of the Claimants' fulfilment of their duty to conduct legal due diligence.[906]

533.     The Respondent also rejects the Claimants' contention that the three-year limitation period for an application for annulment of the auction had expired.[907] According to the Respondent, any mining company which may have had an interest in taking part in the auction and was deprived of this opportunity due to the lack of proper advertisement qualifies as an "interested party".[908] As the Claimants acknowledge, it was difficult to obtain information regarding the auction,[909] and the Respondent alleges that "interested parties" are still to learn about the violation of their rights (as such knowledge cannot be imputed to them for purposes of Article 216(2) of the Kyrgyz Civil Code). The period of limitations to file an application to invalidate the auction has yet to start running.[910]

### b.     The Claimants' Position

534.     The Claimants contest that the Respondent has proven any breach by the Claimants of the requirements for auctions under the Civil Code.[911]

535.     The Claimants argue that it was the Respondent, and not Stans KG, who organised and publicised the auction, so any illegality would be entirely the Respondent's fault and could not

---

[903]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 478. See also, Respondent's Post-Hearing Brief, at para. 35.
[904]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 478.
[905]    Respondent's Post-Hearing Brief, at para. 36, referring to *Maffezini v. Spain* (ICSID Case No ARB/97/7), Award, 13 November 2000, at para. 70 (**Authority CLA-21**).
[906]    Respondent's Post-Hearing Brief, at para. 36.
[907]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 91-95.
[908]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 92.
[909]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 93.
[910]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 94-95, referring to Article 216 of the Kyrgyz Civil Code (**Authority RLA-286**) which provides in relevant part as follows:  *"2. The limitation period starts to run <u>from the day on which the person learned or should have learned about the violation of his right.</u> Exceptions to this rule are set out by this Code and other laws."*
[911]    Reply on the Merits and Counter-Memorial on Jurisdiction, at para. 183.

PCA 278376                                                        155

affect the Tribunal's jurisdiction.[912] In particular, the Claimants aver that only the Respondent was in a position to produce evidence as to how the auction was organised and carried out. However, the Respondent has not done so despite requests from the Claimants in the document production phase.[913] In particular, the Claimants point out that the Respondent has not provided its instructions to the CASE, the full auction report or any evidence "as to whether there was a reserve price equivalent to the statutory tariff for Kutessay II and Kalesay, or some other amount."[914] The Claimants also consider that it would be disproportionate to deny jurisdiction due to a *"de minimis"* violation of a local law, in which the Claimants did not take part.[915]

536.    The Claimants aver that they were given assurances by individuals from different levels of the Kyrgyz Government that the auction complied with local law.[916] According to the Claimants, they could not have known that the notice given prior to the auction was insufficient to satisfy Article 408 of the Kyrgyz Civil Code.[917] Likewise, the Claimants assert that they did not know until the Respondent's Statement of Defence on the Merits and Memorial on Jurisdiction how many bidders took part in the auction or what their qualifications were.[918] They also note that the Respondent does not refer to any provision of the Kyrgyz Civil Code that would disqualify Gremar SA, the "other bidder".[919] According to the Claimants, Article 408(5) of the Civil Code only requires that more than one bidder register to participate and does not suggest that every potential buyer must place a bid.[920]

537.    The Claimants point out that a violation of Articles 408 and 409 of the Kyrgyz Civil Code has no automatic effect under Kyrgyz law, and the auction stands valid until national courts

---

[912]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 183; Rejoinder on Jurisdiction, at paras 64, 66.
[913]    Claimants' Post-Hearing Brief, at para. 30, referring to Annex A to Procedural Order No. 7, request 12.
[914]    Claimants' Post-Hearing Brief, at para. 30, referring to Annex A to Procedural Order No. 7, request 12; Hearing Transcript, Day 1, p. 147:2-6; Resolution of Stans Energy Corp, 25 December 2009 (**Exhibit C-211**); Kutisay Mining OJSC, Auction report, 29 December 2009 (**Exhibit C-53**).
[915]    Rejoinder on Jurisdiction, at para. 64 [emphasis in original]; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 183.
[916]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 185, referring to First Witness Statement of B. Aryev, 29 January 2016, at paras 35-36. See also, Claimants' Post-Hearing Brief, at para. 28, referring to Hearing Transcript, Day 2, pp 281:9-15, 307:22-308:2, 309:5-11. See also, Hearing Transcript, Day 2, pp 276:1-5, 277:5-11, 277:18-278:3.
[917]    Claimants' Post-Hearing Brief, at para. 28.
[918]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 186; Claimants' Post-Hearing Brief, at para. 29, referring to Hearing Transcript, Day 2, pp 323:21-324:3, 420:19-25.
[919]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 186. See also, Rejoinder on Jurisdiction, at paras 65-66.
[920]    Rejoinder on Jurisdiction, at para. 65.

uphold a petition to invalidate it.[921] Hence, even if the Tribunal were to find that the auction breached Kyrgyz law, there would be no impact on jurisdiction because any violation would be entirely the responsibility of the Respondent and "would be insufficiently serious in light of the absence of any automatic nullifying effect under local law".[922]

538.    Engaging with the disputed contention that the prior Government's conduct cannot be attributed to the Respondent today, the Claimants underscore that the Respondent had two years after the change of regime before the statute of limitations expired in 2012, and it never took any action to invalidate the auction.[923] The Claimants also deny that any would-be bidders would be still unaware about the auction and could still seek to reverse the auction, as it was publicly declared, investigated, and the subject of a complaint by the previous owner, CAMG.[924]

### 5.    The Tribunal's Analysis

539.    From its Procedural Order No. 9, Regarding Post-Hearing Procedures, the Tribunal recalls its Question 2:

> **Jurisdiction**
>
> 2.  Assuming that the Tribunal concludes that the 29 December 2009 auction at the Central Asian Stock Exchange was contrary to Kyrgyz law, what is the evidence on the record that the Claimants (i) were aware or (ii) could have been expected to be aware of such unlawfulness? What would be the legal consequence if the auction was contrary to Kyrgyz law but the Claimants were unaware of it?

540.    Article 20 of the 2003 Investment Law provides:

> **Article 20. Observance by Investors of Kyrgyz Laws**
>
> 1.  Investors shall observe Kyrgyz laws when carrying out their economic activity in the

---

[921]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 187; Rejoinder on Jurisdiction, at para. 67. See also, Claimants' Post-Hearing Brief, at para. 32.

[922]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 188. See also, Claimants' Post-Hearing Brief, at para. 32.

[923]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 189, referring to Civil Procedure Code of the Kyrgyz Republic No 146 of 29 December 1999, (as amended on 12 October 2009), Article 263(3) (**Authority CLA-294**); Civil Code of the Kyrgyz Republic of 8 May 1996 No 15, (as amended on 12 October 2009), Article 212  (**Authority CLA-292**). See also, Claimants' Post-Hearing Brief, at para. 31.

[924]    Rejoinder on Jurisdiction, at para. 67, referring to  Central Asian Stock Exchange CJSC announcement of public auction of shares in Kutisay Mining OJSC (**Exhibit C-155**); Resolution of the Committee of the Kyrgyz Republic Jogorku Kenesh for Development of Industries of the Economy "On the Protocol Instruction of the Kyrgyz Republic Jogorku Kenesh II No 242-V dated 21 June 2012", 26 June 2012, (**Exhibit C-18**); Letter from the First Deputy of the Prosecutor General R. Baktybaev to the Minister of Natural Resources of the Kyrgyz Republic, August 2011 (**Exhibit R-362**); Letter from the Public Association "Aktyuz Platinum" to the Speaker of the Jogorku Kenesh of the Kyrgyz Republic, 3 August 2012 (**Exhibit R-376**).

territory of the Kyrgyz Republic.

2.   In the event of a violation of Kyrgyz laws, investors shall be held liable in accordance with Kyrgyz laws.[925]

541.      While it is clear that this provision is relevant for the substantive application of Kyrgyz law, the Tribunal sees no indication from the text or a possible interpretation of the provision that it excludes the jurisdiction provided for in Article 18 of the same Law irrespective of whether one relies on one or the other of the slightly different English translations of Article 18 provided by the Parties. Though Article 18 is very elaborate, it does not make any kind of exception to the effect that the question of the observance of Kyrgyz law should not fall under the jurisdiction it provides for investment disputes.

542.      And the definition of "Investment Disputes" in Article 1(6) of the same Law provides as follows:

> "Investment dispute" means any dispute between an investor and government bodies, officials of the Kyrgyz Republic and other participants of investment activity, arising in the process of investment.[926]

Again, there is no indication in the text or a possible interpretation that violations of Kyrgyz law should not be within the jurisdiction. Rather, the words "any dispute" suggest otherwise.

543.      In view of these considerations, the Tribunal has no doubt that it has jurisdiction also over alleged breaches of Kyrgyz law, to the extent relevant to decide an "Investment Dispute" within the meaning of Article 18 of the 2003 Investment Law. The breaches of Kyrgyz law alleged by Respondent will therefore be examined in the Tribunal's consideration of the merits in so far as considered relevant.

## F.   WHETHER THE CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMANTS BROUGHT THEM IN BAD FAITH

### 1.   The Respondent's Position

544.      The Respondent argues that the claims pursued in these proceedings are only available to those who pursue them in good faith.[927] The Respondent asserts that Stans Energy made a

---

[925]   Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[926]   Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[927]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 570.

deliberate decision to withhold from the market, in breach of relevant Canadian disclosure obligations for listed companies, and even from the CFO herself, AsiaRud's conclusions which advised that their Licenses were worthless.[928]

545.      According to the Respondent, the only plausible explanation for the suppression of AsiaRud's advice was "to justify an inflated claim for damages in these arbitral proceedings […] [t]his constitutes bad faith and the seeking of an unfair advantage in the pursuit of an international remedy, and justifies the Tribunal dismissing the claims".[929]

546.      The Respondent initially indicates that, in the interests of procedural economy, it does not contest jurisdiction or admissibility on this basis.[930] Nevertheless, in its Post-Hearing Brief the Respondent asserts that the Claimants should be denied protection because they have "unclean hands" and acquired their investments in bad faith.[931]

## 2.      The Claimants' Position

547.      The Claimants aver that the claims were brought in good faith.[932] While accepting that in certain limited circumstances an abuse of process could lead a tribunal to decline jurisdiction, the Claimants contend that "[n]o tribunal has ever found that a claim for reparation or compensation constitutes an abuse of process, regardless of its motivation".[933] According to the Claimants, the vindication of actual rights through arbitration cannot possibly occur in bad faith.[934]

548.      The Claimants aver that recourse to arbitration was "not a convenient 'early' exit from their projects" but a last resort after having attempted to obtain reinstatement of their rights between 2012 and 2014.[935] Accordingly, the Respondent's objection is without basis and should be rejected.[936]

---

[928]      Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 571-573.
[929]      Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 574-575.
[930]      Rejoinder on the Merits and Reply on Jurisdiction, at para. 359.
[931]      Respondent's Post-Hearing Brief, at para. 18, referring to Civil Code, Arts. 9(1) and (3) (**Authority RLA-287**); *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA227, Final Award, 18 July 2014, at para. 1364 (**Authority RLA-173**); *Inceysa Vallisoletana SL v. Republic of El Salvador*, ICSID Case No ARB/03/26, Award, 2 August 2006, at para. 242 (**Authority RLA-56**); *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, at para. 144 (**Authority RLA-146**).
[932]      Reply on the Merits and Counter-Memorial on Jurisdiction, at paras 230-235.
[933]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 231.
[934]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 231.
[935]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 232-233.
[936]      Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 235.

### 3.    The Tribunal's Analysis

549.       It is not clear to the Tribunal whether, in spite of its express withdrawal in paragraph 359 of its Rejoinder on the Merits and Reply on Jurisdiction, the argument raised in the Respondent's Post-Hearing Brief, at para. 18, referring to the Kyrgyz Civil Code, Arts. 9(1) and (3), is to be understood as a reintroduction or revival of its bad faith objection to jurisdiction. Therefore, as a precaution, the Tribunal addresses this objection. The Tribunal concludes that it does not see any grounds that the Claimants' claims are outside its jurisdiction due to bad faith. Should the bad faith allegation be considered as relevant on the merits, it will be considered later in this Award.

## VI.   MERITS

550.       The Tribunal shall now turn to the merits of the Parties' arguments. In essence, the Claimants contend that the Respondent has unlawfully expropriated their investments without paying any compensation, and has failed to provide them with fair and equitable treatment by frustrating their legitimate expectations and acting arbitrarily. The Respondent denies the breaches alleged by the Claimants.

### A.   WHETHER THE RESPONDENT UNLAWFULLY EXPROPRIATED THE CLAIMANTS' INVESTMENTS

551.       The Claimants assert that the Respondent has unlawfully expropriated their investments through a series of measures that were later endorsed through the formal revocation of their Licenses. The Claimants argue that such expropriation of their investments was unlawful, as it breached rules of international law, the 2003 Investment Law and the Moscow Convention.[937] Conversely, the Respondent denies the existence of an expropriation and avers that the contested measures were merely the consequence of the enforcement of Kyrgyz law in accordance with proper legal procedure.

---

[937]     Statement of Claim, at para. 193.

1.    **Whether the Respondent's Termination of the Licenses Constituted an Expropriation**

   a.    **The Claimants' Position**

552.    The Claimants assert that a series of cumulative and interconnected measures by the Respondent "deprived the Claimants of the effective use and control of their investments", constituting an indirect *de facto* expropriation.[938] They are accordingly entitled to compensation pursuant to Article 6 of the 2003 Investment Law, which reads:

> **Article 6. Guarantees of Protection from Expropriation of Investments and Compensation of Damages to Investors**
>
> 1. Investments shall not be subject to expropriation (nationalization, requisition, or other equivalent measures, including actions or omissions by the government bodies of the Kyrgyz Republic resulting in forced withdrawal of investor's funds or in depriving investor of an opportunity to gain on the investments' results), except as provided by Kyrgyz laws when such expropriation is in the public interest and is carried out on a non-discriminatory basis and pursuant to a proper legal procedure with the payment of timely, appropriate and effective compensation of damages, including lost profit.
>
> 2. The amount of the compensation shall be equivalent to a fair market price of the expropriated investment or part thereof, including lost profit, determined as of the date of the expropriation decision. The fair market price must not reflect any change in the value of the investment caused by having advance knowledge of the expropriation.
>
> 3. The compensation must be effectively realizable and shall be payable in a freely convertible currency within the term agreed on by the parties. The compensation shall include interest calculated in US Dollars at the London interbank offered rate (LIBOR) for the term for which the compensation is calculated. If such term is more than one year, a twelve-month LIBOR shall be used.
>
> 4. A proper legal procedure means that investors shall have a right to prompt consideration of the case based on the complaint about the impact of the expropriation, including the evaluation of their investments and payment of compensation in accordance with the provisions of this Article, by a judicial body or any other competent authority of the Kyrgyz Republic without prejudice to the procedure for compensation of damages to investors pursuant to Article 18 hereof.
>
> 5. The investors whose investments in the Kyrgyz Republic are impaired as a result of war or any other armed conflict, revolution, state of emergency, civil collisions or other similar circumstances, shall be granted the legal status and conditions as favorable as applied to legal and physical persons of the Kyrgyz Republic.[939]

553.    According to the Claimants, these measures started with the adoption of the 26 June 2012 Resolution ordering the SAGMR to cancel the Kutessay II License Agreement No. 3 and to

---

[938]    Statement of Claim, at para. 188. For a discussion of case-law concerning indirect expropriation see, Statement of Claim, at paras 194-200. See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras. 256, 270-273; Claimants' Post-Hearing Brief, at paras 52-54.

[939]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

re-tender both Licenses.[940] According to the Claimants, it is "unnecessary to show that each and every step in a creeping expropriation is an expropriatory act, or even has a perceptible independent effect."[941] The Claimants aver that, although that Resolution was subsequently declared invalid, it reflects "an increasingly hostile and obstructive attitude by the Kyrgyz authorities".[942] Furthermore, it is submitted that the conduct of the Respondent's authorities between June 2012 and October 2014 must be considered in the context of "the clear expropriatory intent that was first made explicit in the 26 June 2012 Resolution".[943] This argues "in favour of showing a measure to be expropriatory".[944]

554.    In response to the Respondent's argument that SAGMR was entitled to revoke the Licenses due to the Claimants' failure to perform their obligations, the Claimants argue that it was the Respondent, through SAGMR, who made performance of the License impossible.[945] Kutisay Mining LLC was prevented from operating, which became a permanent situation following the injunction issued on April 2013 at the request of the Prosecutor General.[946] The Claimants argue in this regard that the Respondent "misrepresents" Mr. Aryev's testimony when it suggests that he stated the contrary at the Hearing.[947] This injunction prohibited Kutisay Mining LLC and anyone else from using, controlling, enjoying the benefits and disposing of the investments, so the Claimants were "deprived of the economical use and enjoyment of its investments".[948]

555.    The Claimants argue that it is well-established that a decision of a judicial organ may engage the international responsibility of a State and may amount to a taking of property.[949] The injunction, in the Claimants' view, constitutes the final step in the process of the indirect expropriation of the Claimants' investments.[950] These measures, individually and collectively, allegedly deprived the Claimants of the effective use and control of the mining Licenses even

---

[940] Statement of Claim, at para. 202; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 256; Claimants' Post-Hearing Brief, at para. 55.
[941] Claimants' Post-Hearing Brief, at para. 54.
[942] Statement of Claim, at para. 203.
[943] Statement of Claim, at para. 203; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 268.
[944] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 269.
[945] Claimants' Reply Post-Hearing Brief, at para. 25.
[946] Statement of Claim, at paras 188, 206.
[947] Claimants' Reply Post-Hearing Brief, at para. 43.
[948] Statement of Claim, at para. 207; Claimants' Post-Hearing Brief, at para. 58.
[949] Statement of Claim, at paras 208-209; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 265-267.
[950] Statement of Claim, at para. 210.

before the SAGMR formally confirmed their termination on 17 October 2014.[951] The SAGMR decision extinguished without compensation the Claimants' rights by definitely destroying their legal title to the Licenses and "transforming the expropriation into an outright taking".[952] In this regard, the Claimants point out that "tribunals have consistently held that it is possible to have 'a creeping expropriation plus an indirect expropriation before a direct expropriation[.]'"[953]

556.     In sum, the Claimants argue that the acts and omissions of the Respondent and its authorities in relation to their mining projects constitute an indirect *de facto* expropriation, which was later judicially endorsed and implemented by the formal annulment and revocation of the mining Licenses, amounting to a direct expropriation of their investments. These facts give rise to a duty on the Respondent's part to compensate the Claimants.[954]

557.     The Claimants underscore that the Licenses were neither terminated on the ground that Claimants had breached the License Agreements nor on the ground of allegations of corruption.[955] According to the Claimants, whether the SAGMR or the courts could have terminated the Licenses on these grounds is irrelevant, as these grounds were not alleged when the measures were taken, and cannot accordingly justify their adoption. [956]

558.     Furthermore, the Claimants consider that, while the Respondent's authorities targeted their mining Licenses, the expropriation of these Licenses also "entirely destroyed Claimants' other investments".[957] In this regard, although Stans is still holding the title to 100% of the capital in Kutisay Mining LLC through its wholly-owned subsidiary Stans KG, "this shareholding was rendered entirely useless and has no economic value today".[958]

559.     The Claimants point out that it has been recognized that measures affecting a corporate entity can, under certain circumstances, "be considered tantamount to a *de facto* and indirect expropriation of assets belonging to the corporation's shareholders".[959] Since Kutisay Mining LLC was deprived of all its principal assets, this direct expropriation not only reduced the value

---

[951]   Statement of Claim, at paras 188, 212.
[952]   Statement of Claim, at para. 213.
[953]   Claimants' Post-Hearing Brief, at para. 54, referring to *GPF GP Sarl v. Republic of Poland* [2018] EWHC 409, 2 March 2018, at para. 114 (**Authority CLA-331**).
[954]   Statement of Claim, at paras 193 and 201, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 271-273.
[955]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 259-260.
[956]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 261, 263-264.
[957]   Statement of Claim, at para. 214.
[958]   Statement of Claim, at para. 215.
[959]   Statement of Claim, at para. 216.

of Stans' shareholding in Kutisay Mining LLC but had the effect of "a deprivation and virtual annihilation [on Stans' shares] that constitutes expropriation".[960]

560.     Finally, the Claimants deny that there cannot have been an expropriation unless the Claimants can prove a denial of justice in the court proceedings that led to the termination of their Licenses.[961] This argument of the Respondent's ignores, in the Claimants' view, that they were "depriv[ed] of an opportunity to present their case" in these court proceedings. Moreover, the expropriation alleged by the Claimants was "creeping and indirect, beginning long before the formal cancellation of the Claimants' licenses".[962]

### b.     The Respondent's Position

561.     The Respondent denies that its termination of the Claimants' Licenses amounted to indirect expropriation and considers it to be the consequence of the enforcement of Kyrgyz law in accordance with proper legal procedure.[963] Pursuant to the Kyrgyz courts' decision that the Licenses had been invalidly granted, the Licensing Commission terminated the Licenses under Article 27(5) of the Subsoil Law.[964] Kutisay Mining LLC took part in the invalidation procedure and also appealed the annulment decision before national courts.[965]

562.     The Respondent considers that the SAGMR was legally entitled to terminate the Kutessay II License pursuant to Article 18 of the Subsoil Law (or alternatively, Article 27 of the new version of the Subsoil Law dated 9 August 2012)[966] due to Kutisay Mining's failure to submit a Technical Plan approved by three Expert Reports by the deadline set forth in Kutessay II License Agreement No. 3.[967] The Respondent considers that this entitlement to terminate the License is unaffected under Kyrgyz law by Kutisay Mining LLC's excuses for the breach (namely the 30-

---

[960]  Statement of Claim, at para. 217.
[961]  Claimants' Reply Post-Hearing Brief, at para. 32.
[962]  Claimants' Reply Post-Hearing Brief, at para. 33.
[963]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 635; Rejoinder on the Merits and Reply on Jurisdiction, at paras 485, 523-526; Respondent's Post-Hearing Brief, at para. 144.
[964]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 636.
[965]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 636; Rejoinder on the Merits and Reply on Jurisdiction, at paras 533, 545.
[966]  Respondent's Post-Hearing Brief, at para. 44, referring to Subsoil Law of 24 June 1997, as amended on 17 October 2008, Article 18 (**Authority RLA-296/CLA-97B**); Subsoil Law of 24 June 1997, as amended on 15 July 2011, Article 18 (**Authority RLA-297/CLA-97C**); Subsoil Law of 9 August 2012, Article 27 (**Authority RLA-305**); Subsoil Law of 9 August 2012, as amended on 24 May 2014, Article 27 (**Authority RLA-298/CLA-97D**).
[967]  Respondent's Post-Hearing Brief, at paras 40-53, referring to, *inter alia*, Statement of Defence on the Merits and Memorial on Jurisdiction, Part VI, in particular at paras 321-342, and diagram on page 73; Rejoinder on the Merits and Reply on Jurisdiction, at paras 192-208.

day work suspension in September 2012 and the change in the National Park boundaries).[968] Moreover, the Respondent avers that the SAGMR was entitled to terminate the Kutessay II License due to the Claimants' failure to comply with Kutessay II License Agreement No. 2 and that the "illegal" entry into a third license agreement did not impair this right.[969]

563.    In relation to Kutessay II License Agreement No. 3, the Respondent alleges that it had the right to terminate that License Agreement because Stans KG failed to agree to the free transfer of an interest in Kutisay Mining LLC to the State by the established deadline.[970] In this regard, the Respondent considers that the condition was "plainly *strict*" and "[t]here was no obligation on the State Property Fund to agree to the transfer on any specific terms or at all. Neither was there a promise on the part of the State Property Fund (or the Kyrgyz State) to so agree."[971] In the Respondent's view, the State Property Fund could assess:

> in its absolute discretion, whether such transfer was *at all* of interest, and if so, on what terms […] Kutessay LA 3 (or any other document on the record) did not limit the discretion of the State Property Fund to decline to enter into such an agreement for whatever reason, or from demanding that the interest be transferred on terms unacceptable to C[laimant]s, such as obtaining 95% in the project.[972]

564.    With respect to the Kalesay License Agreement No. 2, the Respondent asserts that it is uncontested that Kutisay Mining failed to comply with its terms, including the failure to submit a technical plan approved by three expert reports.[973] Thus, the Licenses "*shall terminate*" pursuant to Articles 18(3) and (4) of the Subsoil Law.[974]

565.    Having regard to the evidence presented at the Hearing, the Respondent takes the view that "Mr Aryev (and Mr Shilov) unequivocally testif[ied] at the hearing that Kutisay breached the license agreements."[975] Moreover, the Claimants "do not even allege" that they satisfied the requirements of the license agreements.[976] The Respondent also contests that either Mr. Aryev or Mr. Shilov testified that the SAGMR agreed to vary the terms of the license agreement.[977]

---

[968]    Respondent's Post-Hearing Brief, at paras 51-53.
[969]    Respondent's Post-Hearing Brief, at paras 60-62.
[970]    Respondent's Post-Hearing Brief, at paras 40; 54-59.
[971]    Respondent's Post-Hearing Brief, at para. 56 [emphasis in original].
[972]    Respondent's Post-Hearing Brief, at para. 57 [emphasis in original].
[973]    Respondent's Post-Hearing Brief, at para. 63.
[974]    Respondent's Post-Hearing Brief, at para. 63 [emphasis in original]; referring to Subsoil Law of 24 June 1997, as amended on 15 July 2011 (**Authority RLA-297/CLA-97C**).
[975]    Respondent's Reply Post-Hearing Brief, at para. 49.
[976]    Respondent's Reply Post-Hearing Brief, at para. 49.
[977]    Respondent's Reply Post-Hearing Brief, at paras 50-51.

566.     The Respondent notes that where one clear basis exists to seek the invalidation of Licenses, there is no requirement under Kyrgyz law or international law to pursue all possible bases.[978] Moreover, the Respondent points out that "although the Licenses were not terminated on the basis of bribery *per se,* the basis for termination is inextricably linked with the corruption in which the Claimants were involved".[979]

567.     The Respondent avers that by bringing this claim the Claimants are in fact requesting this Tribunal to act as an "appellate court" even though there is no authority for the Tribunal to perform this function under either the 2003 Investment Law or international law,[980] as investment tribunals have consistently averred.[981] The Respondent clarifies that it does not argue that national court decisions are immune from review by an international tribunal.[982] Rather, it asserts that when an international tribunal is called to assess whether there has been a judicial expropriation "it needs to consider whether the decision of the domestic court was "unlawful" in a relevant sense".[983]

568.     Relying on *Azinian v. Mexico*, the Respondent argues that the SAGMR invalidated the Licenses on the basis of decisions from the national courts and, unless such decisions are *"disavowed"* at the international level, the Respondent cannot be faulted for acting on that basis.[984] The Respondent submits that the Claimants have failed to prove how the actions of its national courts could be regarded as "unlawful";[985] nor have they alleged a denial of justice,[986] and even if the Respondent's courts were "wrong" under Kyrgyz law (which the Respondent denies), this would be insufficient to establish that the Licenses were expropriated.[987] According

---

[978]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 486.
[979]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 520.2, 537.
[980]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 646.
[981]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 647, 649-653.
[982]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 521, 536.
[983]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 521, 536.
[984]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 648 [emphasis in original], referring to *Robert Azinian, Kenneth Davitian & Ellen Baca v. The United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award dated 1 November 1999, at paras 97, 99-100 (**Authority RLA-187**). See also, Respondent's Post-Hearing Brief, at para. 144.
[985]   Respondent's Post-Hearing Brief, at paras 146-147.
[986]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 654.
[987]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 654; Rejoinder on the Merits and Reply on Jurisdiction, at para. 545; Respondent's Post-Hearing Brief, at para. 144, referring to *Swisslion DOO Skopje v. The Former Yugolsav Republic of Macedonia*, ICSID Case No ARB/09/16, Award, 6 July 2012, at paras 264-265, 268 (**Authority RLA-188**); *Mr. Franck Charles Arif v. Moldova*, ICSID Case No ARB/11/23, Award, 8 April 2013, at para. 415 (**Authority RLA-189**); *Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan*, ICSID Case No. ARB/07/14 Excerpts of Award, 22 June 2010, at paras 274 and 279 (**Authority RLA-186**)*; Garanti Koza LLP v. Turkmenistan*, ICSID Case No. ARB/11/20, Award, 19 December 2016, at para. 365 (**Authority RLA-190**); *Middle East Cement Shipping and Handling Co. S.A. v. Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, at para. 139 (**Authority RLA-223**).

to the Respondent, domestic courts can terminate rights (both contractual and non-contractual) without such termination amounting to expropriation.[988]

569.      Furthermore, according to the Respondent, the Claimants, "by making an omnibus complaint of indirect expropriation", have failed to address the circumstances in which a domestic court decision might amount to expropriation. The Respondent considers that any interference with the Claimants' operations prior to the court proceedings had been minimal.[989]

570.      In this regard, the Respondent contends that the 26 June 2012 Resolution and the 30-day suspension on which the Claimants rely were promptly invalidated by national courts, which demonstrates their independence and willingness to find against the Government in appropriate cases. [990] These measures accordingly had no lasting impact, as demonstrated by contemporaneous statements from the Claimants,[991] and cannot be invoked as the basis of an expropriation.[992] In support of this position, the Respondent notes that as at 3 October 2012, after the 30-day suspension, Stans Energy's market price was higher than it was immediately before the 26 June 2012 Resolution.[993] The Respondent asserts that the 26 June 2012 Resolution was adopted in response to the Claimants' numerous breaches of the Licenses Agreements, which is relevant in assessing the nature of the measure.[994]

571.      The Respondent also points out that the Claimants put forward "an unsubstantiated allegation that the Kyrgyz government conspired with a Chinese mining company to terminate the Licenses" so that they could be acquired by the latter.[995] The Respondent notes that the Claimants have failed to provide any evidence of such conspiracy. Moreover, the Respondent points out that, when the Chinese mining company in question initiated proceedings before

---

[988]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 526, 528-532; Respondent's Post-Hearing Brief, at para. 148.
[989]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 522.
[990]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 661; Rejoinder on the Merits and Reply on Jurisdiction, at para. 553.
[991]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 542, 544, referring to Stans Energy Corp, Press Release *"Stans Energy Disputes Jokorgu Kenish Committee Decision"*, dated 30 July 2012, at p. 2 (**Exhibit C-120**).
[992]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 638, 645; Rejoinder on the Merits and Reply on Jurisdiction, at paras 488-495, 505-509, 511-512, 540-542, 544.
[993]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 662, referring to "Bloomberg, "Market Capital for Stans Energy Corp – Daily" dated 27 January 2016, at p. 15 (**Exhibit C-40**). See also, Rejoinder on the Merits and Reply on Jurisdiction, at paras 510, 543.
[994]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 538.
[995]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 639; Rejoinder on the Merits and Reply on Jurisdiction, at para. 496.

Kyrgyz courts, the Government intervened to oppose its claims. Finally, the Licenses have never been issued to that company.[996]

572.      The Respondent argues that the 2003 Investment Law and international law exclude from the definition of expropriation measures taken to enforce Kyrgyz law, as steps taken to enforce national laws do not demonstrate expropriatory intent.[997] The termination of the Licenses was thus a consequence of the enforcement of Kyrgyz law, and not an expropriation.[998]

573.      The Respondent denies the Claimants' contention that the injunction granted by the Inter-district Court of Bishkek on 15 April 2013 constituted the final step in the process of indirect expropriation. According to the Respondent, the injunction was a temporary measure, not amounting to an expropriation.[999] It notes that, prior to that injunction, Kutisay Mining LLC had failed to submit the TP, Expert Reports and TEA in time.[1000] Accordingly, Kutisay Mining LLC was in fundamental breach of the Kutessay II License Agreement No. 3 and was not entitled to any extension or approvals.[1001]

574.      Moreover, the Respondent points out that, despite prior testimony to the contrary,[1002] Mr. Aryev confirmed at the Hearing that the injunction did not prevent Kutisay Mining LLC from progressing with the work it was required to develop under its license agreement,[1003] which is consistent with Stans Energy's public statements.[1004]

575.      Finally, the Respondent rejects the Claimants' characterization of the Respondent's conduct as a "creeping" expropriation. The Respondent argues, with reference to *Burlington v. Ecuador*, that a creeping expropriation *"only exists when 'none' of the challenged measures*

---

[996]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 639; Rejoinder on the Merits and Reply on Jurisdiction, at paras 497-504.
[997]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 658.
[998]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 643-644.
[999]   Respondent's Post-Hearing Brief, at para. 157, referring to *Achmea BV v. The Slovak Republic*, PCA Case No 2008-13, Final Award, 7 December 2012, at para. 289 (**Authority RLA-191**); Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 666-668.
[1000]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 664.
[1001]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 663-668.
[1002]   Respondent's Post-Hearing Brief, at para. 157, referring to First Witness Statement of B. Aryev, 29 January 2016, at para. 120.
[1003]   Respondent's Post-Hearing Brief, at para. 157, referring to Hearing Transcript, Day 2, p. 406:3-6. See also, Hearing Transcript, Day 2, pp 403:11-406:2.
[1004]   Respondent's Post-Hearing Brief, at para. 157, referring to Respondent's Opening Presentation, 9 April 2018, quoting Stans Energy Press Release *"Stans Energy Legal Update"*, 7 May 2013 (**Exhibit R-147**); Stans Energy Press Release *"Stans Energy Corporate Update"*, 6 August 2013 (**Exhibit R-148**).

*separately constitutes expropriation".*[1005] In the present case, however, the Claimants also contend that "the invalidation of the Licenses due to the courts' decision amounted to a direct expropriation."[1006] Moreover, according to the Respondent, the Claimants have failed to prove "any *link*" between the initial steps of the purported creeping expropriation and the ultimate invalidation of the Licenses.[1007] Finally, the Claimants have not established that the measures preceding the invalidation of the Licenses amounted to an indirect expropriation.[1008]

### c.    The Tribunal's Analysis

576.     At the outset, the Tribunal recalls Article 6(1) of the 2003 Investment Law:

> **Article 6. Guarantees of Protection from Expropriation of Investments and Compensation of Damages to Investors**
>
> 1. Investments shall not be subject to expropriation (nationalization, requisition, or other equivalent measures, including actions or omissions by the government bodies of the Kyrgyz Republic resulting in forced withdrawal of investor's funds or in depriving investor of an opportunity to gain on the investments' results), except as provided by Kyrgyz laws when such expropriation is in the public interest and is carried out on a non-discriminatory basis and pursuant to a proper legal procedure with the payment of timely, appropriate and effective compensation of damages, including lost profit.[1009]

577.     Through the wording "measures, including actions or omissions by the government bodies of the Kyrgyz Republic resulting in forced withdrawal of investor's funds or in depriving investor of an opportunity to gain on the investments' results", the provision provides a very wide definition of the kind of dispossession falling under this Article.

578.     The Tribunal has to examine first whether such a dispossession took place. Such an examination is without prejudice for the later examination as to whether the dispossession was lawful and at which time it occurred.

579.     The Respondent does not deny that its authorities terminated the Claimants' Licenses. It only considers that this was done as a consequence of the enforcement of Kyrgyz law in accordance with proper legal procedure and pursuant to the Kyrgyz courts' decisions. In the view

---

[1005]   Respondent's Reply Post-Hearing Brief, at para. 56 [emphasis in original].
[1006]   Respondent's Reply Post-Hearing Brief, at para. 56.
[1007]   Respondent's Reply Post-Hearing Brief, at para. 57 [emphasis in original].
[1008]   Respondent's Reply Post-Hearing Brief, at para. 58.
[1009]   Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

of the Tribunal this latter allegation by the Respondent concerns the question whether the termination was lawful, but does not suggest that there was no dispossession at all at any time.

580.     For this conclusion, it is also irrelevant which of the disputed measures occurring at different points in time were a dispossession. The Respondent's measures, whether individually or collectively, deprived the Claimants of the effective use and control of the mining Licenses at least when the SAGMR formally decided their termination on 17 October 2014.

581.     Therefore, the Tribunal concludes that there was indeed a dispossession by the Respondent, and Article 6(1) of the 2003 Investment Law is applicable.

## 2.     Whether the Respondent's Expropriation of the Claimants' Investments was Lawful

### a.     The Claimants' Position.

582.     While the Claimants accept that the Respondent has the right to nationalize or expropriate, they aver that it must do so in accordance with the requirements and conditions set out under the relevant rules of international law and its domestic legislation.[1010]

583.     The Claimants assert that it is uncontroversial that the conditions and limits on a State's right to expropriate property are part of customary international law,[1011] and that these conditions and limits are in turn reflected in Article 6 of the 2003 Investment Law.[1012] Likewise, the Moscow Convention, which is also part of the Kyrgyz legal order, lays out comparable conditions for expropriations of investments.[1013]

584.     The Claimants argue that the expropriation of their investments violated the conditions set out under international law, the 2003 Investment Law and the Moscow Convention.[1014] In particular, they contend that the measures were arbitrary, did not further public interest and, in any case, were not accompanied by "timely, appropriate and real" compensation.[1015] The Claimants regard as an "academic issue" the Respondent's contention that Article 9 of the Moscow Convention does not apply, allegedly because it only refers to "nationalisation" and

---

[1010]     Statement of Claim, at para. 189.
[1011]     Statement of Claim, at para. 190.
[1012]     Statement of Claim, at para. 191.
[1013]     Statement of Claim, at para. 192.
[1014]     Statement of Claim, at para. 193.
[1015]     Statement of Claim, at para. 218.

"requisitions", rather than the allegedly broader concept of expropriation, "since it is undisputed that Article 6 of the 2003 Investment Law and general international law impose the full range of conditions on expropriation or measures having an equivalent effect".[1016]

585.    The Claimants aver that the indirect expropriation was not carried out in accordance with the procedures established within the Kyrgyz legal regime on expropriations,[1017] as was recognised by the Respondent's judicial authorities with respect to the 26 June 2012 Resolution and the SAGMR's August 2012 order to stop work.[1018] They note that "creeping expropriations, in practice, if not by definition, almost without exception prove to be unlawful".[1019]

586.    The Claimants consider that "the manoeuvres of the Respondent to eject Stans and to reattribute the mining licenses to a different investor", despite their efforts to perform their work as planned, "are tainted by arbitrariness and lack of due process".[1020] The Kyrgyz authorities' conduct, according to the Claimants, demonstrates a "wilful disregard of due process of law".[1021] The Claimants note that the sequence of acts "including the strong interest of a Chinese REE company in Kutesay II, as well as the involvement of its associates within the Kyrgyz authorities […] indicate that the process of expropriation was arbitrary".[1022] The Kyrgyz authorities first encouraged an investment under a certain interpretation of the law and later challenged the validity of the investment made.[1023]

587.    They Claimants also contend that the judicial proceedings initiated by the GPO against the SAGMR "fail any test of judicial propriety. Kutisay Mining was not able to join the proceedings as a full party […] The Claimants were given no opportunity to present their case […] they were not entitled to appeal".[1024]

---

[1016]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 258 [footnotes omitted].
[1017]   Statement of Claim, at paras 220-221; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 275.
[1018]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 277.
[1019]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 274.
[1020]   Statement of Claim, at para. 222.
[1021]   Statement of Claim, at para. 223; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 278.
[1022]   Statement of Claim, at para. 224.
[1023]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 263, 281, referring to, respectively, *Saar Papier Vertriebs GmbH v. Republic of Poland* (UNCITRAL) Final Award, 16 October 1995, at para. 97 (**Authority CLA-272**); *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka* (ICSID Case No ARB/09/2) Award, 31 October 2012, at para. 523 (**Authority CLA-66**).
[1024]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 275-276.

588.     The Claimants contend that the arbitrary nature of the measures and their breach of domestic law preclude any public interest justification.[1025] In addition, the Claimants observe that the Respondent's authorities never invoked any public interest to justify the adoption of their measures.[1026] In particular, the Claimants point out that the Kyrgyz authorities did not identify combating corruption as the basis for the adoption of any measures. The circumstances of the alleged illegality, in turn, involved only entities within the Respondent's control. In any event, the measures "were disproportionate to the protection of any public interest".[1027] The taking of mining licenses from a company that has effectively developed previously unproductive mines, without any shortcomings in their operation, is by definition contrary to the public interest.[1028]

589.     The Claimants point out that customary international law requires that an expropriation be accompanied by prompt, adequate and effective compensation,[1029] an obligation recognized in the 2003 Investment Law and in the Moscow Convention.[1030] Contrary to this obligation, the Respondent has never offered any compensation.[1031] According to the Claimants, the Respondent's contention that it only bears an obligation to establish a procedure by which an investor can seek compensation is incompatible with international law and Article 6 of the 2003 Investment Law. The need to apply for compensation cannot be reconciled with the requirement of "promptness".[1032] The Claimants argue that, instead, the State should offer appropriate compensation on its own initiative.[1033]

590.     The Claimants assert that the lack of compensation is even more difficult to understand as the Respondent's authorities justified the termination of the Licenses by reference to alleged illegalities to which such authorities were the only parties.[1034] The Claimants consider that the lack of any offer of compensation "renders this expropriation unlawful *per se*".[1035]

---

[1025]    Statement of Claim, at para. 226; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 282.
[1026]    Statement of Claim, at para. 225.
[1027]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 280.
[1028]    Statement of Claim, at para. 227;
[1029]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 284.
[1030]    Statement of Claim, at para. 228; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 267.
[1031]    Statement of Claim, at para. 228.
[1032]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 283-285.
[1033]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 284.
[1034]    Statement of Claim, at para. 229.
[1035]    Statement of Claim, at para. 229.

### b.    The Respondent's Position

591.    The Respondent argues that, even if the measures it took could be characterised as an expropriation (which it denies), the requirements laid out by Article 6 of the 2003 Investment Law were fulfilled, namely the expropriation was (1) provided for by Kyrgyz law, (2) in the public interest, (3) carried out on a non-discriminatory basis and (4) carried out pursuant to proper legal procedure.[1036]

592.    With regard to the first point, the Respondent avers that Article 27(5) of the Subsoil Law was the legal basis for the termination of the Licenses and that, even if there had been an incorrect application of Kyrgyz law, it is not for this Tribunal to substitute its views for that of the Respondent's courts.[1037]

593.    With regard to the public interest requirement, in the Respondent's view, the fact that the SAGMR decision to terminate the Licenses was taken to enforce compliance with the Subsoil Law suffices to demonstrate that it was taken in the public interest, as States have a public interest in the enforcement of their laws.[1038] Indeed, the SAGMR was legally obliged to terminate the Licenses because the Claimants had failed to effectively develop the deposits and failed to provide basic documentation, in breach of the fundamental requirements of their Licenses. [1039] The Respondent denies that the concept of proportionality plays any role in assessing whether the measures were taken in the public interest, as this case merely concerns the enforcement of pre-existing laws. [1040]  In addition, the Respondent, relying on several international investment treaty decisions, submits that States have discretion to decide whether a particular action is in their public interest.[1041]

594.    With regard to the non-discrimination requirement, the Respondent asserts that the Claimants have not demonstrated that they suffered any discriminatory treatment with regard to

---

[1036]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 669-670, 672; Rejoinder on the Merits and Reply on Jurisdiction, at para. 546.
[1037]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 673-676.
[1038]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 677; Rejoinder on the Merits and Reply on Jurisdiction, at paras 554-555.
[1039]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 681.
[1040]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 555.3.
[1041]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 678; Rejoinder on the Merits and Reply on Jurisdiction, at para. 555.4.

similarly placed mining license holders, since many other mining licenses were also cancelled.[1042] In any event, the Claimants' complaints of arbitrariness are without foundation.[1043]

595.     Finally, the decision to terminate the Licenses was taken "pursuant to proper legal procedure", as required by Article 6(1) of the 2003 Investment Law. Kutisay Mining LLC exercised its right to appeal such decision before the Respondent's courts.[1044] Likewise, the court decisions which were the basis for the invalidation of the Licenses were the result of a "proper legal procedure".[1045] The Respondent contends that the formal status of Kutisay Mining LLC as a defendant or a third party in the proceedings is a question of Kyrgyz procedural law and is irrelevant because due process requirements were met. In this regard, the Respondent underscores that the Claimants have not alleged to have suffered a denial of justice.[1046] The Respondent rejects the Claimants' argument that they were not entitled to any appeal, noting that they did in fact appeal and "the judgment also records that Kutisay's arguments were considered and rejected by the Appellate Instance of the Bishkek City Court".[1047]

596.     With regard to compensation, the Respondent contends that if Article 6(1) is read in conjunction with Article 6(4) of the 2003 Investment Law, it becomes clear that it is not incumbent upon the Kyrgyz Republic to offer compensation to an investor for the expropriation of its investment. Rather, the investor has the right to a proper legal procedure by which it can seek compensation.[1048] In the Respondent's view, it cannot be held responsible for the Claimants' failure to apply to Kyrgyz courts for compensation.[1049] In sum, the fact that the Claimants have not been compensated would not render the expropriation unlawful under Article 6 of the 2003 Investment Law.[1050] Likewise, the Respondent submits that under customary international law the failure to provide compensation does not render what would otherwise be a lawful expropriation

---

[1042]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 682.
[1043]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 687.
[1044]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 684-685.
[1045]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 686.
[1046]  Rejoinder on the Merits and Reply on Jurisdiction, at paras 548-549.
[1047]  Rejoinder on the Merits and Reply on Jurisdiction, at para. 550, referring to Decision of the Appellate Instance of the Bishkek City Court, *Case No AB-311/14-AD* dated 30 July 2014, at p. 6: *"The judicial panel for administrative and economic cases of the Bishkek City Court considers the arguments of KutisayMining LLC that the said claims violate its rights and interests to be untenable"* (**Exhibit C-31**).
[1048]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 688-689; Rejoinder on the Merits and Reply on Jurisdiction, at paras 556-558.
[1049]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 690; Rejoinder on the Merits and Reply on Jurisdiction, at para. 559.
[1050]  Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 691-694.

"unlawful",[1051] and avers that *"an expropriation only lacking fair compensation should be treated in the same manner as a lawful expropriation"*.[1052]

597.    The Respondent, finally, reiterates that the Claimants are not entitled to bring a claim under the Moscow Convention because (1) the 2003 Investment Law does not provide a jurisdictional basis for such claim and (2) they are not "investors" within the meaning of the Moscow Convention.[1053] In any event, the Respondent has not breached Article 9 of that Convention because there has been neither a "requisition" nor a "nationalisation". Article 9 of the Moscow Convention does not prohibit measures having an equivalent effect to a "requisition" or a "nationalisation".[1054]

### c.    The Tribunal's Analysis

598.    Regarding the 26 June 2012 Resolution and the SAGMR's August 2012 order to stop work, the Tribunal notes that the Respondent contends that the 26 June 2012 Resolution was not implemented and is irrelevant to the ultimate termination of the Licenses.[1055] In support of this contention, the Respondent argues that the 26 June 2012 Resolution was not binding, the SAGMR actually did not follow it, and it was ultimately invalidated by Kyrgyz courts.[1056] Since the Respondent does not rely on these as a justification for the lawfulness of the dispossession and, indeed, the Claimants continued their work thereafter, the Tribunal need not examine the effects of these.

599.    For similar reasons, the Tribunal need not examine whether the suspension order of 30 August 2012 constituted a dispossession, because, after the suspension order expired on 30 September 2012, Stans Energy resumed its work on the Kutessay II project and announced that it had produced dysprosium, terbium and gadolinium metals at the KRP.[1057]

---

[1051]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 561.
[1052]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 693, referring to *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplun v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/02, Partially Dissenting Opinion of Brigitte Stern dated 07 September 2015, at para. 10 (**Authority RLA-196**).
[1053]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 695
[1054]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 696-701.
[1055]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 410, 419.
[1056]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 410.
[1057]    Statement of Claim, at para. 121, referring to Stans Energy Corp, Press release "Stans Energy Produces Dysprosium, Terbium and Gadolinium Metals", 4 October 2012 (**Exhibit C-128**).

600.      The Tribunal now turns to the SAGMR's decision of 17 October 2014, [1058] by which the SAGMR's Subsoil Use Licensing Commission decided to terminate Kutisay Mining LLC's Licenses, referring to the decisions of the Kyrgyz courts in favour of the GPO. [1059] Kutisay Mining LLC filed its claim with the Inter-District Court of Bishkek seeking invalidation of the 17 October 2014 Minutes. [1060] On 8 December 2014, the Inter-District Court of Bishkek dismissed this claim, referring to the court decisions of 19 March 2014 and 30 July 2014 which invalidated the 21 December 2009 Minutes. [1061] The Bishkek City Court and the Supreme Court of Kyrgyzstan averred this decision on 27 January 2015 and 15 October 2015, respectively. [1062]

601.      As described above, in the Summary of Facts, the reason for the revocation of the Claimants' Licenses was the GPO's finding that the issuance of the Licenses without tender was illegal under Kyrgyz law—a finding that was subsequently confirmed by the Kyrgyz courts. As noted above, the Supreme Court notably concluded that the attribution of the Licenses "through direct negotiations, as indicated in the Minutes No. 1736-H-09 dated 21 December 2009", "had violated the law in force in the Kyrgyz Republic". [1063] Given the invalidation of the 21 December 2009 Minutes on these grounds, the SAGMR resolved to terminate the Licenses acquired by the Claimants.

602.      Here, the Tribunal will address the Respondent's arguments that the Licenses were granted to the Claimants in breach of Kyrgyz law. Above, the Tribunal has already found that this Tribunal's jurisdiction is not affected by these allegations. The following examination thus only refers to the merits.

603.      Also above, the Tribunal has already found that the Respondent, which has the burden of proof, has not provided sufficient evidence that the Claimants obtained the Licenses through

---

[1058]   Extract from Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 31 October 2014, (**Exhibit C-14**).

[1059]   Statement of Claim, at para. 149, referring to Extract from Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 31 October 2014, 17 October 2014 (**Exhibit C-14**). See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 116.

[1060]   Statement of Claim, at para. 150.

[1061]   Statement of Claim, at para. 150, referring to Decision of the Inter-District Court of Bishkek, *Case No AD-2290/14mbs7*, 8 December 2014 (**Exhibit C-32**).

[1062]   Statement of Claim, at para. 150, referring to Decision of the Appellate Instance of the Bishkek City Court, *Case No AB-79/15-AD*, 27 January 2015 (**Exhibit C-33**); Decision of the Kyrgyz Republic Supreme Court, *Case No AD-2290/14 mbs7*, 15 October 2015 (**Exhibit C-35**).

[1063]   Decision of the Kyrgyz Republic Supreme Court, *Case No AD-149/14mbs4*, 24 March 2015 (**Exhibit C-34**). See also, Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 403; and Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 113.

corruption. For the same reasons, which need not to be repeated here, no participation in or awareness of money laundering by the Claimants has been proved.

604.    While, in the present proceedings, the Respondent alleges that the Claimants did not fulfil certain obligations which they had under the Licenses, the SAGMR's decision of 17 October 2014 and the decisions of the Kyrgyz courts in favour of the GPO to which it refers do not mention these allegations, but focus on what the Respondent alleges was a breach of the tender requirements of the Subsoil Law which is argued to prevent the Claimants from having obtained a valid licence. Article 16 of the Subsoil Law (using Respondent's translation) provides as follows:

**Article 16. Procedure for Granting Subsoil Use Rights**

Subsoil use rights shall be granted by holding tenders and direct negotiations.

Tenders shall be announced and held for gold ore, oil, gas and other sites of national significance by decision of the Government of the Kyrgyz Republic. The terms and conditions of the tender and the winning bidder shall be determined by the tender committee of the Government of the Kyrgyz Republic to be appointed for each particular site.

Subsoil use rights by way of direct negotiations shall be granted on application by natural persons and legal entities by the state subsoil use authority to be determined by the Government of the Kyrgyz Republic. The application must contain information about the applicant, and the location and type of subsoil use. The following documents shall be annexed to the application:

- copies of the constitutive documents and charter for legal entities, or registration documents for natural persons;

- geological survey or development project or project of construction and operation of underground structures not connected with the extraction of minerals at the site in question, with consolidated technical and economic assessment of capital investments, operating expenses, revenues and project profitability;

- statement of availability of financing for the works envisaged at the subsoil site in question pursuant to the submitted development project. [...][1064]

605.    The first sentence clarifies that there are two methods to grant subsoil rights: tenders and direct negotiations. The wording "other sites of national significance by decision of the Government of the Kyrgyz Republic", particularly by the inclusion of the word "other" indicates that a tender is only mandatory if the respective site has been put on the list of sites of national

---

[1064]    Translation as provided by the Respondent in "Subsoil Law of 24 June 1997, as amended on 17 October 2008 (including comparison to Claimants' translation of CLA-97B)" (**Authority RLA-296**). See also, the translations provided by the Respondent in Subsoil Law No. 42 of 24 June 1997, as amended on 4 February 2002 (including comparison to Claimants' translation of CLA-97A) (**Authority RLA-295**); and Subsoil Law of 24 June 1997, as amended on 15 July 2011 (including comparison to Claimants' translation of CLA-97C) (**Authority RLA-297**), which are identical to that quoted above, with the exception of the use of "for" instead of "of" in the second sub-point of paragraph 3.

significance. Accordingly, the Government had the authority to decide whether a tender was required or the option of direct negotiations should be used for certain sites.

606.     On 1 December 2009, the Kyrgyz Government issued Resolution No 725, which permitted the Ministry of Natural Resources to issue mining licenses without a tender to entities wholly managed by the Development Fund, for subsequent sale of these entities by auction at stock exchange.  As is undisputed, Stans Energy obtained the Kutessay II and Kalesay Licenses without a tender procedure, by purchasing Kutisay Mining OJSC.

607.     The legal effect under Kyrgyz law of the decisions of the Kyrgyz courts in favour of the GPO, to which SAGMR's decision of 17 October 2014 refers, stating the invalidity of the 21 December 2009 Minutes is not fully clear to the Tribunal. The 17 October 2014 Minutes deemed the subsoil use rights under the Licenses terminated "pursuant to Article 27, Part 5, of the Kyrgyz Republic Law 'On Subsoil'," [1065] which reads: "[t]ermination of subsoil use rights shall be effected by the decision of the government body responsible for implementation of the state policy on subsoil use. From the date of entry into force of a judicial act invalidating the decision to award a subsoil use right, such right shall be deemed terminated." [1066] From this language, at least in its English translation, it seems not clear whether the 21 December 2009 Minutes were invalidated *ex tunc* or *ex nunc*.

608.     What can certainly be said is that the Kyrgyz government changed its position in respect of the legality of the acquisition of the Licenses by the Claimants. Clearly, when the SAGMR signed the 21 December 2009 Minutes and on occasions thereafter, the Government assumed that the acquisition of the Licenses was lawful.

609.     In the present context, the Tribunal only has to examine the relevance of this process for making the dispossession of the Claimants' investments lawful under Article 6 of the 2003 Investment Law, irrespective of any further implications within the internal jurisdiction of Kyrgyzstan. In this respect, the Tribunal takes into account the following: it has not been shown that the Claimants as foreign investors knew or at least by due diligence should have known that

---

[1065]   Extract from Minutes No 320-N-14 of the meeting of the Subsoil Use Licensing Commission contained in the letter from the State Agency of Geology and Mineral Resources to Kutisay Mining LLC dated 31 October 2014 , at p. 2 (**Exhibit C-14**).

[1066]   Translation as provided by the Claimant in Law on Subsoil of 9 August 2012, as amended on 24 May 2014 (**Authority CLA-97D**) and by the Respondent in Law on Subsoil No. 160 of 9 August 2012, as amended on by Law No. 77 dated 24 May 2014 (including comparison to Claimants' translation of CLA-97D) (**Authority RLA-298**) [emphasis added].

Resolution No 725 was invalid. The Claimants correctly contend that the Kyrgyz Republic later ratified the transaction.  Indeed, when Kutisay Mining OJSC was reorganized as Kutisay Mining LLC, the Kyrgyz Government re-issued the Licenses in accordance with Kyrgyz law. This process was an opportunity for the Respondent to re-consider the legality of the Licenses and the transaction underlying them, however the Government failed to point out any concern over the Licenses and re-issued them.

610.     Therefore, not only could the Claimants trust that the Licenses were granted in accordance with Kyrgyz law, but the Respondent continued to cooperate with the Claimants while they continued with their investment and even confirmed this by re-issuing the Licenses.

611.     The termination by the SAGMR and the courts of the Licenses cannot therefore be considered as making the dispossession lawful under Article 6 of the 2003 Investment Law.

612.     Finally, Article 6(1) of the 2003 Investment Law expressly requires that the dispossession be "pursuant to a proper legal procedure with the payment of timely, appropriate and effective compensation of damages, including lost profit."[1067]

613.     As no compensation has been offered by the Respondent, this being a mandatory requirement to make a dispossession lawful, there is no need for the Tribunal to examine whether the other requirements mentioned in Article 6(1) that it "is in the public interest and is carried out on a non-discriminatory basis"[1068] are complied with.

614.     The Tribunal therefore concludes that the Respondent has breached Article 6(1) of the 2003 Investment Law by an unlawful dispossession, and is liable accordingly.

615.     The Tribunal adds that it has reached this conclusion without recourse to any new legal concepts or evidence allegedly submitted by the Claimants for the first time with their Reply Post-Hearing Brief (see paras 150 and 151 above). In particular, the Tribunal does not consider the notion of estoppel, argued by the Claimants in that submission, to be relevant here. Accordingly, the Tribunal has decided not to take into account the portions of the Claimants' Reply Post-Hearing Brief and the accompanying legal authorities to which the Respondent has objected.

---

[1067]  Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

[1068]  Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).

**B.**    **WHETHER THE RESPONDENT FAILED TO ACCORD TREATMENT AS REQUIRED BY ARTICLE 4 OF THE 2003 INVESTMENT LAW**

616.    The Claimants also contend that the Respondent has failed to accord them fair and equitable treatment by breaching their legitimate expectations and by acting arbitrarily. The Respondent denies that, under the applicable law, it is required to accord fair and equitable treatment to the Claimants.

**1.    Whether the Respondent Was Required to Accord Fair and Equitable Treatment to the Claimants**

**a.    The Claimants' Position**

617.    The Claimants assert that the Respondent was required to accord them fair and equitable treatment.[1069] They note that Article 4 of the 2003 Investment Law details different elements characteristic of fair and equitable treatment, in that the Kyrgyz Republic has undertaken:

> to provide foreign investors with "the national treatment in the sphere of economic activity", to not permit discrimination, and to "refrain from interfering in economic activity, rights and legal interests of investors, except as provided by Kyrgyz laws".[1070]

618.    According to the Claimants, Article 4 implements the fair and equitable treatment standard within the 2003 Investment Law.[1071] They consider that this is confirmed by the Preamble which, despite not creating self-standing legal obligations, is part of the statutory context and lays out that its provisions are aimed at "improving the investment climate in the [Kyrgyz] [R]epublic and promoting the flow of local and foreign investment by providing investors with a fair and equitable legal regime […]".[1072]

619.    Claimants also contend that by enacting the 2010 Investment Protection Decree, the Respondent assumed and reiterated to the international community its obligation to provide fair and equitable treatment to foreign investors.[1073] They define this decree as a unilateral undertaking of the Respondent which creates independent legal obligations binding it as a matter

---

[1069]    Statement of Claim, at para. 236; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 286-297; Claimants' Post-Hearing Brief, at para. 59.
[1070]    Statement of Claim, at para. 233 [footnotes omitted].
[1071]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 288.
[1072]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 289, referring to Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation),  preamble (**Authority CLA-98**).
[1073]    Statement of Claim, at para. 231, referring to 2010 Investment Protection Decree (**Authority CLA-101**).

of international law.[1074] The Claimants regard it as an authoritative interpretation of the 2003 Investment Law; its paragraph 3 expressly confirms that such law imposes on the Respondent the obligation to treat foreign investors fairly and equitably:[1075]

> Pursuant to the Kyrgyz Law "On investments in the Kyrgyz Republic", foreign and domestic investors shall be guaranteed, and shall continue to enjoy, a fair and equitable legal regime, including guarantees of protection of their investments made into the economy of the Kyrgyz Republic. [1076]

620.     The Claimants also point to Article 8 of the Moscow Convention, which contains broad obligations for the Respondent, such as the obligation to provide to investments within its territory "unconditional legal protection to be secured by this Convention, the national legislation of the Parties as well as international treaties (agreements) […]".[1077]

621.     The Claimants assert that the fair and equitable treatment standard is part of general international law, regardless of whether it is referred to as the "international minimum standard" of protection or the fair and equitable treatment standard.[1078] As general international law, it is part of the Respondent's legal system and, as such, remains applicable in this case because the Respondent cannot "pick and choose through legislation some of its obligations under international law, disavowing others".[1079]

**b.     The Respondent's Position**

622.     The Respondent argues that, assuming that the Claimants satisfy the jurisdictional requirements, they would only be entitled to bring claims for breaches of the 2003 Investment Law, and not claims for breach of the fair and equitable treatment standard,[1080] for which the Claimants have not identified any applicable normative source. The Respondent notes that such

---

[1074]   Statement of Claim, at para. 231.
[1075]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 290.
[1076]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 290, referring to Decree No 23 of 26 April 2010 of the Provisional Government of the Kyrgyz Republic on the Protection of Investments (with English translation), at para. 3 (**Authority CLA-101**).
[1077]   Statement of Claim, at para. 234.
[1078]   Statement of Claim, at para. 235; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 295-297.
[1079]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 291- 294.
[1080]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 702; Respondent's Post-Hearing Brief, at para. 151, referring to, *inter alia,* Hearing Transcript, Day 1, pp 203:17-206:10.

standard is not amongst the substantive provisions of the 2003 Investment Law.[1081] The Respondent emphasizes:

> There is a distinction between the scope of a State's international obligations and the remedies which an investor is entitled to pursue under a particular investment instrument […] This is not a question of a State "picking and choosing" some of its obligations, as the Claimants suggest. It is a common feature in investment treaties that an investor will only be entitled to bring certain claims […] Indeed, the default situation is that, absent an applicable investment instrument, no international proceedings can be pursued by an aggrieved foreign investor.[1082]

623.    The Respondent argues that the 2003 Investment Law does not allow a covered investor to bring a claim on the basis of the fair and equitable treatment standard as this standard is not expressly provided for in the Law.[1083]

624.    The Respondent notes that Article 4 of the 2003 Investment Law provides for various protections to covered investors, namely (1) national treatment; (2) non-discrimination when granting investment rights; and (3) non-interference with rights and interests of investors except as provided for by Kyrgyz law.[1084] While the Claimants argue that this provision details different elements of the fair and equitable treatment standard, the Respondent contends that the express enumeration of each of these protections means that a covered investor cannot bring a claim for a broader fair and equitable treatment standard.[1085]

625.    The Respondent avers that the 2003 Investment Law should be interpreted by looking at its literal meaning. If the Law is interpreted literally, it is apparent that reference to the fair and equitable treatment standard is absent.[1086] The Respondent denies that the reference in the Preamble to a "fair and equitable regime" may create any free-standing obligation.[1087]

626.    The Respondent also rejects the Claimants' argument that it has reiterated and assumed the obligation to provide fair and equitable treatment through the 2010 Investment Protection

---

[1081]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 704; Rejoinder on the Merits and Reply on Jurisdiction, at para. 563; Respondent's Post-Hearing Brief, at para. 151.
[1082]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 573 [footnotes omitted].
[1083]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 705.
[1084]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 706.
[1085]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 707; Rejoinder on the Merits and Reply on Jurisdiction, at para. 567.
[1086]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 708; Rejoinder on the Merits and Reply on Jurisdiction, at para. 566.
[1087]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 709; Rejoinder on the Merits and Reply on Jurisdiction, at paras 565, 568.

Decree.[1088] The Respondent notes that the Claimants do not point to any other instrument in which the Respondent would have assumed any such obligation that could have been "reiterated".[1089] Rather, the Decree merely reaffirms the continued application of the 2003 Investment Law, which does not contain such standard of protection.[1090] The Respondent denies that the 2010 Decree amounts to a unilateral declaration. Even if it did, however, it would have to be interpreted restrictively pursuant to Article 7 of the ILC Guiding Principles.[1091] Thus, had the Respondent wished to make a unilateral declaration providing for the applicability of the fair and equitable treatment standard, it would have used clear words to that effect.[1092] The 2010 Decree does not contain any *"clear and specific"* assumption of new obligations.[1093]

627.     The Respondent reiterates its position to the effect that covered investors under the 2003 Investment Law may only bring claims for breaches of that Law and cannot file a claim for breach of customary international law[1094] or the Moscow Convention.[1095] Even assuming that this were possible, however, neither of the Claimants could have filed such a claim because (1) customary international law on investment protection only applies to *foreign* investors, a condition not fulfilled by Kutisay Mining LLC; and (2) customary international law bars claims by shareholders for damage suffered by a company in which it hold shares, such that claims by Stans Energy would be precluded.[1096]

628.     Finally, the Respondent considers that the Claimants misstate the contents of the customary international law rules on the treatment of aliens.[1097] The Respondent contests that the fair equitable treatment standard can be equated with the customary international law minimum standard.[1098]

---

[1088] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 710; Rejoinder on the Merits and Reply on Jurisdiction, at paras. 569-570.

[1089] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 710.1.

[1090] Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 710.2; Rejoinder on the Merits and Reply on Jurisdiction, at para. 570.

[1091] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 714, referring to Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations, with commentaries thereto, U.N. Doc. A/61/10 (2006), Article 7 (**Authority RLA-76**).

[1092] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 715.

[1093] Rejoinder on the Merits and Reply on Jurisdiction, at para. 572 [emphasis in original].

[1094] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 717; Rejoinder on the Merits and Reply on Jurisdiction, at paras 574, 580; Respondent's Post-Hearing Brief, at para. 151.

[1095] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 716.

[1096] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 718; Rejoinder on the Merits and Reply on Jurisdiction, at paras 575-579.

[1097] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 719.

[1098] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 717, 719; Rejoinder on the Merits and Reply on Jurisdiction, at paras 581-582.

c.    **The Tribunal's Analysis**

629.    Article 4(4) of the 2003 Investment Law provides:

> The Kyrgyz Republic through its authorized government bodies, officials and municipal
> governance bodies shall refrain from interfering in economic activity, rights and legal
> interests of investors, except as provided by Kyrgyz laws.[1099]

630.    The Parties dispute whether this provision, perhaps together with the Preamble of the
2003 Investment Law, provides an obligation for the Respondent to grant Fair and Equitable
Treatment ("**FET**") to the Claimants as is provided expressly in many investment treaties. The
Tribunal considers that it does not have to enter into that debate, but should rather examine
whether this quoted provision of Article 4(4), as it stands, has been breached.

631.    In this context, the Tribunal agrees with the Claimants that for the interpretation of
Article 4(4) of the 2003 Investment Law it is relevant that the new Government of the Republic
issued the 2010 Investment Protection  Decree[1100] which expressly provided in its Section 3:

> Pursuant to the Kyrgyz Law "On investments in the Kyrgyz Republic", foreign and domestic
> investors shall be guaranteed, and shall continue to enjoy, a fair and equitable legal regime,
> including guarantees of protection of their investments made into the economy of the Kyrgyz
> Republic.[1101]

632.    The Tribunal does not have to decide whether the words "a fair and equitable legal
regime" have to be interpreted as identical with the FET-standard found in investment treaties.
But the express reference to "the Kyrgyz Law 'On investments in the Kyrgyz Republic'" makes
it clear that this is indeed an authoritative interpretation by the Government which is relevant for
the interpretation of Article 4(4) of the 2003 Investment Law.

---

[1099]    Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as
amended on 22 October 2009 (with English translation) (**Authority CLA-98**).
[1100]    Decree No 23 of 26 April 2010 of the Provisional Government of the Kyrgyz Republic on the Protection of Investments
(with English translation) (**Authority CLA-101**).
[1101]    Decree No 23 of 26 April 2010 of the Provisional Government of the Kyrgyz Republic on the Protection of Investments
(with English translation) (**Authority CLA-101**).

**2.     Whether the Respondent Failed to Accord Treatment in Accordance with Article 4.4 of the 2003 Investment Law to the Claimants**

**a.     Whether the Respondent Breached the Claimants' Legitimate Expectations**

i.     The Claimants' Position

633.     The Claimants argue that the Respondent has failed to respect the fair and equitable treatment standard by frustrating the Claimants' legitimate expectations and by acting arbitrarily.[1102]

634.     The Claimants provide an overview of what they regard as the relevant case-law regarding the content and scope of the fair and equitable treatment standard.[1103] According to the Claimants, the concept of legitimate expectations has been described as the "dominant element" of the fair and equitable treatment standard,[1104] and a "stable and predictable environment in accordance with the investor's legitimate expectations" is required.[1105]

635.     The Claimants' legitimate expectations in the present case are derived not only from the law in force in the Kyrgyz Republic when they acquired Kutisay Mining OJSC but also from representations made by the Government, including the Prime Minister, various Ministers of Natural Resources and heads of the SAGMR;[1106] including "direct assurances and representations made by Minister Kurmanaliev to Stans in November 2009"[1107] as well as by Mr. Eliseev.[1108] The Claimants aver that such representations were "cloaked with the mantle of Governmental authority[,]"[1109] such that Stans' trust in the legality of the mining Licenses was legitimate under the circumstances, and Stans relied in good faith on the expectations created by the Respondent.[1110] The Claimants see the reasonableness of their belief confirmed by the fact that

---

[1102]   Statement of Claim, at para. 244; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 298-304.
[1103]   Statement of Claim, at paras 237-243.
[1104]   Statement of Claim, at para. 245.
[1105]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 298.
[1106]   Claimants' Post-Hearing Brief, at para. 35.
[1107]   Statement of Claim, at para. 247. See also, Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 299-301.
[1108]   Claimants' Post-Hearing Brief, at para. 23, referring to Hearing Transcript, Day 2, pp 276:1-5, 277:5-11, 277:18-278:3, 289:5-10, 417:15-24.
[1109]   Claimants' Post-Hearing Brief, at para. 35, referring to *Ioannis Kardassopoulos v. Georgia* (ICSID Case No ARB/05/18) Decision on Jurisdiction, 6 July 2007, at paras 193-194 (**Authority CLA-276**); *Pezold v. Republic of Zimbabwe* (ICSID Case No ARB/10/15) Award, 28 July 2015, at paras 354 and 411 (**Authority CLA-309**).
[1110]   Statement of Claim, at paras 248-250; Claimants' Post-Hearing Brief, at para. 35, referring to *Ioannis Kardassopoulos v. Georgia* (ICSID Case No ARB/05/18) Decision on Jurisdiction, 6 July 2007, at paras 193-194 (**Authority CLA-276**).

over a period of three years no official or authority disputed the validity of the Licenses.[1111] According to the Claimants, the change in the attitude of the Kyrgyz authorities in 2013, when the legality of previous administrative acts carried by the government was questioned, "was arbitrary and contrary to elementary principles of good faith […] entirely frustrated Claimants' legitimate expectations".[1112]

636.     Furthermore, the Claimants contest the Respondent's position during the Hearing to the effect that the verbal character of the assurances would prevent them from "form[ing] the basis for legitimate expectations and a claim of unfair treatment for the purposes of international law." [1113] According to the Claimants, there is no prescribed form for assurances under international law.[1114] In support of their position, the Claimants invoke the decision in *Pezold v. Zimbabwe,* where the tribunal upheld a claim for breach of the FET standard and determined that the Claimants' legitimate expectations "could be based on encouragement from civil servants and verbal assurances from ministers."[1115]

637.     The Claimants further aver that, while this would suffice to find a violation of the fair and equitable treatment standard insofar as no proof of bad faith is required, the authorities also "acted in manifest bad faith […] took positions hostile to Stans […] apparently driven by individuals who had close contacts with the new potential investor".[1116]

ii.     The Respondent's Position

638.     The Respondent rejects the Claimants' contention that it frustrated a legitimate expectation in "the validity and legality of the licenses".[1117] It is clear from the circumstances in which Stans Energy acquired Kutisay Mining OJSC that the Claimants "could have had no legitimate expectation that the Kyrgyz government would not seek to enforce the terms of the

---

[1111]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 302.
[1112]   Statement of Claim, at paras 251-252; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 303; Claimants' Post-Hearing Brief, at para. 36.
[1113]   Claimants' Post-Hearing Brief, at para. 60, referring to Hearing Transcript, Day 1, pp 159:17-160:17, 209:5-14.
[1114]   Claimants' Post-Hearing Brief, at para. 61.
[1115]   Claimants' Post-Hearing Brief, at para. 61, referring to *Pezold v. Republic of Zimbabwe* (ICSID Case No ARB/10/15) Award, 28 July 2015, at para. 547 (**Authority CLA-309**).
[1116]   Statement of Claim, at para. 253; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 304.
[1117]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 720; Rejoinder on the Merits and Reply on Jurisdiction, at para. 583.

Subsoil Law".[1118] The Respondent argues that "[t]here can be no breach of legitimate expectations by reason of an investor being subject to national law, properly applied by national courts."[1119]

639.     The Respondent considers that it was not reasonable for the Claimants to rely on any of the representations allegedly made by Mr. Eliseev in this regard, given the factual circumstances and numerous red flags which should have alerted the Claimants to corruption.[1120] As a result such representations could not give rise to any legitimate expectations.[1121] The Respondent notes that Mr. Aryev testified at the Hearing that the Claimants did not rely on any assurance given by Mr. Eliseev.[1122]

640.     The Respondent argues that the relevant time for assessing the expectations of the Claimants is the time when the investment was made.[1123] According to the Respondent, provisions of general legislation do not create a legitimate expectation as they are not specific enough to justify reliance.[1124] In any event, as noted above, Stans KG acquired its shares in Kutisay Mining OJSC on 29 December 2009; Resolution No 725 however entered into force only on 9 January 2010. Accordingly, the 21 December 2009 Minutes could not have provided a basis for any expectations when the investment was made.[1125] Rather, the Respondent points out that when the Claimants acquired their investment, the legal framework in force provided for a tender procedure. In order to be granted valid rights to the deposits, investors had to observe Kyrgyz laws when developing economic activity, and were subject to enforcement procedures under Kyrgyz law.[1126] Accordingly, the Claimants could have had no legitimate expectation that they would be exempt from the tender requirement under the Subsoil Law or that they would not be subject to enforcement procedures.[1127] The Respondent also points out that Mr. Aryev testified at the Hearing that the Claimants did not receive specific assurances in relation to the lawfulness of the allocation of the Licenses before he left Bishkek,[1128] nor subsequently.[1129]

---

[1118]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 720-724; Rejoinder on the Merits and Reply on Jurisdiction, at paras 583-586.
[1119]   Respondent's Reply Post-Hearing Brief, at para. 65.
[1120]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 726.
[1121]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 725-726; Rejoinder on the Merits and Reply on Jurisdiction, at para. 584.3 cf. Claimants' Post-Hearing Brief, at paras 10(c), 25, 60-61.
[1122]   Respondent's Post-Hearing Brief, at para. 152, referring to Hearing Transcript, Day 2, pp 277:21-278:1.
[1123]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 727.
[1124]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 584.1.
[1125]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 727.
[1126]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 728.
[1127]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 729.
[1128]   Respondent's Post-Hearing Brief, at para. 152, referring to Hearing Transcript, Day 2, pp 280:10-281:1.
[1129]   Respondent's Post-Hearing Brief, at para. 152, referring to Hearing Transcript, Day 2, p. 281:9-24.

641.     The Respondent submits that the Claimants' suggestion that its conduct must be assessed by reference to the 26 June 2012 Resolution is misconceived, *inter alia,* because the basis on which the Licenses were ultimately terminated was completely unrelated to the basis for termination which the 26 June 2012 Resolution had recommended.[1130]

642.     The Respondent denies that any potential delay that may have occurred in invalidating the Licenses was relevant to the reasonableness of the Claimants' expectations, as such expectations must be assessed at the time the investment was made and subsequent events are irrelevant.[1131] There was no change of position by the Respondent which could have violated the fair and equitable treatment standard or the international minimum standard.[1132]

643.     The Respondent also contests the Claimants' reliance on *Pezold v. Zimbabwe,* for the proposition that legitimate expectations "could be based on encouragement from civil servants and verbal assurances from ministers."[1133] The Respondent points out that, in that case, specific written and oral assurances were made over a period for 25 years, while in the present case any alleged verbal assurances "remain elusive, unproven and contradicted by Mr Aryev's own testimony." [1134] Moreover, the Claimants failed to prove their reliance on any purported assurances.[1135]

644.     In sum, even if the Claimants were entitled to bring a claim for breach of the fair and equitable treatment standard, such claim should be dismissed.[1136]

           iii.     The Tribunal's Analysis

645.     In view of its above considerations, the Tribunal does not have to enter into the Parties' dispute whether the standard of legitimate expectations as it is used to interpret the FET standard in  investment treaties has been breached in the present case. Rather, the Tribunal will examine whether the Respondent accorded to the Claimants the treatment expressly required by Article

---

[1130]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 731.
[1131]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 585.
[1132]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 587.
[1133]   Respondent's Reply Post-Hearing Brief, at para. 60.
[1134]   Respondent's Reply Post-Hearing Brief, at para. 61.
[1135]   Respondent's Reply Post-Hearing Brief, at para. 64.
[1136]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 732.

4(4) of the 2003 Investment Law as clarified by the above quoted interpretation in Section 3 of the Government's 2010 Investment Protection Decree.

646.     Above, in its examination of a breach of Article 6 of the 2003 Investment Law, the Tribunal has found that not only could the Claimants trust that the Licenses were granted in accordance with Kyrgyz law as the entire process was organized and controlled by the Respondent, but the Respondent continued cooperating with the Claimants while they continued with their investment and the Respondent even confirmed this by re-issuing the Licenses. In these circumstances termination by the SAGMR of the Licenses, based on the invalidation by the courts of the 21 December 2009 Minutes, in the view of the Tribunal, was not consistent with the promise of "a fair and equitable legal regime, including guarantees of protection of their investments" according to the Government's own interpretation of the 2003 Investment Law, and was therefore a breach of Article 4(4) of the 2003 Investment Law.

647.     In view of this conclusion, the Tribunal does not have to enter into the detailed discussion between the Parties whether any particular individual steps in the implementation of the Licenses were justified or not.

> **b.     Whether the Respondent Acted Arbitrarily**
>
> > i.     The Claimants' Position

648.     The Claimants assert that investment tribunals have held consistently that arbitrary or discriminatory conduct is *per se* a breach of the fair and equitable treatment standard.[1137]

649.     According to the Claimants, the Respondent has acted arbitrarily towards them and their investments in "wilful disregard of due process of law and juridical propriety".[1138] In particular, the Claimants allege that, after sustained and coherent conduct recognizing the validity and legality of the mining Licenses granted to the Claimants, the Respondent's authorities later reversed their position arbitrarily and in bad faith in order to replace the Claimants with a new investor "for political and commercial reasons".[1139] Relying on the decision in *Belokon v. Kyrgyz*

---

[1137]   Statement of Claim, at para. 239; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 305.
[1138]   Statement of Claim, at para. 258.
[1139]   Statement of Claim, at para. 260; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 307.

*Republic*, they deny that the fact that the measures were taken to comply with local law could alter this conclusion.[1140]

650.    According to the Claimants, the arbitrariness of the Respondent's conduct is underscored by the exclusion of Kutisay Mining LLC as a party in the proceedings before the Kyrgyz courts, which allowed "the prosecutor and the SAGMR to collude in the disposal of the matter to the State's benefit"[1141] and left them without standing to appeal the court's decision, in breach of due process.[1142] In this regard, they invoke *Belokon v. Kyrgyz Republic*, where the tribunal found that the respondent had violated the fair and equitable treatment standard by "be[ing] able to seize control of a foreign investment and provid[ing] no remedy for access to the courts to challenge that seizure".[1143]

651.    In sum, the Claimants assert that the Respondent, acting arbitrarily and in bad faith, has frustrated the Claimants' legitimate expectations and destroyed their investments, thereby breaching its obligation to treat them and their investments fairly and equitably.[1144]

ii.    The Respondent's Position

652.    The Respondent argues that it did not act arbitrarily and states that the two complaints put forward by the Claimants in this regard are without merit.[1145]

653.    First, the Respondent denies that it has arbitrarily changed its position regarding the legality of the granting of Licenses to Kutisay.[1146] States are entitled to change their position when they become aware of new facts, and the Respondent argues that it cannot be faulted for seeking to enforce the Subsoil Law once it had become aware of breaches of this Law by allegedly corrupt

---

[1140]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 306, referring to *Valeri Belokon v. The Kyrgyz Republic* (UNCITRAL) Award, 24 October 2014, at para. 260 (**Authority CLA-71**).

[1141]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 308.

[1142]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 308: *"The Appellate Instance of the Bishkek City Court confirmed that Kutisay Mining had no standing to present a claim"*. See also, Decision of the Appellate Instance of the Bishkek City Court, *Case No AB-311/14-AD*, 30 July 2014, at p. 6 (**Exhibit C-31**).

[1143]    Statement of Claim, at para. 261, referring to *Valeri Belokon v. The Kyrgyz Republic* (UNCITRAL) Award, 24 October 2014, at para. 264 (**Authority CLA-71**).

[1144]    Statement of Claim, at para. 262; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 286.

[1145]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 733; Rejoinder on the Merits and Reply on Jurisdiction, at para. 590.

[1146]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 734.

members of the former Bakiev regime, particularly in circumstances in which the Claimants were aware of the illegality.[1147]

654.     Second, the Claimants allege that they were precluded from opposing the injunction ordered by the Inter-District Court of Bishkek—a complaint which the Respondent qualifies as "simply misguided" because Kutisay did in fact challenge the injunction.[1148] The Respondent avers that the mere fact that its challenge was unsuccessful does not evidence any arbitrary conduct.[1149] The Respondent argues that if the Claimants had any complaint about the conduct of Kyrgyz national courts, this would be a denial of justice claim. Such a claim would be subject to a different standard and to the requirement of exhaustion of local remedies. However, the Claimants do not argue denial of justice in the present case.[1150]

655.     In sum, the Respondent denies that its conduct was arbitrary. It also argues that any "interference" with the Claimants' economic activity was in accordance with Kyrgyz law, and they had an opportunity to present their case.[1151] Moreover, even if a particular act were considered arbitrary, the Claimants would still need to establish that such particular arbitrary conduct caused them loss or damage in order to recover any damages.[1152]

            iii.     The Tribunal's Analysis

656.     In view of its conclusions above that both Article 6 and Article 4(4) of the 2003 Investment Law were breached by the Respondent, the Tribunal does not have to examine whether a breach additionally occurred due to the Respondent acting arbitrarily, as neither Party requests any other or additional relief on the basis of such a further breach.

## VII.   QUANTUM

657.     The Tribunal shall now turn to the determination of damages. First, the legal standard by which damages are to be assessed is discussed. Second, the Parties' positions as to the date by

---

[1147] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 735; Rejoinder on the Merits and Reply on Jurisdiction, at paras. 591-592.
[1148] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 736.
[1149] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 736; Rejoinder on the Merits and Reply on Jurisdiction, at para. 593.
[1150] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 739.
[1151] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 740; Rejoinder on the Merits and Reply on Jurisdiction, at para. 594.
[1152] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 742.

reference to which damages are to be calculated are set out. Finally, the Parties' views regarding the appropriate valuation methodology to calculate the damages suffered by the Claimants as well as their quantification are discussed.

## A.   LEGAL STANDARD

658.     According to the Claimants, the compensation due must be determined in accordance with general international law, which provides for the principle of full reparation. In contrast, the Respondent argues that any damages should be calculated in accordance with Article 6(2) of the 2003 Investment Law.

659.     Article 6(2) of the 2003 Investment Law provides:

> 2. The amount of the compensation shall be equivalent to a fair market price of the expropriated investment or part thereof, including lost profit, determined as of the date of the expropriation decision. The fair market price must not reflect any change in the value of the investment caused by having advance knowledge of the expropriation.[1153]

### 1.   The Claimants' Position

660.     The Claimants examine Article 6(2) of the 2003 Investment Law and note that it does not contain an express stipulation regarding the meaning of "fair market value", nor does it set out a compensation formula for unlawful acts and omissions (including unlawful expropriations or breaches of the fair and equitable treatment obligation).[1154] In any event, they argue that Article 6(2) prescribes full reparation.[1155]

661.     The Claimants argue that, in the absence of any *lex specialis*, compensation for the unlawful expropriation of their investment must be determined in accordance with the general international law principle of "full reparation".[1156] This principle applies to all the internationally wrongful acts committed by the Respondent.[1157]

---

[1153]   Translation as provided by the Claimants in Law No 66 of 27 March 2003 on Investments in the Kyrgyz Republic, as amended on 22 October 2009 (with English translation) (**Authority CLA-98**).
[1154]   Statement of Claim, at para. 268; Claimants' Post-Hearing Brief, at paras 63-64.
[1155]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 314.
[1156]   Statement of Claim, at paras 274-275; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 311-313; Claimants' Post-Hearing Brief, at paras 65-67.
[1157]   Statement of Claim, at para. 274.

662.     The Claimants refer to the principle of full reparation enunciated by the Permanent Court of International Justice in the *Chorzów Factory* judgement to the effect that "reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed".[1158] Accordingly, the Tribunal's award should place the Claimants in the economic position in which they would have been had the internationally wrongful act not occurred.[1159] The amount of compensation to be paid should be assessed on the basis of the diminution in the fair market value of the Claimants' investment resulting from the Respondent's wrongful conduct.[1160]

663.     The Claimants contend that, even if it were difficult to quantify the precise value of the losses they sustained, as the Respondent argues, "it is beyond doubt that the Claimants lost them". In other words, the fact that the Claimants incurred losses is "real and certain".[1161]

## 2.     The Respondent's Position

664.     The Respondent asserts that, should the Tribunal find that the Respondent has expropriated the Claimants' investment, any damages should be calculated in accordance with Article 6(2) of the 2003 Investment Law.[1162]

665.     The Respondent contests the Claimants' suggestion that the Tribunal should resort to general international law, asserting that it rests on erroneous assumptions concerning (1) the claims which may be filed before this Tribunal and (2) the law applicable to such claims.[1163] The Respondent reiterates that the Claimants can only bring claims for breaches of the 2003 Investment Law which are to be decided in accordance with Kyrgyz law. The Claimants' reasoning cannot apply in this context, as it is borrowed from investment treaty proceedings in cases where the applicable law does not resemble the applicable law in this case.[1164]

---

[1158]   Statement of Claim, at para. 275.
[1159]   Statement of Claim, at para. 276.
[1160]   Statement of Claim, at para. 280; Claimants' Post-Hearing Brief, at para 67, referring to CN Brower, JD Brueschke, *The Iran-United States Claims Tribunal* (1998) (extract), at p. 539 (**Authority CLA-78**); *Crystallex International Corporation v. Bolivarian Republic of Venezuela* (ICSID Case No ARB(AF)/11/2) Award, 4 April 2016, at para. 850 (**Authority CLA-285**); *Compañía de Aguas del Aconquija SA and Vivendi Universal v. The Argentine Republic* (ICSID Case No ARB/97/3) Award, 20 August 2007, at para. 8.2.10 (**Authority CLA-41**); *CMS Gas Transmission Company v. The Argentine Republic* (ICSID Case No ARB/01/8) Final Award, 12 May 2005, at para. 406 (**Authority CLA-32**).
[1161]   Claimants' Reply Post-Hearing Brief, at para. 38.
[1162]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 752; Rejoinder on the Merits and Reply on Jurisdiction, at paras 602-603.
[1163]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 754-755.
[1164]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 755.

666.     According to the Respondent, there is no reason for the Tribunal to go beyond Article 6(2) of the 2003 Investment Law.[1165] Even if the Tribunal decided not to apply Article 6(2), however, "the application of general principles of Kyrgyz law on damages would lead to the Claimants recovering no damages".[1166]

667.     The Respondent adds that, even if the Claimants could bring a claim for a violation of the Moscow Convention (which the Respondent denies), damages would still need to be assessed according to Kyrgyz law.[1167] The Respondent notes that there is no scope for the application of customary international law, as the Moscow Convention specifies that the standard of compensation applicable to both "lawful" and "unlawful" nationalisations is to be determined in accordance with the law of the host country.[1168]

668.     The Respondent submits that the Tribunal must interpret Article 6 of the 2003 Investment Law in accordance with Kyrgyz law principles of statutory interpretation. The Respondent notes that the 2003 Investment Law does not distinguish between "lawful" and "unlawful" expropriation, and underscores that the Claimants have not suggested the existence of such distinction under Kyrgyz law.[1169] The Respondent reiterates that the absence of an offer of compensation to the Claimants does not render the expropriation "unlawful" as the only obligation imposed by Article 6(1) of the 2003 Investment Law was to make a "proper legal procedure available" to the Claimants;[1170] a procedure which the Claimants decided not to pursue.[1171] The Respondent points out that this position is consistent with the *Chorzów Factory* decision,[1172] the decisions of "non-treaty" investment tribunals,[1173] and the approach followed by the Iran-United States Claims Tribunal.[1174]

669.     Even if the Tribunal were to apply the principle of "full reparation" advocated by the Claimants, the result would be the same.[1175] The Respondent notes that the Claimants have also

---

[1165]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 603-604.
[1166]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 605.
[1167]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 756, referring to the Convention on the Protection of the Rights of the Investor (28 March 1997; in force on 21 January 1999), Article 10 (**Authority CLA-3**).
[1168]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 757.
[1169]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 755.3; Rejoinder on the Merits and Reply on Jurisdiction, at para. 604.1.
[1170]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 758; Rejoinder on the Merits and Reply on Jurisdiction, at para. 604.2.
[1171]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 759.
[1172]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 760-761.
[1173]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 762.
[1174]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 763.
[1175]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 765-766.

accepted this much and argues that "in light of these concessions, the Tribunal should apply Article 6(2) of the 2003 Investment Law".[1176]

670.     Furthermore, the Respondent argues that international tribunals have held that when assessing damages *"it is necessary to define with precision the scope and nature of* [the investor's] *rights."*[1177] In the present case, the Respondent considers that no damages can accrue as Kutisay Mining LLC did not have any legal right to any further license agreement or extension following the expiry of Kutessay II License Agreement No. 3 and Kalesay License Agreement No. 2.[1178] In circumstances as the present, where the SAGMR was legally entitled to revoke the Licenses, the Respondent submits that there is no scope for compensation.[1179]

671.     The Respondent also contends that the Tribunal cannot award compensation "on the speculative assumption that SAGMR would grant further indulgences[.]"[1180] Upon Kutisay Mining LLC's breach of its License Agreement, or its lapse without an extension, Kutisay Mining LLC no longer had *"a right to engage in activity"* and no "investment" to be protected under the 2003 Investment Law.[1181]

672.     According to the Respondent, the Claimants were aware of the consequences of breaching the License Agreements, as they knew that CAMG, the previous licensee of Kutessay II, lost its license for such reason.[1182] The Respondent contends that the Claimants agreed to the License Agreements terms "*knowing* that they were not capable of complying with their terms. Mr Aryev testified that this was clear *from day one*, and that it would take Stans *five years* to comply."[1183]

### 3.     The Tribunal's Analysis

673.     It is recalled that according to the Tribunal's conclusions above, the Respondent is liable for breaches of both Article 6 and Article 4(4) of the 2003 Investment Law. Neither Party has

---

[1176]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 606.
[1177]   Respondent's Post-Hearing Brief, at para. 68 [emphasis in original], referring to *Alpha Projektholding v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, at para. 439 (**Authority RLA-212**).
[1178]   Respondent's Post-Hearing Brief, at para. 67.
[1179]   Respondent's Post-Hearing Brief, at para. 64.
[1180]   Respondent's Post-Hearing Brief, at para. 69.
[1181]   Respondent's Post-Hearing Brief, at para. 71 [emphasis in original].
[1182]   Respondent's Post-Hearing Brief, at paras 72-74.
[1183]   Respondent's Post-Hearing Brief, at para. 75 [emphasis in original, internal footnotes omitted], referring to, *inter alia*, Hearing Transcript, Day 2, pp. 394:13-395:7, 397:22-398:7.

requested any different relief on the basis of breaches of either one of these provisions. The Tribunal can therefore consider the quantum on the basis of both breaches together.

674.     Regarding the standard to determine the standard of the quantum, it is to be noted that, for a breach, the provisions of subparagraphs 2 and 3 of Article 6 of the 2003 Investment Law are not directly applicable as they refer to a lawful taking while the Tribunal has concluded that the taking by the Respondent was not lawful. But it is clear that damages for an unlawful dispossession should not be lower than those for a lawful one. The Tribunal, therefore, can take guidance from the fair market standard provided in Art.  6(2) and (3) of the 2003 Investment Law.

## B.     VALUATION DATE

675.     The Claimants argue that the value of their investments should be assessed as at 25 June 2012, the day before the 26 June 2012 Resolution. The Respondent submits that the valuation date should be 16 October 2014, the day before the SAGMR terminated the Claimants' Licenses.

### 1.     The Claimants' Position

676.     The Claimants assert that the progressive destruction of Stans Energy's market value started with the 26 June 2012 Resolution.[1184] Thus, to eliminate the effects of the Respondent's wrongful conduct, it will be necessary to use a valuation date before the series of measures amounting to a creeping expropriation started.[1185] Accordingly, 25 June 2012 is the correct valuation date.

677.     The Claimants contend that choosing any later valuation date would allow the Respondent to profit from its unlawful conduct by reducing the amount of payable compensation, in view of negative effect produced by the anticipation that the asset will be expropriated.[1186] This would go against the general principle that no one should be permitted to derive an advantage from his own wrong (*nullus commodum capere de sua iniuria propria*).[1187] Otherwise, the

---

[1184]   Statement of Claim, at para. 283.
[1185]   Statement of Claim, at para. 284; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 316; Claimants' Post-Hearing Brief, at paras 52-54, 69.
[1186]   Statement of Claim, at para. 286; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 316, 318.
[1187]   Statement of Claim, at para. 284; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 318.

Claimants contend, the State "could adopt gradual adverse measures, formally expropriating only after the value has dropped to reduce the compensation it must pay".[1188]

678.    Relying on the full reparation principle under international law, the Claimants argue that an assessment of compensation for a creeping expropriation must be done as of the first action of a composite act, not the last.[1189] The Claimants further allege that, if Article 6(2) of the 2003 Investment Law were applicable (which they deny for the reasons set out above), it would require the same approach.[1190]

679.    The Claimants deny that Mr. Aryev, during his testimony at the Hearing, conceded that Kutisay Mining LLC was not prevented from progressing with its work even by the 15 April 2013 Inter-District Court of Bishkek injunction. This allegation, in the Claimants' view, "misrepresents" Mr. Aryev's testimony". The Claimants point out that Mr. Aryev also said that "this injunction stopped our work."[1191]

## 2.    The Respondent's Position

680.    Relying on Article 6(2) of the 2003 Investment Law, the Respondent asserts that the value of the investment is to be assessed as at the date of the alleged expropriation decision.[1192] Hence, the Respondent submits that the valuation date should be 16 October 2014, the day before the date when the SAGMR terminated the Claimants' Licenses because, to the extent that there may have been an expropriation, the SAGMR decision would constitute the "expropriation decision" within the meaning of Article 6(2).[1193]

681.    The Respondent contends that, even if the Tribunal were to assess the valuation of the Licenses according to customary international law, the valuation date still should be the date of the expropriation.[1194]

---

[1188]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 318.
[1189]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 319.
[1190]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 319.
[1191]   Claimants' Reply Post-Hearing Brief, at para. 43.
[1192]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 768-769.
[1193]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 596, 607-608. See also, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 770.
[1194]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 773; Rejoinder on the Merits and Reply on Jurisdiction, at para. 610.

682.     In the alternative, the Respondent argues that the earliest conceivable date to value the Licenses would be 14 April 2013, the day immediately preceding the Inter-District Court of Bishkek injunction restraining all parties from taking any actions regarding the Licenses.[1195] However, the Respondent notes that Mr. Aryev confirmed at the Hearing that the injunction did not prevent Kutisay Mining LLC from progressing with its work.[1196] Therefore, the Respondent argues for 16 October 2014 as the correct valuation date.[1197] In any event, the Respondent notes that its valuation expert, Mr. Ziff, confirmed in his second report that the Licenses had no value as at 14 April 2013.[1198] According to the Respondent, before this date the Claimants had the full enjoyment of the Licenses, and no actions by the Respondent had any substantial impact on their operations.[1199]

683.     The Respondent objects to the "shifting" of the valuation date to the day before the 26 June 2012 Resolution.[1200] The Respondent notes that the Claimants support this shift on the basis that the value of Stans Energy's shares "had been almost completely destroyed by conduct attributable to the Kyrgyz Government before the last formal step".[1201] In response, the Respondent asserts that the 26 June 2012 Resolution did not affect the Claimants' use of the Licenses.[1202] It also points out that Mr. Ziff's analysis "concludes that 91% of the price movement in Stans Energy's stock price in this period was attributable to market sentiments for the REE sector generally".[1203] More generally, the Respondent argues that when awarding damages it is necessary to distinguish between diminution in value caused by wrongful acts of the host State and diminution in value caused by general economic conditions.[1204] Damages should only be awarded for the former, as recognised by the Iran-United States Claims Tribunal and by investment treaty tribunals.[1205]

---

[1195]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 596, 611.
[1196]   Respondent's Post-Hearing Brief, at para. 157, referring to Hearing Transcript, Day 2, p. 406:3-6. See also, Hearing Transcript, Day 2, pp 403:11-406:2.
[1197]   Respondent's Post-Hearing Brief, at para. 157.
[1198]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 612, referring to Second SM Ziff Report, 29 January 2018, at paras 145-147.
[1199]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 611.
[1200]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 775; Rejoinder on the Merits and Reply on Jurisdiction, at para. 613; Respondent's Post-Hearing Brief, at para. 153.
[1201]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 776, referring to Statement of Claim, at para. 284; Rejoinder on the Merits and Reply on Jurisdiction, at para. 616.
[1202]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 616.1. See also, Respondent's Post-Hearing Brief, at para. 154.
[1203]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 778.
[1204]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 780; Rejoinder on the Merits and Reply on Jurisdiction, at para. 617.
[1205]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 780-781.

684.     The Respondent also contests the Claimants' assertion that "compensation for creeping expropriation must be assessed as of the first action of the composite act".[1206] The Respondent denies that this is the case either under Kyrgyz law or under international law.[1207] As regards Kyrgyz law, the Respondent asserts that under the Kyrgyz Civil Code the Claimants would not be entitled to damages, as they "have not put forward evidence to establish the position that they would have been in but for the allegedly wrongful actions of the Kyrgyz Republic".[1208] As regards international law, the Respondent argues that "in the only investment authority cited" by the Claimants, the tribunal in fact determined that the first step of the creeping expropriation qualified as a *"self-standing breach of FET"*.[1209]

685.     The Respondent notes that it has not "benefitted" in any way from its decision to terminate the Licenses.[1210] The shift in the valuation date would result in the Tribunal awarding the Claimants compensation for a deterioration in Stans Energy's share price, which was not attributable to the Respondent's conduct but rather a consequence of the market situation of the REEs sector in general.[1211] In the Respondent's view, Mr. Dellepiane's Third Report confirms that "adopting the 25 June 2012 valuation date impermissibly compensates C[laimant]s for the deterioriation of the REE sector."[1212]

### 3.     The Tribunal's Analysis

686.     In Section VI.A.1 above, the Tribunal concluded that the Claimants were deprived of the effective use and control of the mining Licenses at least when the SAGMR formally decided their termination on 17 October 2014. The Tribunal was therefore satisfied that there was a dispossession within the meaning of Article 6 of the 2003 Investment Law. In that context, the Tribunal left open the question as to the precise date by which the dispossession occurred.

687.     In determining the precise date of the expropriation of the Claimants' investment, the Tribunal refers to its discussion in Section VI.A.2 above. The Tribunal observed that the 26 June 2012 Resolution and the SAGMR's August 2012 order to stop work were not implemented and

[1206]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 618, referring to Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 319.
[1207]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 618.
[1208]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 620.
[1209]   Respondent's Reply Post-Hearing Brief, at para. 55 [emphasis in original].
[1210]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 616.3.
[1211]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 782; Rejoinder on the Merits and Reply on Jurisdiction, at para. 613.
[1212]   Respondent's Reply Post-Hearing Brief, at para. 68.

were irrelevant to the ultimate termination of the Licenses. The suspension order of 30 August 2012 did not prevent Stans Energy, after the suspension order expired on 30 September 2012, from resuming its work on the Kutessay II project. Nor did the proceedings concerning the invalidation of the 21 December 2009 Minutes bring Stans Energy's operations to a halt. Rather, Stans Energy was deprived of its investment only by the SAGMR's decision of 17 October 2014, by which the SAGMR's Subsoil Use Licensing Commission decided to terminate Kutisay Mining LLC's Licenses on the basis of decisions of the Kyrgyz courts.

688.     Accordingly, as the Tribunal has concluded above that the unlawful dispossession was the SAGMR's termination notice, the Tribunal agrees with the Respondent that the valuation date should be 16 October 2014, the day before the SAGMR terminated the Claimants' Licenses.

## C.     VALUATION METHODOLOGY AND QUANTIFICATION

689.     The Claimants argue that the Tribunal should employ the stock market capitalisation approach to calculate damages, and conclude that the fair market value of their investments as at 25 June 2012 was US$ 128.23 million.

690.     The Respondent contends that the only reliable way to valuate the Licenses is through a discounted cash flow analysis, and concludes that the Licenses had no value at either 25 June 2012 or 16 October 2014. Therefore, the Claimants have no entitlement to damages. Should the Tribunal not wish to use DCF analysis, damages should be awarded by reference to the amounts actually spent in developing the Licenses. In this alternative, the Claimants would be at most entitled to recover an amount of C$ 3 million spent.

### 1.     The Claimants' Position

#### a.     The Claimants' Valuation in Accordance with a Market Capitalisation Approach

691.     The Claimants argue that the Tribunal should employ the stock market capitalisation approach, which calculates Stans Energy's market capitalization through its share price.[1213] This method eliminates the need for fact-finding about future costs and uncertainties, as this method

---

[1213]     Statement of Claim, at para. 291; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 322; Claimants' Post-Hearing Brief, at paras 76-77.

incorporates the market's assessment of all known costs and risks.[1214] The Claimants contend that the Respondent's expert, Mr. Ziff, accepted during cross-examination at the Hearing that in principle and under the relevant valuation guidelines of the mining industry, mining properties should be valued using the market capitalisation approach.[1215] On the basis of the publicly available information on the valuation date, the Claimants conclude that the market capitalization of Stans Energy was US$ 102.34 million.[1216]

692.     The Claimants note that share prices represent a company's fractional value, while they argue that the asset affected by the Respondent's wrongful conduct was the whole company. It is an accepted principle of corporate finance that control of a company carries separate and additional value in the market due to the opportunity of the owner to direct the business.[1217] Accordingly, the Claimants argue that it is necessary to add a "control premium" to reflect the full value of the company,[1218] as Stans Energy's rights would otherwise be undervalued.[1219] Mr. Dellepiane concludes that 25.3% is a reasonable control premium on the basis of the "evidence from a closely related industry and the same time period as the case at hand".[1220] After adding the control premium, the Claimants calculate the fair market value of their investments as at 25 June 2012 as US$ 128.23 million.[1221] The Claimants reject Mr. Ziff's suggestion to apply a discount rate rather than a control premium, noting that "discounts accorded for equity offerings in order to raise capital to fund the company's operations have nothing to do with control premiums that are paid when acquiring a majority stake in a company".[1222]

693.     The Claimants argue that the same valuation should be applied regardless of whether the Tribunal ultimately decides that the Respondent unlawfully expropriated Stans' investments or failed to accord fair and equitable treatment under the 2003 Investment Law, the 2010 Investment Protection Decree, the Moscow Convention or general international law.[1223] Similarly, according to the Claimants, even if that the Tribunal were to decide that the cancellation

---

[1214] Statement of Claim, at para. 291; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 322-323.
[1215] Claimants' Post-Hearing Brief, at para. 78, referring to Hearing Transcript, Day 4, pp 821:15-822:6, 826:3-11.
[1216] Statement of Claim, at para. 292.
[1217] Statement of Claim, at para. 293.
[1218] Statement of Claim, at para. 293.
[1219] Statement of Claim, at para. 295; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 342-343.
[1220] Statement of Claim, at para. 296, referring to Compass Lexecon Report, 29 January 2016, at para. 59.
[1221] Statement of Claim, at para. 297, referring to Compass Lexecon Report, 29 January 2016, at para. 5; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 320.
[1222] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 344.
[1223] Statement of Claim, at para. 298.

of the Claimants' Licenses amounted to a lawful expropriation, the same approach to valuation should be applied.[1224]

694.     The Claimants address the following criticisms by the Respondent regarding the use of the stock market capitalisation method: (1) that Stans Energy was not a single asset company, and its stock was illiquid; (2) that Stans Energy withheld material information from the market; and (3) that the Claimants would not have been able to raise the necessary funding to develop the mines.[1225]

695.     First, the Claimants argue that Mr. Ziff uses a set of rules to measure liquidity created for another purpose (preventing stock price manipulation) which have no bearing on valuation or on whether the share price reflects the underlying asset value.[1226] Mr. Dellepiane, on the other hand, identifies two measures of liquidity that do indicate whether a share price will be a reliable indicator of underlying value. Those measures show that Stans Energy shares were of average liquidity in comparison with similar mining companies.[1227] Regarding the contention that Stans Energy owned other assets and that the License Agreements only represented a small portion thereof, the Claimants assert that all cash and short-term investments were directly related to the development of the mining projects, which was Stans Energy's only substantial activity at the time.[1228]

696.     Second, the Claimants deny that they withheld any material information from the market when they chose not to disclose the AsiaRud Reports. Had that been the case, they would have been subject to regulatory enforcement and security fraud claims by their shareholders. They note that Stans Energy has never been investigated, and no market participant has ever suggested that any information was withheld.[1229] In the Claimants' view, Stans Energy was in fact prohibited from disclosing such information pursuant to Canadian securities regulations insofar as it had not

---

[1224]   Statement of Claim, at para. 299.
[1225]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 328.
[1226]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 330, referring to Compass Lexecon Supplemental Report, 9 November 2017, at paras 47-48.
[1227]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 331, referring to Compass Lexecon Supplemental Report, 9 November 2017, at paras 50, 56-57, 60-61. See also, Claimants' Post-Hearing Brief, at para. 80, referring to Hearing Transcript, Day 3, pp 645:12-646:22. See also, Hearing Transcript, Day 4, pp 873:11-875:1.
[1228]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 322, referring to Compass Lexecon Supplemental Report, 9 November 2017, at paras 73-75, 77-79. See also, Claimants' Post-Hearing Brief, at para. 79.
[1229]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 337.

been prepared by a "Qualified Person".[1230] In any event, the Claimants allege that the Respondent admitted at the Hearing that Stans Energy had no obligation to disclose the AsiaRud Report to the market.[1231] According to the Claimants, "[t]he market always had the information that Stans Energy was allowed to disclose under the applicable disclosure rules".[1232]

697.    The Claimants also reject the Respondent's additional argument that Stans Energy misled the market by publishing "aspirational statements" in respect of the start of production. The Claimants deny that Stans Energy breached Section 4A of National Instrument 51-102. Among other things, the Claimants point out that NI 51-102 applies only to information *"other than forward-looking information contained in oral statements"*, while the statements cited by the Respondent are oral.[1233]

698.    Third, regarding the ability to raise the necessary funding, the Claimants argue that they provided substantial evidence regarding third-party interest in Stans Energy and further argue that, in any case, the availability and cost of financing are already reflected in the share price of publicly traded companies.[1234]

699.    Turning to other possible valuation methods, the Claimants explain that their expert, Mr. Dellepiane, disregarded the use of book-value and other asset-based approaches, such as replacement value, liquidation value or the historical values of capital contributions, as he considered these inappropriate.[1235] Mr. Dellepiane also determined that a market multiples approach would not be possible as there are too few comparable publicly-traded companies in the REEs market.[1236] He finally concluded that a stock market valuation would be relatively superior to the income approach because it "is based on real transactions and represents an amalgam of all investor expectations regarding the parameters described above".[1237]

700.    In particular, the Claimants consider the DCF method put forward by the Respondent to be inappropriate, alleging that it is an unreliable valuation method for mining properties as it

---

[1230]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 335, referring to, *inter alia*, Compass Lexecon Supplemental Report, 9 November 2017, at para. 39.
[1231]    Claimants' Post-Hearing Brief, at para. 81, referring to Hearing Transcript, Day 1, pp 228:23-229:1, 230:5-7.
[1232]    Claimants' Reply Post-Hearing Brief, at para. 39.
[1233]    Claimants' Reply Post-Hearing Brief, at para. 49 [emphasis in original].
[1234]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 339-340.
[1235]    Statement of Claim, at para. 287.
[1236]    Statement of Claim, at para. 289.
[1237]    Statement of Claim, at para. 290, referring to Compass Lexecon Report, 29 January 2016, at para. 40; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 320.

"will consistently understate the value of mining assets in periods of price volatility, because it does not capture the value of "optionality"".[1238] Moreover, Mr. Dellepiane considers the use of DCF methodology to be inconsistent with the Respondent's view that the REEs market was in "free-fall", as this method is highly sensitive to certain key assumptions; the DCF method becomes speculative when prices are unstable.[1239] A reliable estimate can only be obtained on the basis of substantial information regarding past and future income. The analysis of Mr. Ziff, in contrast, is based almost entirely on a preliminary economic analysis of the projects.[1240]

701.     Finally, the Claimants reject the Respondent's argument that any loss was entirely attributable to the background economic conditions, arguing that the correlation analysis used by Mr. Ziff is unconvincing, does not prove causality[1241] and, in any event, the companies selected as comparators are not comparable to Stans Energy.[1242]

702.     The Claimants further aver that the Respondent's position that their projects were valueless "is also impossible to reconcile with the Republic's recent tenders for the Kutessay II and Kalesay mines, demanding a US$10 million up-front fee from investors, based on a government-commissioned valuation of US$110 million".[1243]

> **b.     The Claimants' Responses to the Tribunal's Questions Annexed to Procedural Order No. 9**

703.     In Procedural Order No. 9 the Tribunal put forward several questions for the Parties to address in their Post-Hearing Briefs, including in relation to the calculation of damages under various valuation approaches and as at different hypothetical valuation dates. The Claimants' responses to such questions are summarised below.

---

[1238]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 324, referring to Compass Lexecon Supplemental Report, 9 November 2017, at paras 7, 11-12, 92-94.
[1239]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 325-326.
[1240]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 327.
[1241]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 315, referring to Compass Lexecon Supplemental Report, 9 November 2017, at para. 25.
[1242]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 315, referring to Compass Lexecon Supplemental Report, 9 November 2017, at para. 20.
[1243]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 7.

i.      The Market Capitalisation Approach as at Alternative Valuation Dates

704.    In response to the Tribunal's questions, the Claimants applied a market capitalization approach to two further hypothetical valuation dates, in addition to the valuation date of 25 June 2012 discussed above (which results in a value of US$ 128.23 million).[1244]

705.    Pursuant to the Tribunal's questions, the Claimants calculated the amount of damages following a market capitalisation approach as at 14 April 2013 and as at 16 October 2014.[1245] The Claimants note that the application of the market capitalisation approach to these dates "is slightly more difficult" as the share price observed in the market on these dates "incorporates the market's expectations and judgment concerning the illegal measures taken by the Kyrgyz Republic since 26 June 2012."[1246]

706.    Since the Claimants consider that using the share price observed at these alternative dates would not re-establish the situation in which they would have been but for the Respondent's wrongful measures, Mr. Dellepiane instead referred to the "actual share price movement up to the last trading date that was free of any threat of unlawful act and then makes it evolve according to a relevant industry index." [1247] Accordingly, Mr. Dellepiane calculated Stans Energy's hypothetical share price as at the alternative dates "by reference to the movement of an index comprised of other publicly-traded REE companies."[1248] He later used this corrected share price to determine Stans Energy's counterfactual market capitalisation adjusted by the relevant control premia at the relevant dates.[1249] Mr. Dellepiane's calculations result in a valuation of US$ 91.3 million as at 14 April 2013; and a valuation of US$ 58.7 million as at 16 October 2014.[1250]

---

[1244]   Claimants' Post-Hearing Brief, at para. 83, referring to Compass Lexecon's Responses to the Tribunal's Questions, 29 June 2018 ("**Compass Lexecon's Responses to the Tribunal's Questions**"), at para 7. See also, Compass Lexecon Report, 29 January 2016, Table 1; Compass Lexecon Supplemental Report, 9 November 2017, Table 1.

[1245]   Claimants' Post-Hearing Brief, at paras 82-86; Compass Lexecon's Responses to the Tribunal's Questions, at paras 4-14; Tables 1 and 5.

[1246]   Claimants' Post-Hearing Brief, at para. 84.

[1247]   Claimants' Post-Hearing Brief, at paras 84-85, referring to *Crystallex International Corporation v. Bolivarian Republic of Venezuela* (ICSID Case No ARB(AF)/11/2) Award, 4 April 2016, at para. 893 (**Authority CLA-285**). See also, Compass Lexecon's Responses to the Tribunal's Questions, at para. 9.

[1248]   Claimants' Post-Hearing Brief, at para. 85, referring to Compass Lexecon's Responses to the Tribunal's Questions, at para. 9(b).

[1249]   Claimants' Post-Hearing Brief, at para. 85, referring to Compass Lexecon's Responses to the Tribunal's Questions, at paras 12-14.

[1250]   Claimants' Post-Hearing Brief, at para. 86, Compass Lexecon's Responses to the Tribunal's Questions, at para. 14, Tables 1 and 5.

ii.     The Income Approach as at Different Valuation Dates

707.    First, the Claimants reiterate their consideration of an income approach as an inappropriate method to value their investments.[1251] They argue that DCF is "massively sensitive to input date and assumptions";[1252] is "directly contrary to the valuation guidelines applicable in the Canadian mining industry, i.e., the CIMVal Guidelines",[1253] which would not approve the use of DCF for mining properties at Kutessay's II stage of development;[1254] "ignores the economic reality of mining projects[,]" and does not capture their "optionality" value.[1255]

708.    The Claimants provided, in response to the Tribunal's questions, DCF analyses as at different valuation dates and with varying assumptions.[1256] All of the DCF calculations requested by the Tribunal result in a negative value.[1257]

709.    The Claimants point out that the DCF analyses prepared at the Tribunal's request "rely heavily on OPEX and CAPEX assumptions drawn from the AsiaRud Reports […] [which] are the result of very preliminary economic analysis."[1258] They contend that these assumptions ignore the Claimants' actual plans for the mine development.[1259]

710.    The Claimants explain that Mr. Dellepiane used price forecasts and price assumptions different from those indicated by the Tribunal in order to illustrate the high sensitivity of DCF analyses to price assumptions.[1260] Depending on the underlying assumptions, the DCF results in valuations ranging from negative US$ 486 million to positive US$ 240 million for the same

---

[1251]   Claimants' Post-Hearing Brief, at paras 88-94.
[1252]   Claimants' Post-Hearing Brief, at para. 88.
[1253]   Claimants' Post-Hearing Brief, at para. 89, referring to Civil Standard Guidelines for Valuation of Mineral Properties – Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on Valuation of Mineral Properties (CIMVAL), February 2003 (**Exhibit R-36**).
[1254]   Claimants' Post-Hearing Brief, at paras 89-91, referring to, *inter alia*, Civil Standard Guidelines for Valuation of Mineral Properties – Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on Valuation of Mineral Properties (CIMVAL), February 2003, at p. 10 (**Exhibit R-36**); VV Danilov, Kazakhstan Mineral Company, "Technical Report on the Kutessay II Rare Earth Property, Kemin District, Kyrgyzstan, with Rare Earth Resource Estimate – JORC Report", 21 March 2011, at pp 8, 40-41, and 127 (**Exhibit C-76**).
[1255]   Claimants' Post-Hearing Brief, at para. 92.
[1256]   Claimants' Post-Hearing Brief, at paras 87-97; Compass Lexecon's Responses to the Tribunal's Questions, at paras 15-22, Table 2, Table 6.
[1257]   Claimants' Post-Hearing Brief, at para. 88.
[1258]   Claimants' Post-Hearing Brief, at para. 95.
[1259]   Claimants' Post-Hearing Brief, at para. 96, referring to Innovation Metals Corp. Announces the Successful Separation of High-Value Rare-Earth Elements From Mineracao Serra Verde Concentrate Using the RapidSX Process, 11 August 2016 (**Exhibit C-326**); Asiarudproject Mining Planning-Production Company CJSC, "Technical and economic assessment of Kutessay-II rare earth deposit development", July 2011, table 7.17 (**Exhibit C-86**).
[1260]   Claimants' Post-Hearing Brief, at para. 97; referring to Compass Lexecon's Responses to the Tribunal's Question, Table 7.

valuation date.[1261] According to the Claimants, "[t]his confirms the speculative nature of DCF in the present circumstances."[1262]

        iii.    The Sunk Costs Approach as at Different Valuation Dates

711.      The Claimants consider that a sunk costs approach "do[es] not accurately reflect fair market value of an investment" since it only reflects past costs but does not capture the investment's "profit-generating potential[.]"[1263] Similarly, the Claimants point out that Mr. Ziff confirmed that book value does not represent fair market value.[1264]

712.     The Claimants calculate the amounts invested by Stans Energy as at the three hypothetical valuation dates indicated by the Tribunal.[1265] The calculations were made by Mr. Dellepiane on the basis of Stans Energy's financial statements on the record,[1266] and two interim financial statements for the years 2013 and 2014.[1267]

713.     Mr. Dellepiane's calculations result in an amount of US$ 17.3 million as at 25 June 2012; US$ 23.1 million as at 14 April 2013; and US$30.6 million as at 16 October 2014.[1268]

714.     The Claimants note what they regard as "conceptual errors in the Respondent's sunk costs calculations". In particular, the Claimants disagree with various deductions from the

---

[1261]    Claimants' Post-Hearing Brief, at para. 97.
[1262]    Claimants' Post-Hearing Brief, at para. 97.
[1263]    Claimants' Post-Hearing Brief, at para. 99.
[1264]    Claimants' Post-Hearing Brief, at para. 99.
[1265]    Claimants' Post-Hearing Brief, at para. 100; Compass Lexecon's Responses to the Tribunal's Question, at paras 23-27, Tables 3, 8 and 9.
[1266]    Claimants' Post-Hearing Brief, at para. 100, referring to Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2009 and 2008", April 2010 (**Exhibit R-26**); Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2010 and 2009", 29 April 2011 (**Exhibit R-27**); Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2011 and 2010", 30 April 2012 (**Exhibit R-28**); Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2012 and 2011", 23 April 2013 (**Exhibit R-29**); Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2013 and 2012", 29 April 2014 (**Exhibit R-30**); Stans Energy Corp, "Consolidated Financial Statements For the Years Ended December 31, 2014 and 2013", 29 April 2015 (**Exhibit R-31**); Stans Energy Corp, "Consolidated Financial Statements for the years ending 31 December 2014 and 31 December 2015", 29 April 2016 (**Exhibit C-257**).
[1267]    Claimants' Post-Hearing Brief, at para. 100, referring to Stans Energy Corp, "Interim Condensed Consolidated Financial Statements for the Three months period ended March 31, 2013 and 2012", 23 May 2013 (**Exhibit C-327**); Stans Energy Corp, "Interim Condensed Consolidated Financial Statements for the nine months period ended September 30, 2014 and 2013", 28 November 2014 (**Exhibit C-328**).
[1268]    Claimants' Post-Hearing Brief, at para. 100, referring to Compass Lexecon's Responses to the Tribunal's Questions, Table 9.

amounts invested by the Claimants that the Respondent's expert, Mr. Ziff, made in his calculations.[1269]

iv.     Insufficient Information for Conventional Valuation Methodologies

715.    The Claimants argue that "[t]he obligation to make full reparation for damage caused by a wrongful act is unaffected by any difficulty in quantifying the magnitude of the harm based on the information available."[1270] In support of this position, several decisions of the International Court of Justice are invoked.[1271]

716.    According to the Claimants, even in cases in which the exact damage caused cannot be ascertained with certainty, investment tribunals have recognised that "the Tribunal must do its best to quantify the loss caused to the Claimants by the Respondent's wrongful acts."[1272] Some tribunals have determined that such difficulties "should be resolved by reference to a 'rule of reason' or reasonable approximation."[1273]

717.    According to the Claimants, the Respondent "cannot benefit from the difficulties created by a creeping expropriation over a period of important price fluctuations in the REE market" in order to escape the obligation to make full reparation.[1274] Thus, even if the Tribunal were of the view that the information available is insufficient to precisely determine the Claimants' loss, the Tribunal would need to "determine the amount of damage that it considers rational and fair based on the evidence submitted by the Parties."[1275]

---

[1269]   Claimants' Reply Post-Hearing Brief, at paras 54-56.
[1270]   Claimants' Post-Hearing Brief, at para. 70.
[1271]   Claimants' Post-Hearing Brief, at para. 70, referring to *Certain Activities carried out by Nicaragua in the Border Area (Costa Rica v. Nicaragua)* Judgment, 2 February 2018, at para. 35 (**Authority CLA-330**); *Trail Smelter case (United States/ Canada)* (16 April 1938) 3 RIAA 1911, p 1920 (**Authority CLA-322**).
[1272]   Claimants' Post-Hearing Brief, at paras 71-72, referring to *Sapphire International Petroleums Ltd v. National Iranian Oil Co*, Arbitral Award, 15 March 1963, 35 ILR 136 (**Authority CLA-9**); *Ioannis Kardassopoulos v. Georgia* (ICSID Case No ARB/05/18) Award, 3 March 2010, at para. 229 (**Authority CLA-54**); *Koch Minerals Sàrl and Koch Nitrogen International Sàrl v. Bolivarian Republic of Venezuela* (ICSID Case No ARB/11/19) Award, 30 October 2017, at para. 9.7 (**Authority CLA-329**). See also, *Marco Gavazzi and Stefano Gavazzi v. Romania* (ICSID Case No ARB/12/25) Award, 18 April 2017, at para. 124 (**Authority CLA-328**); *Copper Mesa Mining Corporation v. Republic of Ecuador* (PCA Case No 2012-2) Award, 15 March 2016, at paras 7.25-7.26 (**Authority RLA-251**).
[1273]   Claimants' Post-Hearing Brief, at para. 73, referring to *Marco Gavazzi and Stefano Gavazzi v. Romania* (ICSID Case No ARB/12/25) Award, 18 April 2017, at para. 121 (**Authority CLA-328**); *Crystallex International Corporation v. Bolivarian Republic of Venezuela* (ICSID Case No ARB(AF)/11/2) Award, 4 April 2016, at para. 871 (**Authority CLA-285**); *Sistem Mühendislik İnşaat Sanayi ve Ticaret AŞ v. Kyrgyz Republic* (ICSID Case No ARB(AF)/06/1) Award, 9 September 2009, at para. 155 (**Authority CLA-52**).
[1274]   Claimants' Post-Hearing Brief, at para. 74.
[1275]   Claimants' Post-Hearing Brief, at para. 74.

718.     The Claimants argue that the Tribunal should pay due regard to the valuation of the expropriated mining properties prepared by the Respondent in relation to the re-tendering of the mining licenses in 2016,[1276] and take into consideration the strategic importance of REEs for a range of essential technological products and procedures.[1277]

## 2.     The Respondent's Position

### a.   The Respondent's Valuation in Accordance with an Income Approach

719.     The Respondent argues that even if the Tribunal were to find that it had expropriated the Licenses, the Claimants would have suffered no damage because the Licenses were worthless.[1278] The Respondent notes that the Claimants' own engineers, AsiaRud, advised them that the project was "loss making"—information which the Respondent claims was "deliberately concealed" from the market and from the Claimants' CFO.[1279] The Respondent also contends that Mr. Irwin confirmed at the Hearing that Stans Energy did not obtain any independent advice to contradict AsiaRud's conclusions.[1280] Nor did Stans Energy seek the views of Stans' Qualified Person (Dr. Savchenko) with regard to the negative AsiaRud 2013 Report.[1281] Furthermore, even if the Claimants had wanted to pursue production, they would not have been able to raise the necessary funds; and, in any event, the Licenses were liable to termination due to persistent breaches of their terms.[1282]

720.     As noted above, the Respondent argues that the Claimants' use of the share price of Stans Energy in June 2012 as the basis for their valuation is as an attempt to benefit from the REEs price bubble of 2010-2012 in a moment where their value was already falling sharply.[1283] The Respondent considers that "[t]he share price of Stans Energy bore no relation to the value of the Licenses […] The only reliable way to value the Licenses is through using a discounted cash flow ("DCF") analysis".[1284] The Tribunal should establish the fair market value of the Licenses

---

[1276]   Claimants' Post-Hearing Brief, at para. 74, referring to Economic Model of Development of REE deposit Kutessay II, 2016 (**Exhibit C-256**).
[1277]   Claimants' Post-Hearing Brief, at para. 74, referring to Hearing Transcript, Day 1, pp 118:13-119:11.
[1278]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 746.
[1279]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 747. See also, Respondent's Post-Hearing Brief, at para. 172.
[1280]   Respondent's Post-Hearing Brief, at paras 172-173, referring to, *inter alia*, Hearing Transcript, Day 3, pp 502:18-503:3, 505:10-15.
[1281]   Respondent's Post-Hearing Brief, at para. 173, referring to Hearing Transcript, Day 3, p. 503:13-24.
[1282]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 767.
[1283]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 748.
[1284]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 750-751.

on the basis of the DCF method, which represents the market standard for the valuation of mining and other limited life licenses, [1285] while the market capitalisation method advanced by the Claimants cannot be relied upon. [1286]

721.    The Respondent notes that the Claimants have not invoked any case in which an investment tribunal has assessed damages by reference to the value of shares traded on the stock exchange. Rather, the only authority relied on by them is *Khan v. Mongolia* where, the Respondent notes, "the tribunal declined to award compensation by reference to Khan's market capitalisation on the Toronto stock exchange […] recogni[zing] that Khan's share price bore little resemblance to the underlying asset". [1287] Other investment tribunals and scholars have similarly recognised the limitations of the market capitalisation approach. [1288]

722.    Moreover, the CIMVal (Canadian Institute of Mining, Metallurgy and Petroleum Mineral Property Valuation Committee) Standards and Guidelines ("**CIMVal**"), applicable at the valuation date advanced by the Claimants and upon which Mr. Dellepiane relies, make it clear that the DCF method is a primary valuation methodology and *"[g]enerally accepted in Canada as the preferred method"*, while market capitalisation is a secondary method, which is *"[m]ore applicable to Valuation of single property asset junior companies than to properties"*. [1289]

723.    According to the Respondent, there is evidence that Stans Energy's management recognised that its share price did not reflect the value of the underlying assets. [1290] Hence, Stans

---

[1285]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 783-784, referring to the First SM Ziff Report, 14 June 2017, at paras 58 and 65.

[1286]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 783-785.

[1287]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 623, referring to *Khan Resources Inc., Khan Resources B.V. and CAUC Holding Company Ltd. v. Government of Mongolia*, UNCITRAL, PCA Case No. 2011-09, Award on the Merits, 2 March 2015, at paras 406-407 (**Authority CLA-284**). See also, Respondent's Reply Post-Hearing Brief, para. 70.

[1288]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 626-628.

[1289]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 629 [emphasis in original], referring to Civil Standard Guidelines for Valuation of Mineral Properties – Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on Valuation of Mineral Properties (CIMVAL), February 2003, at pp. 22-23, Table 2 (**Exhibit R-36**). See also, Respondent's Post-Hearing Brief, at para. 158.

[1290]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 625, referring to Stans Energy Corp. Form 51-102 Annual Management Discussion and Analysis as of 23 April 2013, at p. 25 (**Exhibit R-396**); Stans Energy Corp. Form 51-102 Annual Management Discussion and Analysis For the three months ended 31 March 2013 (as of 23 May 2013), at p. 22 (**Exhibit R-400**); Stans Energy Corp. Form 51-102F1 Interim Management Discussion and Analysis for the six months ended 30 June 2013 (as of 23 August 2013), at p. 23 (**Exhibit R-404**); Form 51-102: Interim Management's Discussion & Analysis – For the three and nine months ended 30 September 2013 (as of 27 February 2014) at p. 20 (**Exhibit R-421**).

Energy's share price is not a suitable proxy for the value of the Licenses, and market capitalisation is not an appropriate valuation method.[1291]

724.     Even if the market capitalisation approach could be used as a primary valuation method (which the Respondent denies),[1292] the Respondent contends that Mr. Dellepiane relies on several assumptions that are unfounded and make its use inappropriate in this case, namely (1) that the market was being kept informed;[1293] (2) that the market was sufficiently liquid;[1294] (3) that Stans Energy's "sole significant asset" was the Licenses;[1295] and (4) that it would have been possible to obtain financing to develop the project.[1296]

725.     First, the Respondent maintains that the Claimants did not comply with their disclosure obligations under Canadian law,[1297] and that the relevant NI 43-101 did not prevent the disclosure of the economic assessments produced by AsiaRud on 2011 and 2013.[1298] The Respondent also points out that Stans Energy's disclosures were "overwhelmingly promotional, aspirational and ambitious".[1299] The Respondent further contends that Claimants misled the market by, *inter alia*, claiming that Kutisay had complied with its license agreement obligations and had delivered all the required documentation.[1300]

726.     According to the Respondent, Stans Energy had previously filed a non-compliant Report that contained a positive assessment. In contrast, it decided to suppress the AsiaRud Report, which provided a negative analysis, on the basis that it was non-compliant with NI 43-

---

[1291]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 788; Rejoinder on the Merits and Reply on Jurisdiction, at paras 621, 649-651. See also, Respondent's Post-Hearing Brief, at para. 158.

[1292]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 622.3.

[1293]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 786.1, referring to Compass Lexecon Report, 29 January 2016, at para. 37. See also, Rejoinder on the Merits and Reply on Jurisdiction, at para. 650.1; Respondent's Post-Hearing Brief, at paras 159-161.

[1294]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 786.2, referring to Compass Lexecon Report, 29 January 2016, at para. 34. See also, Rejoinder on the Merits and Reply on Jurisdiction, at para. 650.2. See also, Respondent's Post-Hearing Brief, at para. 167.

[1295]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 786.3, referring to Compass Lexecon Report, 29 January 2016, at para. 37. See also, Rejoinder on the Merits and Reply on Jurisdiction, at para. 650.3. See also, Respondent's Post-Hearing Brief, at para. 167.

[1296]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 622.3, 650.4. See also, Respondent's Post-Hearing Brief, at para. 167.

[1297]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 221-231, 292-293, 653.2, 654. See also, Respondent's Post-Hearing Brief, at para. 166.

[1298]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 655. See also, Respondent's Post-Hearing Brief, at para. 166, referring to Rejoinder on the Merits and Reply on Jurisdiction, at paras 221-224, 232-249, 310-324. See also, paras 294-309.

[1299]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 251-271, 654.3. See also, Respondent's Post-Hearing Brief, at paras 161-162.

[1300]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 325-332, 654.4-654.5. See also, Respondent's Post-Hearing Brief, at paras 163-165.

101.[1301] Furthermore, it is underscored that the Claimants have failed to disclose the legal advice which they allegedly received and which purportedly formed the basis of their decisions whether to disclose certain information.[1302]

727.       In any event, even if Stans Energy did comply with its disclosure obligations (which the Respondent denies), the market was not informed of facts material to assessing the value of the Kutessay II and Kalesay projects with the result that the market capitalisation approach advocated for by the Claimants is not appropriate for valuing the Licenses.[1303]

728.       Second, the Respondent argues that a company's shares must be sufficiently liquid in order to use the market capitalisation approach.[1304] Mr. Ziff considers that Regulation M, despite having been originally designed to be used in the context of policing market manipulation, provides an appropriate standard to determine whether shares are sufficiently liquid.[1305] Stans Energy's shares fail to meet this test at the Claimants' proposed valuation date.[1306] However, while Mr. Dellepiane criticizes the use of such standard, he himself merely assumes that the TSX Venture Exchange was liquid and Stans Energy was of average liquidity.[1307] Hence, according to the Respondent, the Claimants have failed to demonstrate that Stans Energy's shares were sufficiently liquid to allow the use of the market capitalisation approach.[1308]

729.       Third, the Claimants' reliance on the market capitalisation approach rests on the assumption that Stans Energy was a single asset company. However, the Claimants' expert has not developed any analysis as to whether the value of Stans Energy's shares was entirely attributable to the Kutessay II and Kalesay developments.[1309] The Respondent points to Mr. Ziff's conclusion that Stans Energy was not viewed by the market as a single asset company.[1310] Accordingly, it would be inappropriate to value the Licenses by reference to Stans Energy's share price.[1311]

---

[1301]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 249, 272-275, 286-289, 294-313, 317.
[1302]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 289.6.
[1303]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 219-220, 656, 659.
[1304]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 660.
[1305]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 661, referring to Second SM Ziff Report, 29 January 2018, at para. 87.
[1306]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 661, referring to Second SM Ziff Report, 29 January 2018, at para. 87.
[1307]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 662-663.
[1308]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 664.
[1309]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 665.
[1310]    Rejoinder on the Merits and Reply on Jurisdiction, at paras 665-667.
[1311]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 668.

730.     Fourth, the Respondent claims that, even if the Licenses had not been cancelled, the Claimants would not have been able to develop them into production because they did not have the necessary financing. [1312] The Respondent points out that the Claimants allege that *"significant third-party interest in Stans Energy emerg[ed] throughout 2011"* but have failed to provide sufficient evidence to support this contention. [1313]

731.     Even if market capitalisation were an appropriate methodology, Mr. Ziff criticizes (1) that Mr. Dellepiane has failed to deduct the approximate C\$15.8 million of cash and short term investment assets which Stans Energy held as at 25 June 2012; [1314] and (2) considers that it would be inappropriate to apply a control premium to Stans Energy. [1315] Rather, given Stans Energy own capital issuance history, Mr. Ziff considers that it may in fact be more appropriate to apply a control discount of approximately 18.5%. [1316]

732.     The Respondent submits that the Claimants' Licenses had no value either at 25 June 2012 or 16 October 2014. [1317] In reaching this conclusion, Mr. Ziff relied on the detailed information provided by the Claimants' project engineers, AsiaRud, to develop his DCF analysis taking 25 June 2012 as valuation date. In this regard, the Respondent argues that the 2011 AsiaRud 2011 Report conforms to the standards for a prefeasibility study [1318] and, contrary to the Claimants' assertions, provides a reliable basis for undertaking a DCF analysis. [1319]

733.     Mr. Ziff then adjusted those figures by applying the REEs prices forecast contained in the 2012 Visiongain report [1320] (which provides independent forecasts on REEs prices and was produced before the Claimants' proposed valuation date). [1321] The Respondent points out that

---

[1312] Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 799-801; Rejoinder on the Merits and Reply on Jurisdiction, at paras 670-671.
[1313] Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 802-804 [emphasis in original].
[1314] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 789; Rejoinder on the Merits and Reply on Jurisdiction, at para. 669.
[1315] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 789; Rejoinder on the Merits and Reply on Jurisdiction, at paras 651, 672-673.
[1316] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 789. See also, First SM Ziff Report, 14 June 2017, at para. 71 (vi); Rejoinder on the Merits and Reply on Jurisdiction, at para. 674, referring to Second SM Ziff Report, 29 January 2018, at para. 122.
[1317] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 790.
[1318] Rejoinder on the Merits and Reply on Jurisdiction, at paras 639-640, referring to, *inter alia*, Second SM Ziff Report, 29 January 2018, at paras 43-44.
[1319] Rejoinder on the Merits and Reply on Jurisdiction, at paras 641-644.
[1320] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 792, referring to "The Rare Earths Market 2012-2022: 6. Price Forecast of Rare Earths 2012-2022" (Visiongain.com) (**Exhibit R-49**).
[1321] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 792.

contemporaneous independent REEs forecasts exist, which all confirm that the REEs prices were projected to decline significantly over the coming year.[1322]

734.     Finally, the Respondent explains that Mr. Ziff reached the conclusion that the project would have been so costly that it would be uneconomic regardless of the discount rate used (even using a WACC of 0%).[1323] The Respondent notes Mr. Ziff's conclusion that the project has a NPV of negative US$ 456.8 million, and his confirmation through sensitivity analysis that the Kutessay II License was worthless.[1324] While the Respondent acknowledges that valuation always involves an element of uncertainty, "the NPV of the project is so negative, that what is certain is that the Licenses were worthless".[1325]

735.     The Respondent notes that Mr. Dellepiane relied on a DCF analysis produced by Visor Capital to verify his valuation of the Claimants' investments.[1326] This reliance on a DCF valuation to confirm his results is contradictory with his qualification of the use of a DCF valuation as not reliable.[1327] In any event, the Respondent points out that Mr. Ziff explains that the DCF analysis invoked by Mr. Dellepiane is based on key assumptions very different from the ones contained in the 2011 AsiaRud Report, presumably because such report was not disclosed to the public.[1328] According to Mr. Ziff, had the conclusions contained in the AsiaRud Report been used, Mr. Dellepiane's analysis would also have concluded that the project was valueless.[1329] Mr. Ziff demonstrates that, with adjustments to the Visor Capital's DCF analysis, the result is an NPV value of negative US$ 427 million.[1330]

736.     The Respondent also notes that Mr. Dellepiane presented a new DCF "sensitivity analysis" at the Hearing[1331] which, in the Respondent's view, confirms that on the basis of "the

---

[1322]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 645-647.
[1323]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 793-795, referring to First SM Ziff Report, 14 June 2017, at paras 95. 97, 99. See also, Respondent's Post-Hearing Brief, at para. 168.
[1324]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 796, referring to First SM Ziff Report, 14 June 2017, at para. 100.
[1325]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 648, referring to Second SM Ziff Report, 29 January 2018, Appendix G, at para. 1.
[1326]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 797, referring to Compass Lexecon Report, 29 January 2016, at para. 61.
[1327]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 630-634, referring to Compass Lexecon Report, 29 January 2016, at para 61 *cf.* Compass Lexecon Supplemental Report, 9 November 2017, at para. 21.
[1328]   Rejoinder on the Merits and Reply on Jurisdiction, at para. 658.
[1329]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 797, referring to First SM Ziff Report, 14 June 2017, at para. 76.
[1330]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 797, referring to First SM Ziff Report, 14 June 2017, at paras 102-104.
[1331]   Respondent's Post-Hearing Brief, at para. 169; referring to S. Dellepiane's Presentation, 11 April 2018, at pp. 9-12.

*primary* approach to valuing mines (DCF), all independent forecasts and assumptions led to a *negative NPV*."[1332] The Respondent considers that Mr. Dellepiane adjusted several assumptions of Mr. Ziff's DCF model, such as capital expenditure and operating costs, mill recovery rates,[1333] and timing of production,[1334] without any basis.[1335] The Respondent argues that, even if a wide sensitivity analysis is conducted, the value of the mining rights remains negative.[1336]

737.     Mr. Ziff also developed an alternative DCF analysis taking 16 October 2014 as valuation date and concluded that the Licenses had zero value at this date on the basis of (1) his conclusion that they had no value as at 25 June 2012; (2) the continued deterioration of the REEs market between June 2012 and October 2014; (3) AsiaRud's view that the project has a negative NPV as at July 2013.[1337]

738.     The Respondent notes that the Claimants' expert alleges that rather than using the DCF, a more appropriate income approach would be based on a real options analysis.[1338] The Respondent disagrees, noting, among other issues, that the ability of a license holder to act is significantly constrained by the licensing conditions.[1339] The Respondent contends that, while DCF is frequently applied in investment arbitration cases, the Claimants have not pointed to any decision in which a real options analysis has been applied.[1340]

739.     Finally, the Respondent argues, in the event that the Tribunal were to conclude that the project prospects are too speculative to value the Licenses using the DCF method, the Tribunal should award no damages, as the burden of proof rests on the Claimants.[1341] Alternatively, "damages should be awarded by reference to the amounts actually spent in developing the Licenses […] there is evidence establishing that the Claimants spent the around C$ 3 million developing the Licenses".[1342]

---

[1332] Respondent's Post-Hearing Brief, at para. 169 [emphasis in original]. See also, Hearing Transcript, Day 3, pp 658-667; Day 4, pp 678-685; S.M. Ziff's Presentation, "Valuation Expert Presentation", 12 April 2018, at p. 14.
[1333] Respondent's Post-Hearing Brief, at para. 170, referring to Hearing Transcript, Day 4, p. 719:15-18.
[1334] Respondent's Post-Hearing Brief, at para. 170, referring to Hearing Transcript, Day 4, pp 713:16-714:14.
[1335] Respondent's Post-Hearing Brief, at para. 170, referring to Hearing Transcript, Day 4, pp 712:20-713:4.
[1336] Respondent's Post-Hearing Brief, at para. 171.
[1337] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 798, referring to First SM Ziff Report, 14 June 2017, at para. 109.
[1338] Rejoinder on the Merits and Reply on Jurisdiction, at para. 675, referring to Compass Lexecon Second Report, at para. 91.
[1339] Rejoinder on the Merits and Reply on Jurisdiction, at paras 676-678.
[1340] Rejoinder on the Merits and Reply on Jurisdiction, at para. 679.
[1341] Rejoinder on the Merits and Reply on Jurisdiction, at para. 681.
[1342] Rejoinder on the Merits and Reply on Jurisdiction, at para. 681 [footnotes omitted].

b.      **The Respondent's Responses to the Tribunal's Questions Annexed to Procedural Order No. 9**

740.      The Respondent's answers to the questions put to the Parties in Procedural Order No. 9 are summarized below.

i.      The Market Capitalisation Approach as at Different Valuation Dates

741.      Pursuant to the Tribunal's instructions, Mr. Ziff calculated the amounts of damages following a market capitalisation approach as at 25 June 2012, 14 April 2013, and 16 October 2014.[1343]

742.      The Respondent considers that Stans Energy's share price fell after 25 June 2012 "in line with general REE market conditions", which was accepted by Mr. Dellepiane.[1344] The decline in Stans Energy's share price between the three valuation dates is, in the Respondent's view, "attributable to the general deterioration in the REE market as opposed to R[espondent]'s alleged measures, and for which no compensation is due".[1345] For the purposes of his analysis, Mr. Ziff prepared his preferred index of Stans Energy's main traded comparable companies ("**Main Composite Index**");[1346] and an alternative index taking into account the companies proposed by Mr. Dellepiane ("**Alternative Composite Index**").[1347]

743.      The Respondent argues that there is no basis to apply a control premium, and that the Claimants have not offered any authority supporting otherwise.[1348] The Respondent also considers that cash, cash equivalents and all other unrelated assets must be deducted.[1349] The Respondent contends that Mr. Dellepiane's justification for not deducting cash balance (i.e. that

---

[1343]   Respondent's Post-Hearing Brief, at paras 77-81; Third SM Ziff Report, 29 June 2018,  at paras 56-91.
[1344]   Respondent's Post-Hearing Brief, at para. 77; referring to Hearing Transcript, Day 4, pp 737:12-19, 738:1-18.
[1345]   Respondent's Post-Hearing Brief, at para. 77; referring to *CME Czech Republic BV v. The Czech Republic*, UNCITRAL, Final Award, 14 March 2003, at para. 562 (**Authority CLA-219**); *Occidental Petroleum Corporation v. Ecuador*, ICSID Case No ARB/06/11, Award, 5 October 2012, at para. 543 (**Authority RLA-215**); *American International Group Inc v. Iran*, 4 Iran-US CTR (1983) 96, 107 (**Authority RLA-211**); *Khan Resources Inc. et al. v. Mongolia*, UNCITRAL, PCA Case No. 2011-09, Award on the Merits, 2 March 2015, at para. 405 (**Authority CLA-284**); Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 775-782.  See also, Third SM Ziff Report, 29 June 2018, at paras 71-78.
[1346]   Third SM Ziff Report, 29 June 2018, at paras 72-74, 78, and Table 3-1.
[1347]   Third SM Ziff Report, 29 June 2018, at paras 75-77, and Table 3-1.
[1348]   Respondent's Post-Hearing Brief, at para. 80, referring to *Crystallex International Corporation v. Bolivarian Republic of Venezuela* (ICSID Case No ARB(AF)/11/2) Award, 4 April 2016, at para. 893 (**Authority CLA-285**). See also, Third SM Ziff Report, 29 June 2018, at paras 66-70.
[1349]   Respondent's Post-Hearing Brief, at para. 81, referring to Third SM Ziff Report, 29 June 2018, at paras 59-63.

it was used *"for arbitration-related expenses"*) "is unevidenced and is contrary to Article 40(2) of the UNCITRAL Rules, concerning the Tribunal's discretion to award costs."[1350]

744.     The value estimated by Mr. Ziff on the basis of a market capitalisation approach results in an amount of US$ 55.45 million as at 25 June 2012;[1351] US$ 6.71 million as at 14 April 2013;[1352] and US$ 12.46 million as at 16 October 2014.[1353] For the latter valuation date, Mr. Ziff adds that his preferred approach would be to use an "extrapolated" market capitalisation which would result:

 (1) using the Main Composite Index, in an estimated value of either US$ 5.21 million (using the market cap as at 25 June 2012) or US$ 1.72 million (using the market cap as at 14 April 2013);[1354] and

 (2) using the Alternative Composite Index, in an estimated value of either US$ 7.98 million (using the market cap as at 25 June 2012) or US$ 4.51 million (using the market cap as at 14 April 2013).[1355]

745.     The Respondent argues that Mr. Dellepiane's calculations made in response to the Tribunal's request in Procedural Order No. 9 are "materially inflated". In particular, it disagrees with the approach of "us[ing] Stans' market capitalization on 25 June 2012 to assess damages as at 14 April 2013 and 16 October 2014." [1356] Moreover, the Respondent considers that the Claimants have failed to prove any "permanent impact" of the Respondent's conduct on Stans Energy's share price. The correct approach would be to refer to Stans Energy's market capitalization on 12 April 2013, the day before Stans Energy announced the Prosecutor's proceedings.[1357]

---

[1350]   Respondent's Post-Hearing Brief, at para. 81 [emphasis in original], referring to Compass Lexecon Supplemental Report, 9 November 2017, at para. 78.
[1351]   Respondent's Post-Hearing Brief, at para. 78. See also, Third SM Ziff Report, 29 June 2018, at paras 80-81, and Table 3-2.
[1352]   Respondent's Post-Hearing Brief, at para. 78. See also, Third SM Ziff Report, 29 June 2018, at paras 83-84, and Table 3-4.
[1353]   Respondent's Post-Hearing Brief, at para. 78. See also, Third SM Ziff Report, 29 June 2018, at paras 86-87, and Table 3-6.
[1354]   Respondent's Post-Hearing Brief, at para. 78; Third SM Ziff Report, 29 June 2018, at para 89, and Table 3-7A.
[1355]   Respondent's Post-Hearing Brief, at para. 78; Third SM Ziff Report, 29 June 2018, at para 90, and Table 3-7B.
[1356]   Respondent's Reply Post-Hearing Brief, at para. 23.
[1357]   Respondent's Reply Post-Hearing Brief, at para. 23.

ii.     The Income Approach as at Alternative Valuation Dates

746.     In response to the Tribunal's questions, the Respondent's expert, Mr. Ziff, having performed his own DCF sensitivity analyses, [1358] concluded that "even with generous assumptions, the value of the Kutessay II project is severely negative under all scenarios."[1359] The Respondent points out that this is confirmed by the analysis of the Claimants' expert: "Mr. Dellepiane's own DCF calculations in his Responses to the Tribunal's Questions confirm that the project would be unprofitable under *all* scenarios (however generous to C[laimant]s, on *all* valuation dates.)"[1360] The Respondent disagrees that such a result is "absurd". In particular, the Respondent disputes that the REEs pricing assumption or operating costs were too uncertain to conduct a DCF analysis.[1361]

747.     The Respondent contends that there is "no evidential basis for assuming lower operating costs or a higher extraction/recovery rate" than in the AsiaRud Reports.[1362] In particular, the Respondent notes that the Claimants "do not even *allege* that [new] technology could have reduced operating costs by *more than* the Tribunal-requested sensitivity analysis of 25%."[1363] According to the Respondent, the significance of the VNIIHT reports was overstated by the Claimants during Mr. Ziff's cross-examination at the Hearing,[1364] as would be evidenced by the fact that none of the reports are cited by Mr. Dellepiane in his expert reports.[1365]

748.     The Respondent notes that the Claimants have not submitted any expert evidence to prove "likely cost savings from these chemistry studies."[1366] It adds that, despite being granted permission to admit new evidence "*concerning the costs of extracting REEs and new technology*", the Claimants failed to produce such evidence (other than a generalized media

---

[1358]   Respondent's Post-Hearing Brief, at para. 82; Third SM Ziff Report, 29 June 2018, at paras 12-55.
[1359]   Respondent's Post-Hearing Brief, at para. 82. See also, Third SM Ziff Report, 29 June 2018, at paras 12, 20, 24, 50, 53, and Table 2-1A, Table 2-1B, Table 2-2, Table 2-3.
[1360]   Respondent's Reply Post-Hearing Brief, at para. 4 [emphasis in original].
[1361]   Respondent's Reply Post-Hearing Brief, at para. 29.
[1362]   Respondent's Post-Hearing Brief, at para. 83. See also, Third SM Ziff Report, 29 June 2018, at paras 30-35, 39-44.
[1363]   Respondent's Reply Post-Hearing Brief, at para. 29 [emphasis in original].
[1364]   Respondent's Post-Hearing Brief, at para. 83, referring to Rosatom Nuclear Energy State Corporation (VNIIHT OJSC), "Research Report: Study of Kutessay II Ore Mineral and Chemical Composition with Consultation on Process Flow Diagram Development for Total Rare Earth Concentrate Production", 2012 (**Exhibit C-227**); Rosatom Nuclear Energy State Corporation (VNIIHT OJSC), "Annotation Research Report, Stage 1 - Development of Technology for Total Rare Earth Concentrate Separation into Groups", 5 September 2012 (**Exhibit C-230**); Rosatom Nuclear Energy State Corporation (VNIIHT OJSC) "Annotation Research Report, Stage 2 – Development of Extraction Technology for Medium-Heavy Rare Earth Concentrate Separation Producing Medium REE Concentrate and Dysprosium and Yttrium Oxides", 28 February 2013 (**Exhibit C-238**); Hearing Transcript, Day 4, pp 833 *et seq.*
[1365]   Respondent's Post-Hearing Brief, at para. 83.
[1366]   Respondent's Post-Hearing Brief, at para. 84.

release).[1367] Accordingly, the Claimants' reliance on Mr. Aryev's "unsubstantiated assertions" that *"new technologies would have substantially reduced operating expenses"* does not discharge the Claimants' burden of proof.[1368]

iii.     The Sunk Costs Approach as at Different Valuation Dates

749.     The Respondent argues that, to the extent that the Kyrgyz Republic was legally entitled to revoke the Licenses, they have no value and the Claimants have no right to recover any sunk costs in respect of alleged work completed, costs which would have been incurred notwithstanding the alleged measures.[1369] Moreover, it is not open to the Claimants to claim their sunk costs, as the Respondent considers that it has established "on the balance of probabilities" that the value of their mining rights was *"overwhelmingly negative"*.[1370]

750.     Nevertheless, the Respondent contends that, on the basis of the information on the record, as contained in Stans Energy's Consolidated Financial Statements, "the upper limit of C[laimant]s' expenditures on Kutessay II and Kalesay between 2009 and 16 October 2014 (which remain unproven) is approximately **CAD$ 2,460,385**."[1371]

751.     The Respondent argues that, despite its request in the document production phase,[1372] the Claimants failed to particularise and evidence:

> the nature, date and amount of the expenditures, that the sums were actually expended by Stans or Kutisay and were directly concerned with the projects, and that they were reasonably and legitimately incurred.[1373]

752.     The Respondent does not accept the amounts stated in the Financial Statements as proven.[1374] In particular, these Statements do not show that "the alleged expenditures were spent in relation to the Kutessay II and Kalesay licenses." [1375] Among other things, it is "unclear" to what extent the amounts claimed include "expenditures for the Kashka Chemical Processing

---

[1367]    Respondent's Reply Post-Hearing Brief, at para. 29 [emphasis in original].
[1368]    Respondent's Post-Hearing Brief, at para. 84 [emphasis in original], referring to Second Witness Statement of B. Aryev, 9 November 2017, at paras 20-21.
[1369]    Respondent's Post-Hearing Brief, at para. 64.
[1370]    Respondent's Post-Hearing Brief, at para. 85 [emphasis in original].
[1371]    Respondent's Post-Hearing Brief, at para. 86 [emphasis in original]; Rejoinder on the Merits and Reply on Jurisdiction, at paras 24-28.
[1372]    Respondent's Post-Hearing Brief, at para. 87; referring to Procedural Order No. 7, Annex B, Request 34.
[1373]    Respondent's Post-Hearing Brief, at para. 87; referring to *Southern Pacific Properties (Middle East) v. Egypt* , ICSID Case No. ARB/84/3, Award, 20 May 1992, at para. 200 (**Authority RLA-207**).
[1374]    Respondent's Post-Hearing Brief, at para. 87.
[1375]    Respondent's Reply Post-Hearing Brief, at para. 31.

Plant", which was a "separate asset, owned by a separate legal entity", and in relation to which no expropriation has been alleged.[1376] Moreover, the Respondent argues that "[t]he Licenses overpayment should not be recovered […] Even if the overpayment was not a bribe, Stans Energy's management were negligent in paying double the fees[.]"[1377] Likewise, the Respondent considers that the Tribunal should also exclude costs incurred "when Kutisay only held an expired license agreement or after its final deadline for submission of its TP under Kutessay LA 3", as they were not legitimately incurred.[1378]

753.    With regard to alternative valuation date of 14 April 2013, the Respondent argues that, on the basis of the evidence on the record, the upper limit of the Claimants' expenditures (which are said to remain unproven) is approximately C$ 2,356,453.[1379] In this case, the Respondent also argues that "overpayment for the licenses, and costs incurred when Kutisay did not hold a valid license agreement, should be excluded."[1380]

iv.    Insufficient Information for Conventional Valuation Methodologies

754.    The Respondent reiterates that the Claimants bear the burden of proving their alleged injury.[1381] In this regard, the Respondent disputes the relevance of decisions of the International Court of Justice relied upon by the Claimants, as these concerned "claims for *environmental damage*, which by its nature is difficult (if not impossible) to quantify in monetary terms."[1382] None of these authorities relieve the Claimants from the burden of "proving that the investments would be profitable."[1383]

755.    According to the Respondent, should the Tribunal find that there is *"insufficient information for conventional valuation methodologies"*, it would follow that the application of those conventional methods would be too speculative and the Claimants would not have met their burden of proof.[1384] In this vein, the Respondent invokes the decision in *SPP v. Egypt* which held

---

[1376]    Respondent's Reply Post-Hearing Brief, at para. 33.
[1377]    Respondent's Post-Hearing Brief, at para. 88.
[1378]    Respondent's Post-Hearing Brief, at para. 88.
[1379]    Respondent's Post-Hearing Brief, at para. 89.
[1380]    Respondent's Post-Hearing Brief, at para. 89.
[1381]    Respondent's Post-Hearing Brief, at para. 91, referring to, *inter alia, Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21, Award, 30 November 2017, at para. 598 (**Authority RLA-254**).
[1382]    Respondent's Reply Post-Hearing Brief, at para. 35 [emphasis in original].
[1383]    Respondent's Reply Post-Hearing Brief, at para. 35.
[1384]    Respondent's Post-Hearing Brief, at para. 91 [emphasis in original].

that *"[o]ne of the best settled rules of the law on international responsibility of States is that no reparation for speculative or uncertain damage can be awarded[.]"*[1385]

756.     The Respondent points out that international tribunals have rejected DCF analyses in cases where the investment *"lacked a history of performance record and profitability[.]"*[1386] The Respondent also notes that the tribunal in *Bear Creek v. Peru*, following *Vivendi v. Argentina*, held that in order to overcome the lack of a history of profitability, "the claimant needed to produce *'convincing evidence of its ability to produce profits in the particular circumstances it faced'*."[1387]

757.     The Respondent acknowledges that a number of international tribunals have adopted the approach of awarding sunk costs when the application of other valuation methods based on *"'potential expected profitability'* (such as the DCF method), is too *'speculative and uncertain'*."[1388] Nonetheless, the Respondent considers it inappropriate to award sunk costs where, as here:

> the evidence shows that the investment would, on the balance of probabilities, be loss-making, otherwise C[laimant]s will be put in a better position than they would have been in but for R[espondent]'s alleged measures.[1389]

The Respondent argues that this follows from the *Chorzów Factory* principle[1390] and Article 6(2) of the 2003 Investment Law.[1391]

---

[1385]   Respondent's Post-Hearing Brief, at para. 91 [emphasis in original], referring to *Southern Pacific Properties (Middle East) v. Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, at para. 189 (**Authority RLA-207**), quoting *Amoco Int'l Finance Cop v. Iran* (15 Iran-US CTR, p. 89).  See also, Respondent's Post-Hearing Brief, at paras 92-93, referring to *Wena Hotels Limited v. Arab Republic of Egypt* (ICSID Case No ARB/98/4), Award, 8 December 2000, at para. 123 (**Authority RLA-181**); *Técnicas Medioambientales Tecmed SA v. The United Mexican States* (ICSID Case No ARB(AF)/00/2) 29 May 2003, at paras 185-186 (**Authority CLA-25**); *Bear Creek Mining Corporation v. Republic of Peru,* ICSID Case No. ARB/14/21, Award, 30 November 2017, at para. 604 (**Authority RLA-254**); *Metalclad Corp v. The United Mexican States* (ICSID Case No ARB(AF)/97/1) 30 August 2000, at para. 121 (**Authority CLA-20**); *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v. The Argentine Republic* (ICSID Case No ARB/97/3) 20 August 2007, at paras 8.3.3-8.3.4 (**Authority CLA-41**).
[1386]   Respondent's Post-Hearing Brief, at para. 93.
[1387]   Respondent's Post-Hearing Brief, at para. 94 [emphasis in original].
[1388]   Respondent's Post-Hearing Brief, at para. 96 [emphasis in original], referring to *Bear Creek Mining Corporation v. Peru*, ICSID Case No. ARB/14/21, Award, 30 November 2017, at para. 604 (**Authority RLA-254**); *Wena Hotels Limited v. Egypt*, ICSID Case No ARB/98/4, Award, 8 December 2000, at para. 125 (**Authority RLA-181**); *Metalclad Corp v. The United Mexican States* (ICSID Case No ARB(AF)/97/1) 30 August 2000, at para. 121 (**Authority CLA-20**).
[1389]   Respondent's Post-Hearing Brief, at para. 96.
[1390]   Respondent's Post-Hearing Brief, at para. 96, referring to *Case Concerning the Factory at Chorzów (Germany v. Poland) (Merits)* PCIJ Series A No 17 (1928), at p. 47 (**Authority RLA-195**); Statement of Claim, at para. 275.
[1391]   Respondent's Post-Hearing Brief, at para. 97.

758.    The Respondent disputes the Claimants' suggestion that methodological "difficulties" are created in the present case by "important price fluctuations in the REE market". The Respondent characterizes these fluctuations as a "temporary REE price bubble in 2011-2012", which "burst in 2012". The Claimants' investment "was only *potentially* viable during the temporary price bubble."[1392]

### 3.    The Tribunal's Analysis

### a.    Methodology

759.    Turning to possible valuation methodologies, the Tribunal considers that the stock market capitalization approach advocated by the Claimants is not appropriate in this case. This is so because the market was not adequately informed about the real value of Stans Energy, given that the AsiaRud Reports were not disclosed. Therefore, the Tribunal need not address the status of the Reports under Canadian law; it suffices to note that the content of those Reports, if available to the market, would in all probability have significantly changed the market's perception of the company's value.

760.    Similarly, the DCF approach advocated by the Respondent is not appropriate. Stans Energy was at an early stage of its business activities, and still far away from being an ongoing concern. Accordingly, a projection of future cash flows would be too speculative.

761.    The sunk costs approach has been widely applied by tribunals in cases where a loss of profits is at best speculative, but there is no consistent reasoning for the application of this approach. In essence, three approaches can be found in the reported decisions:

(a)    Tribunal awards sunk investment costs without any consideration of causation;

(b)    Despite recognizing doubts as to the commercial prospects of the investment, tribunal awards sunk investment costs; and

(c)    Tribunal considers commercial prospect of investment and either adjusts compensation or provides justification for awarding full investment costs.

---

[1392]    Respondent's Reply Post-Hearing Brief, at para. 36 [emphasis in original].

762.     In most of the cases in the summary that follows, only one of the alternatives is applied without consideration of other criteria for determining causation. Moreover, a number of cases do not distinguish between causation of injury/loss and causation of any specific damage. Hereafter, a summary of the respective case law is provided:

i.     Tribunal Awards Sunk Investment Costs Without Consideration of Causation

763.     In one category of cases, tribunals, having reached the conclusion that lost profits were too speculative, then proceeded to award actual investment costs as a proxy for the fair market value of the investment. These tribunals do not appear to have made any enquiry as to whether, but-for the wrongful acts of the respondent State, it was likely that the investment would have generated profits or recouped its investment costs. In the absence of any explanation in the relevant awards, it is difficult to determine whether these tribunals did not regard proof of causation as necessary, or whether it was evident to them in the particular case that the investment had substantial value (exceeding the claimant's investment costs).

764.     An oft-cited case is *Metalclad v. Mexico*, where the tribunal found that Mexico had failed to treat Metalclad fairly and equitably and indirectly expropriated Metalclad's investment by denying Metalclad a local construction permit to complete a waste disposal landfill.[1393] According to that tribunal, Mexico's actions resulted in the "complete frustration of the operation of the landfill and negate[d] the possibility of any meaningful return on Metalclad's investment."[1394] The tribunal rejected Metalclad's proposal to use a discounted cash flow analysis to establish the fair market value of the investment because "the landfill was never operative and any award based on future profits would be wholly speculative."[1395] Instead, the tribunal found that "fair market value is best arrived at in this case by reference to Metalclad's actual investment in the project"[1396] and that this award is consistent with the *Chorzów Factory* principle in that it

---

[1393]   *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 (**Authority CLA-20**).

[1394]   *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ., at para 113 (**Authority CLA-20**).

[1395]   *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 , at para. 121 (**Authority CLA-20**).

[1396]   *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 , at para. 122 (**Authority CLA-20**).

"wipe[s] out all the consequences of the illegal act and reestablish[es] the situation which would in all probability have existed if that act had not been committed (the *status quo ante*)."[1397]

765.     Similarly in *Biloune v. Ghana*, where the tribunal found that Ghana had expropriated Mr. Biloune's interest in a hotel venture, the tribunal declined to award lost profits because "at the time of the project's suspension and effective expropriation, the project remained uncompleted and unoperative [and] was generating no revenue, still less profits."[1398] Accordingly, "[g]iven the nature of the project, and its early interruption by the respondents, the Tribunal … concluded that the most appropriate method for valuing the damages to be paid will be to return to Mr. Biloune the amounts he invested in MDCL, i.e., restitution."[1399]

766.     In both cases, the tribunals justified their award of actual investment costs, *inter alia*, on the basis that it would restore the *status quo ante* and provide restitution to the claimant. It may be argued, however, that the tribunals mistakenly sought to restore the claimants to the position in which they would have been, had they not made the investment in the first place, rather than the position in which they would have been, had the respondents had not committed the wrongful acts in question. Such an approach would arguably absolve the claimants of the initial business risk that they voluntarily took on when making the investment in the first instance. An approach of restituting investment costs to restore the *status quo ante* may primarily be appropriate in cases where there is a fundamental misrepresentation by, or other relevant shortcoming attributable to, the respondent *prior* to an investment being made, such that, but for the wrongful actions of the respondent, no investment would have been made at all (in other words, case where an investment was induced by the respondent's breach).

>        ii.    Despite Recognizing Doubts as to the Commercial Prospects of the Investment, Tribunal Awards Sunk Investment Costs

767.     In a second category of cases, tribunals have given some consideration to causation, noted some scepticism as to whether the claimant would have generated profits if the respondent had not committed any wrongful acts, but nevertheless proceeded to award full investment costs.

---

[1397]   *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, at para. 122 (**Authority CLA-20**).

[1398]   *Biloune and Marine Drive Complex Ltd v Ghana Investments Centre and the Government of Ghana*, Award on Damages and Costs, 30 June 1990, at para. 59 (**Authority CLA-16**).

[1399]   *Biloune and Marine Drive Complex Ltd v Ghana Investments Centre and the Government of Ghana*, Award on Damages and Costs, 30 June 1990, at para. 60 (**Authority CLA-16**).

768.     For example, in *Wena Hotels v. Egypt*, after finding that Egypt had expropriated the claimant's interest in two hotel ventures,[1400] the tribunal rejected the claimant's claim for lost profits (on the basis of a DCF analysis) on the basis that "there is insufficiently 'solid base on which to found any profit…or for predicting growth or expansion of the investment made' by Wena."[1401] To the contrary, the tribunal noted that "Wena had operated the Luxor Hotel for less than eighteen months, and had not even completed its renovations on the Nile Hotel, before they were seized on April 1, 1991. In addition, *there is some question whether Wena had sufficient finances to fund its renovation and operation of the hotels*."[1402] Nevertheless, the tribunal found that "the proper calculation of 'the market value of the investment expropriated immediately before the expropriation', is best arrived at, in this case, by reference to Wena's actual investments in the two hotels."[1403]

769.     In *Vivendi II*, the tribunal held that Argentina expropriated the claimants' investment in a concession agreement to provide water and sewage services but denied the claimants' claim for lost profits on the basis that they "failed to establish with a sufficient degree of certainty that the Tucumán concession would have been profitable."[1404] The tribunal then went on to note that the provincial water and sewage services company that existed before it was privatized and taken over by the claimant "was never self-sufficient – in the early '90's its revenues covered only 30% of its expenses […] had routinely been looted by successive provincial governments, its operations had been deteriorating steadily, it could not provide services to cover the growth rate of the population, it operated with an average deficit of US$17 million."[1405] In addition, the tribunal noted, the claimant never made a profit while it had operational control of the concession.[1406] Nevertheless, the tribunal held that the "'investment value' of the concession

---

[1400]     *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, at paras 95, 101 (**Authority RLA-181**).

[1401]     *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, at para. 124 (**Authority RLA-181**).

[1402]     *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, at para. 124 [emphasis added] (**Authority RLA-181**).

[1403]     *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, at para. 125 (**Authority RLA-181**).

[1404]     *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, at para. 8.3.5 (**Authority CLA-41**).

[1405]     *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, at para. 8.3.6 (**Authority CLA-41**).

[1406]     *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, at para. 8.3.7 (**Authority CLA-41**).

appears to offer the closest proxy, if only partial, for compensation sufficient to eliminate the consequences of the Province's actions."[1407]

770.    A similar conclusion was reached in *Impregilo v. Argentina*, where the tribunal held that Argentina failed to accord Impregilo fair and equitable treatment with respect to its contract for a concession to privatize water and sewage services in Buenos Aires.[1408] The tribunal rejected the claimant's proposed income-based valuation because of doubts as to the profitability of the concession in a risk area with a poor population and low collectivity rate, even in the absence of interference by Argentina.[1409] Nevertheless, the tribunal acknowledged that "[t]he failure of the concession can […] be ascribed partly to events for which AGBA stood the risk and partly to acts or failures by the Province."[1410] The tribunal then proceeded to base its award on the capital contributions made by Impregilo, reasoning that while it could not precisely evaluate the loss incurred, "Argentina should in principle be obliged to restitute the investment to Impregilo as compensation for its failure to ensure fair and equitable treatment to the concession."[1411]

771.    In these cases, and others,[1412] tribunals appear to have considered the issue of causation *with respect to the question of lost profits*, but not with respect to investment costs. In *Wena,* one might surmise that the tribunal was mainly concerned about the particular *claimant's* ability to bring the project to fruition but had no doubt as to the value as such of the opportunity to operate the hotels. In *Impregilo* and *Vivendi II,* however, the absence of analysis of causation is more difficult to understand. Indeed, if the provincial water and sewage services company in *Vivendi II* was never self-sufficient, operated with a substantial deficit, and had revenues that only covered 30% of its expenses, one might have expected the tribunal to discuss whether the claimant's operation would have recouped the entirety of its investment costs, had Argentina not taken steps to undermine its concession.

---

[1407]    *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, at para. 8.3.13 (**Authority CLA-41**).

[1408]    *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011 (**Authority RLA-194**).

[1409]    *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011 , at paras  374-375, 380 (**Authority RLA-194**).

[1410]    *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011 ., at para. 377 (**Authority RLA-194**).

[1411]    *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, 21 June 2011 , at para. 379 (**Authority RLA-194**).

[1412]    See also, *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Award, 17 January 2007, at paras 362-389 (**Authority CLA-38**) (where the tribunal awarded the costs actually incurred and dismissed the claimant's claim for lost profits because they were "very unlikely to have materialized" for various reasons).

iii.   Tribunal Considers Commercial Prospect of Investment and either Adjusts Compensation or Provides Justification for Awarding Full Investment Costs

772.    In a third category of cases, tribunals appear to have explicitly considered the question of causation and on that basis, either correspondingly adjusted the investment costs ultimately awarded to the claimant, or provided justification for an award of full investment costs. The approaches in this respect, however, vary significantly among the relevant cases.

773.    In some cases, the tribunals adjusted the award of investment costs. In *MTD v. Chile*, for example, the tribunal held that Chile failed to accord the claimants fair and equitable treatment by failing to rezone the land required for the claimants' development project.[1413] Applying the *Chorzów Factory* principle, the tribunal awarded damages on the basis of the claimants' expenditures that were made for purposes of the investment, and that were incurred as a result of Chile's unlawful acts.[1414] The tribunal then proceeded to deduct the residual value of the investment from this amount, and further reduced that amount by 50% to take account of the costs related to the claimants' own failure to exercise business acumen and diligence in purchasing the site.[1415]

774.    In *Copper Mesa Mining Corporation v. Republic of Ecuador*, the tribunal declined to adopt either the market-based or income-based approach for purposes of calculating damages for the expropriation of two of Copper Mesa Mining concessions in Ecuador because they were "too uncertain, subjective and dependent upon contingencies, which cannot fairly be assessed by the Tribunal."[1416] The tribunal considered this unsurprising given that the "Claimant's concessions remained in an early exploratory stage with no actual mining activities, still less any track record as an actual mining business; and, particularly as regards the Junín concessions, that the Claimant's chances of moving beyond an exploratory stage were, by December 2006, slender."[1417] After further noting the "huge differences" in the valuation conclusions reached by the two party-appointed experts and the various methodological uncertainties involved, the

---

[1413]   *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (**Authority RLA-154**).

[1414]   *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 , at paras 240-241 (**Authority RLA-154**).

[1415]   *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 , at paras 242-246 (**Authority RLA-154**).

[1416]   *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-2, Award, 15 March 2016 (Redacted), at para. 7.24 (**Authority RLA-251**).

[1417]   *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-2, Award, 15 March 2016 (Redacted), at para. 7.24 (**Authority RLA-251**).

tribunal concluded that the most "reliable, objective, and fair method in this case" was to assess the proven historical expenditure made by the claimant in relation to the lost investment.[1418] The tribunal, however, reduced the investment costs award pertaining to one concession by 30% on the basis of contributory negligence by the claimant which "substantially reduced its chances of turning [that] concessions into a commercial success."[1419] The implication of that statement would appear to be that the tribunal believed that a substantial – albeit reduced – chance of commercial success remained.

775.     In other cases, the tribunal fully considered the matter of causation and provided a justification as to why it regarded the full award of investment costs appropriate. For example, in *Caratube v. Kazakhstan (Caratube II)*, the tribunal held that Kazakhstan had unlawfully expropriated the claimants' existing contractual rights, but rejected the claimants' request for lost profits on the grounds that they had "not convincingly established that CIOC was a going concern with a proven record of profitability," or that "CIOC would have become a going concern but for the termination of the Contract."[1420] Accordingly, the tribunal held that the claimants' claim is "most appropriately addressed by an award of sunk investment costs."[1421] In applying this approach, the tribunal reasoned that:

> [T]he purpose is to apply restitution to the measure of damages required to restore the claimant to the position it held prior to the commission of the breach (to place it again in the position as if the breach had not occurred, rather than in the position it would have been in had the contract never been concluded). […] Up until the breach, the sunk costs had been spent with a view to some possible benefit. The breach deprived the claimant of the possibility to obtain such benefit. In the present case, CIOC was unable to prove the latter, either as lost profits or loss of an opportunity. However, because the breach deprived these costs of their justification, that deprivation should be repaired.[1422]

776.     While Kazakhstan's expert calculated the investment costs as the difference between total expenditures and the revenues generated, the majority of the tribunal found that revenues did not have to be deducted from the total amount awarded because "[i]t is undisputed that CIOC reinvested into the Caratube project all of the revenues generated from trial production, and such

---

[1418]   *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-2, Award, 15 March 2016 (Redacted), at para. 7.27 (**Authority RLA-251**).

[1419]   *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-2, Award, 15 March 2016 (Redacted), at paras 6.99-6.102 (**Authority RLA-251**).

[1420]   *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, 27 September 2017, at para. 1098 (**Authority CLA-291**).

[1421]   *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, 27 September 2017, at para. 1164 (**Authority CLA-291**).

[1422]   *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, 27 September 2017, at para. 1167 (**Authority CLA-291**).

reinvestment also is part of CIOC's investment."[1423] The minority arbitrator, however, maintained that "deducting oil sales revenues from CIOC's total expenditures is necessary so that the compensation awarded does not exceed the damage CIOC actually incurred."[1424] Despite this difference within the tribunal, it would appear that the arbitrators had no doubt that Caratube's opportunity to explore and potential develop oil fields had a positive value.

777.    In *SPP v. Egypt*, the tribunal found that Egypt had expropriated the claimants' investment in a commercial development venture but rejected the claimants' proposed DCF analysis on the basis that "the project was not in existence for a sufficient period of time to generate the data necessary for a meaningful DCF calculation."[1425] Instead, the tribunal awarded the claimants all their out-of-pocket expenses, while specifically noting:

> In the Tribunal's view, however, it is incontestable that the Claimants' investment had a value that exceeded their out-of-pocket expenses. The record shows that between February of 1977 and May of 1978, ETDC made sales of villa sites and multi-family sites totalling US$10,211,000—more than twice the Claimant's out-of-pocket expenses. Moreover, construction involving roads, water and sewage systems, reservoirs, artificial lakes and a golf course had commenced and the design work for two hotels had been completed. In these circumstances, the Tribunal cannot accept that the project did not have a value in excess of the Claimant's out-of-pocket expenses.[1426]

iv.    Conclusions and Application to the Present Case

778.    By way of conclusion from the above summary of the case law, there does not appear to have been any tribunal that has expressly declined to award investment costs on grounds of lack of causation. On the other hand, there are good reasons for tribunals to ensure that a claimant, through an award of sunk costs, cannot recoup more than the remaining value of its assets.

779.    In the present case, while it is doubtful in view of the decline of the REEs prices whether the Claimants' investment would have become profitable in a short-term perspective, the Claimants' Licenses terminated by the Respondent did have a residual value in the 20 year-perspective for the Licenses. The enquiry into the longer-term value of the Licenses proceeds from a different premise than that concerning the short-term profitability of a company: the

---

[1423]    *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, 27 September 2017, at paras  1169-1170 (**Authority CLA-291**).

[1424]    *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, 27 September 2017, at para.  1171 (**Authority CLA-291**).

[1425]    *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award on the Merits, dated 20 May 1992, at para. 188 (**Authority RLA-207**).

[1426]    *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award on the Merits, dated 20 May 1992, at para.  214 (**Authority RLA-207**).

question here is whether a hypothetical willing buyer would have perceived a business opportunity in the Licenses, had it been offered to acquire them in October 2014. While such a hypothetical buyer would have doubtlessly paid much less in October 2014, when REEs prices were down, than in 2011, when REEs prices were high, it does not follow that it would have paid nothing. Rather, a hypothetical buyer in October 2014 would have noticed that the longer-term outlook for REEs production outside of China was uncertain. While no analysts' reports are available precisely at the valuation date, there are reports on the record of this case that were prepared not long before and after October 2014. And while some analysts regarded the outlook as bleak even in the long run,[1427] others projected a stabilization of the market and a recovery of prices, albeit not "approaching the levels seen in late 2010 and early 2011".[1428]

780.     The Licenses were thus, in the Tribunal's view, assets of interest to certain investors— including mining companies and venture capital investors that were prepared to take the risk of losing their investment in the event of continuously low REEs prices in exchange for the chance of reaping a substantial reward in the event of a market recovery. With qualifications, the Tribunal thus shares the view of the Claimants' expert that there remained a market potential for REEs deposits outside of China. [1429]

781.     This residual value of the Licenses would seem to be confirmed by the Respondent's own conduct and tenders in 2016[1430] and 2017, [1431] from which it can be inferred that the Government did not consider the deposits to be worthless at a time relatively close to the valuation date. In this context, since the tenders were unsuccessful, no conclusion is possible regarding the actual value to be attributed as the Government set the minimum bid for the licenses at US$ 10

---

[1427]   See VisionGain (June 2012) – *"The Rare Earths Market 2012-2022: 6.Price Forecast of Rare Earths 2012-2022"* (**Exhibit R-49**); Andy Home, *"Rare earth metals pay the price of previous excess"* (Reuters), 15 July 2016 (**Exhibit R-22**); Lisa Bonnema, *"Hitachi Develops Electric Motor Without Rare Earth Metals"* (Appliance Design), 12 April 2012 (**Exhibit R-24**); *"Analysis: Rare earth prices to erode on fresh supply, China"*, Reuters, 19 September 2012 (**Exhibit R-136**); *"The poster child for what was once a 'can't lose' investment is filing for bankruptcy"*, Business Insider UK, 25 June 2015 (**Exhibit R-162**).

[1428]   Stormcrow, "Industry Coverage: Rare Earths – Update Note – Chinese Export Quotas on Rare Earths are abolished", 6 January 2015, p. 4 (**Exhibit C-151**). See also, Paul McClean, *"Rare earth metals: Objects of power and risk,"* FT Wealth, 4 December 4 2015 (**Exhibit R-23**)

[1429]   Compass Lexecon Report, 29 January 2016, at para. 28.

[1430]   Statement of Claim, at para. 155, referring to Announcement on conducting a tender for the right to use subsoil for the purpose of development of Kutissay II rare earth elements deposit and Kalesay beryllium deposit, Erkin-Too, 22 January 2016 (**Exhibit C-38**).

[1431]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 117, referring to State Committee of Industry, Energy and Subsoil Use of the Kyrgyz Republic, Press Release, "According to the Law of the Kyrgyz Republic 'On Subsoil' the Government of the Kyrgyz Republic announces a repeated bidding for the right to use subsoil for the development of the deposit of the rare elements Kutessay II and the beryllium deposit Kalesay", September 2017 (**Exhibit C-259**).

million and the 2016 tender was allegedly based on a government valuation of the Kutessay II deposit (as opposed to any particular license), which resulted in a value of that deposit of US$ 110 million,[1432] to which Respondent has objected to it being given any significance.[1433] Further, the file does not provide information on the duration and other conditions of the licenses offered in 2016 and 2017 (the extracts of the tender conditions and press release on the record do not contain those details).[1434] It is therefore not clear to what extent the Claimants' Licenses as they stood in 2014 were comparable to what the Government tried to sell in 2016 and 2017.

782.      In conclusion, it would appear that, it cannot be contested that the Claimants' Licenses terminated by the Respondent did have a residual value though that it cannot be exactly determined what value either Party attributed to them at the time of the taking.

783.      The Tribunal does not consider that an expectation of a profitability of the investment has to be shown for the application of the sunk costs approach. Such an expectation may be necessary for an application of the DCF method, but above, the Tribunal has found that method not to be applicable for the present case. The sunk cost approach has been used exactly in cases where tribunals have found the DCF method not to be applicable.

784.      In view of the above considerations, the Tribunal considers that there is no reason why it should not follow the approach found above in many decisions of comparable jurisdiction to apply the sunk costs approach for calculating the damages to be awarded as a consequence of the Respondent's breach of the 2003 Investment Law.

**b.      Quantification of Sunk Costs**

785.      Regarding the amount of sunk costs in the present case, the Tribunal, in its Annex to Procedural Order No. 9, invited the Parties to reply to the following Question 6:

> Assuming that the Tribunal adopts a sunk costs approach on damages (consistently with the Respondent's submission in the alternative), what are the amounts expended by the

---

[1432]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 309. See also, Economic Model of Development of REE deposit Kutessay II, 2016 (**Exhibit C-256**).

[1433]   Respondent's Reply Post-Hearing Brief, at para. 37.

[1434]   See Announcement on conducting a tender for the right to use subsoil for the purpose of development of Kutessay II rare earth elements deposit and Kalesay beryllium deposit, Erkin Too newspaper, 22 January 2016 (with English translation) (**Exhibit C-38**); Tender document for the Kutessay II and Kalesay licences, 25 December 2015 (**Exhibit R-166**); State Committee of Industry, Energy and Subsoil Use of the Kyrgyz Republic, Press Release, "According to the Law of the Kyrgyz Republic 'On Subsoil' the Government of the Kyrgyz Republic announces a repeated bidding for the right to use subsoil for the development of the deposit of the rare elements Kutessay II and the beryllium deposit Kalesay", September 2017 (with English translation) (**Exhibit C-259**).

Claimants by (i) 14 April 2013 and (ii) 16 October 2014? What is the evidence on the record that such expenditures were incurred?

786.     As the Tribunal has already set the valuation date to be 16 October 2014, the replies to subsection (ii) of that Question are of relevance for the Tribunal.

787.     With the Claimants' Post-Hearing Brief, in reply to the above Question, the Claimants' expert submitted the following results:

Table 8: Sunk Cost Approach: Amounts Spent (December 2009 – September 30, 2014)

| Amounts Spent (US$ millions) | | 2009* | 2010 | 2011 | 2012 | 2013 | 9 months ended 30-Sep-14 | Total |
|---|---|---|---|---|---|---|---|---|
| (+) Operating Activities | C$ millions | n.a. | 1.8 | 4.1 | 4.5 | 5.4 | 2.7 | 18.6 |
| (+) Investing Activities ** | C$ millions | 0.9 | 1.1 | 7.9 | 3.1 | 1.6 | 0.4 | 15.0 |
| (-) Exploration Licenses | C$ millions | n.a. | 0.6 | 1.3 | 0.2 | 0.3 | 0.1 | 2.6 |
| Total | C$ millions | 0.9 | 2.3 | 10.7 | 7.4 | 6.7 | 3.0 | 31.0 |
| Exchange Rate | C$/US$ | 0.96 | 0.97 | 1.01 | 1.00 | 0.97 | 0.91 | |
| Total | US$ millions | 0.9 | 2.2 | 10.8 | 7.4 | 6.5 | 2.7 | 30.6 |

Notes: * 2009 costs only include the price paid for the Mining Licenses (including legal fees). ** Short-term investments and interest received have been excluded from cash from investing activities. Source: Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6) (**C-335**).

788.     As set out in more detail in section VII.C.2.B.iii above, the Respondent disputes that the Claimants would be entitled to recover any sunk costs.[1435] According to the Respondent, on the basis of Stans Energy's Consolidated Financial Statements, the upper limit of any sunk costs claim would be C$ 2,460,385.[1436] Nevertheless, the Respondent argues that the Claimants have failed to particularise and evidence such expenditures, and the Respondent does not accept such amounts as proven.[1437]

789.     Furthermore, the Respondent argues that the following expenditures may not be recovered: (1) those incurred in relation with the Kashka Chemical Plant;[1438] (2) the "overpayment" for the Licenses;[1439] and (3) expenditures incurred after the License Agreement

---

[1435]   Respondent's Post-Hearing Brief, at para. 64.
[1436]   Respondent's Post-Hearing Brief, at para. 86; Rejoinder on the Merits and Reply on Jurisdiction, at paras 24-28.
[1437]   Respondent's Post-Hearing Brief, at para. 87.
[1438]   Respondent's Reply Post-Hearing Brief, at para. 33.
[1439]   Respondent's Post-Hearing Brief, at para. 88.

expired or after the final deadline for the submission of a TP under Kutessay II License Agreement No. 3.[1440]

790.    In the Parties' Post Hearing Briefs, the evidence in support of a quantification of the sunk costs award was addressed to some extent in response to the Tribunal's Question 6 in Procedural Order No. 9.

791.    The Claimants addressed this question, in particular, in paragraphs 98 to 100 of their Post Hearing Brief,[1441] and in paragraphs 54 to 56 of their Second Post Hearing Brief.[1442] In turn, the Respondent addressed this question, in particular, in paragraphs 85 to 89 of its Post Hearing Brief,[1443] and in paragraphs 31 to 33 of its Reply Post Hearing Brief.[1444]

792.    As stated by the Claimants in their Post-Hearing Brief: "Mr Dellepiane has calculated the amounts invested by Stans Energy as of the relevant valuation dates indicated by the Tribunal on the basis of Stans Energy's financial statements already on the record, and two interim financial statements for the years 2013 and 2014." [1445] This approach was criticized by the Respondent on the basis that the Claimants would have purportedly failed to evidence and particularise the amounts claimed.[1446]

793.    The Respondent's first objection regarding the amount for the KRP (formerly known as KCMP) cannot be accepted by the Tribunal. The Tribunal does not consider that this amount should be excluded because that investment would not have been undertaken but for the larger investment.

794.    Regarding the Respondent's second objection regarding the "overpayment" for the Licenses, the Claimants are right in pointing out that the Kyrgyz Republic was entitled to set any price it thought should be paid for Kutisay Mining OJSC and that Respondent has no basis in law

---

[1440]    Respondent's Post-Hearing Brief, at para. 88.
[1441]    Claimants' Post-Hearing Brief, at paras 98-100. See also, Compass Lexecon's Responses to the Tribunal's Questions, at paras 23-27.
[1442]    Claimants' Second Post-Hearing Brief, at paras 54-56. See also, Compass Lexecon Response to Respondent's Post-Hearing Brief and Third Ziff Report, 17 August 2018 ("**Compass Lexecon's Response to the Respondent's Post-Hearing Brief and Third Ziff Report**"), at paras 77-86.
[1443]    Respondent's Post-Hearing Brief, at paras 85-89.
[1444]    Respondent's Reply Post-Hearing Brief, at paras 31-33. See also, Fourth SM Ziff Report, 17 August 2018, at paras 37-47.
[1445]    Claimants' Post-Hearing Brief, at para. 100 [footnotes omitted].
[1446]    See, for example, Respondent's Reply Post Hearing Brief, at paras 31-32; and Fourth SM Ziff Report, 17 August 2018, at paras. 37-38 *cf.* Compass Lexecon Responses to Respondent's Post Hearing Brief and Third Ziff Report, at para. 80.

for deducting half the expenditures that the Claimants actually made at Respondent's request when acquiring their investments. [1447]

795.     The Tribunal also cannot accept the Respondent's third objection concerning expenditures incurred after the License Agreement expired or after the final deadline for the submission of a TP under Kutessay II License Agreement No. 3.  The Respondent never alleged at the time that the Claimants were not in compliance with the Licenses, and in fact issued new License Agreements while seeking a stake in Kutisay Mining LLC. The Claimants continued to undertake expenditure on the Licenses to develop Kutessay II and Kalesay according to their license obligations. The Respondent cannot now claim that these costs were "not legitimately incurred".

796.     In its quantification of the sunk costs, at the outset, the Tribunal recalls that the Claimants have the burden of proof for any sunk costs they claim. It is further recalled that, as mentioned above, Procedural Order No. 9 expressly invited the Parties to address in their Post-Hearing Briefs the assumption "*that the Tribunal adopts a sunk costs approach on damages (consistently with the Respondent's submission in the alternative),*" and sought their views as to "*what are the amounts expended by the Claimants by: .... (ii) 16 October 2014? What is the evidence on the record that such expenditures were incurred?*". As the Parties have had the opportunity to, and in fact did, respond to these questions in their Post-Hearing Briefs referring to the evidence that they felt supported their positions, the Tribunal must therefore assume that the evidence before it is the best evidence available to the Parties and proceed on the basis of the evidence now on the record.

797.     As the Claimants bear the burden of proof, and where doubts remain, the Tribunal considers that the Claimants have not sufficiently fulfilled their burden of proof, and those doubts are to be resolved in favour of the Respondent. The Tribunal is mindful of the risk of double-counting expenditures identified in different documents form the basis for ascertaining costs incurred. Again, using the same approach, uncertainties are to be resolved in favour of the Respondent.

---

[1447]     Claimants' Second Post Hearing Brief, at para. 55.

798.     That said, various documents in the record make it clear that payments were made by the Claimants. The Tribunal thus comes to the following evaluation of the evidence on quantification of the Claimants' sunk costs.

i.     Valuation Based on Financial Statements

799.     The first body of evidence reviewed by the Tribunal consists in the Financial Statements of Stans Energy on the record (the "**Financial Statements**"). [1448]

800.     The Respondent does not dispute the veracity of the Financial Statements or the figures recorded therein. However, it contends that the Financial Statements do not provide specific and detailed information regarding Stans Energy's sunk costs. [1449] The Tribunal agrees with the Respondent but this does not mean that the Financial Statements are of no value. The Tribunal considers that the Financial Statements are convincing and reliable evidence of expenditures *insofar as* the Financial Statements provide sufficient detail to allocate a position to the Claimants' operation in relation to the Kutessay II and Kalesay Licenses in the relevant time period.

801.     The Financial Statements set out a number of categories such as current assets, property and equipment, mineral properties, current liabilities and expenses. [1450] Out of these categories, only the mineral properties category, which expressly refers to the Kutessay II and Kalesay fields, unambiguously relates to the investment expenditures of the Claimants in relation to the Licenses that form the basis of the expropriation claim in the present proceedings. The Financial Statements also provide figures regarding costs incurred by the Claimants in relation to the KRP (formerly

---

[1448]   See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2009 and 2008, 30 April 2010 (**Exhibit R-26**); Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2010 and 2009, 29 April 2011 (**Exhibit R-27**); Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2011 and 2010, 30 April 2012 (**Exhibit R-28**); Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2012 and 2011, 23 April 2013 (**Exhibit R-29**); Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2013 and 2012, 29 April 2014 (**Exhibit R-30**); Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2014 and 2013, 29 April 2015 (**Exhibit R-31**); Stans Energy Corp Consolidated Financial Statements for the years ending 31 December 2014 and 31 December 2015, 29 April 2016 (**Exhibit C-257**); Stans Consolidated Interim Financial Statements For the Nine Months of the Period Ended September 30, 2014 and 2013, 28 November 2014 (**Exhibit C-328/R-521**). The figures found in the following interim reports were not taken into account in order to avoid double-counting: Stans Energy Corp. Condensed Interim Financial Statement for the three and six months ended June 30, 2012 and June 30, 2011 (**Exhibit R-41**); Stans  Consolidated Interim Financial Statements For the Three Months Ended March 31, 2013 and 2012, 23 May 2013 (**Exhibit C-327/R-520**).

[1449]   See for instance, Rejoinder on the Merits and Reply on Jurisdiction, at paras 25-28.

[1450]   See for example, Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2009 and 2008, 30 April 2010, at pp1-2 (**Exhibit R-26**).

known as KCMP). The Tribunal considers that these expenditures should also be included as the purchase of the KRP (formerly known as KCMP) was closely linked to, and would not have occurred but for, the acquisition by the Claimants of the Licenses. In particular, the Tribunal is prepared to accept the Claimants' statement that "[g]*iven the Company's current inability to further develop its Kutessay II, Kalesay and other mineral properties and the inability to date to identify a feasible alternate source of rare earth elements that could be processed at this facility, it is expected that this Kashka will remain idle for an indefinite period.*"[1451] On the other hand, the Tribunal did not include in its calculation the amounts paid pursuant to the KCMP Option Agreement as it does not appear to be established that they represented any additional disbursement since these amounts "were capitalized toward the future investment in KCMP".[1452]

802.    The Tribunal has not taken the financial statements for the period ending in December 2014 (the "**December 2014 Statements**") into consideration. While the December 2014 Statements contain certain additional expenditures, such as "*additional expenditures expense of $719,762 relating to the impaired Kashka Rare Earth Processing Facility, expenditures to maintain the plant and for completion of technical reports and researches*",[1453] it is not established that such additional expenditures were incurred prior to the valuation date.

803.    Furthermore, while the Tribunal is satisfied that some of the amounts recorded under other positions of the Financial Statements might also relate to the Claimants' investments, the Financial Statements do not allow the Tribunal to single out the relevant portion (or proportion) of such other positions that can qualify as sunk costs. Hence, the Tribunal will have no account of such positions for its calculation.

804.    The table below provides a summary of the mineral properties and KRP (formerly known as KCMP) figures related to the investment expenditures of the Claimants evidenced in the Financial Statements.

---

[1451]   See Stans Consolidated Interim Financial Statements For the Nine Months of the Period Ended September 30, 2014 and 2013, 28 November 2014, at pp 11-12 (**Exhibit C-328/R-521**).

[1452]   Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2010 and 2009, 29 April 2011, at p. 13 (**Exhibit R-27**) ("Under the [KCMP] Option Agreement, the Company was responsible for covering the costs of security, maintenance and utilities for the plants and rail terminal of approximately USD$10,000/month. [...] During the year ended December 31, 2010, the Company paid $108,514 which was capitalized toward the future investment in KCMP.")

[1453]   Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2014 and 2013, 29 April 2015, at p. 18 (**Exhibit R-31**).

| Year / Asset | 2009[1454] | 2010[1455] | 2011[1456] | 2012[1457] | 2013[1458] | 2014 (Until Sept.)[1459] |
|---|---|---|---|---|---|---|
| Kutessay II | C$ 887,287 | C$ 245,665 | C$ 254,517 | C$ 1,129,098 | C$ 969,959 | C$ 126,796 |
| Kalesay | C$ 37,596 | C$ 103,972 | C$ 219,969 | C$ 20,100 | C$ 22,864 | - |
| KRP (formerly known as KCMP) | - | - | US$ 5,500,000 | - | - | - |
| Total | C$ 924,883 | C$ 349,637 | C$ 474,486 + US$ 5,500,000 | C$ 1,149,198 | C$ 992,823 | C$ 126,796 |

805.    Hence, the Tribunal concludes that the expenditures of the Claimants are, at a minimum, **C$ 4,017,823** and **US$ 5,500,000**. For the reasons indicated above, it is clear that these figures do not encompass the entirety of the Claimants' investment expenditures. Therefore, the Tribunal cannot determine, on the basis of the Financial Statements alone, the total expenditures that were made.

806.    The Tribunal will now, as a second step, turn to the remaining body of evidence in the record.

---

[1454]    See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2009 and 2008, 30 April 2010, Table at p. 12 (**Exhibit R-26**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**); referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 15 (**Exhibit C-111**).

[1455]    See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2010 and 2009, 29 April 2011,Table at p. 12 (**Exhibit R-27**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**); referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at pp 16-17 (**Exhibit C-111**).

[1456]    See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2011 and 2010, 30 April 2012, Table at pp 15, 17 (**Exhibit R-28**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**); referring to Stans Energy Corp, "Annual Information Form for the year ended 31 December 2011", 30 April 2012, at p. 18 (**Exhibit C-111**).

[1457]    See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2012 and 2011, 23 April 2013, Table at p. 19 (**Exhibit R-29**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**); referring to Stans Energy Corp. Form 51-102 Annual Management's Discussion and Analysis for the year ended December 31, 2012, 31 December 2012, at p. 11 (**Exhibit R-35**).

[1458]    See Stans Energy Corp.: Consolidated Financial Statements For the Years Ended December 31, 2013 and 2012, 29 April 2014, Table at p. 22 (**Exhibit R-30**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**).

[1459]    Stans Consolidated Interim Financial Statements For the Nine Months of the Period Ended September 30, 2014 and 2013, 28 November 2014, at p. 12 (**Exhibit C-328/R-521**). See also, Compass Lexecon Sunk Cost Analysis in Response to Tribunal's Question (6), 29 June 2018, Additional Data Sheet (**Exhibit C-335**).

ii.     Valuation Based on the Information Reports

807.     Among the documents in evidence, the Information Reports submitted by the Claimants for the years 2010 and 2012 (the "**Information Reports**")[1460] are particularly relevant. Even though the Information Reports do not have the same statutorily mandated character, and are not subject to the same audits, as the Financial Statements, the Tribunal is prepared to consider the expenditures recorded therein *prima facie* correct as long as they are not contradicted by other evidence.[1461]

808.     Further, the Tribunal notes that the Information Reports were submitted by the Claimants to the competent Kyrgyz regulatory authority seeking approval of the work programs contained therein.[1462] Hence, the Information Reports constitute formal documents comparable to regulatory filings. Moreover, though some tensions with the Respondent were already felt, the Information Reports were prepared at a time when the Claimants continued to proceed with their operations. For this reason, it cannot be said that the Information Reports were prepared in contemplation of litigation. This sets them apart from evidence produced in connection with the present proceedings, such as the witness statements submitted by the Claimants.

809.     The Tribunal is mindful of the fact that the 2013 Work Program contained in the 2012 Information Report was rejected by the SAGMR on the basis that the 2013 Work Program was not supported by Technical Plans and Expert Reports.[1463] However, in the Tribunal's view, the refusal of Kyrgyz regulatory authority to approve the 2013 Work Program does not call into

---

[1460]   See Information Report on Works Performed in 2010 and Programme of Work for 2011 at the Kutessay II Field, 30 January 2010 (**Exhibit C-214**) (the "**2010 Information Report**"); Information Report on Works Performed in 2012 and program of work for 2013 at the Kutessay II field, January 2013 (**Exhibit C-234**) (the "**2012 Information Report**").

[1461]   In contrast, future projections or plans mentioned in the Information Reports, which merely indicate an intention to make an expenditure, will not be taken into account by the Tribunal since there is no assurance that these planned expenditures were actually made.

[1462]   Whether the Information Reports were submitted to the Kyrgyz governmental authorities in pursuance of an obligation under the Licenses is a matter contested between the Parties. See, for instance, Statement of Claim, at paras 126-128; Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 321-326, 394, 665.3; Reply to the Respondent's Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 72, 77, 103-105; Rejoinder on the Merits and Reply on Jurisdiction, at paras 205.4, 516, 611.2; Respondent's Post-Hearing Brief, at para. 156; Claimants' Second Post-Hearing Brief, at para. 44. See for instance, Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 323 ("The work program must be developed and submitted for approval subsequent to, and based on, the TP approved by the relevant Expert Reports.") [emphasis in original].

[1463]   See, for instance, Statement of Claim, at para. 128; Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 321-326.

question the reliability of the Information Reports for the purposes of determining the Claimants' sunk costs.

810.     The table below provides a summary of the most relevant figures outlined in the Information Reports.

| Field | Description of expenditure | Amount |
|---|---|---|
| Kalesay | Cumulative operational costs in 2010[1464] | KGS 6,470,000 |
| Kutessay II | Total cost of "Kutisai Mining" in 2010-2012 for the implementation of pre-project and design work[1465] | KGS 403,800,000 |
| Kutessay II | Additional exploration of deep horizons and flanks in 2012[1466] | KGS 35,357,000 |
| Kutessay II | Taxes and payments in 2012[1467] | KGS 3,729,097 |
| Kutessay II | Charitable assistance in 2010-2012[1468] | KGS 9,040,000 |
| Total | | KGS 458,396,097 |

811.     Of these items, the amount of KGS 35,357,000 is explained on page 10 of the Report as follows: "*35.357 million soms were spent on the additional exploration of deep horizons and flanks.*" In the view of the Tribunal, it is not sufficiently clear or explained that this amount of KGS 35,357,000 is not already included in the amount of KGS 403,800,000 provided earlier on page 6 of the same report by the following explanation: "*The **total costs** of "Kutisai Mining" LLC in 2010-2012 of the implementation of pre-project and design work for the Development Project of the Kutessai II field at the design stage amounted to 403.8 million soms.*" (emphasis added) In view of the Claimants' burden of proof, these KGS 35,357,000 are therefore not accepted as sunk costs and the resulting total is **KGS 423,039,097**.

812.     On the other hand, the Tribunal is aware that a valuation of the Claimants' sunk costs solely based on the Information Reports would not encompass the entirety of the Claimants'

---

[1464]     2010 Information Report, at p. 5 (**Exhibit C-214**).
[1465]     2012 Information Report, at p. 6 (**Exhibit C-234**). The Tribunal notes a discrepancy in the 2012 Information Report with regard to the total costs of the Kutessay II development project at the design stage for 2012. While it is provided at page 9 that the total costs of the Kutessay II development project at the design stage for 2012 amounted to KGS 74.19 million, a figure of KGS 53.841 million is found at page 11 of the same document. ("The total costs of the Kutessai II development project at the design stage for 2012 reached 74.19 million soms."/"The total costs of the Kutessai II development project at the design stage in 2012 amounted to **53.841 million soms**.") [emphasis in original]. Since the Claimants bear the burden of proof, the Tribunal will assume the lower figure – of KGS 53.841 million – to be true. Moreover, in order to avoid double-counting, the Tribunal will assume that this figure is already included in the total cost of "Kutisay Mining" LLC for the period 2010-2012 included in the table above.
[1466]     2012 Information Report, at p. 10 (**Exhibit C-234**).
[1467]     2012 Information Report, at p. 11 (**Exhibit C-234**).
[1468]     2012 Information Report, at p. 11 (**Exhibit C-234**).

investments. Indeed, the Information Reports do not contain detailed information regarding the costs incurred by the Claimants in relation to their investments for the years 2009, 2013 and 2014. Moreover, the 2012 Information Report does not discuss the Kalesay field and focusses solely on the Kutessay II field. Finally, some expenditures are not included in the Information Reports due to their nature. Insofar as expenditures are not documented in the Information Reports, the Tribunal consults other documents on the record.

<blockquote>iii.   Valuation Based on Other Documents in the Record</blockquote>

813.   Having thus consulted other documents on the record, the Tribunal finds that there are few expenditures of which it can say with sufficient confidence that they are not already recorded in either the Financial Statements or the Information Reports. The record shows that the Claimants paid US$ 8,635.50 in relation to a broker fee with regard to the acquisition of Kutisay Mining OJSC at auction.[1469] This broker fee was not reflected in the mineral properties category of the 2009 Financial Statements, as the amount recorded in that category for 2009 is C$ 924,883, composed of the purchase price of Kutisay Mining OJSC (C$ 898,524) and legal fees (C$ 26,359). Nor would the broker fee have been reflected in the 2010 and 2012 Information Reports, as it was already incurred in 2009.

814.   Beyond that payment, the Tribunal was unable to identify any further expenditures that were sufficiently supported by evidence on the record and in respect of which it can say with confidence that they are not already included in the Financial Statements or the Information Reports. Amounts were notably disregarded in the calculation of the total amounts invested by the Claimants in Kutessay II and Kalesay for the following reasons.

---

[1469]   Mandate Agreement No 26/12-1 between Stans Energy Kg LLC and Ak Tilek Investment LLC, 26 December 2009, at p. 2 (**Exhibit C-212**). ("The Broker's fee for the performance of this mandate [acquisition of Kutisay Mining OJSC at auction] shall be 0.5 per cent of the amount of the Securities transaction completed in the Exchange's trading system at the bidding [0.5% of US$ 863,550 is US$ 4317.75]. The Broker's fee shall include all charges of the Exchange and costs of the Registrar."); Central Asian Stock Exchange CJSC announcement of public auction of shares in Kutisay Mining OJSC, at p. 2 (**Exhibit C-155**). ("Additional charges: brokerage fee to the broker representing the Fund in the amount of 0.5% of the total amount of the securities transaction in accordance with the auction results [0.5% of US$ 863,550 is US$ 4317.75].").

815.     First, certain amounts were merely asserted within a witness statement without any further documentary support. This is the case of the amount of KGS 750 million allegedly representing the total cost of taxes paid with respect to Kutisay Mining LLC.[1470]

816.     Second, certain amounts were asserted in a letter from the Claimants to the Respondent's governmental authorities without further documentary support or by reference to supporting documents that do not form part of the record. This is the case with the amount of US$ 345,893 related to the total expenditures for Kalesay for the period 2010-2011.[1471] Similarly, the Tribunal did not take into account in its calculation the alleged amounts of US$ 8.7 million and US$ 10 million related to aggregate expenditures on implementation of the project to develop the Kutessay II deposit at the design stage for the period 2011-2010 and 2012 respectively.[1472] Furthermore, the Tribunal considers that the Claimants did not discharge their burden of proof in relation to the amount of C$ 468,000 allegedly incurred in relation to the execution of their contract concluded with Asiarud.[1473] Likewise, the Tribunal did not include in its calculation the amount of US$ 328,931 allegedly incurred by the Claimants in relation to the contracts concluded with Tien-Shan Gold LLC, Tien-Shan Ltd., the IT Research Centre and others.[1474] A similar approach was adopted with regard to the amount in excess of US$ 9 million allegedly incurred during the period 2010-2011 in relation to predesign, design, surveying at Kutessay II and Kalesay as well as the acquisition and reconstruction of the KCMP.[1475] The Tribunal would note, however,

---

[1470] Statement made in court by Mr Savchenko in the Pervomaysky District Court of the City of Bishkek, 25 September 2013, at p. 6 (**Exhibit C-245**) ("Please tell us with respect to Kutisay Mining LLC what amount was allocated for taxes. Witness G. A. Savchenko: - The total cost of 750 million. 58 million for three years.").

[1471] Letter from Kutisay Mining LLC (Mr Savchenko) to the Minister of Natural Resources (Mr Esenamanov), 16 December 2011, at p. 2 (**Exhibit C-97**). ("As at 1 December 2011, the Company's total expenditures for Kalesay during the period of 2010 to 2011 were **345,893 USD**, while expenditures are expected to reach not less than **486,944** USD by end of the year.") [emphasis in original].

[1472] Letter No 17/2012km from Kutisay Mining LLC (Mr Savchenko) to the State Agency of Geology and Mineral Resources (Mr Tashbayev), 29 March 2012, at p. 2 (**Exhibit C-109**) ("Aggregate expenditures on implementation of the project to develop the Kutessay II Deposit at the design stage during 2010-2011 at 1 December 2011 had reached **8.7 million US** dollars, and in 2012 it is intended to invest a minimum of **10 million US** dollars in the project.") [emphasis in original]; Letter from Kutisay Mining LLC (Mr Savchenko) to the Minister of Natural Resources (Mr Esenamanov), 12 December 2011, at p. 2 (**Exhibit C-95**) ("The aggregate expenses for implementation of the project to open up the Kutessay II Deposit at the planning stage at 01 December 2011 had reached **8,681,749 US dollars**.) [emphasis in original].

[1473] Statement of Issues of the Defendants, *Anna Kuranova v Stans Energy Corp and Boris Aryev* (Court File No CV-14-4999462), 27 August 2015, at para. 47 (**Exhibit C-255**) ("The Asiarud Contract provided for several payments to Asiarud totaling $468,000").

[1474] See Letter from Kutisay Mining OJSC (Mr Savchenko) to the Deputy Minister of Natural Resources (Mr Oseledko), 27 May 2010, at p. 2 (**Exhibit C-318**) ("since the beginning of 2010 Kutisay Mining OJSC has already concluded and is performing contracts with Tien-Shan Gold LLC, Tien-Shan Ltd., the IT Research Centre and others in the total amount of USD 328,931.").

[1475] Letter from Stans Energy KG LLC (Mr Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr Babanov), 1 March 2012 at p. 2 (**Exhibit C-104**). ("During 2010-2011 [...] the amount of expenditure [...] on predesign, design and surveying and other works [...] at the Kutessay II and Kalesay Deposits, and also the expenditure on the acquisition

that some or all of these amounts may already be accounted for in the Financial Statements or the Information Reports, which the Tribunal *is* prepared to use as a basis for its sunk costs valuation.

817.     Third, it is not clear to what extent certain amounts bear a relationship with the Licenses.[1476] Considering the Claimants' burden of proof, these amounts have not been taken into consideration by the Tribunal. This is the case for the increase in travel expenses recorded in the fourth quarter of 2009.[1477] Likewise, the amount of US$ 19,000,000 allegedly invested by the Claimants in Kyrgyzstan for the exploration and design phases does not distinguish between expenditures related to the Licenses and other projects.[1478]

818.     Fourth, certain amounts were merely an estimation of future expenditures rather than evidence of sunk costs. This is the case with the figure of US$ 24 million representing the approximate amount of expenditures planned during the period of 2011-2029.[1479] Similarly, the Tribunal considers that the amount of US$ 1-2 million that the Claimants planned to spend on the "supplementary exploration of deep horizons and flanks" of the deposit for the period of May 2012-December 2014 should not be included in its calculation.[1480] Likewise, the anticipated cost of KGS 22 million for AsiaRud is a mere estimation of a future expenditure and not a cost proven

---

and reconstruction of former production facilities Nos 2 and 3 of KKhMZ OJSC (now Kashkinskiy Rare Earth Elements Plant LLC) amounted to **more than 9.0 million US dollars.**") [emphasis in original]; Letter from Stans Energy Kg LLC (Mr Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr Babanov), 19 March 2012, at p. 1 (**Exhibit C-106**) ("In the same period, the expenditure on pre-design/verification and design and exploration works for the development of the Kutessay II and Kalesay Deposits, and likewise for the acquisition from KKhMZ OJSC and reconstruction of production facilities Nos 2 and 3 (now Kashkinskiy Rare Earth Elements Plant LLC) amounted to **more than 9 million US dollars.** In 2012, an investment of at least **10 million US dollars** is proposed here.") [emphasis in original].

[1476]   A number of documents on the record show expenditures by Stans Energy for the acquisition of assets, office leases, salaries, travel expenses, administration, etc., without however distinguishing between expenditures related to Kutessay II and Kalesay and general overhead costs or expenditures related to other projects.

[1477]   "Interim Management's Discussion & Analysis for the year ended December 31, 2009" SEDAR Filings, 29 April 2010, at p. 10 (**Exhibit C-164**) ("The increase in travel expenses to $33,506 in Q4 of 2009 compared to $16,962 in Q4 of 2008 is due to increase in trips to Kyrgyzstan and Russia in order to complete the acquisition of Kutessay II and Kalesay mining right/licenses.").

[1478]   Letter from Stans Energy Corp (Mr Mackay) to Prime Minister of the Kyrgyz Republic (Mr Satibaldiyev), 25 February 2013, at p. 1 (**Exhibit C-237**) ("Over the years in Kyrgyzstan, the company has invested over $19,000,000 USD for the exploration and design phases only.").

[1479]   Minutes No 1736-N-09 of negotiations between the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC, 21 December 2009, at p. 1 (**Exhibit C-12**) ("The Kutessay II and Kalesay development programs are identical and provide for the following until 31 December 2010: surveying of archive materials; preparing feasibility studies with respect to the development plans; expert examinations; obtaining land allotments. Ore mining is planned during the period of 2011-2029. The approximate amount of expenditures for the fields is USD 24 million.").

[1480]   "Interim Management's Discussion & Analysis for the three months ended June 30, 2012" SEDAR Filings, 24 August 2012, at p. 3 (**Exhibit C-175**) ("$1-2 Million USD to be spent on Supplementary exploration of deep horizons and flanks of the deposit [Completion Date] May 2012-December 2014").

to have been incurred.[1481] The approximate amount of US$ 400 million related to future investments for the implementation of the Licenses was also excluded by the Tribunal in its calculation of the Claimants' sunk costs.[1482] The amount of US$ 450,000-500,000 estimated for the purposes of the Claimants' contracts with Tian Shan Gold LLC, Tian Shan Ltd. LLC, IRC LLC, Kazakhstan Minerals LLC and other companies for the year 2010 was also excluded by the Tribunal in its calculation of the Claimants' sunk costs.[1483] In like manner, the Tribunal considers that the amount of US$ 9.3 million representing the estimated budget for the program of work recommended by KMC in relation to Kutessay II cannot be considered a sunk cost.[1484] If such planned expenditures were actually incurred in subsequent years, they may be accounted for in the Financial Statements or the Information Reports.

819.      Fifth, the Tribunal cannot exclude that the broker fee (or "cash commission") in an amount of C$ 1,680,000, paid by the Claimants in 2011 to its agents in relation to a C$ 28 million private placement,[1485] was not already reflected in the 2012 Information Report. The Tribunal recalls that the 2012 Information Report indicates "[t]he total costs of 'Kutisai Mining' LLC in 2010-2012 of the implementation of pre-project and design work", without specifying the precise expenditures that form part of that category of costs. The proceeds of the private placement in relation to which the broker fee was incurred, according to Stans Energy's own press release, were to "be used for a feasibility study on Kutessay II and Kalesay, purchase of the KCMP Rare Earth (RE) Processing Complex, refurbishment and upgrades to the KCMP RE Processing Complex, Aktyuz exploration and for working capital".[1486] It is thus conceivable that the broker

---

[1481]    2012 Information Report, at p. 10 (Exhibit C-234) ("("Kutisai Mining") signed an agreement with the company CJSC SDC "Asiyarudproekt" on the development of a new technical project for the mining complex, review of feasibility studies and the conditions. […] The cost of drafting the necessary projects may amount to 22 million soms.").

[1482]    Letter from Stans Energy KG LLC (Mr Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr Babanov), 1 March 2012 at p. 2 (**Exhibit C-104**). ("Overall, anticipated investments into the implementation of the Project to Develop the Kutessay II and Kalesay Deposits over the next 3-5 years will amount to **> 400 million US dollars.**") [emphasis in original]. See also, Letter from Stans Energy Kg LLC (Mr Savchenko) to the Prime Minister of the Kyrgyz Republic (Mr Babanov), 19 March 2012, at p. 1 (**Exhibit C-106**) ("Overall, the anticipated investments into implementation of the Project to Develop the Kutessay II and Kalesay Deposits over the forthcoming 3-5 years will amount to **400 million US dollars.**") [emphasis in original].

[1483]    Letter from Kutisay Mining (Mr Savchenko) to the Ministry of Natural Resources of the Kyrgyz Republic (Mr Dzhumaliyev), 30 June 2010, at p. 2 (**Exhibit C-215**) ("For the purpose of completing the verification works at Kutessay II and Kalesay deposits and preparation for drawing up the feasibility study, Stans Energy KG LLC and Kutisay Mining OJSC have entered into and already performed contracts with Tian Shan Gold LLC, Tian Shan Ltd. LLC, IRC LLC, Kazakhstan Minerals LLC and other companies. Before the end of this year the estimated expenditures for these purposes will amount to approximately USD 450-500 thousand […]").

[1484]    VV Danilov, Kazakhstan Mineral Company, "Technical Report on the Kutessay II Rare Earth Property,Kemin District, Kyrgyzstan, with Rare Earth Resource Estimate – JORC Report", 21 March 2011, at pp 9, 10, 129 (**Exhibit C-76**).

[1485]    Letter from TSX Venture Exchange (Ms Yee) to Stans Energy Corp (Ms Masters), 1 June 2011, at p. 1 (**Exhibit C-82**).

[1486]    Stans Energy Corp, Press release "Stans Energy Corp Closes $28,000,000 Private Placement", 28 April 2011, at pp 1-2 (**Exhibit C-80**).

fee formed part of the costs of "the implementation of pre-project and design work" already accounted for in the Information Report.

820.     Finally, the Tribunal did not include in its calculation of the Claimants' sunk costs the amount of KGS 19,086,468 paid in relation to taxes and bonuses payments for the Kutessay II and Kalesay Licenses in accordance with respective License Agreement No. 1.  It appears from the evidence provided that the payment of these bonuses/taxes did not require any additional disbursements by the Claimants further to Stans Energy's purchase of Kutisay Mining OJSC.[1487] While some uncertainty remains, the Tribunal thus regards it as possible, and indeed likely, that such payment would have been indirectly reflected in the Financial Statements.

iv.     Conclusion on Valuation

821.     The Tribunal accordingly finds that, according to the Financial Statements, the Claimants' sunk costs amount at a minimum to C$ 4,017,823 and US$ 5,500,000.  Furthermore, the Information Reports record the Claimants' expenditures at a minimum of KGS 423,039,097. To avoid any risk of double-counting, the Tribunal will take the most reliable information it has for a particular time period and category of expenditures.

822.     In particular, the Tribunal is mindful of the fact that both the Financial Statements and the Information Reports record costs incurred by the Claimants for the period 2010-2012. For this period, the Tribunal prefers the more detailed record of expenditures incurred in the Information Reports. Therefore, the Tribunal will adopt for purposes of its calculation the amount of KGS 423,039,097. For the years 2009, 2013 and 2014 (until the valuation date), the Tribunal will

---

[1487]   See, First Witness Statement of B. Aryev, 29 January 2016, at paras 46-47 and footnotes 19-20 ("When we purchased Kutisay Mining JSC, enough money was left with the company to allow payment of these taxes.").  See also, License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kalesay, 21 December 2009 (**Exhibit C-4**) ("Kutisay Mining shall pay a bonus in the amount of US$35,103 to the tax authorities"); License Agreement No 1 entered into by the State Agency of Geology and Mineral Resources and Kutisay Mining OJSC for Kutessay II, 21 December 2009 (**Exhibit C-5**) ("Kutisay Mining shall pay a bonus in the amount of US$392,220 to the tax authorities"); Payment order No 2 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 23 March 2010 (**Exhibit C-63**) (Tax payment- 9,000,000 soms); Payment order No 3 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 31 March 2010 (**Exhibit C-64**) (Tax payment-3,000,000 soms); Payment order No 4 from Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 1 April 2010 (**Exhibit C-65**) (Payment of bonus for the Kutessay II Deposit in accordance with License Agreement No 1 – 7,000,000 soms); Cash payment receipt No 501107 with respect to payment made by Kutisay Mining OJSC to the Leninskiy Regional Treasury Department, 20 April 2010 (**Exhibit C-66**) ("Payment of bonus for the Kutessay 2 Deposit under License Agreement No 1- 86,467 soms"); and Letter from the State Taxation Service for the Leninskiy District of Bishkek (Mr Torobekov) to the Ministry of Natural Resources, 28 May 2010 (**Exhibit C-69**) ("in accordance with the calculations submitted in respect of subsoil use tax (bonus), Kutisay Mining OJSC […] has paid a total amount of 19,086,468 Kyrgyz soms,").

rely on the amounts recorded in the Financial Statements in relation to the Kutessay II and Kalesay Licenses of a total of C\$ 2,044,502. The same goes for the amount of US\$ 5,500,000 recorded in the 2011 Financial Statements in relation to KCMP. To these amounts should be added the expenditure for the broker fees of US\$ 8,635.50, not accounted for in the Financial Statements and Information Reports.

823.     The Tribunal is therefore satisfied on the basis of the evidence before it that the Claimants' investment in relation to the Kutessay II and Kalesay Licenses amounted to at least **C\$ 2,044,502**, **KGS 423,039,097**, and **US\$ 5,508,635.5**. When the former two amounts, recorded in C\$ and KGS, are converted to US\$ pursuant to the exchange rates of 0.8877 and 0.01821 as of 16 October 2014 (the day before the SAGMR terminated the Licenses),[1488] the amounts are **US\$ 1,814,904.43** and **US\$ 7,703,541.96**.

824.     As a result of the review of evidence on the record, the Tribunal concludes that the Claimants have fulfilled their burden of proof for sunk costs showing investments by them in the acquisition and development of the Licenses in the amounts of **US\$ 1,814,904.43**, **US\$ 7,703,541.96** and **US\$ 5,508,635.50** established above. The Tribunal therefore awards the total amount of **US\$ 15,027,081.89** to the Claimants as compensation.

## VIII.    REDUCTION OF DAMAGES

825.     The Tribunal now turns to the Respondent's contention, disputed by the Claimants, that damages should be reduced to take into account the fact that the Licenses were due to be terminated as well as the Claimants' contributory fault.

### A.    THE RESPONDENT'S POSITION

826.     The Respondent alleges that the damages should be reduced because: (1) "the Licenses were liable to be terminated";[1489] and (2) the Claimants engaged in "wilful or negligent acts or omissions" contributing to the injury.[1490]

827.     The Respondent asserts that investment treaty tribunals "have consistently affirmed the position that when assessing damages, it is necessary to consider the nature and scope of an

---

[1488]   These exchange rates are recorded on https://www.xe.com/currencytables/.
[1489]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 805.
[1490]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 813.

investor's rights" as this affects its entitlement to future profits and the amount that a third party would be willing to pay for the investor's rights.[1491] The Respondent recalls its argument that Kutisay Mining LLC consistently failed to fulfil the requirements imposed by the License Agreements, such that the Licenses were liable to termination.[1492] Thus, the Respondent concludes that "[a]s at 1 April 2013, Kutisay had no right to a further license agreement, nor to keep its license in respect of the Kutessay II and Kalesay deposits […] the Licenses were worthless before the Republic took any action to terminate them".[1493]

828.    The Respondent argues that, should the Tribunal agree that the Claimants' alleged loss was a direct consequence of the Claimants' conduct, "including its active participation in efforts to circumvent the tender requirement in the Subsoil Law and persistent non-compliance with the terms of the License Agreements", the Tribunal should not award damages at all.[1494]

829.    Finally, in the event that the Tribunal finds that the Claimants suffered losses as a result of the Respondent's conduct, and awarded damages on the basis of international law, the amounts awarded should be reduced, pursuant to Article 39 of the ILC Articles on State Responsibility, to take into account the Claimants' contributory fault.[1495]  The Respondent argues that the Claimants engaged in wilful or negligent acts or omissions (1) by actively participating in efforts to circumvent the tender requirement in the Subsoil Law through the payment of a bribe; and (2) through persistent non-compliance with the terms of their License Agreements.[1496]

830.    The Respondent contends that expert evidence in this regard is not required.[1497] The Tribunal has broad discretion when deciding the amount of reduction of damages and argues for a significant reduction of any damages award taking into consideration (1) the seriousness of the alleged bribery and corruption; (2) the Claimants' lack of due diligence when purchasing the

---

[1491]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 805.
[1492]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 806.
[1493]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 807.
[1494]    Respondent's Post-Hearing Brief, at para. 174.
[1495]    Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 809-812; Rejoinder on the Merits and Reply on Jurisdiction, at paras 682-683. See also, Respondent's Post-Hearing Brief, at para. 174, referring to, *inter alia*, *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, at paras 687, 825 (**Authority CLA-65**); *MTD Equity v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, at paras 242-243 (**Authority RLA-154**); *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA Case No. 2012-2, Award (Redacted), 15 March 2016, at paras 7.30, 10.7 (**Authority RLA-251**); *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA227, Final Award, 18 July 2014, at paras 1373-1374, 1637 (**Authority RLA-173**).
[1496]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 813; Rejoinder on the Merits and Reply on Jurisdiction, at paras 684, 686.
[1497]    Rejoinder on the Merits and Reply on Jurisdiction, at para. 686.3.

Licenses; and (3) their persistent breaches of the License Agreements.[1498] The Respondent submits that the reduction should be of 75% taking into account the facts established at the hearing,

> including C[laimant]s' deliberate ignorance and complete lack of due diligence, and that C[laimant]s obtained the Licenses and agreed to the terms of the license agreements in full knowledge that they had no intention or ability to comply.[1499]

## B.  THE CLAIMANTS' POSITION

831.     The Claimants allege that there is no basis for reducing damages due to their conduct.[1500] At the outset, the Claimants note that the Respondent relies on general international law, rather than Kyrgyz law, thereby undermining its own position on the law applicable to the substance of this arbitration.[1501] The Claimants also reiterate their position that the Licenses were not subject to termination for the reasons described above, and that any risk in this regard related to the Claimants' performance was entirely reflected in the stock market price of Stans Energy on 25 June 2012.[1502]

832.     Regarding the allegation that the Claimants engaged in "wilful or negligent acts or omissions" by participating in bribery and persistently violating the License Agreements, the Claimants argue that this has nothing to do with the legal concept of contributory fault, which requires that the extent of the harm be increased by the victim's conduct.[1503] The Respondent does not actually allege that the Claimants' conduct has increased the resulting harm but merely reiterates its arguments on jurisdiction and the merits.[1504] The Claimants' conduct played no part in the termination of the Licenses.[1505] In any event, not every act that contributes to damages qualifies as "contributory fault" and the Respondent has not proved or attempted to prove the commission by the Claimants of any "wilful" or "negligent" (i.e. unreasonable or imprudent) acts.[1506]

---

[1498]  Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 815; Rejoinder on the Merits and Reply on Jurisdiction, at para. 687.
[1499]  Respondent's Post-Hearing Brief, at para. 175.
[1500]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 354.
[1501]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 354.
[1502]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 355.
[1503]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 357.
[1504]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 357.
[1505]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 358.
[1506]  Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 359.

833.     The Claimants also argue that the Respondent does not provide any basis for such a substantial reduction of damages, not having proved that the Claimants' conduct caused the invoked percentage of their loss and note that in *Yukos v. Russia*, where the Tribunal found "material and significant misconduct", damages were only reduced by 25%.[1507]

## C.   THE TRIBUNAL'S ANALYSIS

834.     The Tribunal cannot agree with the Respondent's arguments for a reduction of any damages award due to (1) the seriousness of the alleged bribery and corruption; (2) the Claimants' lack of due diligence when purchasing the Licenses; and (3) their persistent breaches of the License Agreements.[1508]

835.     Regarding the first argument, the Tribunal recalls its finding above that no bribery or corruption, for which the Respondent would bear the burden of proof, can be attributed to the Claimants.

836.     Regarding the second argument, the Tribunal recalls its earlier finding that no lack of due diligence by the Claimants in purchasing the Licenses has been found, but, rather, it has been concluded that the process of granting the Licenses occurred under the full control of the Respondent and that the Respondent's termination of the Licenses in 2014 was unlawful.

837.     Regarding the third argument, the Tribunal recalls its finding above that the Claimants' conduct in implementing the Licenses played no part in the termination of the Licenses, as the SAGMR's termination notice and the court decisions it relied on did not refer to such conduct and only focussed on the alleged illegality of the procedure granting the Licenses.

## IX.   INTEREST

838.     The Tribunal now addresses the question concerning the applicable interest rate and how it should be applied to the amount of compensation quantified in Section VII.C.3.b.iv.

---

[1507] Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 361.
[1508] Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 815; Rejoinder on the Merits and Reply on Jurisdiction, at para. 687.

A.    THE CLAIMANTS' POSITION

839.    The Claimants consider that the interest rate provided for in Article 6(3) of the 2003 Investment Law only applies in the case of lawful expropriations and that there are no provisions concerning the interest rate applicable to unlawful expropriations or other forms of unlawful conduct.[1509]

840.    Hence, the Claimants contend that the principle of full reparation applicable under general international law to the calculation of damages should also be applied to the calculation of interest.[1510] In particular, it should inform the appropriate interest rate, whether interest is simple or compound, and the periods of compounding.[1511]

841.    The Claimants allege that Stans Energy is entitled to both pre-award interest applied from the valuation date (25 June 2012) to the date of the Award, and post-award interest on the full amount of damages awarded by the Tribunal.[1512]

842.    The Claimants argue that the interest rate should be a suitable commercial rate, equivalent to the return which Stans Energy would have earned had it been able to invest the funds of which it has been deprived.[1513] According to the Claimants, the interest rate should be 15.5% on the basis of the best proxy available, namely the WACC of Stans Energy pursuant to the calculations of the independent market analysts Visor Capital on a report issued on 21 June 2012.[1514] In contrast, the award of a risk-free interest rate, as advanced by the Respondent, is said to ignore commercial realities.[1515]

843.    The Claimants also assert that interest should accrue on a compounded basis so as to fully reflect the time value of the Claimants' losses and to ensure full reparation under customary

---

[1509]    Statement of Claim, at paras 300-301; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 346-347.
[1510]    Statement of Claim, at para. 301; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348; Claimants' Post-Hearing Brief, at para. 69.
[1511]    Statement of Claim, at para. 307; Claimants' Post-Hearing Brief, at para. 69.
[1512]    Statement of Claim, at paras 304-306.
[1513]    Statement of Claim, at para. 308; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348.
[1514]    Statement of Claim, at para. 311; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348, referring to A Yermekova, L Kulbayeva, Auerbach Grayson and Visor Capital, "Stans Energy Analyst Report", 21 June 2012, at p. 6 (**Exhibit C-115**). See also, Claimants' Post-Hearing Brief, at para. 69.
[1515]    Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 349.

international law.[1516] They refer to several cases in which the award of compound interest was defined as the default solution.[1517] In particular, the Claimants allege that a commercially reasonable approach would be to compound both pre- and post-award interest semi-annually.[1518]

**B.    THE RESPONDENT'S POSITION**

844.    The Respondent asserts that the interest rate should be the twelve-month LIBOR pursuant to the express provision within Article 6(3) of the 2003 Investment Law.[1519] The Respondent reiterates that this formula remains applicable to all expropriations as the 2003 Investment Law makes no distinction between "lawful" and "unlawful" expropriation and, in any event, to the extent that the Claimants' investments were expropriated, the Respondent acted lawfully.[1520]

845.    The Respondent also asserts that there is no justification to depart from the interest rate specified in Article 6(3) of the 2003 Investment Law, as this rate is consistent with the one used by numerous investment tribunals in practice, and there is an economic rationale behind the granting of a risk-free rate.[1521] Even if Article 6(3) were not formally applicable, it provides the best guidance on an appropriate interest rate in this case.[1522]

846.    The Respondent notes that the Claimants attempt to obtain interest on the basis of the returns that they *"hoped"* to achieve by seeking an interest rate of 15.5% on the basis of Stans Energy's WACC.[1523] The Respondent argues that it would be inappropriate to award interest on this basis, particularly because the Claimants have never demonstrated that they were able to obtain such returns on their capital.[1524] Moreover "[i]nvestment treaty tribunals have consistently rejected the use of WACC, or similar measures, as a basis for awarding interest".[1525]

---

[1516]   Statement of Claim, at para. 312; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 352.
[1517]   Statement of Claim, at para. 313.
[1518]   Statement of Claim, at para. 314.
[1519]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 816; Rejoinder on the Merits and Reply on Jurisdiction, at para. 688.
[1520]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 817; Rejoinder on the Merits and Reply on Jurisdiction, at para. 689.
[1521]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 818.
[1522]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 690-691.
[1523]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 819 [emphasis in original].
[1524]   Rejoinder on the Merits and Reply on Jurisdiction, at paras 692, 698.
[1525]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 820-823; Rejoinder on the Merits and Reply on Jurisdiction, at paras 693-697.

847.     The Respondent asserts that "any interest should accrue on a simple rather than a compounded basis"[1526] and avers that the Claimants have not established any entitlement to compound interest in a claim brought under the 2003 Investment Law.[1527] In any event, even international law has traditionally "frowned upon" the award of compound interest. The Respondent considers that the Tribunal should approach with caution a recent trend towards the grant of compound interest by investment tribunals, which "is by no means universal. Numerous tribunals have awarded simple interest […] [a]s explained by the International Law Commission: 'the general view of courts and tribunals has been against the award of compound interest'".[1528]

## C.   THE TRIBUNAL'S ANALYSIS

848.     The Tribunal agrees with the Claimants that the interest rate provided for in Article 6(3) of the 2003 Investment Law only applies in the case of lawful expropriations and that there are no provisions concerning the interest rate applicable to damages for unlawful expropriations or other forms of unlawful conduct.[1529] In the present case, the principle of full reparation applicable under general international law to the calculation of damages should also be applied to the calculation of interest.[1530]

849.     The principle of full reparation also implies that Stans Energy is entitled to both pre-award interest applied from the valuation date (which the Tribunal has found to be 16 October 2014) to the date of the Award, and to post-award interest on the full amount of damages awarded by the Tribunal.[1531] Guidance can be taken from the principle of *restitutio ad integrum* under international law as reflected in Art. 38 of the ILC Articles, which states: "*Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result.*"[1532]

---

[1526]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 825.
[1527]   Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 826; Rejoinder on the Merits and Reply on Jurisdiction, at para. 699.
[1528]   Statement of Defence on the Merits and Memorial on Jurisdiction, at paras 827-829. See also, Rejoinder on the Merits and Reply on Jurisdiction, at paras 700-701.
[1529]   Statement of Claim, at paras 300-301; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at paras 346-347.
[1530]   Statement of Claim, at para. 301; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348; Claimants' Post-Hearing Brief, at para. 69.
[1531]   Statement of Claim, at paras 304-306.
[1532]   See International Law Commission, "Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries" [2001-II(2)] Yearbook of the International Law Commission 26, Article 38.1 (**Authority CLA-5**).

850.     Regarding the rate of interest, the principle of full reparation also implies that it should be a suitable commercial rate, equivalent to the return which Stans Energy would have earned had it been able to invest the funds of which it has been deprived.[1533] In view of the considerably later evaluation date, the Tribunal doubts that, as submitted by Claimants, the interest rate should be 15.5% on the basis of the best proxy available, namely the WACC of Stans Energy pursuant to the calculations of the independent market analysts Visor Capital on a report issued on 21 June 2012.[1534] On the other hand, the Tribunal also doubts that a risk-free interest rate, as advanced by the Respondent, can be applied and would reflect commercial realities.[1535] Rather, the Tribunal considers that taking into account publicly available information regarding the average rate for small business lending in Canada, the rate of 5% should be applied in the present case.

851.     The Claimants assert that interest should accrue on a compounded basis so as to fully reflect the time value of the Claimants' losses and to ensure full reparation under customary international law.[1536] They refer to several cases in which the award of compound interest was defined as the default solution.[1537] As no guidance is provided by Kyrgyz law for unlawful expropriation, the Tribunal agrees that, in accordance with the standard practice in recent investment arbitration,[1538] pre-award interest on the amount of US$ 15,027,081.89 should be compounded annually from 16 October 2014 until the date of the present Award, and post-award interest on the full amount awarded should be compounded annually from the date of the present Award until the date of payment.

---

[1533]   Statement of Claim, at para. 308; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348.
[1534]   Statement of Claim, at para. 311; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 348, referring to A Yermekova, L Kulbayeva, Auerbach Grayson and Visor Capital, "Stans Energy Analyst Report", 21 June 2012, at p. 6 (**Exhibit C-115**). See also, Claimants' Post-Hearing Brief, at para. 69.
[1535]   Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 349.
[1536]   Statement of Claim, at para. 312; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 352.
[1537]   Statement of Claim, at para. 313.
[1538]   See *e.g., Bear Creek Mining Corporation v. Republic of Perú* (ICSID Case No. ARB/14/21), Award (30 November 2017) (**Authority RLA-154**); *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB 06/18, Award (28 March 2011), at para. 360 (**Authority RLA-198**); *Siemens A.G. v. The Argentine Republic*, ICSID Case No ARB/02/8, Award, 17 January 2007, at paras 399- 401 (**Authority CLA-38**); Compañía de Aguas del Aconquija SA and Vivendi Universal SA v The Argentine Republic , ICSID Case No. ARB/97/3, Award, 20 August 2007, at paras 9.6.1-9.6.2 (**Authority CLA-41**).

## X.    COSTS

852.    Finally, the Tribunal shall address the question of the amount and allocation of costs of these arbitration proceedings.

### A.    ALLOCATION OF COSTS

853.    The Claimants seek an award of all the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and the administrative costs of the PCA.[1539]

854.    The Respondent requests an award of the costs associated with this arbitration, including, but not limited to, fees and expenses of the arbitral tribunal, costs of expert advice, costs of legal representation, fees and expenses of the appointing authority and expenses of the Secretary General of the PCA, and all other professional fees, disbursements and expenses, plus interest thereon.[1540]

855.    The Parties' submissions concerning allocation of costs are summarized in the following paragraphs.

### 1.    Applicable Legal Principles

856.    The Parties partly disagree with regard to the legal provisions that are relevant for this question.

#### a.    The Claimants' Position

857.    The Claimants rely on Articles 38 and 40 of the UNCITRAL Rules.[1541] The Claimants aver that Article 40 of the UNCITRAL Rules establishes "the baseline principle" that costs "follow the event[.]"[1542]

---

[1539]    Statement of Claim, at para. 316.h; Reply to the Statement of Defence on the Merits and Counter-Memorial on Jurisdiction, at para. 363.i; Rejoinder on Jurisdiction, at para. 90.i.; Claimants' Post-Hearing Brief, at para.101(i); Claimants' Second Post-Hearing Brief, at para. 58(i).

[1540]    Statement of Defence on the Merits and Memorial on Jurisdiction, at para. 830.4; Rejoinder on the Merits and Reply on Jurisdiction, at para. 702.4; Respondent's Post-Hearing Brief, at para. 176.

[1541]    Claimants' Submission on Costs dated 5 October 2018 ("**Claimants' Submission on Costs**"), at paras 3-6.

[1542]    Claimants' Submission on Costs, at para. 5.

858.     According to the Claimants, the principle that the unsuccessful party bears the costs is "consistent with the general practice of tribunals in investment arbitrations[.]"[1543] The Claimants argue that to "deny the successful party recovery of costs incurred pursuing its case would have the effect of denying that party's 'full reparation' as required by international law".[1544] It is the Claimants' position, relying on *Philip Morris v. Australia*,[1545] and *Luigiterzo Bosca v. Lithuania*;[1546] that this principle is not affected by the amount of damages that might be eventually awarded by the Tribunal.[1547]

859.     The Claimants note that "the Tribunal retains the discretion to apportion costs in what it considers a reasonable manner taking into account the circumstances of the case."[1548] However, the Claimants assert that "[a] different apportionment of costs is appropriate only in exceptional circumstances, taking into account a party's conduct during the proceedings."[1549]

860.     The Claimants aver that the Parties agree on the relevant principles applicable to the allocation of costs which are found in the UNCITRAL Rules.[1550] The Claimants contend that the provisions regarding costs in the 1996 Arbitration Act, referred to by the Respondent, are not mandatory.[1551] In the Claimants' view, such provisions do not apply to the present arbitration as the Parties chose the UNCITRAL Rules.[1552]

### b.     The Respondent's Position

861.     The Respondent avers that the procedural framework of this arbitration is governed by the UNCITRAL Rules and, as the seat of the arbitration is London, by the Arbitration Act 1996.[1553] According to the Respondent, both empower the Tribunal to determine the costs and

---

[1543]   Claimants' Submission on Costs, at para. 7.
[1544]   Claimants' Submission on Costs, at para. 8, quoting *AWG Group Ltd v The Argentine Republic* (UNCITRAL) Award, 9 April 2015, at para. 111 (**Authority CLA-339**).
[1545]   Claimants' Submission on Costs, at para. 9, referring to *Philip Morris v. Australia* (PCA Case No 2012-12) Final Award Regarding Costs, 8 March 2017, para 60 (**Authority CLA-341**).
[1546]   Claimants' Submission on Costs, at para. 9, quoting *Luigiterzo Bosca v. Republic of Lithuania* (PCA Case No 2011-04) Award, 17 May 2013, at para. 326 (**Authority CLA-340**).
[1547]   Claimants' Submission on Costs, at para. 9.
[1548]   Claimants' Submission on Costs, at para. 5.
[1549]   Claimants' Submission on Costs, at para. 11.
[1550]   Claimants' Comments on the Respondent's Submission on Costs dated 2 November 2018 ("**Claimants' Comments on the Respondent's Submission on Costs**"), at para. 3.
[1551]   Claimants' Comments on the Respondent's Submission on Costs, at para. 3, quoting Section 4(1)-(3) of the English Arbitration Act 1996 (**Authority CLA-342**).
[1552]   Claimants' Comments on the Respondent's Submission on Costs, at para. 3.
[1553]   Respondent's Submission on Costs dated 5 October 2018 ("**Respondent's Submission on Costs**"), at para. 4.

fees in these proceedings and no other agreement or instrument is relevant for this determination.[1554]

862.     The Respondent asserts that pursuant to the English Arbitration Act 1996, "the Tribunal may determine by an award the recoverable costs of the arbitration on such basis as it thinks fit[.]"[1555]

863.     The Respondent argues that the general rules for the allocation of costs is that "costs should follow the event", except in exceptional circumstances.[1556] The Respondent avers that this general rule is reflected in Article 40 of the UNCITRAL Rules and in Section 61(2) of the English Arbitration Act; [1557] which, the Respondent argues, are in accordance with the consistent jurisprudence requiring that the successful party "should be made whole[.]"[1558]

864.     Furthermore, the Respondent contends that:

> [i]n addition to overall success, tribunals have taken into account factors such as: (i) the quantum of the claim; (ii) the overall conduct of the arbitration; (iii) the complexity of the facts and law in issue; (iv) whether claims advanced were untenable or frivolous; (v) the failure to meet deadlines and other procedural misconduct; and (vi) the relative quality of submissions and the importance of the case to each side.[1559]

## 2.     The Parties' Application of the Legal Principles to their Cost Allocation Claims

### a.   The Claimants' Position

865.     The Claimants argue that the circumstances of this case do not justify deviating from the principle that costs follow the event.[1560] The Claimants aver to have "consistently abided by procedural rules and sought to minimise time and costs wherever possible."[1561] Moreover, the Claimants assert that, regardless of the outcome, their claims were not "purely speculative[.]"[1562]

---

[1554]   Respondent's Submission on Costs, at para. 4.
[1555]   Respondent's Submission on Costs, at para. 7, referring to section 63(3) of the Arbitration Act (**Authority RLA-311**).
[1556]   Respondent's Submission on Costs, at para. 9.
[1557]   Respondent's Submission on Costs, at paras 10-11.
[1558]   Respondent's Submission on Costs, at para. 12.
[1559]   Respondent's Submission on Costs, at para. 15 [footnotes omitted].
[1560]   Claimants' Submission on Costs, at para. 12; Claimants' Comments on the Respondent's Submission on Costs, at para. 5.
[1561]   Claimants' Comments on the Respondent's Submission on Costs, at para. 5.
[1562]   Claimants' Comments on the Respondent's Submission on Costs, at para. 6.

In sum, the Claimants' position is that "the entirety of the costs of this arbitration falls to be paid by the Kyrgyz Republic."[1563]

866.     Accordingly, the Claimants dispute the Respondent's position that even if they succeed on all or part of their claim there would be reasons to depart from the presumption that costs follow the event. Similarly, the Claimants disagree with the Respondent's contention that the Claimants should be ordered to bear part of the Respondent's costs even if it loses the case due to the Claimants' purportedly "unreasonable behaviour" [1564] (see section below, for the Respondent's position on this issue).

867.     Among others, the Claimants argue that the arbitration before the MCCI did not concern the same dispute insofar as it did not deal with breaches of the 2003 Investment Law.[1565]

868.     With regard to the Respondent's decision not to claim costs in respect of the witness evidence provided by Mr. Beysheyev, the Claimants aver that such decision would confirm that the allegations of fraud and corruption are not related to the Claimants and their investment (given that the evidence was prepared in a prior arbitration) and, in any event, such decision cannot justify a departure from the principle that costs follows the event.[1566]

869.     In the Claimants' view, the issues concerning the translation of certain Russian terms to English were:

> the Respondent's own creation […,] were over-simplistic and irrelevant to whether the Claimants had complied with the License Agreements. Moreover, the Respondent never challenged the Claimants' translations in accordance with Section 16.4 of Procedural Order No 1. In these circumstances, there is no reason to depart from the principle that costs follow the event.[1567]

870.     Furthermore, the Claimants deny having raised any frivolous arguments nor to have abandoned any claims.[1568] Similarly, the Claimants submit that their conduct with regard to procedural issues was "universally proper" and did not cause "significant additional costs".[1569]

---

[1563]   Claimants' Submission on Costs, at para. 23; Claimants' Comments on the Respondent's Submission on Costs, at para. 20.
[1564]   Claimants' Comments on the Respondent's Submission on Costs, at para. 4.
[1565]   Claimants' Comments on the Respondent's Submission on Costs, at para. 7.
[1566]   Claimants' Comments on the Respondent's Submission on Costs, at para. 8.
[1567]   Claimants' Comments on the Respondent's Submission on Costs, at para. 10 [footnotes omitted].
[1568]   Claimants' Comments on the Respondent's Submission on Costs, at para. 11.
[1569]   Claimants' Comments on the Respondent's Submission on Costs, at para. 12.

871.     In contrast, the Claimants argue that the Respondent's procedural conduct should "reinforce the Claimants' entitlement to recover all of their costs, should they prevail on liability." [1570] In the Claimants' view, the Respondent "has pursued a calculated strategy of inflicting maximum financial harm on the Claimants[.]" [1571]

872.     In particular, the Claimants contend that the Respondent's pursuit of jurisdictional objections and bifurcation of proceedings had the purpose of delaying adjudication on the merits and, in any event, the Respondent should bear the costs of the bifurcated proceedings. [1572]

873.     Likewise, the Claimants assert that the Respondent initiated set aside proceedings against the Tribunal's Award on Jurisdiction before the High Court of Justice of England and Wales in an attempt to further delay this arbitration. [1573]

874.     The Claimants also refer to what they consider as a "frivolous" request for security for costs by the Respondent, [1574] and to the Respondent's refusal to bear its share of any of the advance payments in this proceedings. [1575]

875.     Furthermore, the Claimants argue that the Respondent "has consistently displayed a disregard for procedural rules, needlessly compounding the costs incurred[.]" [1576] Specifically, the Claimants refer to the Respondent's engagement in extensive correspondence regarding the merits of the Parties' document production requests, and the "extremely late" filing of the Witness Statements of Mr. Shilov and of Mr. Antonenko. [1577]

876.     According to the Claimants, the above-mentioned conduct reinforces the principle that they are entitled to recover all their costs if they prevail on liability and "[f]or the same reason, in the event the Respondent should prevail on jurisdiction or liability, the Claimants should not bear

---

[1570]   Claimants' Comments on the Respondent's Submission on Costs, at para. 13.
[1571]   Claimants' Submission on Costs at para. 12; Claimants' Comments on the Respondent's Submission on Costs, at para. 14.
[1572]   Claimants' Submission on Costs, at paras 13-14.
[1573]   Claimants' Submission on Costs, at para. 15.
[1574]   Claimants' Submission on Costs, at para. 16.
[1575]   Claimants' Submission on Costs, at paras 17-18.
[1576]   Claimants' Submission on Costs, at para. 19.
[1577]   Claimants' Submission on Costs, at para. 19.

the Respondent's costs."[1578] Specifically, the Claimants argue that the Respondent should bear all costs of the bifurcated proceedings and of its application for security for costs.[1579]

877.     Moreover, the Claimants argue that even if they are awarded less damages than claimed, there would be no reason to depart from the principle that costs follow the event as they would still be the successful Party in the arbitration.[1580]

878.     The Claimants also contest the Respondent's contention that they should be awarded no costs if damages were to be awarded following the market capitalization approach unless Stans Energy's cash balance is deducted, claiming that the Respondent "conflates two entirely separate concepts".[1581] Furthermore, according to the Claimants, they "bore significant expenses in relation to the arbitration, not all of which are recoverable as costs under the […] UNCITRAL Rules."[1582]

### b.     The Respondent's Position

879.     The Respondent argues that, if it wins on the merits, costs should follow the event and the Respondent's costs should be awarded "in full, including in respect of the jurisdiction phase."[1583]

880.     According to the Respondent, it should be reimbursed in full and the amount of Respondent's costs is reasonable considering the length of the proceedings, the nature of the allegations raised by the Claimants, and the amount claimed by the Claimants.[1584]

881.     Additionally, the Respondent requests reimbursement in full on the basis of the following "additional factors": (1) the "purely speculative" nature of the Claimants' claim; (2) the fact that this is said to be the second arbitration commenced by the Claimants in relation to the same dispute (the first one before the MCCI); (3) the fact that a significant portion of the Respondent's costs in relation with the witness evidence offered by Beysheyev has not been

---

[1578]   Claimants' Submission on Costs, at paras 20-21; Claimants' Comments on the Respondent's Submission on Costs, at para. 18.
[1579]   Claimants' Comments on the Respondent's Submission on Costs, at para. 18.
[1580]   Claimants' Comments on the Respondent's Submission on Costs, at para. 16.
[1581]   Claimants' Comments on the Respondent's Submission on Costs, at para. 17.
[1582]   Claimants' Comments on the Respondent's Submission on Costs, at para. 17.
[1583]   Respondent's Submission on Costs, at paras 18-19.
[1584]   Respondent's Submission on Costs, at para. 21.

claimed (as a significant portion of his witness statement was prepared in a prior arbitration); and (4) the "significant additional costs" incurred due to the Claimants' behaviour.[1585]

882.     As illustration of "significant additional costs" allegedly incurred due to the Claimants' behaviour, the Respondent refers to: (1) the Claimants' contention that they had complied with the License Agreements (which required the Respondent to address this matter at length "on the basis of complex evidence and investigations, with the assistance of Kyrgyz counsel and of certain members of SAGMR"); (2) the Claimants' application to exclude the Expert Witness Statement of Shilov; (3) the disagreement about the translation of certain Russian terms to English; (4) the allegedly "unsubstantiated allegations […] including spurious allegations of a conspiracy between the Respondent and Baotou"; (5) the Claimants' failure to produce documents subject to production orders; (6) the Claimants' "repeated flout[ing]" of procedural rules; and (7) the "Claimants insiste[nce] on a market capitalisation approach as the only appropriate valuation method in this case, [… which] forced the Respondent and its valuation expert to deal with additional damages calculations and submissions in its post-hearing briefs, at the Tribunal's request in PO9."[1586]

883.     Accordingly, the Respondent requests, pursuant to Article 40 of the UNCITRAL Rules, that the Claimants be ordered to pay in full the fees of the Tribunal and of the PCA and to reimburse the Respondent's costs; as well as interest on all amounts from the date of the award at the rate of 6% compounded annually.[1587]

884.     Moreover, the Respondent disputes the Claimants' allegation that, even if the Respondent prevails on jurisdiction or liability, the Respondent's costs should not be awarded. The Respondent contends that it "complied with the procedural rules and took no improper steps in this arbitration."[1588] In particular, the Respondent argues that (1) its jurisdictional objections and request for bifurcation of proceedings were legitimately raised; (2) its request for security for costs was justified; (3) its decision not to pay the advance of costs "is not a relevant factor in the

---

[1585]    Respondent's Submission on Costs, at para. 22.
[1586]    Respondent's Submission on Costs, at para. 22.
[1587]    Respondent's Submission on Costs, at para. 24.
[1588]    Respondent's Reply Submission on Costs dated 2 November 2018 ("**Respondent's Reply Submission on Costs**"), at paras 9-10.

apportionment of costs under the applicable rules", and (4) it did not disregard procedural rules.[1589]

885.    In the event that the Claimants succeed on all or part of their claim, the Respondent argues that there are reasons to depart from any presumption that costs follows the event.[1590] The Respondent's position in such case is that "at least, the parties should bear their own costs, and further submits that the Claimants should be ordered to pay those of Respondent's costs which it occasioned by [the Claimants'] unreasonable behaviour,"[1591] some purported instances of which have been set out above. The Respondent avers that its "best estimate of the additional costs caused by the Claimants' behaviour is around 20% of its total costs."[1592]

886.    Furthermore, in the event that the Claimants succeed on liability but the Tribunal awards no damages, the Respondent contends that it should be awarded its costs in full considering that the Claimants would be "substantively the *'unsuccessful party'* within the meaning of Article 40 of the UNCITRAL Rules."[1593]

887.    The Respondent considers that the Claimants' assertion that the quantum of damages awarded does not affect the principle that costs follow the event is contradicted by "established jurisprudence",[1594] relying on the findings in *Copper Mesa Mining Corporation v. Republic of Ecuador*,[1595] and in *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador*.[1596] Moreover, the Respondent recalls that the Tribunal "retains a discretion to apportion the costs between the parties, regardless of which party is deemed 'successful'[,]"[1597] referring to *Philip Morris v. Australia*.[1598]

---

[1589] Respondent's Reply Submission on Costs, at para. 18.
[1590] Respondent's Submission on Costs, at para. 25.
[1591] Respondent's Submission on Costs, at para. 26.
[1592] Respondent's Submission on Costs, at para. 27.
[1593] Respondent's Submission on Costs, at para. 28 [emphasis in original]; Respondent's Reply Submission on Costs, at para. 16.
[1594] Respondent's Reply Submission on Costs, at para. 11.
[1595] Respondent's Reply Submission on Costs, at para. 12, referring to *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA Case No. 2012-2, Award (Redacted), 15 March 2016, at para. 9.7 (**Authority RLA-251**).
[1596] Respondent's Reply Submission on Costs, at para. 13; referring to *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v Republic of Ecuador*, PCA Case No. AA 277, Final Award, 31 August 2011, at para. 376 (**Authority RLA-312**).
[1597] Respondent's Reply Submission on Costs, at para. 14.
[1598] Respondent's Reply Submission on Costs, at para. 15, referring to *Philip Morris Asia Limited v. The Commonwealth of Australia*, PCA Case No. 2012-12, Final Award Regarding Costs, 8 March 2017, at paras 59-61 (**Authority CLA-341**).

888.      Likewise, in the event the Tribunal awards an amount of damages lower than claimed by the Claimants, the Respondent argues that it should be awarded its costs due to the significant time and resources devoted to valuation issues or, in the alternative, that "the Respondent should be awarded its costs in proportion to the relative success of the Claimants in its claim for damages."[1599] According to the Respondent, even if the Tribunal were to find the Claimants to be the "successful party" in such circumstances, it would be justified to depart from the presumption that the unsuccessful party should bear the costs.[1600]

889.      In the event that the Claimants are awarded any damages on the basis of the market capitalization approach, and "contrary to the Respondent's submissions, Stans Energy's cash balance is not deducted from Stans Energy's market capitalisation on the valuation date, then the Claimants should be awarded no costs at all." [1601] The Respondent argues that any cost award would result in double recovery given Mr. Dellepiane's affirmation in his supplemental report that Stans Energy's cash balance was *"eventually used for arbitration-related expenses[.]"*[1602]

890.      In the event that the Claimants are awarded damages following the sunk costs approach based on Mr. Dellepiane's calculations, the Respondent contends that they should be awarded no costs because such calculations "are based on operating expenditures stated in Stans Energy's consolidated financial statements, which already include legal costs […] any costs award would amount to double recovery."[1603]

### 3.      The Tribunal's Analysis

891.      Article 40 of the UNCITRAL Rules provides in relevant part as follows:

> 1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph *(e)*, the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

---

[1599]      Respondent's Submission on Costs, at para. 28.
[1600]      Respondent's Reply Submission on Costs, at para. 17.
[1601]      Respondent's Submission on Costs, at para. 29.
[1602]      Respondent's Submission on Costs, at para. 29 [emphasis in original].
[1603]      Respondent's Submission on Costs, at para. 30.

892.     Using the discretion accorded by Article 40, the Tribunal takes into account in particular: the Respondent failed in its objections to jurisdiction both in the first phase of the bifurcated procedure and in its objections examined in the second phase, and the respective parts of the proceedings caused a considerable part of the total costs of arbitration. The Claimants succeeded on liability which caused also a considerable part of the total costs of arbitration, but in quantification only for an amount of US\$ 15,027,081.89 of damages of the total requested amount of US\$ 128.23 million.

893.     In view of these considerations, the Tribunal finds it appropriate that the Respondent shall bear two thirds of the costs of arbitration and of the Claimants' costs of legal representation.

## B.   AMOUNT OF COSTS OF ARBITRATION

### 1.    The Claimants' Position

894.     As noted above, the Claimants request that the entirety of the cost of this arbitration "falls to be paid" by the Respondent.[1604] In particular, the Claimants argue that a comparison between their costs for legal fees and expenses and those of the Respondent is not appropriate in assessing the reasonableness of such costs, among other reasons, given the burden of proof.[1605]

895.     The Claimants seek reimbursement of the following costs:

> 19. For the above reasons and pursuant to Articles 38 and 40 of the 1976 UNCITRAL Rules, the Claimants seek reimbursement of:
>
> (a) its and the Respondent's portions of PCA and Tribunal advances that the Claimants has paid (Article 38(2)(a), (b), and (f); *see* Appendix A below);
>
> (b) costs associated with expert advice (Article 38(2)(c); *see* Appendix A below);
>
> (c) travel costs and other expenses of the Claimants' witnesses and representatives (Article 38(2)(d) and (e); *see* Appendix A below);
>
> (d) legal costs reasonably incurred (Article 38(2)(e); *see* Appendices A and B below and Appendix C of the Claimants' First Submission on Costs); and
>
> (e) other costs incurred in relation to the arbitration, particularly compensation paid to witnesses to prepare for the arbitration (Article 38(2)(e); *see* Appendix A below).[1606]

896.     The Claimants specify the amounts of costs requested as follows:

---

[1604]   Claimants' Submission on Costs, at para. 23; Claimants' Comments on the Respondent's Submission on Costs, at para. 20.
[1605]   Claimants' Submission on Costs, at para. 10.
[1606]   Claimants' Comments on the Respondent's Submission on Costs, at para. 19.

21. Accordingly, the Claimants request that the Tribunal:

(a) ORDER that the Kyrgyz Republic reimburse the Claimants for the following fees and costs, plus interest from the date at which said costs were incurred until the date of payment by the Kyrgyz Republic:

(i) US$4,060,295.07 and US$41,340.00, which correspond to legal fees and disbursements of Freshfields Bruckhaus Deringer LLP and Interlex respectively;

(ii) €1,150,000.00, which corresponds to the advances on the costs of the Tribunal and the PCA made by the Claimants;

(iii) US$605,150.69, which corresponds to the fees and expenses of the experts (Compass Lexecon and SRK);

(iv) CAD24,708.21, €7,010.44 and US$45.00 in party expenses;

(b) ORDER the Kyrgyz Republic to reimburse any additional amounts incurred by the Claimants in relation to its legal representation or in relation to the fees and costs of the Tribunal and of the PCA between the date of the present submission and the date of the final award; and

(c) AWARD any other relief it may deem appropriate.[1607]

## 2.    The Respondent's Position

897.      The Respondent seeks full reimbursement of its costs.[1608] The Respondent agrees with the Claimants' assertion that a comparison between the Parties' costs is inappropriate and avers that, although its costs are slightly higher, they are reasonable and should be awarded in full.[1609] In particular, the Respondent refers to the allegations of bribery and corruption, over which the Respondent had the burden of proof, and contends that it had to develop "extensive investigations and had to deal with these issues extensively in its pleadings."[1610] Likewise, the Respondent argues that it "was also forced to show that the Claimants had failed to comply with their obligations."[1611]

898.      The Respondent's request for an award of costs is as follows:

24. Pursuant to Article 40 of the UNCITRAL Rules, the Respondent therefore requests:

24.1 That the Claimants be ordered to pay in full the fees: (i) of the Tribunal (including travel and other expenses incurred by the Arbitrators); and (ii) of the PCA;

24.2 Reimbursement for the costs it has incurred in this arbitration in the total amount of US $5,417,453.57, comprised of:

24.2.1 US $5,268,542.29 for its legal representation (fees, expenses and

---

[1607]    Claimants' Comments on the Respondent's Submission on Costs, at para. 21. See also, Claimants' Submission on Costs, Appendix A, B and C; Claimants' Comments on the Respondent's Submission on Costs, Appendix A and B.
[1608]    Respondent's Submission on Costs, at para. 23.
[1609]    Respondent's Reply Submission on Costs, at paras 5-7.
[1610]    Respondent's Reply Submission on Costs, at para. 6.
[1611]    Respondent's Reply Submission on Costs, at para. 7.

> attendance at the final hearing); and
>
> 24.2.2 US $148,911.28 for its experts (fees and expenses); and
>
> 24.3 Interest on all amounts awarded by the Tribunal from the date of the award until payment at the rate of 6% compounded annually, being the rate that has been commonly applied by investment treaty tribunals. [1612]

899.    In the Respondent's Reply Submission on Costs, the Respondent specifies the legal fees incurred in preparation of its costs submissions.[1613]

### 3.    The Tribunal's Analysis

900.    By letter dated 2 November 2015, the PCA, on behalf of the Tribunal, requested the Parties to establish a deposit of EUR 400,000 (EUR 200,000 from each side) to assure sufficient funds for the initial phase of the proceedings.

901.    By letter dated 19 November 2015, the Respondent informed the Tribunal that it respectfully declined to pay for the deposit, arguing that this was the second arbitration which the Claimants had sought to commence in reliance on Article 11 of the Moscow Convention and Article 18.3 of the 2003 Investment Law, the first award having been set aside on the grounds that the Tribunal did not have jurisdiction. The Respondent argued that it had incurred significant costs in the set-aside proceedings in Russia as well as in proceedings in Ontario, where Stans Energy sought to enforce the award. None of these costs were compensated by the Claimants in full or in part. Moreover, according to the Respondent, there was a significant risk that in the event of an award of costs in these proceedings against the Claimants, they would be unable to pay on such award, and the Respondent would be unable to recover its past or future costs.

902.    On 26 November 2015, the PCA acknowledged receipt of the Respondent's letter dated 19 November 2015. The PCA confirmed receipt of an amount of EUR 200,000 from the Claimants, representing the Claimants' share of the initial deposit. By letter dated 30 November 2015, the PCA, on behalf of the Tribunal, requested, pursuant to Article 41(4) of the UNCITRAL Rules, that the Claimants made a substitute payment of EUR 200,000 in lieu of the Respondent by 22 January 2016 in order to allow the arbitration to proceed.

---

[1612]    Respondent's Reply Submission on Costs, at para. 19; Respondent's Submission on Costs at para. 24. See also, Respondent's Submission on Costs, Annex A and B; Respondent's Reply Submission on Costs, Annex A [footnotes omitted].

[1613]    Respondent's Reply Submission on Costs, Annex A (Additional Fees and Costs in PCA Case No 2015-32).

903.     On 21 December 2015, the PCA confirmed receipt of an amount of EUR 200,000 from the Claimants, representing the requested substitute payment by the Claimants.

904.     By letter dated 12 July 2017, the PCA, on behalf of the Tribunal, requested the Parties to make a supplemental deposit of EUR 500,000 (EUR 250,000 from each side) no later than 18 August 2017, in order to ensure sufficient funds to cover the fees and expenses of the Tribunal. On 22 August 2017, the PCA acknowledged receipt of an amount of EUR 250,000 from the Claimants, representing the Claimants' share of the supplementary deposit in the present arbitration.

905.     By letter dated 21 September 2017, the Respondent informed the Tribunal that it respectfully declined to pay its share of the supplemental deposit, explaining that the Kyrgyz Republic had limited budgetary resources and had a history of investors routinely failing to meet costs awards made against them.

906.     By letter dated 22 September 2017, the PCA, on behalf of the Tribunal, requested that, pursuant to Article 41(4) of the UNCITRAL Rules, in order to allow the arbitration to proceed, the Claimants made a substitute payment of EUR 250,000 in lieu of the Respondent by 3 November 2017. On 16 October 2017, the PCA acknowledged receipt of an amount of EUR 250,000 from the Claimants, representing a substitute payment by the Claimants of the supplementary deposit requested.

907.     By letter dated 22 August 2018, the PCA, on behalf of the Tribunal, requested the Parties to make a supplemental deposit of EUR 250,000 (EUR 125,000 from each side) no later than 21 September 2018.

908.     On 1 October 2018, the PCA confirmed receipt of an amount of EUR 125,000 from the Claimants, representing the Claimants' share of the supplementary deposit requested on 22 August 2018. The Respondent was invited to confirm whether its share of the deposit might be expected in the near future.

909.     By letter dated 25 October 2018, the Respondent was requested to pay its share of the supplementary deposit by 8 November 2018.

910.     By letter dated 31 October 2018, the Respondent informed the Tribunal that it respectfully declined to pay its share of the supplemental deposit for the reasons explained in previous correspondence.

911.     By letter dated 31 October 2018, the PCA, on behalf of the Tribunal, requested that, pursuant to Article 41(4) of the UNCITRAL Rules, in order to allow the arbitration to proceed, the Claimants made a substitute payment of EUR 125,000 in lieu of the Respondent by 30 November 2018.

912.     On 5 December 2018, the PCA confirmed receipt of a substitute payment of EUR 125,000 from the Claimants in lieu of the Respondent in accordance with Article 41(4) of the UNCITRAL Rules.

913.     By letter dated 27 May 2019, the PCA, on behalf of the Tribunal, requested the Parties to make a final supplementary deposit of EUR 100,000 (EUR 50,000 from each side) by 17 June 2019.

914.     On 18 June 2019, the PCA acknowledged receipt of an amount of EUR 50,000 from the Claimants, representing the Claimants' share of the supplementary deposit. The PCA also noted that the Respondent's share of the supplementary deposit remained outstanding and requested the Respondent to inform the PCA by 21 June 2019 as to the status of the payment of its share. No response was received from the Respondent in respect of this request.

915.     By letter dated 27 June 2019, the PCA, on behalf of the Tribunal, requested that, pursuant to Article 41(4) of the UNCITRAL Rules, in order to allow the arbitration to proceed, the Claimants make a substitute payment of EUR 50,000 in lieu of the Respondent by 15 July 2019.

916.     On 16 July 2019, the PCA confirmed receipt of a substitute payment of EUR 50,000 from the Claimants in lieu of the Respondent in accordance with Article 41(4) of the UNCITRAL Rules.

917.     Therefore, total deposit payments amount to EUR 1,250,000, all of which have been paid by the Claimants.

918.     In accordance with Article 38 of the UNCITRAL Arbitration Rules 1976, the Tribunal fixes the costs of arbitration pursuant to sub-paragraphs (a), (b), (c) and (f), which have been covered from the case deposit established with the PCA, as follows:

| | |
|---|---|
| ***Arbitrator fees* (EUR)** | |
| The Honourable Colin L. Campbell, Q.C. | 175,500 |
| VAT | 22,815 |
| Mr. Stephen Jagusch, Q.C. | 215,100 |
| Professor Karl-Heinz Böckstiegel | 512,300 |
| ***Registry fees of the PCA* (EUR)** | 175,056.06 |
| ***Expenses* (EUR)** | |
| Arbitrator expenses | 25,216.36 |
| General expenses (hearing room rental, court reporting, audio-visual technology, catering, courier and other expenses) | 61,457.94 |
| **Total (EUR)** | **1,187,445.36** |

919.     The difference of that amount with the total of deposits paid by Claimants is therefore EUR 62,554.64, which shall be reimbursed by the PCA to the Claimants.

920.     According to the above conclusion on allocation of costs, the Respondent shall reimburse the Claimants two thirds of the costs of arbitration, i.e. EUR 791,630.24.

921.     Further, the Tribunal finds the costs of legal representation and assistance claimed by the Claimants as reasonable. According to the above conclusion on allocation of costs, the Respondent shall reimburse the Claimants two thirds of these costs (US$ 4,706,830.76, C$ 24,708.21 and EUR 7,010.44), i.e. US$ 3,137,887.17, C$ 16,472.14 and EUR 4,673.62.

\* \* \*

267

## XI.    DISPOSITIF

922.    **Having carefully considered the Parties' arguments, the Tribunal decides as follows:**

     i.   **The Tribunal has jurisdiction over the claims submitted by the Claimants.**

     ii.   **The Respondent has breached its obligations under both Article 6 and Article 4(4) of the 2003 Law on Investments in the Kyrgyz Republic.**

     iii.   **The Respondent shall pay damages to the Claimants amounting to US$ 15,027,081.89.**

     iv.   **On the amount of US$ 15,027,081.89, the Respondent shall pay pre-award interest at a rate of 5%, compounded annually from 16 October 2014 until the date of the present Award.**

     v.   **The Claimants shall bear one third and the Respondent two thirds of the total costs of arbitration as fixed by the Tribunal. These two thirds amount to EUR 791,630.24 and shall be paid by the Respondent to the Claimants.**

     vi.   **The Respondent shall reimburse the Claimants two thirds of their costs of legal representation and assistance. These two thirds amount to US$ 3,137,887.17, C$ 16,472.14 and EUR 4,673.62.**

     vii.   **On the amounts due according to the above paragraphs iii, iv, v and vi, the Respondent shall pay post-award interest at a rate of 5%, compounded annually from the date of this award until the date of payment.**

     viii.   **All other claims are dismissed.**

PCA Case No. 2015-32
Award

Place of Arbitration: London, United Kingdom.

Date of Award: 20 August 2019.

The Honourable Colin L. Campbell, Q.C.                    Mr. Stephen Jagusch, Q.C.

Professor Karl-Heinz Böckstiegel

(President)